Jennifer C. Pizer (CA Bar No. 152327)
Lambda Legal Defense and Education Fund
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 590-5903
jpizer@lambdalegal.org

M. Currey Cook (NY Bar No. 4612834)
(pro hac vice application forthcoming)
Lambda Legal Defense and Education Fund
120 Wall St., 19th Fl.
New York, New York 10005
ccook@lambdalegal.org
Telephone: (212) 809-8585

Sasha Buchert (OR Bar No. 070686)
(pro hac vice application forthcoming)
Lambda Legal Defense and Education Fund
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Sbuchert@lambdalegal.org
Telephone: (202) 804-6245

Jeffrey B. Dubner (DC Bar No. 1013399)
(pro hac vice application forthcoming)
Kristen Miller (DC Bar No. 229627)
(pro hac vice application forthcoming)
Sean A. Lev (DC Bar. No. 449936)
(pro hac vice application forthcoming)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
jdubner@democracyforward.org
kmiller@democracyforward.org
slev@democracyforward.org
Telephone: (202) 448-9090

Kathryn E. Fort (MI Bar No. 69451)
(pro hac vice application forthcoming)
Michigan State University College of Law
Indian Law Clinic
648 N. Shaw Lane
East Lansing, M.I. 48824
fort@msu.edu
Telephone: (517) 432-6992

*Counsel for Plaintiffs*                    *Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA TRIBAL FAMILIES COALITION, YUROK TRIBE, CHEROKEE NATION, FACING FOSTER CARE IN ALASKA, ARK OF FREEDOM ALLIANCE, RUTH ELLIS CENTER, and TRUE COLORS, INC., | Case No. |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | Administrative Procedure Act Case |
| ALEX AZAR, in his official capacity as Secretary of Health and Human Services, LYNN A. JOHNSON, in her official capacity as Assistant Secretary for the Administration for Children and Families, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, and ADMINISTRATION FOR CHILDREN AND FAMILIES, | |
| Defendants. | |

**<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

I.      INTRODUCTION.................................................................................................1

II.     JURISDICTION AND VENUE..........................................................................5

III.    PARTIES..............................................................................................................5

IV.     FACTUAL ALLEGATIONS.............................................................................14

    A.      Overview of Federal Child Welfare Programs........................................14

    B.      The Adoption and Foster Care Analysis and Reporting System.............15

    C.      The Overrepresentation of and Poor Outcomes for LGBTQ+ and AI/AN Youth in Foster Care ...............................................................................20

        1.      *Issues Regarding LGBTQ+ Youth in Foster Care* ......................20

        2.      *Issues Regarding American Indian and Alaska Native Youth in Foster Care* ...................................................................................22

    D.      The Decade-Long Effort Producing the 2016 Revisions to AFCARS....26

        1.      *2015 NPRM* ................................................................................28

        2.      *2016 SNPRM* ..............................................................................29

        3.      *2016 Final Rule* ..........................................................................32

    E.      Defendants' Efforts to Prevent the 2016 Final Rule from Taking Effect ...............36

    F.      Defendants' Decision to Gut the 2016 Final Rule .................................38

        1.      *2018 ANPRM and 2019 NPRM* ..................................................38

        2.      *2020 Final Rule* ..........................................................................48

V.      HARM TO PLAINTIFFS ..................................................................................59

    A.      California Tribal Families Coalition ........................................................59

    B.      Yurok Tribe .............................................................................................62

    C.      Cherokee Nation......................................................................................64

    D.      Facing Foster Care in Alaska ..................................................................66

    E.      Ark of Freedom Alliance.........................................................................68

    F.      Ruth Ellis Center .....................................................................................70

    G.      True Colors, Inc........................................................................................72

VI.     CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF .......................74

Plaintiffs California Tribal Families Coalition, Yurok Tribe, Cherokee Nation, Facing Foster Care in Alaska, Ark of Freedom Alliance, Ruth Ellis Center, and True Colors, Inc., by and through undersigned counsel, hereby allege as follows:

## I.     INTRODUCTION

1.     More than 430,000 children are removed from their homes and placed in foster care every year. As a result of systemic inequities, marginalized populations are significantly over-represented in the child welfare system and experience worse outcomes once they become involved with the system. This includes children of color, children from low-income families, and—of particular relevance to this case—lesbian, gay, bisexual, transgender, queer/questioning, and two-spirit ("LGBTQ+") youth and American Indian and Alaska Native ("AI/AN") youth.[1]

2.     To address long-standing concerns about the safety, health, and long-term outcomes of children in care and the efficacy of states' child welfare systems, Congress requires Defendant Department of Health and Social Services ("HHS") to collect "comprehensive national information" on the number of youth in foster care, their demographics and status, and their experiences in care. 42 U.S.C. § 679(c)(3). This data collection, known as the Adoption and Foster Care Analysis and Reporting System ("AFCARS"), is used to inform policy and direct resources at both the federal and state level and to ensure that the $10 billion per year of taxpayer funding that goes to support state child welfare systems is spent effectively.

3.     Until 2016, AFCARS was operating under regulations issued in 1993. For years, HHS and its division Defendant Administration for Children and Families ("ACF") had recognized that those regulations were outdated and inadequate to capture the demographics of children in care nationwide and how they fared when placed out of home.

4.     Between 1993 and 2016, a growing body of research funded by HHS and ACF, in addition to information from participants across the child welfare system, highlighted the

---

[1] LGBTQ+ is used throughout this complaint, except when quoting or referring to documents that use a different acronym. LGBTQ+ includes terms not listed above and reflects the variety of terms children and youth may use to describe themselves in terms of their sexual orientation, gender identity, and gender expression, such as pansexual, asexual, genderqueer, and nonbinary, among others. Two-spirit is an umbrella term that some AI/AN people use to describe themselves in relation to sexual orientation, gender identity, or gender expression, but is not a term used by all AI/AN people or tribes.

numerous systemic failures in foster care, including those for AI/AN and LGBTQ+ children and youth. Among these systemic ills was an alarming rate of poor educational outcomes, justice system involvement, commercial sexual exploitation or trafficking, and homelessness for children in care; the greater likelihood of children of color being removed from their families and their communities; and an ongoing shortage of foster and adoptive families and an over-reliance on congregate care, including group homes and treatment facilities, as placements for children who cannot safely be at home. Additionally, child welfare agencies frequently ignore the rights of AI/AN tribes to participate in the foster care and adoption process when their children are involved and to ensure their children's well-being and placement with family—rights that Congress codified in the Indian Child Welfare Act ("ICWA") in 1978, 25 U.S.C. § 1901 *et seq.*

5.      Despite this research, nationwide data is lacking to measure and develop solutions to problems, including the particular challenges faced by AI/AN LGBTQ+ youth and other LGBTQ+ youth of color.

6.      In 2016, after more than a decade of work, including thousands of interviews with stakeholders and multiple notice-and-comment periods, ACF finalized a rule updating the AFCARS regulations for the first time in nearly 25 years, addressing these and other issues. Of particular note, the 2016 rule required child welfare agencies to report data on the sexual orientation of foster youth aged 14 and older as well as legal guardians, foster parents, and adoptive parents, and data showing how state child welfare agencies implement ICWA's requirements, such as attempting to place AI/AN children with relatives or tribal members.

7.      As ACF recognized when issuing the 2016 rule, the data would have immense value to ACF and participants throughout the child welfare system—including the most vulnerable among the hundreds of thousands of children in care across the country. The data would help ACF, child welfare agencies, tribes, and organizations serving youth in foster care identify the most pressing problems, direct their resources more effectively, understand how the intersection of issues like sexual orientation and race affects experiences and outcomes, and work to ameliorate some of the problems that drive youth into homelessness, involvement with the juvenile justice system, sexual exploitation, and other traumatic experiences.

8.      After a change in administration, however, ACF's decade of work has gone for naught. Despite overwhelming support for the changes from tribes, organizations representing and working with foster youth, LGBTQ+ civil rights groups, service providers, and other stakeholders, Defendants delayed and then, in May 2020, rescinded large portions of the 2016 rule.

9.      The May 2020 rule reversing much of the 2016 update is arbitrary and capricious. Its analysis is riddled with errors and omissions, from a cost-benefit analysis that ignores any consideration of the lost benefit to children and families of the abandoned data; to a failure to consider the core statutory requirement that Defendants collect "comprehensive national information" about the "demographics," "status," and "characteristics" of foster youth, 42 U.S.C. § 679(c)(3); to a refusal to consider arguments and alternatives other than Defendants' favored ones; to a failure to address substantive comments; to a mischaracterization of key documents; to numerous unexplained departures from its previous analysis, research, and long-standing positions.

10.      For example, Defendants eliminated the requirement that child welfare agencies collect voluntarily reported data on the sexual orientation of youth aged 14 and older, legal guardians, and foster and adoptive parents. Their principal justification for this reversal was a supposed concern that the questions were too sensitive to be asked of youth 14 and over or foster parents, adoptive parents, and legal guardians, even on a voluntary basis. But the document that they relied upon for this claim expressly approves the exact same questions as asked on an HHS behavioral survey administered to youth. Moreover, ACF considered and rejected this concern during the 2016 rulemaking, yet, in conflict with basic principles of reasoned decision-making, Defendants refused to grapple with or rebut their prior analysis.

11.      Similarly, Defendants eliminated most questions related to how child welfare agencies treat children to whom ICWA applies. Although ACF had in 2016 found these questions essential to guide its allocation of resources to help AI/AN youth, Defendants abandoned them without any discussion of the value of the information being lost for AI/AN youth and the tribes seeking to protect them.

12.      Plaintiffs in this case include two federally recognized Indian tribes, a coalition of

36 tribes based in California, a foster youth and foster care alumni organization, and three organizations that work with LGBTQ+ foster youth and/or youth who have experienced sex or labor trafficking with the goal of improving their living conditions, connecting them with educational and supportive services such as medical care and mental health counseling, helping them advocate for themselves, and reducing the chances that they will end up homeless, incarcerated, or otherwise severely harmed.

13.     The data that Defendants have abandoned are irreplaceable for making these efforts effective. As Defendants themselves recognized when requiring the data in 2016, both the sexual orientation data and the ICWA data are crucial: the sexual orientation data for identifying and addressing the drivers contributing to the over-representation of LGBTQ+ youth in the foster care population and their disproportionately negative experiences while in care and for recruiting and retaining potential foster and adoptive parents who are supportive of LGBTQ+ youth; and the ICWA data for facilitating tribes' efforts to vindicate their and their children's rights and well-being in individual cases and improving deficient and harmful practices at underperforming child welfare agencies.

14.     Without the data, organizations providing services to LGBTQ+ youth have no way to determine whether they are reaching the full population of LGBTQ+ youth in child welfare systems or to identify what programs and services are needed to reduce their over-representation in care, poor treatment while in care, and worse outcomes. The lack of data disqualifies them from some grants and makes it more difficult to obtain and deploy other funding for programs and services, and impairs their ability to advocate for training, changes in practice, and law and policy reform. Tribes have no idea how many of their children are in state systems, whether a court has ordered ICWA to apply to them, and whether they have been placed into non-kin or non-tribal families despite the ICWA's statutory placement preferences. And, most importantly, the harmful experiences of many of the most vulnerable children in America continue unabated in the shadows of the child welfare system, unexamined at the comprehensive, national level that AFCARS requires.

15.     Accordingly, and for the reasons set forth herein, Plaintiffs respectfully request that

1  the Court set aside the 2020 final rule as arbitrary and capricious under the Administrative

2  Procedure Act, 5 U.S.C. § 706(2)(A).

## II.    JURISDICTION AND VENUE

4      16.    This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28

5  U.S.C. § 1331.

6      17.    Venue is proper under 28 U.S.C. § 1391(e)(1) because Plaintiff Yurok Tribe, the

7  largest federally recognized tribe in California, is located in and has reservation lands in Del Norte

8  and Humboldt counties. These counties are located within the Northern District of California.

## III.    PARTIES

10      18.    Plaintiff California Tribal Families Coalition ("CTFC") is a 501(c)(4) non-profit

11  membership association of 36 federally recognized tribes, including Plaintiff Yurok Tribe, and

12  three Tribal Leaders' Associations located in California. CTFC's broad mission is to promote and

13  protect the health, safety, and welfare of tribal children and families, which are inherent tribal

14  governmental functions and at the core of tribal sovereignty and governance. CTFC was formed to

15  carry out the recommendations of California's ICWA Compliance Task Force, an independent and

16  tribal-led group comprised of tribal leaders, representatives, and advocates. Convened in 2015 at

17  the invitation of the California Attorney General, the Task Force's central objective was to

18  identify ways to improve the implementation of ICWA and California's corresponding state

19  legislation for the benefit of tribes, Indian families, and their children. The Task Force recognized

20  that tribal rights under ICWA continue to be frustrated four decades after the statute's enactment,

21  leaving tribes unable to effectively protect their member children in state child welfare systems or

22  prevent their children from being removed from their communities unnecessarily. After

23  conducting listening sessions to identify gaps where tribes, Indian families, and their children were

24  left out of legal protections, the Task Force issued its recommendations in the form of a final

25  report ("Task Force Report").

26      19.    CTFC accomplishes its mission through a variety of activities guided by the Task

27  Force Report. Among other things, CTFC works to improve data collection on ICWA

28  implementation as recommended by the Task Force Report, which explained that the Task Force's

ability to understand and improve ICWA implementation was severely hindered by a lack of data. The Report explained that the California child welfare system lacks "data sets essential to tracking ICWA compliance," making it "much more difficult for tribes to guide policy and budget allocation processes to ensure compliance."[2] The Report recognized that this problem would be addressed in part by ACF's 2016 Final Rule adding ICWA data to AFCARS.[3] As the successor organization to the Task Force, CTFC has a significant interest in ICWA data and has engaged in both state- and federal-level efforts to improve ICWA data collection, including by working with California's Department of Social Services to develop and implement state-level data collection requirements once it became clear that ACF intended to gut ICWA data elements from the AFCARS reporting requirements, and by submitting comments opposing ACF's proposal.[4]

20.     CTFC also works in a myriad of other ways to address the challenges identified by the Task Force Report and would benefit greatly from the collection of ICWA data. For example, CTFC works to improve ICWA competency for various individuals and organizations working in the child welfare system, including by providing free ICWA training to child welfare agencies and social workers, and by advocating for policy changes, such as a revision of court rules that would mandate ICWA competency among attorneys, party representatives, and social workers. CTFC also works to address challenges faced by tribes in state courts when seeking to intervene in cases involving tribal children, including by securing the right of tribes to participate in courtroom proceedings, improving tribal access to case records, and ensuring that tribes obtain legal counsel. Additionally, CTFC advocates for state legislation and regulations that would improve outcomes under ICWA, such as a Foster Care Bill of Rights Amendment. Similarly, CTFC regularly engages with the California Department of Social Services to improve the agency's ICWA

---

[2] California ICWA Compliance Task Force, *Report to the California Attorney General's Bureau of Children's Justice* 98 (2017) ("Task Force Report"), https://www.caltribalfamilies.org/wp-content/uploads/2019/06/ICWAComplianceTaskForceFinalReport2017.pdf.

[3] *Id.*

[4] CTFC, Comment Letter on Adoption and Foster Care Analysis and Reporting System ("AFCARS") Notice of Proposed Rulemaking (June 17, 2019), https://www.regulations.gov/document?D=ACF-2018-0003-0297.

policies and implementation, including enhanced oversight of the county-level subdivisions that are ultimately responsible for complying with ICWA's requirements. As explained further below, CTFC's ability to conduct trainings, engage in advocacy, and improve outcomes under ICWA would be greatly improved if it had access to data on ICWA implementation.

21.    Plaintiff Yurok Tribe ("Yurok" or "the Tribe") is a federally recognized Indian tribe located in Del Norte and Humboldt Counties in California. With 6,234 members and 1,279 reported households, the large majority of which are family or multi-family households, Yurok Tribe is the largest Native American tribe in California. Yurok Tribe is committed to continuing its tribal traditions, including respect for the dignity and individual rights of all persons living within its jurisdiction.

22.    Consistent with that mission, Yurok Tribe aims to help its tribal members and families achieve independence and self-sufficiency. To do so, and to ensure that Yurok children are safe and remain with their families and the Yurok community, the Tribe provides a variety of services through its designee Yurok Health and Human Services ("YHHS"), a social services agency that receives partial funding under a title IV–E "pass-through agreement" with the state of California.[5] As part of that work, YHHS collaborates with state child welfare agencies to ensure that the state agency is properly implementing ICWA to protect Yurok children. The Tribe also provides direct services to children eligible for tribal membership and their families, including, but not limited to: intake and investigation of reports of abuse and neglect; services designed to ensure the safety of children in their homes and placements; prevention services designed to reduce the likelihood that a child will be removed from the home; referrals to other services to strengthen families; case management services for children placed in the custody of YHHS; and court intervention services designed to ensure YHHS involvement throughout the life of a child's court case.

---

[5] As explained further below, *infra* ¶ 54, title IV–E of the Social Security Act is the principal statutory provision through which the federal government funds state and tribal child welfare agencies. While tribes can receive money directly from the federal government, they may also receive such funding indirectly by entering into a "pass-through" agreement with the state.

23.     Yurok Tribe also maintains a Wellness Court, with separate calendars for families, adults, and youth, that provides additional services such as foster care placement, counseling sessions, and drug testing. The Tribe also intervenes and participates in ICWA cases heard in state courts throughout California and the Pacific Northwest.[6] The Tribe's ICWA-eligible children live across North America. As explained further below, Yurok's ability to work with state child welfare agencies to improve ICWA implementation and provide services to its families and children would be greatly improved if it had access to data on ICWA implementation.

24.     Plaintiff Cherokee Nation is the sovereign government of the Cherokee people and is the largest tribe in the United States, with more than 380,000 tribal citizens residing across the country. Cherokee Nation is committed to protecting its inherent sovereignty; preserving and promoting Cherokee culture, language, and values; and improving the quality of life for future generations of Cherokee Nation citizens. To that end, Cherokee Nation provides a number of governmental services, including health and human services, education, employment, housing, economic development, and environmental protection.

25.     Among other services, Cherokee Nation provides Indian Child Welfare services under a direct title IV–E plan, including foster care and adoption services for Indian children. As part of that work, Cherokee Nation engages in the following activities: (1) advocating for and establishing the safest and most appropriate environment for the child; (2) providing referrals and networking services to parents and children; (3) conducting home assessments to determine whether a child's living environment is safe; (4) making recommendations to courts regarding a child's best interest; (5) providing expert testimony in cases involving Indian children; (6) monitoring case activity to ensure compliance with ICWA and other relevant state and tribal laws; and (7) educating attorneys, court-appointed guardians, and families on their rights and responsibilities within the judicial system to ensure the protection of Cherokee children under federal and state law.

26.     Cherokee Nation also has a nationwide Court Advocacy and Permanency Service

---

[6] As discussed *infra* ¶ 82, under ICWA, every federally recognized tribe has a right of intervention in state child custody proceedings that involve their children.

("CAPS") that provides advocacy for Cherokee families and children in tribal and state court systems. To ensure that Cherokee children receive the protections offered under ICWA and similar state laws, the CAPS program sends advocates to court hearings on behalf of Cherokee children, provides planning services, and helps refer children and families to services designed to address problems that contributed to the initial removal of a child. As explained further below, Cherokee Nation's ability to provide its advocacy and child welfare services would be greatly improved if it had access to comprehensive ICWA data.

27.     Plaintiff Facing Foster Care in Alaska ("FFCA") is a 501(c)(3) non-profit membership organization comprised of current and former foster youth. FFCA is dedicated to improving the foster care system, developing leadership and self-advocacy skills among its members, and creating a network of peer support that is a lifeline for many foster youth and alumni. FFCA's members include more than 300 current and former foster youth in Alaska, including Alaska Native youth (who represent approximately 60 percent of youth in foster care in Alaska despite making up only 16 percent of the general population), LGBTQ+ youth, and Alaska Native LGBTQ+ youth. To represent the views of its members, FFCA is led by a Statewide Youth Leadership Board composed of 9 elected FFCA members aged 15-24. FFCA's staff and Board of Directors oversee the organization's non-profit operations and follow the direction of the Youth Leadership Board to further the organization's mission.

28.     To advance its mission, FFCA staff and members conduct various activities. First, FFCA regularly advocates at the state level for legislation, regulations, and policies that will improve the safety, permanency, and well-being of youth in the foster care system, including LGBTQ+ and Alaska Native youth. As part of that work, FFCA mentors its members to improve their ability to advocate for themselves and for policy changes that will improve the experiences of foster youth. For example, FFCA members have successfully advocated for millions of dollars to be included in the state operating budget for transition-aged youth; those dollars have been focused on housing, education, employment, mentorship, extended foster care, re-entry, and increased staff positions in Alaska's Office of Children Services ("OCS"), Alaska's state child welfare agency. FFCA members are currently working to secure passage of a foster youth bill of

rights that would include, among other things, the right: to be free from discrimination on the basis of age, race, disability, religion, sexual or gender identity, foster care status, or family history; to be placed in a safe, supportive, and stable environment; to practice the child's religion and engage in cultural activities; and to consent to the use of medication. In addition to legislative advocacy, the Youth Leadership Board meets with OCS officials on a quarterly basis to educate the agency on the needs of youth in foster care and to collaborate to improve agency policies and practices.

29.     Second, FFCA provides direct services and support to current and former foster youth through trainings and peer support. For example, FFCA contracts with OCS to host quarterly retreats through OCS's Independent Living Program designed to help foster youth develop the skills and resiliency that are key to their transition to adulthood. Through interactive sessions and presentations, FFCA's retreats focus on a variety of topics, such as reproductive health, healthy relationships, cooking, career and job skills, and higher education.

30.     Third, FFCA provides community education and training to ensure that individuals involved in the child welfare system—such as child welfare staff, judges, child advocates, tribal advocates, service providers, educators, and foster parents—have the tools to support foster youth throughout their experience in the foster care system. In the past, such trainings have covered topics such as the unique challenges faced by Alaska Native children, including reducing the over-representation of Alaska Native children in the foster care population in Alaska, the importance of cultural and educational continuity for children when moved to a new placement, and the ways in which caregivers can provide safe and supporting environments for LGBTQ+ youth and reduce the disproportionately high representation and poor outcomes of LGBTQ+ youth in care, including by increasing the number of safe and supportive foster homes.

31.     As explained further below, FFCA's ability to engage in advocacy, provide direct services to youth, and educate adults in the child welfare system would be greatly improved if it had access to data on ICWA implementation and sexual orientation.

32.     Plaintiff Ark of Freedom Alliance ("AFA") is a 501(c)(3) non-profit organization that works to end the sex and labor trafficking of children and young adults and to empower male and LGBTQ+ survivors, as well as youth at risk, by providing a variety of services and economic

support to those young people. To that end, AFA provides services to communities, children, LGBTQ+ youth, youth in and aging out of foster care, and young adult male survivors of violence, human trafficking, and exploitation, with a particular focus on those experiencing homelessness, with mental health disorders, or struggling with addiction. Relevant here, youth in the child welfare system are particularly at risk of trafficking.

33.     To accomplish its mission, AFA engages in a number of activities. First, it provides a variety of support services to youth, including education, housing, mental health services, and economic empowerment. Second, AFA provides preventative outreach, mentoring, and education to youth at risk of exploitation as a result of homelessness, anti-LGBTQ+ discrimination, histories of abuse, substance abuse, mental health challenges, barriers to employment, or involvement with the criminal justice system. Third, because more than half of all youth exploited for commercial sex identify as male, AFA provides community outreach and training in order to educate the community, law enforcement, and service providers on (1) how to identify and engage with male victims and others at risk of human trafficking and (2) how to report trafficking and otherwise support marginalized youth. Fourth, given the high correlation between involvement with the foster care system and the risk of trafficking, AFA provides education to child welfare system professionals and stakeholders about male and LGBTQ+ youth and young adult survivors of trafficking.

34.     As explained further below, AFA's ability to provide its services would be greatly improved if it had access to data on the sexual orientation of youth in the child welfare system.

35.     Plaintiff Ruth Ellis Center ("Ruth Ellis") is a 501(c)(3) non-profit organization that provides trauma-informed services to LGBTQ+ youth in Michigan, with an emphasis on youth of color (given their over-representation in Michigan's child welfare and other government systems of care), youth experiencing homelessness, youth in the child welfare and juvenile justice systems, and youth experiencing other barriers to health and well-being. Ruth Ellis provides services through five core programs.

36.     First, Ruth Ellis runs a health and wellness center that provides fully integrated primary and behavioral health care, including care for long-term medical issues, STI testing and

1   treatment, HIV prevention services, transition care, gender-affirming hormone treatment, birth

2   control, and screening for medical emergencies.

3        37.   Second, Ruth Ellis' drop-in center provides support groups, case management, and

4   a safe place for LGBTQ+ youth and young adults to connect with each other and their community.

5        38.   Third, Ruth Ellis operates a Center for Lesbian and Queer Women and Girls that

6   provides outreach and case management services to girls and women, including education,

7   workforce development, health and wellness, family/parenting support, and juvenile justice and

8   foster care support services.

9        39.   Fourth, through the Ruth Ellis Institute, Ruth Ellis advocates for policies to reform

10  both Michigan's foster care system and nation-wide systems of care, including the child welfare

11  system, to ensure that LGBTQ+ youth can be safe and supported.

12       40.   Fifth, Ruth Ellis operates several pilot programs designed to study how novel direct

13  services and trainings might improve outcomes for LGBTQ+ youth. For example, in recognition

14  of the importance of sexual orientation and gender identity data to its other programs, Ruth Ellis is

15  currently operating a pilot program to train foster care workers in three counties on collecting such

16  data in a culturally competent manner. Similarly, Ruth Ellis is conducting a pilot program to work

17  directly with the families of LGBTQ+ youth to improve family acceptance of their child's identity,

18  which is understood to play a significant role in improving outcomes for such youth, including

19  reducing the over-representation of LGBTQ+ youth in foster care. Ruth Ellis is currently shifting

20  from operating a group home specifically for LGBTQ+ youth who could not find supportive foster

21  home placements or need additional support to providing training and technical assistance on

22  LGBTQ+-supportive programing for group homes that serve all youth.

23       41.   As explained further below, Ruth Ellis's programs would benefit from access to

24  sexual orientation data through AFCARS.

25       42.   Established in 1999, Plaintiff True Colors, Inc. ("True Colors") is a 501(c)(3) non-

26  profit organization that works with child welfare agencies, other social services agencies, schools,

27  organizations, and communities to ensure that the needs of LGBTQ+ youth in Connecticut are

28  both recognized and competently met.

43.     True Colors accomplishes its mission in a variety of ways. First, in collaboration with Connecticut's Department of Children and Families ("DCF"), True Colors has established a Safe Harbor Project designed to ensure that DCF staff and contractors provide competent, safe, and supportive services to LGBTQ+ youth. To that end, the Safe Harbor Project provides trainings on LGBTQ+ cultural competency for a variety of professionals (e.g., social workers, clinicians, youth service providers, child welfare professionals, and educators), covering topics such as how to balance professional responsibilities with personal beliefs, how to identify risks and challenges specific to LGBTQ+ populations (e.g., a lack of supportive foster placements and homelessness), and how to address sensitive situations involving LGBTQ+ youth in the child welfare system.

44.     Second, True Colors regularly advocates for legislative, regulatory, and policy reform through the Safe Harbor Project, which has established a Task Force whose sole purpose is to identify and fill gaps in services for LGBTQ+ youth. In that role, the Task Force has successfully advocated for the implementation of supportive policies at DCF, including policies that prohibit DCF service providers from discriminating on the basis of sexual orientation and gender identity and expression, as well as written protocols for serving transgender and non-binary youth in congregate and foster care.

45.     Third, through the Safe Harbors Taskforce, True Colors works to enlarge the pool of foster homes for LGBTQ+ youth by recruiting affirming foster parents, including parents who are themselves LGBTQ+, and providing them with training on LGBTQ+ issues.

46.     Fourth, True Colors provides a number of direct services to LGBTQ+ youth, including Connecticut's first mentoring program that pairs LGBTQ+ youth in out-of-home care with an LGBTQ+ adult or ally, weekly activities designed to improve the overall quality of life for LGBTQ+ youth in foster care by helping them to connect with their communities, and leadership programs that empower LGBTQ+ youth to advocate for themselves and others. Youth participating in True Colors' mentoring program reflect the over-representation of youth of color in Connecticut's foster care system.

47.     As explained further below, True Colors' trainings, advocacy, and direct services would be greatly improved if it had access to sexual orientation data through AFCARS.

48.     Defendant Alex Azar is sued in his official capacity as the U.S. Secretary of Health and Human Services. His official address is 200 Independence Avenue SW, Washington, DC 20201.

49.     Defendant Lynn A. Johnson is sued in her official capacity as the Assistant Secretary for the Administration for Children and Families. Her official address is 330 C Street SW, Washington, DC 20201.

50.     Defendant U.S. Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, DC at 200 Independence Avenue SW, Washington, DC 20201. HHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

51.     Defendant Administration for Children and Families ("ACF") is a federal agency and a division of HHS headquartered in Washington, DC at 330 C Street SW, Washington, DC 20201. ACF is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

## IV.     FACTUAL ALLEGATIONS

### A.     Overview of Federal Child Welfare Programs

52.     Since Congress enacted the Social Security Act of 1935, 42 U.S.C. § 301 *et seq.*, the federal government and its agencies have administered federal funding for child welfare programs. In 1974, Congress passed the first national child welfare law, the Child Abuse Prevention and Treatment Act, 42 U.S.C. § 5101 *et seq.* Over the last 46 years, Congress has continued to fund and regulate state child welfare agencies through federal legislation.[7]

53.     In 1991, ACF was created to "promote[] the economic and social well-being of families, children, individuals and communities through a range of educational and supportive programs in partnership with states, tribes, and community organizations."[8] ACF, largely through its Children's Bureau subdivision, administers the vast majority of the federal government's child welfare efforts, including programs to help state and tribal, as well as government-funded private

---

[7] *See e.g.*, Adoption Assistance and Child Welfare Act of 1980, Pub. L. No. 96-272, 94 Stat. 500; Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115; Family First Prevention Services Act, Pub. L. No. 115-123, §§ 50701-82, 132 Stat. 64, 232-69 (2018).

[8] ACF, ACF History, https://www.acf.hhs.gov/about/history.

and nonprofit, child welfare agencies administer their own programs and provide for the best interests of the children in their care.

54.     The federal government spends nearly $10 billion a year to support state child welfare programs.[9] The principal means through which Congress allocates this money are title IV–E of the Social Security Act (the "Act"), which partially reimburses states for providing foster care, adoption assistance, and guardianship assistance, and title IV–B, which provides grants to states and tribes for child welfare services that protect children from abuse or neglect, preserve and reunite families, and promote and support adoption. *See* 42 U.S.C. §§ 621, 624, 670, 674. Agencies that receive this funding are known as "title IV–E agencies."

55.     One of the core goals of modern child welfare initiatives is permanency—that is, long-term placement in a "legally permanent, nurturing family," rather than care in foster homes or congregate care.[10] This can be achieved through family reunification, guardianship, or adoption.

56.     In spite of ACF's work on behalf of children, child welfare disparities continue to disproportionately impact certain groups of children. These disparities affect which children and families are likely to enter the foster care system, which children achieve permanent placements, how children are treated within the system, which children are trafficked or exploited within or after exiting the system, and what outcomes those children experience.[11]

**B.     The Adoption and Foster Care Analysis and Reporting System**

57.     The Adoption and Foster Care Analysis and Reporting System ("AFCARS") is the only source of national data on the almost 500,000 children in foster care or adopted through a

---

[9] Emilie Stoltzfus, Congr. Research Serv., *Child Welfare Funding in FY 2018* (July 30, 2018), https://fas.org/sgp/crs/misc/R45270.pdf.

[10] Child and Family Services Reviews: Information Portal, *Achieving Permanency*, https://training.cfsrportal.acf.hhs.gov/section-2-understanding-child-welfare-system/3030.

[11] *See, e.g.*, Children's Bureau, *Racial Disproportionality and Disparity in Child Welfare* 6 (2016), https://www.childwelfare.gov/pubpdfs/racial_disproportionality.pdf; Children's Bureau, *Human Trafficking and Child Welfare: A Guide for Caseworkers* 4 (2017), https://www.childwelfare.gov/pubPDFs/trafficking_caseworkers.pdf.

1  state agency.[12]

2        58.     To maximize the benefit of its child welfare expenditures to improve the wellbeing

3  of children in foster care, Congress and HHS have long expressed an interest in collecting data to

4  understand the demographics, procedures, and challenges of the foster care and adoption system.

5  From the late 1940s through the early 1970s, the Children's Bureau collected this information

6  voluntarily.[13] But this data was "characterized by variation from State to State in reporting periods,

7  the lack of common definitions for data elements and services, and inconsistent methodologies in

8  reporting." 58 Fed. Reg. at 67,913. These shortcomings "limit[ed] its usefulness for purposes of

9  planning or policy development at either the Federal or State levels." *Id.*

10        59.     As a result, both ACF and state agencies were operating in the dark. "[P]ublic child

11  welfare systems in many of the States did not know how many children were actually in foster

12  care; how long they had been in care; where they resided; their race, age, sex and special needs; or

13  the plan for each child." *Id.* The results for youth were dismal:

> [T]he public child welfare system had become a receiving and holding system for children in foster care. . . . [T]housands of children remained in foster care with little hope of being reunited with their parents or placed with adoptive families. The prospect of adoption was particularly bleak if the child was a member of an ethnic or racial minority group, an older child, a member of a sibling group, or mentally or physically disabled.

18  *Id.*

19        60.     Motivated by this "belief that the public child welfare system had become a

20  receiving and holding system for children in foster care," *id.*, Congress passed a series of laws

21  between 1978 and 1986 authorizing and then requiring HHS to develop a comprehensive reporting

22  system, which became AFCARS. *See* 42 U.S.C. § 679(c).

23        61.     By statute, AFCARS must:

---

[12] HHS, *The AFCARS Report No. 26*, 1 (2019),
https://www.acf.hhs.gov/sites/default/files/cb/afcarsreport26.pdf  ("HHS AFCARS Report")
(number of youth in foster care or adopted with public child welfare agency involvement during
Fiscal Year 2018).

[13] *See* Title IV–B and IV–E of the Social Security Act: Data Collection for Foster Care and
Analysis, 58 Fed. Reg. 67,912, 67,913 (Dec. 22, 1993) ("1993 Rule").

(3) provide comprehensive national information with respect to--

    (A) the demographic characteristics of adoptive and foster children and their biological and adoptive or foster parents,

    (B) the status of the foster care population (including the number of children in foster care, length of placement, type of placement, availability for adoption, and goals for ending or continuing foster care),

    (C) the number and characteristics of--

        (i) children placed in or removed from foster care,

        (ii) children adopted or with respect to whom adoptions have been terminated, and

        (iii) children placed in foster care outside the State which has placement and care responsibility,

    (D) the extent and nature of assistance provided by Federal, State, and local adoption and foster care programs and the characteristics of the children with respect to whom such assistance is provided; and

    (E) the annual number of children in foster care who are identified as sex trafficking victims--

        (i) who were such victims before entering foster care; and

        (ii) who were such victims while in foster care; and

   (4) utilize appropriate requirements and incentives to ensure that the system functions reliably throughout the United States.

*Id.* § 679(c)(3)-(4).

62.    The AFCARS collection must "avoid unnecessary diversion of resources from agencies responsible for adoption and foster care" and "assure that any data that is collected is reliable and consistent over time and among jurisdictions through the use of uniform definitions and methodologies." *Id.* § 679(c)(1)-(2).

63.    ACF also must "disseminate the data and information made available through" AFCARS via the National Adoption Information Clearinghouse, a public database administered by HHS to centralize information related to child welfare, adoption, and foster care. *Id.* § 679a(4). The full AFCARS dataset is available to the public through the National Data Archive on Child Abuse and Neglect. In addition, ACF releases annual AFCARS Reports that provide preliminary

1    snapshots based on the data sent in by the states.

2         64.    States and tribes are required to report information to AFCARS as prescribed by

3    ACF's implementing regulations. In return for providing this data and meeting other federal

4    requirements, including the submission of a sufficient state plan for foster care and adoption

5    assistance, *id.* § 671, states and tribes receive title IV–B grants and a significant reimbursement of

6    their title IV–E costs, including 50 percent of expenditures "to plan, design, develop, install, and

7    operate data collection and information retrieval systems" that comply with AFCARS

8    requirements. *Id.* § 674(a)(3)(C), (c).

9         65.    Until 2016, AFCARS operated under regulations ACF issued in 1993. *See* 58 Fed.

10   Reg. at 67,912. In devising those 1993 regulations, ACF "was guided by the . . . principles" that

11   the data collection must "produce national information on adoption and foster care, permit

12   meaningful State-specific analyses, permit meaningful comparisons among States, allow for

13   detailed analyses which address critical child welfare policy issues, [and] not unduly burden the

14   Federal government or the States." *Id.* at 67,915 (punctuation and capitalization altered).

15        66.    The 1993 Rule required states to report a number of data elements about foster and

16   adopted youth and their parents, including date of birth, demographic information such as sex and

17   race, the circumstances of a child's removal from a home, the presence of abuse or neglect,

18   previous placements, details of the current placement, adoptive parents, the length of time youth

19   remain in foster care, information about their caretakers, and whether parental rights are

20   terminated. *See id.* at 67,912, 67,926-27. As the agency recognized during the rulemaking,

21   AFCARS serves a number of vital purposes for child welfare programs and ultimately is a

22   "catalyst" for local improvement. *Id.* at 67,915.

23        67.    As ACF recognized when it finalized the 1993 AFCARS data requirements (and as

24   Congress recognized when it required dissemination of AFCARS data), AFCARS data provide

25   broad benefits to diverse stakeholders, including to Congress, states, federal agencies, tribes, child

26   welfare advocates, and researchers—and ultimately to youth in care themselves. Comprehensive

27   data would "enable policymakers to assess the reasons why children are in foster care and develop

28   remedies to prevent it" and "be useful for research, the ultimate purpose of which is to gain a

better understanding of the foster care program and the causes and other factors contributing to its expansion and other changes; and, eventually, to make suggestions and proposals for change to improve the child welfare system." *Id.* at 67,912. They also noted that it would "strengthen and preserve family life insofar as the demographic information provided on children in foster care will aid in permanency planning for these children and their families." *Id.* at 67,923.

68.    ACF identified a number of purposes for which it would use the data, including "[s]hort and long-term budget projections; trend analyses and short and long-term planning; targeting areas for greater or potential technical assistance efforts, for discretionary service grants, for research and evaluation, and for regulatory change; and background and justification for policy changes and legislative proposals." *Id.* at 67,912 (punctuation and capitalization altered).

69.    ACF also explained that it would use the data "to respond to questions and requests from other Departments and agencies, including the General Accounting Office,[14] the Office of Management and Budget (OMB), the DHHS Office of Inspector General, national advocacy organizations, States and other interested organizations." *Id.*

70.    ACF also recognized that, as a congressionally mandated advisory committee had found, "[s]pecial provision needs to be made for Indian children who are affected by requirements in the Indian Child Welfare Act of 1978." *Id.* at 67,914.

71.    ACF issued the 1993 Final Rule over "frequent expressions of concern [about] the potential time and cost burdens on the States resulting from the time required to collect and process the data and the possible diversion of resources from services to children; [and] the need for greater Federal support in the costs of the information system." *Id.* at 67,915. In adopting a semi-annual collection over these objections, ACF relied significantly on the provision of "technical assistance to those States desiring it on the planning, development and implementation of the required system." *Id.* at 67,916. It further encouraged states to implement technological solutions that could reduce the burden of collection, and promised to "provide guidance in the development of these comprehensive systems." *Id.* It also anticipated that AFCARS "would allow

---

[14] Now called the Government Accountability Office ("GAO").

and encourage States to manage programs more effectively." *Id.* at 67,915.

C.   **The Overrepresentation of and Poor Outcomes for LGBTQ+ and AI/AN Youth in Foster Care**

72.   Under the 1993 Final Rule, AFCARS did not collect any demographic data on sexual orientation or gender identity, and provided only race-based information on AI/AN youth, without distinguishing between youth protected by ICWA and those to whom it did not apply. Over the next 25 years, however, ACF-funded research and the efforts of tribes, states, and non-profits revealed that both LGBTQ+ youth and AI/AN youth are overrepresented in the foster care system compared to their numbers in the general population and suffer disproportionately from a wide range of negative outcomes, including sex trafficking, abuse and neglect, placement instability, homelessness, juvenile justice involvement, psychiatric hospitalization, and housing in group homes and residential treatment facilities.

73.   Without data on LGBTQ+ youth or the status and treatment of AI/AN youth under ICWA, AFCARS could not shed any light on the causes and factors contributing to the disproportionately negative outcomes of LGBTQ+ and AI/AN youth in foster care (or LGBTQ+ AI/AN, in particular), nor could it help ACF or title IV–E agencies determine how to use their resources to address those problems.

1.   *Issues Regarding LGBTQ+ Youth in Foster Care*

74.   LGBTQ+ youth are disproportionately represented in the child welfare system and in the population of youth experiencing homelessness. As ACF has acknowledged, studies have found that, although LGBTQ+ people represent approximately 5 to 10 percent of the general U.S. population, they account for more than 20 percent of female youth and more than 10 percent of male youth in the child welfare system.[15] As many as 65 percent of LGBTQ+ youth have lived in

---

[15] ACF, ACYF-CB-IM-11-03, *Lesbian, Gay, Bisexual, Transgender and Questioning Youth in Foster Care*, 1-2 (2011), https://www.acf.hhs.gov/sites/default/files/cb/im1103.pdf ("2011 ACF Info. Mem."); *see also* UCLA School of Law Williams Institute, Comment Letter on AFCARS Notice of Proposed Rulemaking (June 18, 2019), https://www.regulations.gov/document?D=ACF-2018-0003-0371 ("Williams Inst. NPRM Comment") (citing studies, including ACF-funded research, finding "that there are two times as many LGBTQ youth in foster care as in the general population").

a foster or group home, and 39 percent have been forced to leave their home because of adverse reactions to their sexual orientation or gender identity.[16] And between 20 and 40 percent of youth who become homeless each year are LGBTQ+.[17]

75.     The treatment of LGBTQ+ youth within the child welfare system and their outcomes after entering the system are also disproportionately negative. LGBTQ+ youth are more than twice as likely to report being treated poorly within the child welfare system than their non-LGBTQ+ peers.[18] LGBTQ+ foster youth suffer higher numbers of total placements while in care, higher rates of placement in group homes, longer stays in residential care, higher rates of homelessness, greater rates of hospitalization for emotional reasons, and greater rates of justice system involvement than their non-LGBTQ+ peers.[19]

76.     The poor safety, permanency, and well-being outcomes for LGBTQ+ youth are fueled by a lack of services promoting acceptance and support by parents or legal guardians and a lack of safe and supportive foster and adoptive homes, including LGBTQ+ foster and adoptive parents, who are more likely to foster, adopt, and provide supportive homes for LGBTQ+ youth. Many states have historically banned LGBTQ+ parents from adopting or fostering children or otherwise discriminated against LGBTQ+ foster and adoptive parents. At least 9 states permit government-funded contract child welfare agencies to refuse to license LGBTQ+ prospective foster and adoptive parents.

77.     Given the disproportionate numbers of children of color in the foster care system, studies show a majority of LGBTQ+ youth in care are youth of color and, thus, also face the same disparities and poor outcomes that disproportionately impact youth of color generally in the child

---

[16] 2011 ACF Info. Mem. at 2.

[17] *Id.*

[18] *See, e.g.*, Lambda Legal et al., Comment Letter on AFCARS Notice of Proposed Rulemaking (June 18, 2019) ("Lambda Legal NPRM Comment"), https://beta.regulations.gov/document/ACF-2018-0003-0358.

[19] *Id.*; *see also* Williams Inst. NPRM Comment; Child Welfare League of Am., Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 12, 2018) ("Child Welfare ANPRM Comment"), https://beta.regulations.gov/document/ACF-2018-0003-0109.

welfare system, including AI/AN children.[20] There is no nationwide data, however, regarding numbers or experiences of LGBTQ+ youth of color in foster care.

**2.**     ***Issues Regarding American Indian and Alaska Native Youth in Foster Care***

78.     AI/AN youth have been vastly overrepresented in the child welfare system for decades. During the 1970s, a Congressional inquiry found that approximately 25 to 35 percent of all AI/AN youth had been removed from their homes and placed into non-tribal homes.[21] Out-of-home placements, especially non-family or non-tribal placements, are associated with adverse impacts on the health and well-being of those children.[22]

79.     For example, AI/AN youth adopted by non-tribal families are more likely to report mental health problems than their white counterparts, including alcohol addiction, alcohol recovery, drug recovery, eating disorders, self-harm, and suicidal ideation.[23] Removing AI/AN children to non-tribal placements on a large scale has also had devastating consequences for tribal communities, causing intergenerational and historical trauma that "shattered [the] social fabric and homelands of Indigenous populations . . . ."[24]

80.     To combat the harms caused by the "alarmingly high percentage of Indian families . . . broken up by the removal . . . of their children," 25 U.S.C. § 1901(4), Congress enacted ICWA. In doing so, Congress recognized that children are a vital resource "to the continued existence and integrity of Indian tribes" and declared that it was national policy to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families."

---

[20] *See* Equality N.C. and N.C. Child, Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 12, 2018), https://beta.regulations.gov/document/ACF-2018-0003-0116 ("Equality N.C. ANPRM Comment").

[21] *See* H.R. Rep. No. 95-1386, at 9 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7531.

[22] *See generally, e.g.*, Attorney Gen.'s Advisory Comm. on Am. Indian/Alaska Native Child. Exposed to Violence, *Ending Violence so Children Can Thrive* 38-39 (2014) ("AG Report"), https://www.justice.gov/sites/default/files/defendingchildhood/pages/attachments/2015/03/23/ending_violence_so_children_can_thrive.pdf.

[23] *See, e.g.*, *id.* at 94 (discussing adverse childhood experiences and outcomes).

[24] *Id.* at 40.

1    *Id.* §§ 1901(3), 1902.

2        81.    ICWA implements this policy through a variety of provisions intended to keep

3    AI/AN youth in their communities, including minimum federal standards for the removal of

4    AI/AN children from their families.

5        82.    For example, in any child custody proceeding—*e.g.*, proceedings regarding foster

6    care, the termination of parental rights, pre-adoptive placements, and adoptive placements, *id.* §

7    1903(1)—involving an "Indian Child,"[25] ICWA provides that the child's tribe has a right to

8    intervene, *id.* § 1911(c).

9        83.    Similarly, ICWA contains several provisions intended to prevent unwarranted

10   removals of AI/AN youth from their families, including:

11           a.  a requirement that parties who initiate proceedings to terminate parental rights or to

12               put an AI/AN child in foster care must notify a child's tribe and parents, *id.* §

13               1912(a);

14           b.  a provision establishing the right of parents to court-appointed counsel in any such

15               proceeding if the court determines indigency, *id.* § 1912(b);

16           c.  a requirement that parties seeking to terminate parental rights or to make a foster

17               care placement demonstrate to the court that they have made active efforts without

18               success to prevent the breakup of the Indian family (*e.g.*, through remedial services

19               or rehabilitative programs), *id.* § 1912(d); and

20           d.  a requirement that such parties demonstrate, based on heightened burdens of proof

21               (including testimony of a qualified expert witness), that the continued custody of

22               the child by the parent or Indian custodian is likely to result in serious physical or

23               emotional damage to the child, *id.* § 1912(e)-(f).

24

25   ───────────────

25   [25] ICWA defines an Indian child as "any unmarried person who is under age eighteen and is either
26   (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the
     biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). This definition reflects the
27   unique political status of Indian people, whose rights and status are tied to their membership of a
     federally recognized tribe, rather than race or place of birth. *See Morton v. Mancari*, 417 U.S. 535
28   (1974).

84.     ICWA also permits parents and Indian tribes to petition for a child custody proceeding to be transferred to tribal court jurisdiction. *Id.* § 1911(b).

85.     In those cases where foster care or adoption is ordered, ICWA mandates that child welfare agencies comply with placement preferences that prioritize placing children with extended family members and/or within their tribal community. *Id.* § 1915.

86.     These provisions are intended to afford protections for the approximately two million AI/AN children[26] who are members of, or are the biological child of a member of and are eligible for membership in, one of the 576 federally recognized Indian tribes in the United States.

87.     Because of the protections ICWA provides to AI/AN children, families, and communities, ICWA's requirements are broadly considered the "gold standard" for child welfare.[27]

88.     Nevertheless, due in significant part to state child welfare agencies' failures to meet ICWA's requirements and the lack of data from which those failures can be pinpointed, states have not achieved Congress's goals in passing ICWA. AI/AN youth continue to be overrepresented in the child welfare system at a rate twice that of their representation in the population, accounting for 2 percent of all children in foster care in 2018[28] despite accounting for approximately 1 percent of all youth in the United States during that same time period.[29] In some states, AI/AN youth are the largest, most disproportionately represented group. For example, a 2005 GAO study found that approximately 62% of all youth in foster care in Alaska were AI/AN

---

[26] U.S. Census Bureau, Annual Estimates of the Resident Population by Sex, Age, Race Alone or in Combination, and Hispanic Origin for the United States: April 1, 2010 to July 1, 2019, https://www2.census.gov/programs-surveys/popest/tables/2010-2019/national/asrh/nc-est2019-asr5h.xlsx.

[27] *See, e.g.*, Cal. Tribal Families Coal., Comment Letter on AFCARS Notice of Proposed Rulemaking (June 17, 2019), https://beta.regulations.gov/document/ACF-2018-0003-0297.

[28] HHS AFCARS Report at 2.

[29] Tina Norris et al., *The American Indian and Alaska Native Population: 2010*, U.S. Census Bureau, 3 (2012), https://www.census.gov/history/pdf/c2010br-10.pdf.

1    youth.[30]

2           89.    ACF has recognized that ICWA's inability to remedy these disproportionalities is

3    the result of inconsistent and flawed implementation of ICWA's requirements. For example, ACF

4    has acknowledged, as detailed further below, that state child welfare agencies and state courts

5    have failed to implement ICWA's requirements and that there has generally been confusion

6    regarding when and how to apply the law.[31] Similarly, a taskforce convened by the California

7    Attorney General found that, nearly four decades after ICWA's passage, "the promise and

8    potential of the federal ICWA . . . [has] not been fully realized, as neither the letter nor the spirit of

9    the law has been fully implemented."[32]

10          90.    This problem is exacerbated by the fact that there is no national dataset that tracks

11   the implementation of ICWA and the outcomes for children in ICWA cases. Policymakers and

12   stakeholders—including tribes, foster youth, and families—have struggled to identify effective

13   solutions in part because they lack the data necessary to understand the precise nature and extent

14   of the flaws in ICWA's implementation. For example, without data collection from ICWA cases,

15   stakeholders are unable to know whether state courts and child welfare agencies are implementing

16   specific ICWA requirements.[33] They are also unable to understand the disproportionalities that

17   still exist for AI/AN youth in foster care,[34] or whether the systems serving AI/AN youth are

18   working.[35] Tribal agencies are further hampered by the fact that AFCARS neither distinguishes

19

20   [30] GAO, GAO-05-290, Indian Child Welfare Act: Existing Information on Implementation Issues Could Be Used to Target Guidance and Assistance to States 13 (2005),

21   https://www.gao.gov/assets/250/245936.pdf.

22   [31] Adoption and Foster Care Analysis and Reporting System, 81 Fed. Reg. 20,283, 20,284 (proposed Apr. 7, 2016) ("2016 SNPRM").

23   [32] Task Force Report at v.

24   [33] See, e.g., Casey Fam. Programs, Comment Letter on AFCARS Notice of Proposed Rulemaking (June 17, 2019), https://beta.regulations.gov/document/ACF-2018-0003-0312.

25   [34] See, e.g., Cherokee Nation, Comment Letter on AFCARS Advance Notice of Proposed

26   Rulemaking (June 12, 2018) ("Cherokee Nation ANPRM Comment"), https://beta.regulations.gov/document/ACF-2018-0003-0136 ("In order to fully appreciate this

27   disproportionality we must have better data relating to Indian children in state systems.").

28   [35] See, e.g., Juv. L. Ctr., Comment Letter on AFCARS Notice of Proposed Rulemaking (June 18,

between children who identify as AI/AN and those who meet the definition of "Indian child" under ICWA, nor provides data on AI/AN children by tribe.

91.     The federal government has explicitly recognized these problems and the need for further data. For example, after reporting on the lack of funding for tribal social services systems, disproportionality high rates for AI/AN children in state foster care systems, the overexposure of AI/AN children to violence, and a lack of ICWA compliance in state agencies and courts, the United States Attorney General's Advisory Committee on American Indian and Alaska Native Children Exposed to Violence recommended that ACF collaborate with tribes and the Bureau of Indian Affairs to collect "data on all AI/AN children who are placed into foster care . . . to allow tribes and the BIA to make informed decisions regarding AI/AN children."[36] It specifically called out the need to collect "data regarding compliance with ICWA."[37]

### D.     The Decade-Long Effort Producing the 2016 Revisions to AFCARS

92.     HHS and ACF have long recognized that the limited data collected under the 1993 Rule was insufficient.

93.     In 2003, GAO and the HHS Office of the Inspector General ("OIG") both published reports discussing the limitations of existing AFCARS data.[38] Among other findings, the OIG concluded the data elements in AFCARS may not capture all relevant information and may produce inaccurate results. For example, the limited response categories for AFCARS data could result in youth placed with family members being mistakenly reported as placed with a "Married Couple." 2003 OIG Report at 6. States also interpreted data fields differently, resulting in inconsistent data. *See, e.g.*, *id.* at 8-9. Around this time, Congress also passed the Adoption

---

2019), https://beta.regulations.gov/document/ACF-2018-0003-0345.

[36] AG Report at 76.

[37] *Id.* at 77.

[38] *See* GAO, GAO-04-267T, Child Welfare: States Face Challenges in Developing Information Systems and Reporting Reliable Child Welfare Data (2003), ("2003 GAO Report"), https://www.gao.gov/assets/120/110511.pdf; HHS OIG, OEI-07-01-00660, Adoption and Foster Care Analysis and Reporting System (AFCARS): Challenges and Limitations (2003) ("2003 OIG Report"), https://oig.hhs.gov/oei/reports/oei-07-01-00660.pdf.

Promotion Act of 2003, Pub. L. No. 108–145, 117 Stat. 1879, which necessitated changes to AFCARS.

94.     ACF responded to these developments by requesting public comment on potential improvements to AFCARS.[39] Based on the comments it received, ACF issued a notice of proposed rulemaking in 2008 that would have expanded AFCARS data elements to support more longitudinal data analysis.[40]

95.     Shortly after this proposal, Congress passed the Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110-351, 122 Stat. 3949, which amended title IV in ways that necessitated further changes to the data collection. ACF thereafter issued a request for information seeking additional public comment in 2010.[41]

96.     Before ACF could finalize a proposed rule, Congress amended title IV again in 2014, requiring AFCARS reporting to document "the annual number of children in foster care who are identified as sex trafficking victims" before or since entering foster care. 42 U.S.C. § 679(c)(3)(E).

97.     During this same time period, after extensive research, reports from focus groups with foster youth, and professional standards issued by the Child Welfare League of America and others, ACF published a 2011 Information Memorandum entitled "Lesbian, Gay, Bisexual, Transgender and Questioning Youth in Foster Care." The memorandum recognized that "[LGBTQ] youth are often overrepresented in the population of youth served by the child welfare system and in the population of youth living on the streets"; have negative experiences in care, including a "heightened concern" for their physical safety; and "often cycle through foster homes, group homes, and the streets."[42] ACF also recognized that "LGBT foster and adoptive parents can

---

[39] Request for Public Comment on the Improvement of the Adoption and Foster Care Analysis and Reporting System (AFCARS), 68 Fed. Reg. 22,386 (Apr. 28, 2003).

[40] Adoption and Foster Care Analysis and Reporting System, 73 Fed. Reg. 2,082 (proposed Jan. 11, 2008).

[41] Request for Public Comment and Consultation Meetings on the Adoption and Foster Care Analysis and Reporting System (AFCARS), 75 Fed. Reg. 43,187 (July 23, 2010).

[42] 2011 ACF Info. Mem. at 1-3.

1    provide a loving, stable home, responsive to the needs of LGBTQ youth in care, and are a largely

2    untapped resource—an estimated 2 million LGB individuals are interested in adopting."[43]

3         98.    Additionally, ACF published a notice of proposed rulemaking in August 2015 to

4    require states to update their child welfare databases to match a new federal standard called

5    Comprehensive Child Welfare Information Systems ("CCWIS") in order to receive federal

6    funding.[44] ACF subsequently finalized the CCWIS rule in June 2016, requiring states to update

7    their data collection systems and use case management data systems that allowed for some

8    flexibility in reporting.[45]

9         99.    Thus, by 2015, revisions to AFCARS' implementing regulations were long

10   overdue. Since the 1993 iteration of the regulations, Congress had passed three laws amending the

11   child welfare system, GAO and OIG had issued reports documenting the limitations of the current

12   AFCARS system, and ACF had received multiple rounds of public comment. Many states,

13   moreover, were embarking on an ACF-supported effort to modernize their child welfare databases,

14   a project that made it a particularly efficient time to add data elements to those databases.

15              *1. 2015 NPRM*

16        100.    After this decade-plus of inquiry and legal developments, ACF issued a new notice

17   of proposed rulemaking in February 2015.[46] The 2015 NPRM "buil[t] on" the 2008 NPRM,

18   proposing "many of the same changes," 80 Fed. Reg. at 7132. It also included data elements

19   needed to implement the recent congressional enactments. *Id.*

20        101.    Among other subjects, the 2015 NPRM proposed to add questions regarding health

21   assessments; health, behavioral, and mental health conditions; school enrollment; educational

22   stability; transition planning; sex trafficking; and several other topics. *Id.* at 7148-54. It also

23   _____

24   [43] *Id.* at 3 (citation omitted).

25   [44] Comprehensive Child Welfare Information System, 80 Fed. Reg. 48,200 (proposed Aug. 11, 2015).

26   [45] Comprehensive Child Welfare Information System, 81 Fed. Reg. 35,450 (June 2, 2016) (codified at 45 C.F.R. §§ 1355-1356).

27

28   [46] Adoption and Foster Care Analysis and Reporting System, 80 Fed. Reg. 7132 (proposed Feb. 9, 2015) ("2015 NPRM").

omitted some data elements proposed in the 2008 NPRM due to concerns raised by state agencies and other interested parties. *Id.* at 7138-39.

102.    The 2015 NPRM also recognized the ample research showing that "LGBTQ youth are often overrepresented in the population of youth served by the child welfare system and in the population of youth living on the streets, however there is little or no data on the experiences of these youth." *Id.* at 7155. To determine whether and how "to collect information on LGBTQ youth in AFCARS in light of these practical issues and strategies for identifying LGBTQ youth in the AFCARS reporting population in a manner that permits case-level data analysis between existing federal data collection efforts," ACF

> invite[d] comments on the issues of whether we should collect data relating to LGBTQ statuses; what, if any, data should be collected relating to these statuses; what the utility of such data collection might be; what issues would arise if there were inconsistent approaches between AFCARS and [the National Youth in Transition Database]; and how to best address such inconsistencies if a decision is made for expanded data collection relating to LGBTQ statuses.

*Id.*

103.    ACF emphasized the unique advantages of collecting data on demographics and the experiences of foster and adoptive youth through AFCARS. As it explained, "[o]ther existing data sets cannot yield similar information because AFCARS is the only national, comprehensive case-level data set on the incidence and experiences of children who are in foster care and/or achieve adoption or guardianship with the involvement of the State or Tribal title IV–E agency." *Id.* at 7133.

104.    ACF also considered the burden of the expanded collection on state and tribal title IV–E agencies. It estimated that child welfare agencies would incur a combined $24 million annually for the first five years, fully half of which would be reimbursed by the Federal government under title IV–E. *Id.* at 7133, 7202. ACF spelled out the assumptions underlying its burden analysis and noted that they "may be an overestimate." *Id.* at 7203-04.

### 2.  2016 SNPRM

105.    Both the 2008 and 2015 NPRMs, along with the required tribal consultations ACF undertook, prompted comments requesting that ACF include additional data elements mirroring

1  ICWA requirements.

2      106.    In April 2015, ACF issued a notice of its intent to publish a supplemental notice of

3  proposed rulemaking, explaining that it had concluded that ACF was authorized to collect ICWA-

4  related data because the Social Security Act "permits broader data collection in order to assess the

5  current state of adoption and foster care programs in general, as well as to develop future national

6  policies concerning those programs."[47]

7      107.    ACF issued a supplemental notice of proposed rulemaking in April 2016,

8  proposing to include data elements corresponding with ICWA requirements for state title IV–E

9  agencies.[48] As ACF explained, "[a]lthough ICWA was passed more than 30 years ago, it is unclear

10  how well state agencies and courts have implemented ICWA's requirements into practice" and

11  there was "confusion regarding how and when to apply the law" even in "states with large AI/AN

12  populations." 81 Fed. Reg. at 20,284. This confusion was "complicated by the fact that there is no

13  comprehensive national data on the status of AI/AN children for whom ICWA applies at any stage

14  in the adoption or foster care system." *Id.*

15      108.    ACF found that "AFCARS data can bridge this gap." *Id.* Specifically, collecting

16  ICWA data would serve "several uses in the public interest including: To assess the current state

17  of foster care and adoption of Indian children under the Act, to develop future national policies

18  concerning ACF programs that affect Indian children under the Act, and to meet federal trust

19  obligations under established federal policies." *Id.*; *see also id.* at 20,284-86 (identifying

20  additional ways ACF will use the data). These uses reflected "Department-wide priorities to

21  affirmatively protect the best interests of Indian children and to promote the stability and security

22  of Indian tribes, families, and children." *Id.* at 20,284. They further implemented the Social

23  Security Act because they "will improve the AFCARS data collection system to provide more

24  comprehensive demographic and case-specific information on all children, including children

25

26  ───────────────
[47] Adoption and Foster Care Analysis and Reporting System, 80 Fed. Reg. 17,713, 17,713 (Apr. 2,
27  2015).

28  [48] Adoption and Foster Care Analysis and Reporting System, 81 Fed. Reg. 20,283 (Apr. 7, 2016)
("2016 SNPRM").

1  subject to ICWA." *Id.*; *see also id.* at 20,288 ("Such elements will help establish demographics

2  necessary in identifying ICWA cases that involve parents who are tribal members or that involve

3  an Indian custodian. . . . More accurate data will help ACF better understand the scope of ICWA's

4  impact in AI/AN child foster care cases and state systems, help identify where the application of

5  ICWA may need reinforcement, and help inform ACF technical assistance to state title IV–E

6  agencies.").

7       109.    Accordingly, ACF proposed to include a series of data elements to collect

8  information on how the agency implemented ICWA in a child's case. These data elements

9  "represent the minimum that a state title IV–E agency should be collecting to determine whether

10  the child is an Indian child under ICWA." *Id.* at 20,288. States would need to complete the full set

11  of ICWA data elements only for the roughly 2 percent of youth to whom ICWA applies. *Id*. at

12  20,297. For all other youth—nearly 98 percent of the children about whom states reported—states

13  would need to supply only three data elements addressing whether they knew or had reason to

14  know that the child is an Indian child as defined by ICWA. *Id.* at 20,297, 20,300. Thus, the ICWA

15  questions would impose little burden on child welfare agencies in the vast majority of cases—just

16  half an hour per non-ICWA child, compared to 10 hours per child covered by ICWA. *Id.* at

17  20,298.

18       110.    ACF detailed the need for and benefit of each element that it proposed to include.

19  *Id.* at 20,288-91. It also explained how it tailored the proposed data elements to comply with the

20  Social Security Act's requirement that data collection avoid unnecessarily diverting resources

21  from agencies responsible for adoption and foster care. *Id.* at 20,286. It similarly identified

22  alternatives that it had considered and rejected, specifically noting that "including too few data

23  elements . . . may exclude Indian children and families from the additional benefit of improving

24  AFCARS data." *Id.* at 20,295-96.

25       111.    Considering comments it received from title IV–E agencies, ACF estimated that the

26  one-time costs of modifying systems and training personnel would be approximately $6.5 million,

27  while the annual cost would be approximately under $15 million. *Id.* at 20,298. ACF noted that

28  these estimates likely overstated the burden on title IV–E agencies, because "[a]s more states build

[CCWIS], ACF anticipates it will lead to more efficiency in reporting and less cost and burden to the state agencies." *Id.* at 20,297.[49]

### 3. 2016 Final Rule

112.     In response to the 2015 NPRM and 2016 SNPRM, ACF received 217 comments from "states, Indian tribes and organizations representing tribal interests, national advocacy/ public interest groups, universities, and private citizens."[50]

113.     After considering these comments, ACF issued a 74-page Final Rule adopting many of the data elements proposed in the 2015 NPRM and 2016 SNPRM, but "remov[ing] some data elements in response to comments . . . and modif[ying] others." 81 Fed. Reg. at 90,524.

114.     ACF began the 2016 Final Rule by reiterating its mandate under the Social Security Act to maintain "a data collection system which provides comprehensive national information on: the demographic characteristics of adopted and foster children and their parents; the status and characteristics of the foster care population;" and other information. *Id.* at 90,525. It then explained the many different purposes for which ACF uses AFCARS data, including:

- Draw[ing] national statistics and trends about the foster care and adoption populations for assessing the current state of foster care and adoption.

- Complet[ing] the annual Child Welfare Outcomes Report to Congress (section 479A of the Act).

- Develop[ing] our budgets.

- Calculat[ing] payments for the Adoption and Guardianship Incentive Payments program.

- Monitor[ing] title IV–E agency compliance with title IV–B and IV–E requirements, including drawing the population sample for title IV–E reviews.

- Develop[ing] appropriate national policies with respect to adoption and foster care; and

- Address[ing] the unique needs of Indian children as defined by ICWA in foster care or who exit to adoption, and their families.

---

[49] ACF referred to the Statewide Automated Child Welfare Information System ("SACWIS"), the predecessor to CCWIS.

[50] Adoption and Foster Care Analysis and Reporting System, 81 Fed. Reg. 90,524, 90,525 (Dec. 14, 2016) ("2016 Final Rule").

1  *Id.*

2     115.   ACF explained the many benefits it believed the 2016 Final Rule would provide,

3  including "more comprehensive information to deepen [its] understanding of guardianships and to

4  address the unique needs of Indian children as defined in ICWA" and "further [its] work to draw

5  national statistics and trends about the foster care, adoption, and guardianship populations for

6  assessing the current state of these federal programs and inform national policies with respect to

7  adoption, guardianship, and foster care." *Id.* at 90,525.

8     116.   The Final Rule included data elements on most of the topics addressed in the 2015

9  NPRM and 2016 SNPRM, including health assessments; health, behavioral, and mental health

10  conditions; school enrollment; educational stability; transition planning; sexual orientation;

11  ICWA; and sex trafficking. *See id.* at 90,539-41, 90,550, 90,552-56. In various places, it deleted,

12  modified, or clarified the required data elements in response to comments from title IV–E agencies

13  and others. For example, in response to comments from state title IV–E agencies, ACF deleted

14  data elements regarding whether children were born in the United States and whether they had

15  qualifying disabilities under the Individuals with Disabilities in Education Act. *Id.* at 90,534.

16     117.   As most relevant to this case, the Final Rule included demographic questions

17  regarding sexual orientation and questions about the status and characteristics of, and the extent of

18  assistance and procedural protections provided to, children protected by ICWA.

19     118.   Regarding sexual orientation, ACF was "persuaded" by commenters that showed

20  that LGBTQ+ youth "are overrepresented in the child welfare system, but we do not have a full

21  picture of their experiences in foster care," and that "such youth often have unique service needs,

22  are at an increased risk for poor outcomes, are more likely to be placed in group settings and

23  experience more placements." *Id.*

24     119.   Accordingly, the Final Rule incorporated a data element requiring title IV–E

25  agencies to report the child's voluntarily self-reported sexual orientation for youth age 14 and

26  older. *Id.*

27     120.   ACF explained that it included this demographic question

28     to move closer toward our goal to better support children and youth in foster care

> who identify as LGBTQ and ensure that foster care placement resources and
> services are designed appropriately to meet their needs. We are aware of situations
> where youth in foster care have been unsupported in their foster care placements
> when their foster caregivers became aware of their sexual orientation.

*Id.* at 90,534-35. It also noted that the data would "assist title IV– E agencies in recruiting and

training foster care providers in meeting the needs of these youth." *Id.* at 90,535; *see also id.* at

90,526 ("Our goal in including this information is that the data will assist title IV–E agencies to

help meet the needs of LGBTQ youth in foster care.").

121.    ACF rejected commenters' requests to include additional data elements asking

about gender identity or gender expression, or to include additional response options. Instead, it

chose to make the sexual orientation response options identical to data routinely gathered on

sexual orientation through the Youth Risk Behavior Surveillance System questionnaire from the

Centers for Disease Control and Prevention ("CDC"). *Id.* at 90,534.

122.    ACF acknowledged that some title IV–E agencies, while "express[ing] appreciation

for ACF's interest in supporting and protecting LGBTQ+ youth in foster care and agree[ing] that it

is important to work toward a mechanism for collecting information related to a youth's sexual

orientation, gender identity and expression," opposed the sexual orientation question because the

self-reported nature of the question "could result in an undercount of LGBTQ children in foster

care;" because sexual orientation is sensitive and private; and because collecting the data could

pose safety concerns due to the discrimination that LGBTQ+ individuals still face in many parts of

the country. *Id.*

123.    ACF considered but rejected these concerns, both because response was voluntary

and therefore youth who did not feel comfortable disclosing their sexual orientation could decline

to share it, and because all child welfare databases are subject to confidentiality requirements. *Id.*

at 90,535. Recognizing the sensitivity of the question, ACF explained that "[s]everal state and

county agencies, advocacy organizations and human rights organizations have developed guidance

and recommended practices" for addressing sexual orientation in adoption, foster care, and out-of-

home placement settings. *Id.* at 90,526. It identified resources to guide title IV–E agencies in

asking such questions. *Id.*

124.    Additionally, the Final Rule included a demographic question asking about the sexual orientation of foster parents, adoptive parents, and legal guardians, as well as a data element recording whether there was family conflict related to the child's sexual orientation, gender identity, or gender expression at removal, reflecting findings in ACF's 2011 LGBTQ Information Memorandum. *See id.* at 90,526, 90,554, 90,558-59.

125.    The Final Rule also included a series of ICWA-related data elements, which were drafted to reflect the requirements in recently issued Bureau of Indian Affairs regulations implementing ICWA. *Id.* at 90,536. As in the 2016 SNPRM, these included three data elements designed to assess whether ICWA applies, followed by a set of data elements that only needed to be answered for the roughly 2 percent of children to whom ICWA applies. *See id.* at 90,570.

126.    In response to comments, the Final Rule explained why each element was necessary. *See id.* at 90,535-39, 90,545-48, 90,552-53, 90,556, 90,560-61. For example, ACF explained that it included a data element identifying the availability of ICWA-specific placement options because it was "essential for ACF to determine whether resources are needed for recruitment to increase the availability of AI/AN homes that can meet ICWA's placement preferences." *Id.* at 90,552.

127.    Similarly, ACF explained that it was including a set of yes/no data elements about the basis for court orders for foster care placement because they would

> provide data on the extent to which Indian children as defined in ICWA are removed in a manner that conforms to ICWA's standards, inform[] ACF about the frequency of and evidentiary standards applied to removals of Indian children, help[] identify needs for training and technical assistance related to ICWA, and highlight[] substantive opportunities for building and improving relationships between states and tribes. Removing [the question] . . . would diminish our ability to achieve these purposes.

*Id*. at 90,548.

128.    ACF included only data elements recording child welfare practices "required under the ICWA," and rejected suggestions for questions that addressed data not required by ICWA. *Id.* at 90,547. ACF explicitly determined *not* to add some questions proposed by commenters who sought to expand the ICWA elements further, explaining that it chose not to include them

1  "because we must balance the need to have the information with the burden and cost it places on

2  state agencies to do so." *Id.* at 90,536; *see also, e.g.*, *id.* at 90,547.

3       129.   ACF also conducted a cost and burden analysis, concluding that title IV–E agencies

4  would incur aggregate annual costs of approximately $81 million, half of which would be

5  reimbursed by the federal government. *Id.* at 90,567. ACF noted that these costs would likely

6  decline "[a]s more title IV–E agencies build CCWIS." *Id.* It had also noted previously that title

7  IV–E agencies may be able to obtain further reimbursement because "enhancements in the title

8  IV–E agency's case management system to support new data collection requirements may be

9  eligible for [CCWIS] development funding." 80 Fed. Reg. at 7136.

10      130.   ACF explained the main alternatives that it considered and why it rejected each

11 one. 81 Fed. Reg. at 90,565. Most notably, it noted that no other data set could yield similar

12 information, because "AFCARS is the only comprehensive case-level data set on the incidence

13 and experiences of children who are in out-of-home care under the placement and care of the title

14 IV–E agency or who are adopted under a title IV–E adoption assistance agreement." *Id.*

15      131.   Finally, ACF delayed implementation of the new reporting requirements until

16 October 1, 2019, giving title IV–E agencies two fiscal years to prepare to implement the required

17 changes. *Id.* at 90,529. Many title IV–E agencies had commented that they would need "more time

18 than one year" to prepare. *Id.* Just two states had indicated that they would need two to three years.

19 *Id.*

20          **E.    Defendants' Efforts to Prevent the 2016 Final Rule from Taking Effect**

21      132.   Beginning with the change in administrations in January 2017, ACF ceased all

22 apparent efforts to help states prepare to comply with the 2016 Final Rule, and instead began

23 working to prevent it from ever taking effect.

24      133.   In issuing the 2016 Final Rule, ACF stated repeatedly that it would "provide

25 technical assistance" to title IV–E agencies to prepare to meet their new obligations. *See, e.g.*, *id.*

26 at 90,526, 90,531-33, 90,535, 90,537, 90,539-43, 90,551-52, 90,554, 90,559. Title IV–E agencies

27 had long expressed their need for technical assistance in complying with any new requirements.

28 *See, e.g.*, 80 Fed. Reg. at 7136.

COMPLAINT FOR DECLARATORY AND                    36
INJUNCTIVE RELIEF - Case No. xx

134.     Despite ACF's stated commitment to assisting states, ACF never revised the Technical Bulletins it provides to "assist title IV–E agencies in developing, implementing, and maintaining their AFCAR system."[51] Nor, on information and belief, did it provide other technical assistance to title IV–E agencies to prepare them to comply with the new requirements.

135.     Instead of assisting title IV–E agencies to comply, ACF began laying the groundwork to gut the 2016 Final Rule.

136.     At least as early as the spring of 2017, ACF personnel began informing tribes that the regulation was under review. Tribes asked to discuss the AFCARS regulations with ACF's Deregulation Task Force, but were rebuffed by ACF Acting Assistant Secretary Steven Wagner.

137.     Fifteen months after issuing the 2016 Final Rule, on March 15, 2018, ACF issued a notice of proposed rulemaking stating its intent to delay the compliance deadline by an additional two years.[52] This would give title IV–E agencies four years from the 2016 Final Rule's issuance to come into compliance, even though no agency had requested that amount of time, and the longest amount anyone requested—up to three years—was sought by only two agencies. *See* 81 Fed. Reg. at 90,529.

138.     This notice of proposed rulemaking made clear that ACF intended to revisit the conclusions it had reached 15 months earlier, giving newfound deference to burden objections that it had rejected after evaluating them at length in the 2016 Final Rule. *See* 83 Fed. Reg. at 11,451.

139.     After a 30-day comment period, ACF issued a final rule delaying compliance dates by a year.[53] ACF acknowledged that the majority of the 43 comments it received—all but those from 12 states and one organization—opposed the delay. 83 Fed. Reg. at 42,225-26. And it recognized both the importance of the information to be reported to AFCARS and that the 2016

---

[51] Children's Bureau, AFCARS Technical Bulletins, https://www.acf.hhs.gov/cb/laws-policies/technical-bulletins/afcars. As of the date of this filing, the links to the individual Technical Bulletins on this website all state that they were published in 2012.

[52] Adoption and Foster Care Analysis and Reporting System, 83 Fed. Reg. 11,450 (proposed Mar. 15, 2018).

[53] Adoption and Foster Care Analysis and Reporting System, 83 Fed. Reg. 42,225 (Aug. 21, 2018).

1   Final Rule was the first update to the AFCARS regulations since 1993. *Id.* at 42,226.

2   Nevertheless, with just one sentence of explanation, it dismissed the majority of comments out of

3   hand. *See id.* ("We must balance the need for updated data with the needs of our grantees, the title

4   IV–E agencies, that must revise their systems to meet new AFCARS requirements and will

5   ultimately be held accountable via compliance and penalties to report the data.").

6       140.    Without any analysis of the effect on youth in foster care, families, tribes, or other

7   interested parties, ACF delayed implementation by one year to October 1, 2020. *Id.* This gave

8   states three years to come into compliance—again, longer than all but two states had requested

9   during the rulemaking that led to the 2016 Final Rule.

10      141.    On information and belief, ACF continued its practice of not providing technical

11  assistance to title IV–E agencies that were preparing to comply with this extended deadline, even

12  though states that commented in favor of the delay did so in the hope that the extra time would

13  "allow[] ACF time to provide needed technical assistance and guidance on the new AFCARS

14  requirements." *Id.* Instead of assisting compliance with the existing requirements, ACF turned to

15  rescinding significant portions of the 2016 Final Rule.

16      **F.      Defendants' Decision to Gut the 2016 Final Rule**

17          *1.  2018 ANPRM and 2019 NPRM*

18      142.    Concurrent with its proposal to delay the 2016 Final Rule, ACF issued an advanced

19  notice of proposed rulemaking seeking comments on the "burden" associated with the data

20  elements included in the 2016 Final Rule.[54] The 2018 ANPRM assumed that some data elements

21  were "overly burdensome" and requested that commenters identify those elements and "provide a

22  rationale" for why that was so. 83 Fed. Reg. at 11,450. It invited comments as to how the data

23  elements could be "simplif[ied]" and which data elements "would not be reliable or [are] not

24  necessary." *Id.* It tellingly did not invite input on the benefits of the 2016 Final Rule as a whole or

25  individual data elements, except to the limited extent that they "are important to understanding and

26  assessing the foster care population at the national level," *id.*, just one of the many purposes of

27  _____

28  [54] Adoption and Foster Care Analysis and Reporting System, 83 Fed. Reg. 11,449 (proposed Mar. 15, 2018) ("2018 ANPRM").

1    AFCARS that ACF had recognized in both the 1993 and 2016 Rules. *See supra* ¶¶ 66-70, 114.

2          143.    In response, ACF "received 237 comments from 38 states, 38 Indian tribes or

3    consortiums, 62 organizations representing state or tribal interests, national public advocacy

4    groups, professional associations, universities, two members of Congress, and 97 private

5    citizens."[55]

6          144.    Most (although not all) state commenters took up ACF's invitation to claim that the

7    requested data elements were overly burdensome, repeating the arguments that they had raised

8    against the 1993 Rule and every attempt to update it since. Their estimated burdens ranged wildly,

9    with some states claiming it would take as many as 70,000 hours to revise their databases to track

10   the non-ICWA data elements and 25,000 hours to do so for ICWA elements. 84 Fed. Reg. at

11   16,573. In other words, some states claimed it would take as much as 95,000 hours—the

12   equivalent of 47.5 people working full-time on nothing else for a year—just to update their

13   computer systems to comply with the 2016 Final Rule, even though they could simultaneously be

14   reimbursed to do exactly that in the CCWIS modernization. By contrast, some states estimated just

15   800 and 200 hours to prepare for the non-ICWA and ICWA elements, respectively—

16   approximately 1% of the high-end estimates. *Id.* Similarly, estimates of staff training ranged from

17   20 hours a year to 102,000 hours a year. *Id.* Consistent with ACF's invitation to suggest a higher

18   burden, the high-end estimates reflected a massive increase from states' comments before the 2016

19   Final Rule. *See* 81 Fed. Reg. at 90,568.

20         145.    Despite their burden concerns, "the vast majority of states . . . expressed that the

21   2016 final rule was a considerable improvement to the current AFCARS, will improve data

22   reporting, and provide national information on a number of new topics, including ICWA, health

23   needs, and permanency." 84 Fed. Reg. at 16,573. They similarly "recognized that more

24   comprehensive data allows them to better understand the children and families they serve." *Id.*

25         146.    Various states recommended revisions to nearly every set of data elements,

26   including questions regarding "education, health assessments and conditions, youth

27   _____

28   [55] Adoption and Foster Care Analysis and Reporting System, 84 Fed. Reg. 16,572, 16,573
     (proposed Apr. 19, 2019) ("2019 NPRM").

1  pregnancy/fathering, siblings, prior adoptions, caseworker visits, and sex trafficking." *Id.* at

2  16,574. Just one-third of the states proposed to cut the sexual orientation questions, while about

3  half of the state commenters recommended eliminating some of the ICWA elements that ACF had

4  previously found essential. *Id.*

5       147.   At least five states urged ACF to retain the sexual orientation questions,[56] and at

6  least three states expressly requested that it retain many or all of the ICWA elements.[57] When

7  discussing the state comments, ACF ignored the former altogether and misrepresented the latter as

8  supporting merely "limited information." 84 Fed. Reg. at 16,574. For example, ACF claimed that

9  "states with higher numbers of tribal children in their care reported that they supported including

10  limited information related to ICWA in AFCARS," *id.*, when in actuality the state with the largest

11  number of AI/AN youth in care expressed "steadfast and unequivocal support for the data

12  collection set forth in the [2016 Final Rule]," specifically singling out its ICWA and LGBTQ+

13  elements as "necessary for the proper performance of the functions of the agency."[58]

14       148.   Virtually every other commenter opposed the proposed retrenchment. *See id.* They

15  explained the benefits of the requested data elements, which ACF had previously considered in

16  issuing the 2016 Final Rule. *Id.*

---

[56] Cal. Dep't of Soc. Servs., Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 5, 2018), https://www.regulations.gov/document?D=ACF-2018-0003-0016 ("California ANPRM Comment"); Minn. Dep't of Hum. Servs., Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 13, 2018), https://www.regulations.gov/document?D=ACF-2018-0003-0180; Ohio Dep't of Job and Fam. Servs., Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 13, 2018), https://www.regulations.gov/document?D=ACF-2018-0003-0143; Oregon, Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 14, 2018), https://www.regulations.gov/document?D=ACF-2018-0003-0210; Pa. Dep't of Hum. Servs., Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 13, 2018), https://www.regulations.gov/document?D=ACF-2018-0003-0211.

[57] California ANPRM Comment; North Dakota, Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 12, 2018), https://www.regulations.gov/document?D=ACF-2018-0003-0119; Wash. State Child.'s Admin., Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 13, 2018), https://beta.regulations.gov/document/ACF-2018-0003-0149.

[58] California ANPRM Comment.

149.    ACF took a strikingly narrow view of these comments, rejecting them as simply providing "broad commentary on the benefit of having new data outweighs the burden of having to report it [sic]." *Id.* It largely dismissed these comments as "outside the scope of the ANPRM," because they addressed topics such as "ACF's authority to collect ICWA-related data elements in AFCARS" or the adequacy of prior "opportunities to comment on AFCARS via prior rulemakings," rather than specific "comments on or estimates for cost or burden related to any aspect of the 2016 final rule." *Id.*

150.    ACF's claim that the commenters that opposed evisceration of the 2016 Final Rule "did not provide specific comments on . . . cost or burden," *id.*, was false. Numerous commenters explained why they believed states' burden estimates were overstated, explaining, *inter alia*, that much of the burden of updating states' systems would exist regardless of the ICWA data elements; that many states had already begun updating their systems and incurring such costs; and that title IV–E agencies would need to answer only three ICWA-related data elements for the vast majority of youth in care, ignoring all others as "not applicable" for the 98% of youth in care to whom ICWA does not apply.[59]

151.    Despite ACF's single-minded solicitude for *state* title IV–E agencies rather than children and families, it did not even acknowledge that at least five of the tribes that submitted comments have direct title IV–E agencies, including Plaintiff Cherokee Nation—and all of them opposed the proposed streamlining. Nor did it acknowledge that California, the state with the largest AI/AN population in the country and thus the heaviest burden of compliance, supported retaining the ICWA data elements in full.

152.    After the comment period closed, ACF issued a new notice of proposed rulemaking on April 19, 2019. 84 Fed. Reg. at 16,572. ACF stated that the purpose of the 2019 NPRM was "to reduce the AFCARS reporting burden." *Id.* It proposed to effectuate this goal by eliminating a data element about the sexual orientation of youth in foster care aged 14 and older; a data element about the sexual orientation of foster parents, adoptive parents, and legal guardians; the vast

---

[59] *See, e.g.*, Cherokee Nation ANPRM Comment; Child Welfare ANPRM Comment.

1  majority of ICWA-related data elements; and various data elements regarding health assessments,

2  educational stability, juvenile justice involvement, and other issues. *See id.* at 16,576-81.

3       153.    In keeping with ACF's single-minded focus on reducing burden, its so-called

4  "Costs and Benefits" section did not acknowledge *any* downsides to eliminating these data

5  elements. *See id.* at 16,572. Instead, it focused solely on the "benefit" of reducing title IV–E

6  agencies' reporting burden. *Id.*

7       154.    The 2019 NPRM omitted any mention of the extensive benefits ACF had identified

8  when proposing and enacting the 2016 Final Rule. *See supra* ¶¶ 108, 115, 120, 126-27. The many

9  benefits to youth in foster care, families, title IV–E agencies, and the groups that serve them went

10  completely unconsidered, as did the vast majority of federal purposes ACF believed the new data

11  would advance.

12       155.    Instead, ACF identified a vague and much narrower set of goals, limiting the

13  purposes of ACF for the first time to "for title IV–B/IV–E statute and program monitoring,

14  Congressional reporting, budgeting, and areas where reporting of required information to

15  AFCARS would improve the accuracy and reliability of the data in AFCARS." *Id.* at 16,576. This

16  was a significant change in policy from the set of purposes ACF had cited as far back as the 1993

17  Rule. *See supra* ¶¶ 66-70. ACF did not acknowledge that it was limiting its view of AFCARS'

18  purposes, much less provide a reasoned justification for its shift.

19       156.    ACF also made two general assertions that directly contradicted its previous

20  conclusions without explanation. First, it claimed that "it was not well illustrated why AFCARS is

21  the best vehicle for collecting this data when there are other effective options for gathering

22  qualitative information at the national level, such as via surveys, research, or the Child and Family

23  Services Review." *Id.* at 16,575. ACF had previously analyzed this exact issue and concluded that

24  "AFCARS is the only comprehensive case-level data set on the incidence and experiences of

25  children who are in out-of-home care under the placement and care of the title IV–E agency or

26  who are adopted under a title IV–E adoption assistance agreement." 81 Fed. Reg. at 90,565; *see*

27  *supra* ¶ 130. ACF did not acknowledge this prior reasoning and made no effort to explain the

28  analysis that prompted this reversal. Nor did it attempt to explain or justify its characterization of

1  the data as "qualitative."

2    157.    Second, ACF claimed that the comments did not "sufficiently validate[]" the

3  assertion that the data elements in the 2016 Final Rule were "essential for policy making." 84 Fed.

4  Reg. at 16,575. Of course, this was not just commenters' opinion, but ACF's own position during

5  the prior rulemaking—a fact that ACF again failed even to acknowledge, much less rebut.  *See,*

6  *e.g.*, 81 Fed. Reg. at 90,527, 90,556.

7    158.    The only justification ACF proffered was the non sequitur that "Congress has

8  passed approximately 24 laws that significantly amended federal child welfare programs since

9  1995, when AFCARS became effective." 84 Fed. Reg. at 16,575. The fact that Congress had

10  passed legislation amending child welfare programs does not suggest that the data at issue would

11  not aid future policymaking. For example, sections 50701-82 of the Family First Prevention

12  Services Act, signed into law in February 2018, requires states to reduce the number of children in

13  congregate care and utilize evidence-based treatment programs—the exact kinds of efforts that

14  data collection would inform. *See* 42 U.S.C. § 671(e)(5)(B)(vii). ACF's decision to pull elements

15  that would provide national data regarding placement and permanency for LGBTQ+ and AI/AN

16  youth and promote the ability to measure the success of programs through enhanced data

17  collection is in direct conflict to its assertion that Congress's actions weigh against Defendants'

18  disfavored data elements.

19    159.    As to its specific proposed revisions, ACF provided at best brief and insufficient

20  rationales.

21    160.    For example, regarding the sexual orientation questions, the 2019 NPRM opined

22  that

23    asking for sexual orientation may be perceived as intrusive and worrisome to those
    who have experienced trauma and discrimination as a result of gender identity or
24    sexual orientation. This would be a mandatory conversation a worker must have in
    order to complete the data elements. Mandating such a conversation may be
25    contraindicated based on a child's history of abuse or neglect.

26  84 Fed. Reg. at 16,576.

27    161.    Here again, ACF had previously considered and rejected this exact contention,

28

noting that a response from youth was voluntary and that guidelines existed for asking such questions sensitively and safely. *See, e.g.*, 81 Fed. Reg. at 90,526, 90,535; *see also supra* ¶ 123. The 2019 NPRM did not attempt to explain why ACF had abandoned this view, nor address the fact that other HHS divisions already collect sexual orientation information for youth.[60] Nor did ACF provide any basis for its pseudoscientific speculation that asking a question about sexual orientation on a voluntary basis may be "contraindicated based on a child's history of abuse or neglect." 84 Fed. Reg. at 16,576.

162.    The 2019 NPRM also purported to rely on a white paper issued by an Office of Management and Budget working group.[61] According to ACF, the OMB White Paper "advises that new questions added to a survey or data base should be validated with qualitative techniques and question validation efforts should include both the SOGI [i.e., sexual orientation and gender identity] and non-SOGI groups." 84 Fed. Reg. at 16,576. ACF asserted that its abandonment of the sexual orientation questions was based "in particular" on this validation concern. *Id.*

163.    However, ACF misrepresented the OMB White Paper's recommendations. The working group did not recommend that validation testing be employed for any "new questions added to a survey or data base." *Id.* Rather, it recommended validation only when an agency chooses to develop a question not previously used on other surveys or used in "a new setting with a different audience." OMB White Paper at 17. The questions ACF incorporated in the 2016 Final Rule were taken directly from the Centers for Disease Control and Prevention's Youth Risk Behavior Surveillance System ("YRBSS"), whose questions the OMB White Paper explicitly recognized as one of the "main ways sexual identity is asked in Federal surveys/studies." *Id.* at 5, 9. Indeed, the 2016 Final Rule had expressly rejected suggestions to broaden the questions beyond

---

[60] *See, e.g.*, Hum. Rts. Campaign, Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 13, 2018), https://www.regulations.gov/document?D=ACF-2018-0003-0161.

[61] *See* Fed. Interagency Working Group on Improving Measurement of Sexual Orientation and Gender Identity in Fed. Survs., *Current Measures of Sexual Orientation and Gender Identity in Federal Surveys* (2016) ("OMB White Paper"), https://cpb-us-e1.wpmucdn.com/sites.northwestern.edu/dist/3/817/files/2017/01/WorkingGroupPaper1_Current Measures_08-16-1xnai8d.pdf.

1    the YRBSS model, hewing to the precise questions approved by the OMB White Paper. *See* 81

2    Fed. Reg. at 90,534.

3         164.    The purported justification of intrusiveness is even flimsier with regard to the

4    elimination of data elements reporting the sexual orientation of foster parents, adoptive parents,

5    and legal guardians.  Foster parent home studies to determine suitability routinely involve

6    questions about relationships, relationship history, familial history, and relationship status—

7    realities of child welfare casework that ACF did not acknowledge. Moreover, ACF's suggestion

8    that sexual orientation could be "gleaned" from parents' and guardians' "sex and marital status,"

9    84 Fed. Reg. at 16,577, is the same type of flawed inference that HHS had long recognized as a

10   shortcoming of the pre-2016 AFCARS questions. *See* 2003 OIG Report at 6 (criticizing data

11   limitations under which an aunt and uncle serving as a foster family would be reported only as a

12   "Married Couple"). ACF's inferential method would lead to inaccurate results and be entirely

13   useless for single and unmarried parents and guardians.

14        165.    The 2019 NPRM also failed to address the benefits identified in the 2016 Final

15   Rule with regard to gathering sexual orientation data. In the 2016 Final Rule, ACF noted that the

16   questions would enable the agency "to move closer toward our goal to better support children and

17   youth in foster care who identify as LGBTQ and ensure that foster care placement resources and

18   services are designed appropriately to meet their needs" and would "assist title IV–E agencies in

19   recruiting and training foster care providers in meeting the needs of these youth." 81 Fed. Reg. at

20   90,534-35. The 2019 NPRM failed to acknowledge, let alone explain away, its change in position

21   as to these benefits.

22        166.    Similarly, the 2019 Proposed Rule eliminated the vast majority of ICWA-related

23   data elements, despite having found just three years earlier that each one was essential to evaluate

24   whether AI/AN youth were being appropriately treated and where ACF could provide additional

25   resources and guidance. *See supra* ¶¶ 126-28.

26        167.    For example, where the 2016 Final Rule required title IV–E agencies to report, for

27   each child to whom ICWA applies, whether they had inquired about the child's status with the

28   child and the child's biological or adoptive parents, Indian custodian, and extended family, as

1   required by ICWA, *see* 81 Fed. Reg. at 90,570 (codifying requirements at 45 C.F.R. §

2   1355.44(b)(3)), the 2019 NPRM proposed to require title IV–E agencies only to report generically

3   whether they made undefined "inquiries," *see* 84 Fed. Reg. at 16,577, 16,579. Similarly, the 2019

4   NPRM struck nearly all data elements tracking implementation of the ICWA provisions designed

5   to prevent unwarranted removals and keep AI/AN children within tribal communities where

6   possible. *Compare* 81 Fed. Reg. at 90,574-78 (codifying requirements at 45 C.F.R. §

7   1355.44(d)(3), (e)(8)-(11)) *with* 84 Fed. Reg. at 16,577, 16,594, 16,597.

8       168.    For most of the abandoned data elements, ACF did not even attempt to engage with

9   its previous analysis. For example, as discussed above, ACF previously concluded that questions

10  about the specific types of ICWA-related placement options available were "essential for ACF to

11  determine whether resources are needed for recruitment to increase the availability of AI/AN

12  homes that can meet ICWA's placement preferences." 81 Fed. Reg. at 90,552; *see supra* ¶ 126.

13  The 2019 Proposed Rule did not acknowledge this conclusion, much less explain its reasons for

14  departing from it.

15      169.    Instead, the 2019 Proposed Rule generally provided a generic and conclusory

16  rationale that such data were "better suited for a qualitative review." 84 Fed. Reg. at 16,574; *see*

17  *also, e.g.*, *id.* at 16,577-78. But nearly all of the data elements ACF proposed to cut were yes/no

18  options, dates of recorded events, or similarly quantitative and discrete facts. *See* 81 Fed. Reg. at

19  90,584-97. As numerous commenters pointed out, these were not "qualitative" by any definition,

20  and were facially *less* qualitative than other questions ACF was retaining.[62] ACF did not explain

21  how these were in any relevant sense "qualitative." Nor did it attempt to explain how it or any

22  other entity might conduct a "qualitative review" of information that AFCARS did not collect, let

23  alone on the "comprehensive national" level that the Act requires, 42 U.S.C. § 679(c)(3), or

24  compare the costs of such a hypothetical "qualitative review" against the purported savings from

25  eliminating the data elements from AFCARS.

26

27  ---

[62] *See, e.g.*, Seattle U. Sch. of L. Ctr. For Indian L. & Pol'y, Comment Letter on AFCARS Notice
28  of Proposed Rulemaking (July 17, 2019) ("Ctr. for Indian Law & Pol'y NPRM Comment"),
https://beta.regulations.gov/document/ACF-2018-0003-0284.

170.    ACF also claimed that it would use the State Court Improvement Program ("CIP") instead of AFCARS to address the issues.[63] 84 Fed. Reg. at 16,578. The 2019 Proposed Rule promised that "the next program instruction for the CIP will encourage grantees to work with the dependency courts across their jurisdictions to enhance efforts to collect and track key ICWA data indicators." *Id.* This proved a hollow promise: when ACF sought to renew its CIP program instruction five months later, it submitted it with "minimal updates" that did not address ICWA at all.[64]

171.    Finally, ACF took the title IV–E agencies' estimates at face value, even though some states reported it would take nearly *50 person-years* of full-time work to update their systems. *See supra* ¶ 144. ACF made no effort to determine whether the new estimates were reasonable or to eliminate outlier data, simply adopting the median estimate for development costs and average estimate for annual reporting burdens. 84 Fed. Reg. at 16,587. ACF did not explain why it chose to use the median for one figure and average for another, an approach it had not used in the 2016 Final Rule.

172.    ACF also changed its methodology for estimating the hours needed for reporting and recordkeeping for each child in care. In the 2016 Final Rule, ACF separately calculated burdens for children to whom ICWA applies and those it does not, estimating 13 hours per child for the former and 3 hours per child for the latter. *See* 81 Fed. Reg. at 90,568. This differential estimate was appropriate because title IV–E agencies need to answer only three questions for children to whom ICWA does not apply, marking the rest as not applicable. *See id.* at 90,570; *see supra* ¶ 109. Because there were 273,539 children in care, but only 6,044 reported to be American Indian or Alaska Native, this methodology resulted in a total estimate of 872,027 hours. 81 Fed. Reg. at 90,568.

---

[63] CIP is a statutorily mandated program that provides funding to state court systems to assess certain aspects of their child welfare proceedings. *See* 42 U.S.C. § 629h; Children's Bureau, Court Improvement Program (May 7, 2012), https://www.acf.hhs.gov/cb/resource/court-improvement-program.

[64] Submission for OMB Review; State Court Improvement Program (OMB #0970–0307), 84 Fed. Reg. 50,847, 50,847 (Sept. 26, 2019).

173.    By contrast, the 2019 Proposed Rule lumped *all* children together, even though the vast majority of ICWA questions would be asked of just 2 percent of children (*i.e.*, 6,044 out of 273,539). *See* 84 Fed. Reg. at 16,589. This unexplained methodological change increased the estimate for *all* children to 6 hours per child, including the 98% of children for whom title IV–E agencies would only need to answer three questions. This unreasoned and unjustifiable change nearly doubled ACF's estimate of the burden of the 2016 Final Rule. *Id.*

174.    Similarly, ACF's method for estimating the cost savings to states appeared to assume that all questions would be asked of all youth, even though title IV–E agencies would need to report only three threshold questions regarding whether ICWA applied at all for 98% of youth. Despite the small minority of cases in which the cost savings would occur, the 2019 Proposed Rule assumed a 33% across-the-board cost savings, significantly inflating the apparent savings. *Id.* at 16,586.

175.    Nor did ACF attempt to disaggregate the portion of costs that title IV–E agencies would be incurring even without the 2016 Final Rule as they converted their systems to CCWIS, as commenters noted.[65] Similarly, it failed to account for the progress that some states reported having made since the 2016 Final Rule's promulgation, which would presumably reduce the burden of finishing their efforts to come into compliance. Instead, it increased its cost estimates even for states that had already begun implementing the 2016 Final Rule.

### 2.    *2020 Final Rule*

176.    The comment period from the 2019 Proposed Rule produced "150 comments from 24 state and local child welfare agencies; 33 Indian tribes, tribal organizations or consortiums; 10 organizations representing tribal interests; 45 national advocacy groups and universities; one Member of Congress; and 37 anonymous or private citizens."[66]

177.    As before, many—but not all—of the state title IV–E agencies supported

---

[65] *See, e.g.*, Children's Defense Fund, Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 13, 2018), https://beta.regulations.gov/document/ACF-2018-0003-0212.

[66] Adoption and Foster Care Analysis and Reporting System, 85 Fed. Reg. 28,410, 28,411 (May 12, 2020) ("2020 Final Rule").

1   eliminating data elements on the basis of putative burden concerns. *See* 85 Fed. Reg. at 28,411.

2   And as before, virtually all other commenters opposed the changes. *Id.* This included five tribes

3   that operated direct title IV–E agencies and opposed the elimination of the requirements. Once

4   again, ACF did not even acknowledge the tribal IV–E agencies' position. *See supra* ¶ 151. Nor did

5   it respond to the state title IV–E agencies that specifically supported the sexual orientation and

6   ICWA data elements. *See supra* ¶ 147 & nn.56-58.

7        178.    Despite the overwhelming majority of comments, ACF finalized the changes that it

8   had proposed in the Proposed Rule on May 12, 2020. The 2020 Final Rule, issued by Defendants

9   HHS and ACF and signed by Defendants Azar and Johnson, retained and exacerbated the errors in

10   the Proposed Rule.

11        179.    The sole purpose of the changes, according to the 2020 Final Rule's executive

12   summary, was to comply with a 2017 executive order that directed agencies to identify regulations

13   that could be repealed or modified.[67] 85 Fed. Reg. at 28,410. ACF did not attempt to explain why

14   the executive order supported its decision; it simply cited the order as a conclusory justification for

15   its choice. But as one commenter had pointed out, *none* of the six criteria that the executive order

16   directed deregulating agencies to consider applied to the 2016 Final Rule.[68] Five of the

17   considerations were entirely inapplicable. *See* 82 Fed. Reg. at 12,286 (directing agencies to

18   identify regulations that eliminate jobs; are outdated, unnecessary, or ineffective; interfere with

19   regulatory reform initiatives and policies; are inconsistent with the requirements of 44 U.S.C. §

20   3516; or implement rescinded or substantially modified executive orders).

21        180.    The only factor in the executive order that was even plausibly relevant to the 2020

22   Final Rule was its inquiry whether the regulation "impose[s] costs that exceed benefits." *Id.* But,

23   as in the 2019 NPRM, the 2020 Final Rule did not even acknowledge the benefits of the 2016

24   Final Rule, let alone explain why they were exceeded by the costs. *See* 85 Fed. Reg. at 28,410

25   ─────────────────

26   [67] Exec. Order No. 13777, Enforcing the Regulatory Reform Agenda, 82 Fed. Reg. 12,285 (Feb. 24, 2017).

27   [68] *See* Sault Ste. Marie Tribe of Chippewa Indians, Comment Letter on AFCARS Notice of Proposed Rulemaking (June 3, 2019) ("Sault Ste. Marie NPRM Comment"),

28   https://www.regulations.gov/document?D=ACF-2018-0003-0250.

1   (under "Costs and benefits," listing only the supposed cost savings of eliminating portions of the

2   2016 Final Rule).

3        181.   Commenters identified numerous benefits from the 2016 Final Rule that would be

4   lost with the proposed changes, and thus represented factors that ACF needed to take into

5   consideration. Just to name a few examples, commenters explained that: states would save money

6   because the data would allow for better targeting of resources and provision of services, leading to

7   more placement stability and less need to house youth in expensive congregate care facilities;[69]

8   strengthen and promote ICWA's mandates to protect Indian families and communities;[70] help

9   ACF and states to better recruit foster and adoptive parents;[71] allow ACF and others to identify

10  discrimination and other factors negatively impacting children's safety and well-being;[72] allow

11  ACF to examine the unique experiences of AI/AN LGBTQ+ youth;[73] and help tribes vindicate

12  their rights and the rights of their youth, and to work with states to improve ICWA compliance.[74]

13       182.   ACF did not acknowledge *any* of these lost benefits. Nor did it explain why it was

14  abandoning its prior conclusion that the 2016 Final Rule advanced these goals. Instead, it simply

15  reached the vague and unreasoned conclusion that it did not "have a sufficient justification, or a

16  rational basis, for retaining the data elements proposed for removal." *Id.* at 28,411.

17       183.   Like it did in the 2019 NPRM, ACF construed AFCARS to have a sharply

18  constrained purpose, limited only to "a title IV–B or IV–E statutory requirement, program

19

---

20  [69] *E.g.*, Hum. Rts. Campaign, Comment Letter on AFCARS Notice of Proposed Rulemaking (June 18, 2019) ("Hum. Rts. Campaign NPRM Comment"), https://beta.regulations.gov/document/ACF-

21  2018-0003-0339.

22  [70] *E.g.*, Tribal L. & Pol'y Inst., Comment Letter on AFCARS Notice of Proposed Rulemaking (June 13, 2019), https://beta.regulations.gov/document/ACF-2018-0003-0270.

23

24  [71] *E.g.*, Hum. Rts. Campaign NPRM Comment.

    [72] *E.g.*, Port Gamble S'Klallam Tribe, Comment Letter on AFCARS Notice of Proposed

25  Rulemaking (June 17, 2019), https://www.regulations.gov/document?D=ACF-2018-0003-0362.

26  [73] *E.g.*, Lambda Legal NPRM Comment; Rep. Karen Bass, Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (Jun 12, 2018),

27  https://www.regulations.gov/document?D=ACF-2018-0003-0106 ("Rep. Bass ANPRM Comment").

28  [74] *E.g.*, Ctr. for Indian L. & Pol'y NPRM Comment.

COMPLAINT FOR DECLARATORY AND                    50
INJUNCTIVE RELIEF - Case No. xx

1  monitoring, Congressional reporting, or budgeting." *Id.* at 28,410. This was a significant yet

2  unacknowledged and unexplained shift from ACF's historic interpretation of AFCARS. *See supra*

3  ¶¶ 66-70, 114.

4        184.   Indeed, this statement was inconsistent even with how ACF *currently* represents its

5  uses of AFCARS outside of this rulemaking. ACF's website, which ACF reviewed but did not

6  change after issuing the 2020 Final Rule, identifies numerous ways "ACF uses AFCARS data"

7  that go well beyond the stinted purposes claimed in the 2020 Final Rule, including "[p]reparing

8  the Child Welfare Outcomes report," "[c]onducting trend analyses and short- and long-term

9  planning efforts," "[t]argeting areas for initial or increased technical assistance efforts,

10  discretionary service grants, research and evaluation, and regulatory changes," and "[r]esponding

11  to request[s] for data from federal, state, tribal, and private agencies."[75]

12        185.   ACF did not acknowledge, much less explain, the inconsistencies between this

13  historic and continuing view of AFCARS' uses and the limited view it expressed in the 2020 Final

14  Rule.

15        186.   Similarly, ACF largely chose not to respond to the many arguments raised against

16  its proposal. Instead, it downplayed the analyses provided by the overwhelming body of adverse

17  commenters because they "were not agencies responsible for reporting data to AFCARS." *Id.* at

18  28,412. This was yet another unexplained departure from the approach ACF took in the 1993 and

19  2016 rulemaking processes. *See, e.g.*, 58 Fed. Reg. at 67,912 (including "national advocacy

20  organizations" among the groups that had an interest in AFCARS information). Nor was it true of

21  the five tribal title IV–E agencies that opposed the changes, including Plaintiff Cherokee Nation.

22  ACF purported to reject these comments because they were broadly similar to the comments

23  offered in response to the 2018 ANPRM, 85 Fed. Reg. at 28,412, even though the 2019 NPRM

24  had not responded to most of the points raised in those comments.

25        187.   To the limited extent that ACF acknowledged the substance of adverse comments,

26  it significantly mischaracterized them. For example, ACF claimed that

27

28  [75] Children's Bureau, About AFCARS, (July 2, 2012), https://www.acf.hhs.gov/cb/resource/about-afcars. The website states that ACF last reviewed it on June 5, 2020.

> The commenters that opposed streamlining [a] did not elaborate on why AFCARS is the most effective vehicle for collecting the information required under the 2016 final rule that we proposed to remove, which in large part was qualitative data, [b] describe work done to coordinate with title IV–E agencies in collecting and reporting data for AFCARS, or [c] specify how the data we proposed to remove would help their specific work with children and families served by the title IV–E agency.

*Id.* Each of these contentions was demonstrably false. For example:

    a.  Commenters explained that "[p]revious attempts to capture ICWA data through case file reviews have failed[,]"[76] identifying specific deficits with existing processes for attempting to capture the data and explaining why ACF was better positioned to collect the information from child welfare agencies than the Department of Interior, which "does not have a relationship with state child welfare agencies and does not have an operational data base or resources to collect data on Indian children in state foster care systems."[77]

    b.  Commenters, including some states, described specific engagement with title IV–E agencies to improve data collection, as well as state efforts to collect similar data that had proven effective and administrable.[78]

    c.  Commenters explained in detail how the questions they were removing would help their specific work with children and families, such as representing youth in court proceedings[79] or identifying deficits in state ICWA practices.[80]

188.    Rather than respond to this and other evidence, ACF vaguely criticized commenters

---

[76] Sault Ste. Marie NPRM Comment.

[77] Nat'l Congr. of Am. Indians, Comment Letter on AFCARS Notice of Proposed Rulemaking (June 18, 2019) ("Nat'l Congr. of Am. Indians NPRM Comment"), https://www.regulations.gov/document?D=ACF-2018-0003-0365.

[78] *See, e.g.*, Cal. Dep't of Soc. Servs., Comment Letter on AFCARS Notice of Proposed Rulemaking (June 18, 2019), https://www.regulations.gov/document?D=ACF-2018-0003-0328; Ctr. for the Study of Soc. Pol'y, Comment Letter on AFCARS Notice of Proposed Rulemaking (June 18, 2019), https://www.regulations.gov/document?D=ACF-2018-0003-0308.

[79] *See, e.g.*, Nat'l Ass'n of Couns. for Child., Comment Letter on AFCARS Notice of Proposed Rulemaking (June 18, 2019), https://www.regulations.gov/document?D=ACF-2018-0003-0300..

[80] *See, e.g.*, Ctr. for Indian L. & Pol'y NPRM Comment.

as "misunderstanding . . . AFCARS and its functionality." 85 Fed. Reg. at 28,412. As ACF noted, "[t]he information that title IV–E agencies report to AFCARS is aggregated and de-identified at the national level." *Id.* But, contrary to ACF's apparent understanding, commenters overwhelmingly focused on the benefits of aggregate data and a national and state-by-state demographic picture—the exact point ACF accused them of misunderstanding.

189.     Furthermore, ACF acknowledged that it *does* "release specific information regarding a child's tribal membership or ICWA applicability to . . . the Indian tribe of which the child is or may be a member." *Id.* at 28,413. Thus, for the tribal commenters, including Plaintiffs Yurok Tribe and Cherokee Nation, the omitted elements would provide a wealth of information regarding what happened to specific youth members of their tribes, useable in advocating for the tribes' and their children's rights. Moreover, ACF ignored comments pointing out that tribes had relied on the 2016 Final Rule, working with state child welfare agencies to develop or update agreements about data collection to match the 2016 Final Rule.[81]

190.     ACF claimed without explanation that some removed data elements might not be reliable. *See, e.g.*, *id.* at 28,419. But as noted above, its changes actually *reduce* the reliability of information, relying on speculation about sexual orientation rather than data, *see supra* ¶ 164, and vague generalities about inquiries into ICWA children's status rather than the specific inquiries defined by ICWA, *see supra* ¶ 167.

191.     ACF also asserted that "the 2016 final rule ICWA-related data elements would not be available for ICWA compliance purposes because ACF is unable to release information to other entities that could use it for this purpose." *Id.* at 28,413. But ACF did not identify any legal barriers that would prevent it from sharing the relevant data with the Bureau of Indian Affairs, with which it had collaborated in issuing the 2016 Final Rule. *See* 81 Fed. Reg. at 90,525. Nor, assuming some such barrier existed, did it deny that aggregate data could be used to determine how effectively a state was complying with its obligations.

---

[81] *See, e.g.*, Confederated Tribes of Siletz Indians of Oregon, Comment Letter on AFCARS Advance Notice of Proposed Rulemaking (June 6, 2018), https://beta.regulations.gov/document/ACF-2018-0003-0021.

192.    ACF likewise misstated its authority to collect the data, claiming that it has "authority only for the collection of data elements that are used for functions and oversight under HHS authority, namely the title IV–B and IV–E programs." 85 Fed. Reg. at 28,412. In particular, it claimed, "[t]he AFCARS statute does not provide authority for ACF to require states to report specific details on ICWA's requirements in AFCARS to be used for ICWA compliance." *Id.* This is not a plausible reading of the Act, which requires states to report on "the specific measures taken by the State to comply with the Indian Child Welfare Act," 42 U.S.C. § 622(b)(9), and requires ACF to collect data on both "the status of the foster care population" and "the extent and nature of assistance provided by Federal, State, and local adoption and foster care programs and the characteristics of the children with respect to whom such assistance is provided." 42 U.S.C. § 679(c)(3)(B), (D). ACF noted that it is not authorized to "determine compliance with ICWA and/or penalize states for failure to comply with ICWA," 85 Fed. Reg. at 28,412, but that is simply a non sequitur as to its authority to collect data. Nothing in the statute prohibits ACF from collecting data simply because it could be used by another agency for compliance purposes.

193.    Moreover, this was a 180-degree reversal from ACF's position in the 2015 SNPRM and 2016 Final Rule, when it explicitly concluded that it had "authority to collect state-level ICWA-related data" after "an extensive re-evaluation of the scope of ACF's statutory and regulatory authority." 81 Fed. Reg. at 20,284. ACF did not even acknowledge, much less attempt to explain the rationale for, its change in position.

194.    The 2020 Final Rule also repeated its assurance from the 2019 Proposed Rule that "the next Court Improvement Program (CIP) program instruction will emphasize collecting and tracking ICWA-related data and will be coupled with technical assistance through the CB's technical assistance provider for CIP grantees and the courts to help address this historic and ongoing information gap." 85 Fed. Reg. at 28,424; *see also* 84 Fed. Reg. at 16,578. This was at best disingenuous: as noted earlier, ACF had *already issued* a new CIP program instruction since the 2019 NPRM, making no mention of ICWA at all. 84 Fed. Reg. at 50,847. Indeed, it had described that reissuance as a "three-year extension" of the preexisting CIP program instruction, *id.*, meaning that ACF in fact had no intention of issuing a new CIP program instruction—let

1   alone one dealing with ICWA—until September 2022, at the earliest. And even if ACF does

2   intend to take action under the auspices of CIP at some point in the future, it made no effort to

3   determine how the costs of collecting the data through CIP compare to collecting it in AFCARS.

4          195.    The 2020 Final Rule fared no better in attempting to justify its decision to eliminate

5   the two data elements regarding the sexual orientation of youth, foster and adoptive parents, and

6   legal guardians.

7          196.    Fewer than half of the 24 states that responded to the 2019 Proposed Rule agreed

8   with the proposal to eliminate the sexual orientation data elements. 85 Fed. Reg. at 28,411. Thus,

9   more than half of the states were silent or opposed ACF's proposal, as did virtually all of the

10  organizations, individuals, and tribes that commented. *Id.* Nonetheless, ACF adopted the minority

11  view with less than half a page of analysis. *See id.* at 28,413.

12         197.    As it did throughout the Final Rule, ACF ignored comments that opposed

13  eliminating the requirements. It acknowledged that commenters explained that the data "would (1)

14  enhance recruitment of foster homes; (2) aid permanency and case decision-making; (3) promote

15  visibility for marginalized groups; (4) help to analyze youth outcomes; (5) address disparities; and

16  (6) enable Congress to legislate appropriately at the national-level [sic]." *Id.* Neither the 2020

17  Final Rule nor the 2019 NPRM rebutted this evidence.

18         198.    ACF was entirely silent as to how eliminating the sexual orientation data was

19  consistent with its statutory obligation to "provide comprehensive national information with

20  respect to . . . the demographic characteristics of adoptive and foster children and their biological

21  and adoptive or foster parents." 42 U.S.C. § 679(c)(3)(A).[82] Nor did it mention how it would be

22  possible to address over-representation of LGBTQ+ youth in care, including youth of color, and

23  the litany of poor outcomes for LGBTQ+ youth without state-level and nationwide data, data that

24  is clearly quantitative in nature—points that were specifically raised by commenters, including

25  nearly half of the state agencies that discussed the sexual orientation data elements in particular.

26  _____

27  [82] *See, e.g.*, Rep. Bass ANPRM Comment ("[T]o be comprehensive as required by sec. 479,
    AFCARS must include data elements related to race, sex, sexual orientation, gender, and tribal

28  affiliation.").

199.   ACF's defense of its view that the data could not be confidentially collected was similarly insufficient. In response to numerous comments identifying guidelines that provided best practices for collecting sexual orientation information,[83] the 2020 Final Rule concluded that "those guidelines are not relevant to collecting sexual orientation information through a Federal administrative data collection" because they provided guidelines "for child welfare staff and child welfare agencies on how they interact with clients, and gather and manage SOGI information at the case, local, and state level." 85 Fed. Reg. at 28,413. But of course, all of the information that is eventually reported to AFCARS is collected by child welfare staff and agencies through their interactions with clients; it consists entirely of information gathered and managed at the case level. The guidelines are thus directly on point, and the 2020 Final Rule's basis for dismissing them is nonsensical. Moreover, case workers already collect sensitive information that is reported to AFCARS such as abuse history, reproductive health decisions, trafficking, and mental health diagnoses and medications. ACF made no effort to explain why voluntarily disclosed sexual orientation could not be recorded and safeguarded in a consistent manner.

200.   Here again ACF failed to explain its reversal of its earlier position. In the 2016 Final Rule, ACF had explicitly noted the usefulness of such guidelines in ensuring that sexual orientation information was "obtained and maintained in a manner that reflects respectful treatment, sensitivity, and confidentiality." 81 Fed. Reg. at 90,526. The 2020 Final Rule did not explain its change in view; indeed, it did not even acknowledge it.

201.   ACF's only other response to the comments opposing the deletion of the sexual orientation questions was that such information "can be collected as part of the title IV–E agency's casework and should be documented in the case file, if it pertains to the circumstances of the child, and reporting it to a national database would not enhance [title IV–E agencies'] work with children and families." 85 Fed. Reg. at 28,413. But as numerous commenters explained, national

---

[83] *See* Fam. Builders, Legal Servs. for Child., Nat'l Ctr. for Lesbian Rts., & Ctr. for the Study of Soc. Pol'y, *Guidelines for Managing Information Related to the Sexual Orientation & Gender Identity and Expression of Children in Child Welfare Systems* (2013), https://cssp.org/wp-content/uploads/2018/08/Guidelines-for-Managing-Information-Related-to-the-Sexual-Orientation-Gender-Identity-and-Expression-of-Children-in-Child-Welfare-Systems.pdf.

1   data is needed not just to work with individual children but to determine why LGBTQ+ youth

2   experience worse outcomes, such as greater placement instability and homelessness; to identify

3   what can be done to increase family permanency; and to guide federal, state, and non-

4   governmental allocation of resources.[84] ACF did not attempt to explain how similar analyses—or

5   the programmatic improvements, resource allocations, and policy changes that would grow from

6   them—could be performed with the data documented only in individual case files. Nor did it

7   explain why it no longer viewed these goals, which ACF had espoused in the 2016 Final Rule, *see,*

8   *e.g.*, 81 Fed. Reg. at 90,526, 90,534-35, to be a purpose of AFCARS. *Cf.* 58 Fed. Reg. at 67,912

9   (noting that one purpose of AFCARS data is "for research, the ultimate purpose of which is to

10  gain a better understanding of the foster care program").

11      202.    ACF also rejected out of hand numerous commenters' suggestion that they add a

12  third gender option to allow respondents to provide a gender other than male or female and to

13  include gender identity. *See* 85 Fed. Reg. at 28,417. ACF's only explanation was that the agency

14  "ha[s] no need for it at the Federal level." *Id.* But the relevant statutory test is not how ACF plans

15  to use the data, but whether it is part of "the demographic characteristics of adoptive and foster

16  children and their biological and adoptive or foster parents." 42 U.S.C. § 679(c)(3)(A). ACF did

17  not in any way address this statutory consideration.

18      203.    Indeed, ACF essentially did not consider any alternatives to its preordained plan.

19  The only alternative it considered was "not streamlining the data elements, meaning that the 2016

20  final rule would go into effect." 85 Fed. Reg. at 28,419. But many other alternatives were

21  presented to ACF, from providing additional technical assistance or funding to title IV–E

22  agencies[85] to staggering compliance or penalty dates.[86] ACF was entirely silent regarding these

23  proposals.

24      204.    ACF's burden analysis was substantively unchanged from its analysis in the 2019

25

---

26  [84] *See, e.g.*, Nat'l Ctr. for Transgender Equal., Comment Letter on AFCARS Notice of Proposed Rulemaking (July 18, 2019), https://www.regulations.gov/document?D=ACF-2018-0003-0303.

27  [85] *See, e.g.*, Cherokee Nation ANPRM Comment.

28  [86] *See, e.g.*, Nat'l Congr. of Am. Indians NPRM Comment.

1   Proposed Rule. *See id.* at 28,420-22; *see also supra* ¶¶ 171-75. It did not acknowledge, much less

2   discuss, the facts and arguments that numerous commenters—including some state and tribal title

3   IV–E agencies—provided that showed that that estimate was likely inflated. For example, it did

4   not attempt to justify its treatment of the ICWA questions as if every question would be asked of

5   all youth in care, as opposed to just the 2 percent of youth to whom ICWA applies.[87] Nor did it

6   address the concern that delaying the changes would eliminate the cost savings from timing the

7   changes to go with states' CCWIS updates,[88] or that at least 15 states have enacted their own

8   ICWA data collection requirements and thus would see little cost increase due to the federal

9   requirement.[89] And it ignored commenters' point that much of the putative expense appeared to

10  come from the fact that many states are not currently complying with ICWA, and they would need

11  to begin meeting their obligations to be able to report the required data.[90] ACF simply disregarded

12  these and many other criticisms, rather than provide a reasoned explanation for its unbalanced

13  burden estimate. Nor did it compare the supposed burden against the benefits that would be lost

14  from eliminating the data.

15      205.    Finally, ACF provided states with an additional two years to comply with its

16  changes, even though it was allegedly *reducing* the burden from what states had been preparing

17  for since 2016. *Id.* at 28,411. States will not need to comply with the new requirements, including

18  data elements added to implement explicit statutory commands, until October 1, 2022. *Id.* at

19  28,413. This is five years and nine months from the issuance of the 2016 Final Rule—even though

20  all states indicated that they could comply sooner at the time. *See* 81 Fed. Reg. at 90,529; *see also*

21  *supra* ¶ 131. ACF did not balance this delay against the lost years of national data required by

22  Congress, or consider implementing the data elements that had been undisputed since 2016 on a

23  faster timetable.

24  _____

25  [87] *See, e.g.*, Oneida Nation, Comment Letter on AFCARS Notice of Proposed Rulemaking (June 18, 2019), https://www.regulations.gov/document?D=ACF-2018-0003-0338.

26  [88] *See, e.g.*, Lambda Legal NPRM Comment.

27  [89] *See, e.g.*, Cherokee Nation, Comment Letter on AFCARS Notice of Proposed Rulemaking (June 17, 2019), https://www.regulations.gov/document?D=ACF-2018-0003-0348.

28  [90] *See, e.g.*, *id.*

# V.   **HARM TO PLAINTIFFS**

206.    ACF's unlawful decision to remove the ICWA and sexual orientation data elements deprives each Plaintiff of valuable information to which they are entitled by statute and regulation.

207.    The Act requires Defendants to "disseminate the data and information made available through [AFCARS]." 42 U.S.C. § 679a(4); *see also* H.R. Rep. No. 99-1012 at 419 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 3868, 4064 (purpose of the Clearinghouse is to "disseminate . . . research and data [on issues concerning adoption and foster care] as it becomes available to all those who voluntarily seek this information").

208.    If the ICWA and sexual orientation data were collected and disseminated, as required by the 2016 Final Rule, each Plaintiff would use the data in their daily operations to improve outcomes for children in the child welfare system, just as Congress intended. By unlawfully eliminating those data elements, the 2020 Final Rule prevents Plaintiffs from doing so.

209.    Independently, as detailed further below, the 2020 Final Rule also harms each Plaintiff in other  ways, including by forcing Plaintiffs to divert resources to address harms to their mission-driven activities; by impairing Plaintiffs' ability to obtain funding; and by impeding the ability of tribal Plaintiffs and CTFC's members, many of whom operate title IV–E agencies and are therefore directly regulated by the 2020 Final Rule, to provide child welfare services to their children and exercise their rights under ICWA.

## A.    **California Tribal Families Coalition**

210.    The 2020 Final Rule's removal of ICWA data elements harms CTFC by impeding its ability to carry out its mission to protect the health, safety, and welfare of tribal children, implement the recommendations of California's ICWA Compliance Task Force, train child welfare workers, and obtain funding for its activities.

211.    First, the removal of ICWA data impedes CTFC's ability to allocate resources effectively and to design and advocate for legislation, regulations, and policies that target flaws in ICWA implementation. If armed with such data, CTFC would have a detailed, evidentiary record of the specific problems faced by child welfare agencies and state courts when implementing ICWA, which would in turn enable CTFC to craft appropriate policy solutions targeted at those

1  specific problems. As a direct result of the 2020 Final Rule, CTFC must instead pursue more

2  expensive and less effective reforms.[91]

3      212.    By removing the data elements on ICWA implementation, the 2020 Final Rule also

4  deprives CTFC of persuasive, empirical evidence that it would use in its efforts to design and

5  implement reforms. In the absence of such data, CTFC has historically encountered resistance

6  from stakeholders who are reluctant to take action without empirical evidence of the need for

7  reform. For example, when CTFC sought legislation to fund diversion programs for high risk

8  AI/AN youth, the California Department of Finance—which analyzes legislative fiscal impacts—

9  requested data on the population that would be served. Because CTFC was unable to provide the

10  data, the legislation that was ultimately enacted provided a one-time funding allocation, rather

11  than ongoing funding. By removing the ICWA data elements from AFCARS, the 2020 Final Rule

12  renders CTFC's advocacy efforts less effective and more time-consuming than they otherwise

13  would be, diverting resources away from CTFC's other activities, such as their work to ensure that

14  tribes have access to legal counsel and the right to participate in courtroom proceedings

15  concerning tribes, Indian families, and their children.

16      213.    Second, the removal of ICWA data impedes CTFC's ability to improve ICWA

17  competency by training individuals that work in the child welfare system. If CTFC had access to

18  the ICWA data removed by the Rule, which tracks how state child welfare agencies and state

19  courts are implementing ICWA's requirements, CTFC would be able to identify the most frequent

20  and prevalent flaws in ICWA implementation. This would in turn allow CTFC to focus its finite

21  training resources where they are most needed. As a direct result of the 2020 Final Rule, CTFC is

22  unable to do so. The absence of such data therefore renders CTFC's training services less effective

23  and more time-consuming than they otherwise would be, diverting resources away from CTFC's

24  other activities.

25      214.    Third, the 2020 Final Rule harms CTFC by impairing its ability to obtain funding.

26

27  [91] Task Force Report, *supra* n.2, at 98 (finding that the lack of data on ICWA compliance makes it

28  "much more difficult for tribes to guide policy and budget allocation processes to ensure compliance").

1   For example, without the data provided by the 2020 Final Rule, CTFC cannot provide data to

2   support its own budgetary needs or support member tribe needs when negotiating allocations from

3   state, federal or philanthropic sources.

4         215.    The 2020 Final Rule also harms CTFC's member tribes by impairing their ability to

5   protect and provide services to their children and vindicate their rights under ICWA. As discussed

6   below regarding CTFC member Yurok Tribe, CTFC tribes provide child welfare services to

7   citizens of their tribes, work with state child welfare agencies to ensure appropriate treatment and

8   services, and participate in state court proceedings for tribal citizens. The absence of AFCARS

9   data makes these efforts more expensive and less effective, as CTFC's member tribes must rely on

10   anecdotal or incomplete information to identify their children in state child welfare systems, assess

11   the care they are receiving, determine what actions state child welfare agencies have taken, and

12   provide services and support to their children.

13         216.    Additionally, as ACF recognized in the 2020 Final Rule, collecting the data would

14   allow tribes to obtain "specific information regarding a child's tribal membership or ICWA

15   applicability" for children who are or may be a member of their tribe. 85 Fed. Reg. at 28,413;

16   *accord* 84 Fed. Reg. at 16,578. The availability of this information would allow CTFC's members

17   to exercise their rights in each case involving their members, which would prevent the tribes and

18   their citizens from losing their rights under ICWA. Without the information collected by ACF,

19   CTFC's members are frequently unable to vindicate their rights or protect their children due to

20   states' failures to provide them with the information directly. As the Task Force that led to

21   CTFC's creation explained, this "systemic denial of civil rights that ICWA provides is a symptom

22   of the fundamental breakdown of the systems that are failing tribal families and children across the

23   country."[92]

24         217.    By inhibiting CTFC's member tribes' efforts to vindicate their ICWA rights and

25   protect their children from adverse outcomes, the 2020 Final Rule injures CTFCs' members'

26   sovereign interests. As Congress recognized in ICWA, the care of AI/AN children is "vital to the

27

28       [92] *Id.* at 101.

continued existence and integrity of Indian tribes," yet is threatened by the "alarmingly high percentage of Indian families [that] are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and [the] alarmingly high percentage of such children [that] are placed in non-Indian foster and adoptive homes and institutions." 25 U.S.C. § 1901(3)-(4). The removal of the ICWA data elements from the Final Rule impairs the ability of CTFC and its member tribes to realize the promise and progress of ICWA, and perpetuates the threats to the "continued existence and integrity of Indian Tribes" that Congress passed ICWA to end.

**B.    Yurok Tribe**

218.    The 2020 Final Rule's removal of ICWA data elements harms the Yurok Tribe by impairing its ability to protect and provide services to Yurok children and vindicate its rights under ICWA.

219.    First, the 2020 Final Rule harms the Tribe by impeding the ability of Yurok Health and Human Services ("YHHS") to ensure that ICWA is properly implemented for its children and interfering with its sovereign interest in the health and well-being of its people and in ensuring that it retains connections to its members. Specifically, the 2020 Final Rule prevents tribes like Yurok from identifying recurring ICWA implementation issues and working with state title IV–E agencies to fix those problems. For example, state child welfare agencies have historically struggled to consistently identify Indian children, including Yurok children, and to provide timely notice of such cases to the child's tribe. This problem would have been addressed by the 2016 Final Rule, which included data elements designed to track and improve state title IV–E agencies' efforts to identify and notify tribes of Indian children. Among other things, the 2016 Rule required the agencies to report whether they inquired about a child's ICWA status with a number of persons as required by ICWA (including, as applicable, the biological or adoptive mother, the biological or adoptive father, the child's Indian custodian, the extended family, and the child who is the subject of the proceeding). *See* 81 Fed. Reg. at 90,535, 90,570 (codifying requirements at 45 C.F.R. § 1355.44(b)(3)). The 2020 Final Rule harms Yurok by deleting most of those requirements, instead requiring agencies to report only whether they made any undefined

"inquiries" at all as to a child's ICWA status. 85 Fed. Reg. at 28,424 (same). The 2020 Final Rule also does not identify the tribe of children who are ultimately determined to be eligible for ICWA's protections. The removal of these data elements, along with others, will make it much more difficult for Yurok to assess whether the title IV–E agencies in its jurisdiction are actually making the inquiries required by ICWA, which in turn impedes YHHS's ability to work with the agencies to improve the identification of the Tribe's children—and increases the risk that Yurok children will simply be lost to the Tribe, harming its sovereign interests and contravening its rights under ICWA.

220.    By impairing YHHS's ability to ensure proper ICWA implementation, the 2020 Final Rule interferes with the Tribe's sovereign interests in keeping its children safe and within the tribal community. *See supra* ¶¶ 78-79, 88 (explaining that failures in ICWA implementation lead to adverse outcomes for tribal youth). For example, in a recent case, a state child welfare agency became aware of a Yurok child living in a dangerous home, but either failed to identify the child as a Yurok child or failed to provide the Tribe with timely notification of the case. As a direct result of that failure, the Tribe was unable to provide services to the child in a timely fashion. By the time YHHS became aware of the case and was able to intervene, events at the home had already escalated, resulting in severe injuries to the child. In such instances, proper ICWA implementation, including timely identification and notice, is critical because it provides Yurok the opportunity to protect its children and provide culturally appropriate services to families.

221.    Second, the 2020 Final Rule impedes Yurok's ability to accurately track the number and location of Yurok children in state care, which in turn impedes its ability to effectively administer its child welfare services through YHHS. Under the 2016 Final Rule, state child welfare agencies would have been required to report each child's tribe as formally determined by the court. 81 Fed. Reg. at 90,570 (requiring agencies to report "the Indian tribe that the court determined is the Indian child's tribe for ICWA purposes"). The 2020 Final Rule removed that data element, requiring state agencies to report only a list of tribes that "may *potentially* be the Indian child's tribe(s)." 85 Fed. Reg. at 28,424 (emphasis added). This data element will not yield an accurate count of Yurok's tribal children, as state child welfare agencies

are often over-inclusive when listing potential tribal affiliations at the outset of the ICWA inquiry process, including tribes of which the child is not an eligible member. Without the ability to track and count its children, Yurok cannot effectively plan for or administer the various social services offered through YHHS and the Yurok Wellness Court. For example, without an accurate count of Yurok children in state care, Yurok is unable to estimate the number of cases it may expect to transfer to tribal court as YHHS and the Court expand their programs, which in turn impedes a wide variety of planning decisions, such as how many caseworkers to hire.

222.    Third, the 2020 Rule harms the Tribe's ability to obtain funding.  As explained above, title IV–E of the Social Security Act is the principle statutory provision through which the federal government funds state and tribal child welfare agencies. *Supra* ¶ 54. While tribes have the option of being directly funded by the federal government, they may also be funded indirectly under a "pass-through agreement" with the state. The amount of funds Yurok receives from California under its pass-through agreement depends on the number of children the Tribe brings into tribal court under ICWA's transfer jurisdiction provision. But, as noted above, Yurok's ability to provide that information is impeded by the 2020 Final Rule. Similarly, the lack of data on the number of Yurok children in foster care impairs the Tribe's ability to obtain funding for the Yurok Wellness Court, which relies on such data to apply for other state and federal funding.

223.    In the absence of a requirement that state child welfare agencies collect and report this data through AFCARS, Yurok Tribe is forced to expend significant staff time and resources attempting to track and count the number of Yurok children in the child welfare system on a county-by-county basis. This diverts valuable resources from YHHS's other work.

### C.    Cherokee Nation

224.    The 2020 Final Rule's removal of ICWA data elements harms Cherokee Nation by impeding its ability to protect and provide services to Cherokee children, vindicate its rights under ICWA, and improve the treatment of Cherokee children and families involved in state child welfare systems.

225.    First, the removal of ICWA data elements impairs Cherokee Nation's ability to effectively advocate for the tribal interests of Cherokee families and children in tribal and state

court systems. Through its Court Advocacy and Permanency Service ("CAPS"), Cherokee Nation intervenes in cases involving Cherokee children to help secure and protect their rights under ICWA. The 2020 Final Rule prevents CAPS workers from identifying recurring ICWA implementation issues and working with state title IV–E agencies to fix those problems. The 2016 Final Rule would have required state agencies to submit detailed data tracking their implementation of ICWA. If Cherokee Nation had access to that data, its CAPS workers would focus on the most prevalent implementation issues when working with state agencies. For example, if Cherokee Nation knew that a particular state frequently failed to place Indian children in homes according to ICWA's placement preferences, *see* 25 U.S.C. § 1915, its CAPS workers would work with that state to improve its practices as a general matter, and would pay close attention to placement in individual cases. As a direct result of the 2020 Final Rule, Cherokee Nation is unable to do so. The absence of such data therefore renders Cherokee Nation's CAPS services less effective and more time-consuming than they otherwise would be, diverting resources away from Cherokee Nation's other activities.

226.    Second, the removal of ICWA data impairs Cherokee Nation's ability to provide direct child welfare services to its children by impeding Cherokee Nation's ability to identify Cherokee children in state child welfare systems in a timely fashion. As explained above, *supra* ¶¶ 88-91, state child welfare systems agencies have historically struggled to consistently and accurately identify Indian children under ICWA in a timely fashion. Because Cherokee Nation is the largest federally recognized tribe by population in the United States, state agencies tend to over-identify children as potential members of the Cherokee Nation, notifying the tribe of a significant number of cases that do not actually involve Cherokee children. Before the Nation can provide its services in those cases, it must spend a significant amount of time determining whether or not a child is actually eligible for tribal membership. In some instances, this process can take months, which significantly delays Cherokee Nation's ability to provide its services to Cherokee children. This can have negative consequences for the children, as early intervention can be critical to securing good outcomes. For example, if Cherokee Nation intervenes early in a case, its CAPS workers can ensure that a child is placed in a stable, ICWA-compliant home (*e.g.*, in a tribal

home) in the first instance. In contrast, if Cherokee's intervention is delayed, the child may be placed in a non-ICWA compliant home by the state child welfare agency, only to be moved to an ICWA-compliant home once the Nation is able to intervene and protect the child's rights under ICWA. These kinds of outcomes are destabilizing and harmful to Cherokee children.

227.     The 2016 Final Rule would have addressed these issues in several ways. To begin with, by requiring state child welfare agencies to report data on each of their inquiry efforts under ICWA, the 2016 Final Rule would have ensured that state agencies are actually making the full set of inquiries in the first place. *See supra* ¶ 167 (summarizing the 2016 Final Rule's inquiry data elements). Doing so would improve the speed and accuracy of the states' identification processes, which often over-identify children as Cherokee precisely because states do not make sufficient inquiries regarding the child's status in the first place. Additionally, if Cherokee Nation had access to data on the state agencies' implementation of those inquiry requirements, the Nation could work with states through its CAPS program to improve their identification processes. By removing the inquiry data elements, the 2020 Final Rule reduces Cherokee Nation's ability to improve the speed and accuracy with which their children are identified. This in turn impairs the Nation's ability to provide services to and protect its children, harming Cherokee Nation's sovereign interest in the health and well-being of its people

**D.   Facing Foster Care in Alaska**

228.     The 2020 Final Rule's removal of ICWA and sexual orientation data elements harms FFCA by impeding its ability to improve the foster care system, obtain funding for its activities, and provide services to foster youth and young adults involved in the child welfare system.

229.     First, the removal of both types of data impairs FFCA's ability to effectively advocate for legislation, regulations, and policies that would improve outcomes and services for tribal and LGBTQ+ youth in the foster care system. Specifically, the removed data elements would help FFCA identify policies that would improve the foster care system by improving FFCA's understanding of the problems faced by tribal and LGBTQ+ youth and provide them with evidence that they could use in their advocacy efforts. With respect to tribal youth, the ICWA

implementation data would shed light on the precise ICWA protections that tribal youth in Alaska are not receiving. For LGBTQ+ youth, the sexual orientation data would indicate how many LGBTQ+ youth are in Alaska, which would provide an evidentiary basis to rebut assertions that policy reform is unnecessary due to a supposed low number of LGBTQ+ youth. For both types of youth, the ICWA and sexual orientation data would, when compared against data tracking other outcomes (e.g., homelessness and abuse), indicate the extent to which those youth disproportionately experience negative outcomes. If FFCA had access to such data, it would be able to shape its policy agenda to better address the needs of both tribal and LGBTQ+ youth (and LGBTQ+ AI/AN youth) in the foster care system, including efforts to reduce the over-representation of both populations in care.

230.   The removed ICWA and sexual orientation data would also improve FFCA's ability to effectively advocate for reform by providing forceful and persuasive evidence that such reform is necessary. For example, in its work to improve Alaska's judicial processes for foster care through CIP, FFCA could cite to the removed ICWA data to advocate for reforms that would improve the state courts' implementation of ICWA, such as by improving the timely identification of relatives for placement. Similarly, in its current advocacy for a foster care bill of rights, FFCA members could cite to the sexual orientation data to demonstrate the need for the right to be free from discrimination on the basis of sexual orientation. By removing the ICWA and sexual orientation data elements from AFCARS, the 2020 Final Rule renders FFCA's advocacy efforts less effective and more time-consuming than they otherwise would be, forcing FFCA to divert resources away from its other activities.

231.   Second, the removal of the ICWA and sexual orientation data impedes FFCA's ability to improve its direct services to youth, including the trainings it conducts for youth. If FFCA had access to the abandoned data, it would better understand the needs of, and problems faced by, both tribal and LGBTQ+ youth. This would allow FFCA to shape the content of its trainings to address those needs. For example, if the removed sexual orientation data, when compared against other AFCARS data elements, indicated that LGBTQ+ youth disproportionately experience negative outcomes, such as homelessness, FFCA might adapt its training to include

content to address such issues. By removing the ICWA and sexual orientation data elements from AFCARS, the 2020 Final Rule renders FFCA's direct services less effective than they otherwise would be.

232. Third, the removal of the ICWA and sexual orientation data impedes FFCA's ability to improve trainings for adults involved in the child welfare system, including child welfare staff and foster parents. But for the 2020 Final Rule, FFCA would use the eliminated data to improve its trainings on the unique challenges faced by AI/AN children and the ways in which caregivers can provide safe and supporting environments for LGBTQ+ youth. Specifically, FFCA would rely on the data to convey the significance of challenges faced by tribal and LGBTQ+ youths, would update the trainings to fully capture the nature of those challenges as reflected in the removed data, and would modify its recommendations regarding how to support youths accordingly. By removing the ICWA and sexual orientation data elements from AFCARS, the 2020 Final Rule renders FFCA's training efforts less effective than they otherwise would be.

233. The 2020 Final Rule also harms FFCA by impairing its ability to obtain funding. Currently, FFCA is unable to apply for certain LGBTQ+-related grants that require applicants to submit information on the number of LGBTQ+ youth that would be served by the applicant. For example, FFCA would have applied for the Pride Foundation Grant (intended to support organizations serving LGBTQ+ populations) in past years in order to fund mental health services for LGBTQ+ youth, but was unable to do so because the grant application required information on the number of LGBTQ+ youth that FFCA would be able to serve in Alaska's foster care system. But for the 2020 Final Rule, FFCA would be able to apply for such grants going forward.

**E.    Ark of Freedom Alliance**

234. The May 2020 Rule's removal of sexual orientation data elements impairs and frustrates AFA's mission and activities by impeding its ability to provide services to male and LGBTQ+ survivors of trafficking and other abuses, train law enforcement and other service providers, and obtain funding for its services.

235. First, the removal of sexual orientation data impedes AFA's ability to provide its direct services to male and LGBTQ+ youth. Specifically, having access to sexual orientation data,

along with other data tracked by AFCARS, would allow AFA to improve its preventative outreach and education services to male and LGBTQ+ youth, which rely on targeted interventions for the youth who are at risk of trafficking. Successful targeted interventions, in turn, require accurate data regarding the youth being trafficked, including, among other things, information on their demographics, the settings in which they are trafficked, and various other aspects about their experience. Such information not only allows AFA to locate and reach the youth in the first instance, it also allows AFA to tailor the content of their intervention and educational materials to reflect the demographics and culture of the specific youth. For example, interventions for cisgender, heterosexual girls will use markedly different language, anecdotes, and storytelling than interventions for boys who identify as LGBTQ+. If AFA had access to sexual orientation data, along with other AFCARS data elements (such as whether youth have been trafficked,[93] their gender, their race, and the type of living situation in which they are placed), it would have an improved understanding of the youth who are being trafficked in ways that would greatly improve its ability to target those youth and appropriately tailor its preventative outreach. As a direct result of the 2020 Final Rule, AFA will be unable to do so, rendering AFA's direct services less effective and more time consuming than they otherwise would be.

236.    Second, the loss of the data impedes AFA's ability to improve its trainings for law enforcement and other service providers that interact with LGBTQ+ and marginalized youths. As noted above, if AFA had access to the removed sexual orientation data, in conjunction with AFCARS data on trafficking and other outcomes, it would better understand the extent to which LGBTQ+ youths are disproportionately impacted by human trafficking, homelessness, and violence, enabling it to more effectively train and educate adults in the community regarding how to identify and support such youths. Further, with data demonstrating the prevalence of trafficking among male and LGBTQ+ youth, AFA will be better positioned to communicate the importance

---

[93] As noted above, title IV–E agencies are now required to report on survivors of trafficking. *Supra* ¶¶ 61, 116; 85 Fed. Reg. at 28,429 (requiring agencies to report whether a child has been the victim of sex trafficking in various contexts, as well as whether a child is experiencing homelessness).

of such training to law enforcement and service providers. Historically, trafficking has been misunderstood as a crime that impacts primarily cisgender girls, even though studies suggest that male and LGBTQ+ youth also fall victim of trafficking at significant and alarming rates.[94] These misconceptions make it difficult for law enforcement and other service providers to understand the severity of the danger for male and LGBTQ+ youth. By removing the sexual orientation data element from AFCARS, the 2020 Final Rule therefore renders AFA's education and training services less effective.

237.    Third, the 2020 Final Rule also harms AFA by impairing its ability to obtain funding to provide its services. As noted above, trafficking is commonly misunderstood as a crime that largely impacts young girls. As a result, AFA encountered difficulty in convincing some private funders and grant providers to invest in projects that focus on preventing and addressing trafficking among male and LGBTQ+ youth. If AFA had access to comprehensive data demonstrating the prevalence of trafficking among such youth, it would be able to apply for more grants and submit stronger grant applications, thereby increasing its ability to obtain funding. For example, in a 2020 grant proposal submitted to Our Fund Foundation, AFA requested funding for a project that would provide housing and ancillary support services for LGBTQ+ youth who are victims of human trafficking, but was unable to provide data on the number of LGBTQ+ youth who experience trafficking when discussing the need for the project. If AFA had access to sexual orientation and trafficking data through AFCARS, its ability to obtain such funding would be greatly improved.

**F.    Ruth Ellis Center**

238.    The 2020 Final Rule's removal of sexual orientation data elements impairs and frustrates Ruth Ellis's mission and activities by impeding its ability to provide trauma-informed services to LGBTQ+ youth in Michigan, advocate for reforms that improve the treatment and outcomes of LGBTQ+ youth, including LGBTQ+ youth of color, and obtain funding for its

---

[94] *See, e.g.*, *The Epidemic—Who*, Ark of Freedom Alliance, https://www.aofalliance.org/the-epidemic/who (last visited August 19, 2020) (discussing the prevalence of trafficking among male and LGBTQ+ youth).

1    services.

2          239.    First, the removal of sexual orientation data impairs the ability of Ruth Ellis to

3    effectively advocate through the Ruth Ellis Institute for legislation, regulations, and policies that

4    would ensure that LGBTQ+ youth are safe and supported in the child welfare system. Specifically,

5    the removed data elements would help Ruth Ellis to identify the most effective policies by

6    improving Ruth Ellis's understanding of the problems faced by LGBTQ+ youth, especially with

7    respect to race, homelessness, and other barriers to health and well-being. Because the sexual

8    orientation data would indicate how many LGBTQ+ youth are in Michigan's child welfare system

9    and, when compared against data tracking other outcomes and aspects of identity, the extent to

10   which those youth disproportionately experience homelessness and other barriers to well-being,

11   Ruth Ellis would be better positioned to advance a policy agenda that addresses those barriers and

12   accounts for any differences by race.

13         240.    The lost data would also improve Ruth Ellis's ability to advocate effectively for

14   reform by providing forceful and persuasive evidence that such reform is necessary. Historically,

15   Ruth Ellis has encountered resistance from state policymakers to certain proposed policies—such

16   as its proposal that Michigan reform its foster care licensing rules to require that bed assignments

17   be made based on where the child feels safest as opposed to the sex the child was assigned at

18   birth—because Ruth Ellis could not demonstrate that there were a sufficient number of LGBTQ+

19   children and youth in Michigan's system to justify the cost of reform. By removing the sexual

20   orientation data elements from AFCARS, the 2020 Final Rule renders Ruth Ellis's advocacy

21   efforts less effective and more time-consuming than they otherwise would be, forcing Ruth Ellis to

22   divert resources away from its other activities.

23         241.    Second, the removal of sexual orientation data impedes Ruth Ellis's ability to

24   provide direct services to LGBTQ+ youth. If Ruth Ellis had access to the sexual orientation data,

25   in combination with data tracking other outcomes (*e.g.*, homelessness and placement outcomes), it

26   would be better positioned to assess the extent to which its pilot programs are successful in

27   improving the well-being of LGBTQ+ youth. For example, if Ruth Ellis had access to such data, it

28   could assess the impacts of its pilot program to help families accept the identity of their LGBTQ+

children by evaluating whether homelessness and placement outcomes improved over time for LGBTQ+ youth in the geographic areas included in the program, including reducing the over-representation of LGBTQ+ youth in care due to family rejection.

242.    The 2020 Final Rule also harms Ruth Ellis by impairing its ability to obtain funding to provide its services. Both private funders and Michigan's Department of Health and Human Services ("MDHSS"), which funds many of Ruth Ellis's services through government contracts, are reluctant, and often unwilling, to provide grants or contract for services without data that shows how many LGBTQ+ youth will be served. Similarly, Ruth Ellis would almost certainly be able to expand several of its programs if AFCARS required child welfare agencies to collect the sexual orientation data. For example, Ruth Ellis is currently conducting a pilot program in three counties to train social workers and other professionals working within the child welfare system on how to collect sexual orientation and gender identity data—which will in turn be useful for Ruth Ellis's other activities once collected—in a manner that is culturally competent and affirming. If all child welfare agencies in Michigan were required to collect and report those data to AFCARS, MDHSS would likely fund an expanded program to ensure that other counties receive training on data collection.

### G.    True Colors, Inc.

243.    The 2020 Final Rule's removal of sexual orientation data elements impairs and frustrates True Colors' mission and activities by impeding its ability to provide services to LGBTQ+ youth in the child welfare system.

244.    Specifically, the removal of sexual orientation data impedes True Colors' ability to provide mentoring programs, social activities, and leadership programs to LGBTQ+ youth in Connecticut's child welfare system. But for the 2020 Final Rule, True Colors would use the eliminated sexual orientation data to determine the effectiveness of its efforts to reach LGBTQ+ youth and to ensure that they have access to its services. Currently, True Colors relies on social workers and other professionals in the system to refer LGBTQ+ youth to the organization. While True Colors knows that many LGBTQ+ youth in Connecticut's system are not identified or referred for services, it has no way of knowing how many such youth there are or where they are

located. If child welfare agencies in Connecticut collected sexual orientation data through AFCARS, Connecticut's Department of Children and Families ("DCF") would know how many LGBTQ+ youth were in their system and would be able to work with True Colors to provide youth with the opportunity to receive services.

245.    Additionally, True Colors' ability to successfully recruit affirming foster parents is hindered by a lack of data on the sexual orientation of foster and adoptive parents that are already in the system. Currently, when seeking to find a home for an LGBTQ+ youth, True Colors has recruited families through informal networks and connections. If child welfare agencies in Connecticut were required to collect sexual orientation of foster and adoptive parents, DCF would have access to data on a pool of LGBTQ+ foster and adoptive parents. True Colors could then work with DCF—which funds True Colors' foster parent recruitment program—to more easily identify potential supportive homes for LGBTQ+ youth to improve permanency outcomes for them and avoid congregate where possible.

246.    The 2020 Final Rule also harms True Colors by impairing its ability to obtain funding for increased services to LGBTQ+ youth. If True Colors had data on the number of LGBTQ+ youth in Connecticut, it would use the data to persuade stakeholders to increase services. In the past, through its Safe Harbor Project, True Colors has encountered resistance from DCF to fund certain proposed projects because True Colors could not demonstrate that there were a sufficient number of LGBTQ+ youth to justify the cost of the projects. For example, in past years, True Colors has sought funding from DCF to establish a congregate care facility that would be certified as safe for LGBTQ+ youth and staffed with employees who are culturally competent and affirming. Such a facility would fill an important gap in services for LGBTQ+ youth, who are more likely to end up in congregate care settings due to a lack of affirming foster homes and who are significantly more likely to experience harassment, discrimination, and violence in congregate care settings than their non-LGBTQ+ peers.[95] However, because funding for such facilities depends on the number of children they would serve, and because True Colors could not provide

---

[95] *See, e.g.*, Equality N.C. ANPRM Comment.

1  any data on the number of LGBTQ+ youth in Connecticut's child welfare system who would

2  benefit from the facility, DCF could not fund the project. If True Colors had access to sexual

3  orientation data through AFCARS, it would have data on the number of LGBTQ+ youths in

4  Connecticut and would be better positioned to secure funding for increased services. Instead, as a

5  direct result of the 2020 Final Rule, True Colors is unable to rely on sexual orientation data to seek

6  funding for LGBTQ+ youth services.

7      247.   In the absence of a requirement that state child welfare agencies collect and report

8  sexual orientation data through AFCARS, True Colors will now have to work to obtain state-level

9  data collection requirements. As a direct response to ACF's removal of the sexual orientation data

10  elements, True Colors has already expended, and will continue to expend, significant staff time

11  and resources towards advocating for state legislation that will require Connecticut's child welfare

12  agencies to collect sexual orientation data. These resources are being diverted from True Colors'

13  other work.

### VI.   CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF

**COUNT ONE**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. §§ 706(2)(A)**

17      248.   Plaintiffs re-allege and reincorporate the paragraphs above as fully set forth herein.

18      249.   The APA requires that a reviewing court "hold unlawful and set aside agency

19  action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

20  otherwise not in accordance with law." 5 U.S.C. §§ 706(2)(A).

21      250.   The 2020 Final Rule was arbitrary and capricious because Defendants failed to

22  provide adequate reasoned analysis, properly balance costs and benefits, consider and respond to

23  comments, consider all relevant statutory factors, consider reasonable alternatives, acknowledge

24  that no underlying facts had changed since 2016, explain inconsistencies between their position

25  and the full record of research and policy findings before it, and acknowledge or justify their

26  changes in position.

27      251.   Additionally, Defendants acted contrary to their statutory obligation to implement a

28  data collection system that

shall . . . provide comprehensive national information with respect to (A) the demographic characteristics of adoptive and foster children and their biological and adoptive or foster parents, (B) the status of the foster care population, . . . [and] (D) the extent and nature of assistance provided by Federal, State, and local adoption and foster care programs and the characteristics of the children with respect to whom such assistance is provided.

42 U.S.C. § 679(c)(3).

252.    Accordingly, the 2020 Final Rule should be vacated as arbitrary and capricious.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(1)    Declare that the Final Rule violates the APA and the Social Security Act;

(2)    Issue an order holding unlawful and setting aside the Final Rule;

(4)    Award Plaintiffs their attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

(5)    Grant such other and further relief as this Court deems proper.

Dated: August 27, 2020                    Respectfully submitted,

By: _/s/ Jennifer C. Pizer_
Jennifer C. Pizer (CA Bar. No. 152327)
Lambda Legal Defense and Education Fund
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 590-5903
jpizer@lambdalegal.org

M. Currey Cook (NY Bar No. 4612834)
(pro hac vice application forthcoming)
Lambda Legal Defense and Education Fund
120 Wall St., 19th Fl.
New York, New York 10005
ccook@lambdalegal.org
Telephone: (212) 809-8585

Sasha Buchert (Oregon Bar No. 070686)
(pro hac vice application forthcoming)
Lambda Legal Defense and Education Fund
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Sbuchert@lambdalegal.org
Telephone: (202) 804-6245

Jeffrey B. Dubner (DC Bar No. 1013399)

(pro hac vice application forthcoming)
Kristen Miller (D.C. Bar. No. 229627)
(pro hac vice application forthcoming)
Sean A. Lev (D.C. Bar. No. 449936)
(pro hac vice application forthcoming)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
jdubner@democracyforward.org
kmiller@democracyforward.org
slev@democracyforward.org
Telephone: (202) 448-9090

Kathryn E. Fort (MI Bar No. 69451)
(pro hac vice application forthcoming)
Michigan State University College of Law
Indian Law Clinic
648 N. Shaw Lane
East Lansing, M.I. 48824
fort@msu.edu
Telephone: (517) 432-6992

*Counsel for Plaintiffs*