Jennifer C. Pizer (CA Bar No. 152327)
Lambda Legal Defense and Education Fund
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 590-5903
jpizer@lambdalegal.org

M. Currey Cook (NY Bar No. 4612834)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
120 Wall St., 19th Fl.
New York, New York 10005
ccook@lambdalegal.org
Telephone: (212) 809-8585

Sasha Buchert (OR Bar No. 070686)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Sbuchert@lambdalegal.org
Telephone: (202) 804-6245

*Counsel for Plaintiffs*

Kristen Miller (DC Bar No. 229627)
(admitted *pro hac vice*)
Jeffrey B. Dubner (DC Bar No. 1013399)
(admitted *pro hac vice*)
Sean A. Lev (DC Bar. No. 449936)
(admitted *pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
kmiller@democracyforward.org
jdubner@democracyforward.org
slev@democracyforward.org
Telephone: (202) 448-9090

Kathryn E. Fort (MI Bar No. 69451)
(admitted *pro hac vice*)
Michigan State University College of Law
Indian Law Clinic
648 N. Shaw Lane
East Lansing, M.I. 48824
fort@msu.edu
Telephone: (517) 432-6992

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA TRIBAL FAMILIES COALITION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA,* in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>Defendants. | Case No. 3:20-cv-6018-MMC<br><br>**PLAINTIFFS' NOTICE OF MOTION, MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Not Yet Scheduled. |

---

* Under Rule 25(d) of the Federal Rules of Civil Procedure, Mr. Becerra is automatically substituted as a party for former Secretary of Health and Human Services Alex Azar, and JooYeun Chang is automatically substituted for former Assistant Secretary for the Administration for Children and Families Lynn Johnson.

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, on an as yet to be scheduled date and time when this matter may be heard, in Courtroom 7, 19th Floor, of the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, before the Honorable Judge Maxine M. Chesney of the United States District Court for the Northern District of California, San Francisco Division, Plaintiffs will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 56 for an order granting summary judgment against Xavier Becerra, in his official capacity as Secretary of Health and Human Services; Jooyeun Chang, in her official capacity as Acting Assistant Secretary for the Administration for Children and Families; the U.S. Department of Health and Human Services; and the Administration for Children and Families. This Motion is based on this Notice of Motion and Motion for Summary Judgment, the following memorandum of points and authorities, the accompanying declarations and exhibits, the pleadings and papers on file in this action, and such other matters as the Court may consider.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2
I.      Overview of the Child Welfare System .......................................................... 2
II.     The Adoption and Foster Care Analysis and Reporting System ...................... 4
III.    Regulatory History .......................................................................................... 6
        A.  1993 Rule ............................................................................................... 6
        B.  2003-2016 Rulemaking ......................................................................... 7
IV.     The 2020 Final Rule ...................................................................................... 11
        A.  2018 Delay, 2018 ANPRM, and 2019 NPRM ..................................... 11
        B.  2020 Final Rule ................................................................................... 15
V.      Plaintiffs and Procedural History .................................................................. 16

LEGAL STANDARD ............................................................................................... 16

ARGUMENT ............................................................................................................ 17
I.      Plaintiffs Have Standing to Pursue Their Claims .......................................... 17
II.     The 2020 Final Rule is Not in Accordance with Law ................................... 20
III.    The 2020 Final Rule is Arbitrary and Capricious .......................................... 21
        A.  The 2020 Final Rule is Arbitrary and Capricious as a Whole ............. 21
        B.  The Elimination of the Sexual Orientation Elements was Arbitrary and
            Capricious ............................................................................................. 24
        C.  The Elimination of the ICWA Elements was Arbitrary and Capricious ........ 27

CONCLUSION ......................................................................................................... 30

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*California ex rel. Becerra v. DOI,*
    381 F. Supp. 3d 1153 (N.D. Cal. 2019) .......................................................... 27, 30

5

6

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
    538 F.3d 1172 (9th Cir. 2008) ............................................................ 21, 22, 23

7

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ..................................................................................... 21

8

9

*East Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ...................................................................... 24, 30

10

11

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) .............................................................................*passim*

12

*FCC v. Fox Tele. Stations, Inc.,*
    556 U.S. 502 (2009) ........................................................................... 21, 23, 27

13

14

*FEC v. Akins,*
    524 U.S. 11 (1998) .......................................................................................... 17

15

16

*Fence Creek Cattle Co. v. U.S. Forest Serv.,*
    602 F.3d 1125 (9th Cir. 2010) ........................................................................ 17

17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
    528 U.S. 167 (2000) ........................................................................................ 18

18

19

*Gomez-Sanchez v. Sessions,*
    892 F.3d 985 (9th Cir. 2018) .......................................................................... 30

20

21

*Gresham v. Azar,*
    950 F.3d 93 (D.C. Cir. 2020) ......................................................................... 27

22

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ........................................................................................ 18

23

24

*Hoag Memorial Hosp. Presbyterian v. Price,*
    866 F.3d 1072 (9th Cir. 2017) ........................................................................ 24

25

26

*Keithley v. Homestore.com, Inc.,*
    No. 03-cv-4447, 2007 WL 2701337 (N.D. Cal. Sept. 12, 2007) ................... 20

27

*Lockwood v. Wolf Corp.,*
    629 F.2d 603 (9th Cir. 1980) ............................................................................ 2

28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................... 21, 24, 25, 28

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012) ....................................................... 21

*Nat'l Parks Conservation Ass'n v. EPA*,
    788 F.3d 1134 (9th Cir 2015) ......................................................... 28

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ................................................................ 21, 24

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................................ 17

*State v. U.S. Bureau of Land Mgmt.*,
    277 F.Supp.3d 1106 (N.D. Cal. 2017) ................................................ 22

*Thompson v. U.S. Dep't of Labor*,
    885 F.2d 551 (9th Cir. 1989) ......................................................... 17

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ................................................................ 20

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ....................................................... 18

*WildEarth Guardians v. U.S. Dep't of Agric.*,
    795 F.3d 1148 (9th Cir. 2015) ....................................................... 18

*Zieroth v. Azar*,
    No. 20-cv-172, 2020 WL 5642614 (N.D. Cal. Sept. 22, 2020) ....................... 17

**Statutes**

5 U.S.C. § 706(2)(A) ...................................................... 2, 16, 20, 21

Indian Child Welfare Act, 25 U.S.C. § 1901 *et seq.* ................................. 4

42 U.S.C.

    § 621 ................................................................................ 3

    § 624 ................................................................................ 3

    § 670 ................................................................................ 3

    § 674 ............................................................................. 3, 6

    § 679(c) .................................................... 1, 4, 5, 17, 20, 24

§ 679a(4) ............................................................................................................... 17

Adoption Promotion Act of 2003, Pub. L. No. 108–145, 117 Stat. 1879 ...................................... 7

**Other Authorities**

58 Fed. Reg. 67,912 (Dec. 22, 1993) ........................................................................... 6, 7, 16

73 Fed. Reg. 2082 (Jan. 11, 2008) .................................................................................... 7

80 Fed. Reg. 7132 (proposed Feb. 9, 2015) .................................................................. 3, 7

81 Fed. Reg. 20,283 (Apr. 7, 2016)................................................................... 4, 7, 8, 10, 29

81 Fed. Reg. 90,524 (Dec. 14, 2016) ........................................................................*passim*

Exec. Order No. 13777, 82 Fed. Reg. 12,285 (Feb. 24, 2017)......................................... 15, 16, 22

83 Fed. Reg. 11,449 (proposed Mar. 15, 2015) .............................................................. 12

83 Fed. Reg. 42,225 (Aug. 21, 2018) ............................................................................. 12

84 Fed. Reg. 16,572 (proposed Apr. 19, 2019) ............................................................*passim*

85 Fed. Reg. 28,410 (May 12, 2020) ...........................................................................*passim*

Exec. Order No. 13992, 86 Fed. Reg. 7,049 (Jan. 20, 2021) ....................................... 15

Fed. R. Civ. P. 56(a).......................................................................................................... 16

Federal Surveys, *Current Measures of Sexual Orientation and Gender Identity in Federal Surveys* 17 (2016), https://nces.ed.gov/FCSM/pdf/buda5.pdf.................................. 25

*Demographics*, American Heritage Dictionary (3d ed. 1994) ...................................... 20

HHS OIG, OEI-07-01-00660, Adoption and Foster Care Analysis and Reporting System (AFCARS): Challenges and Limitations (2003), https://oig.hhs.gov/oei/reports/oei-07-01-00660.pdf.......................................................7

1

**INTRODUCTION**

2       In 2016, the Department of Health and Human Service ("HHS") and its Administration for

3   Children and Families ("ACF") updated the requirements for the Adoption and Foster Care

4   Analysis and Reporting System ("AFCARS") for the first time in 23 years. *See* Adoption and

5   Foster Care Analysis and Reporting System, 81 Fed. Reg. 90,524, 90,525 (Dec. 14, 2016) ("2016

6   Final Rule"). Among other new requirements, the 2016 Final Rule required the collection of

7   demographic data on one of the most overrepresented groups within state child welfare systems:

8   LGBTQ+ youth.[1] It also mandated data collection on the application of the requirements of the

9   Indian Child Welfare Act ("ICWA") to another overrepresented group, American Indian and

10   Alaska Native ("AI/AN") youth. ACF identified numerous ways that this data would aid the

11   federal government, state agencies, tribes, groups that support youth in the child welfare system,

12   and the children themselves.

13       After a change in administration, however, Defendants prevented those requirements from

14   taking effect by first delaying, and then gutting, the 2016 Final Rule. Based on purported concerns

15   about the burden on state child welfare agencies, Defendants eliminated the principal sexual

16   orientation questions and the majority of the ICWA questions. Adoption and Foster Care Analysis

17   and Reporting System, 85 Fed. Reg. 28,410, 28,411 (May 12, 2020) ("2020 Final Rule").

18       These changes violated Defendants' obligations under the statute requiring it to collect

19   AFCARS data, 42 U.S.C. § 679(c), and was arbitrary and capricious under the Administrative

20   Procedure Act ("APA"). Although Congress explicitly required Defendants to collect data on the

21   "demographic characteristics of adoptive and foster children and their biological and adoptive or

22   foster parents," *id.* § 679(c)(3)(A), Defendants eliminated the questions about sexual orientation—

23   a key demographic characteristic—without even considering whether doing so was consistent with

24   the statute. Their analysis in the 2020 Final Rule is also independently illegal because it was

25

26   _____

[1] As used in this brief, "LGBTQ+" includes lesbian, gay, bisexual, transgender, questioning, and

27   two-spirit youth, as well as other terms youth may use to describe their sexual orientation, gender
     identity, and gender expression. For purposes of this case, there is no material difference between

28   this and similar terms used in documents quoted herein, such as "LGBT" or "LGBTQ."

riddled with core APA violations. It ignored important aspects of the problem, offered explanations that were contrary to the evidence before the agency, disregarded facts and circumstances that underlay the prior policy, and refused to respond meaningfully to significant comments. Accordingly, it must be set aside. *See* 5 U.S.C. § 706(2)(A).

Plaintiffs have standing to bring this case. Plaintiffs here include the largest federally recognized tribes in California and in the United States, a coalition of dozens of tribes located in California, a foster youth and foster care alumni organization in Alaska, and three organizations from around the country that work with LGBTQ+ foster youth and/or youth who have experienced sex or labor trafficking. Each of these Plaintiffs works to improve the living conditions of youth in child welfare systems and to reduce the chance they will end up homeless, incarcerated, or otherwise severely harmed while in care. The data that Defendants have abandoned are irreplaceable for the efficacy of these efforts. The 2020 Final Rule substantially impedes Plaintiffs' ability to pursue their missions. It makes it harder for tribes to vindicate their and their children's rights and to protect their children's well-being. Likewise, the rule makes it more difficult for groups serving youth in care, including LGBTQ+ youth, to address the overrepresentation of those youth in the foster care population and to prevent their disproportionately negative experiences. The 2020 Final Rule thus injures Plaintiffs—along with the vulnerable children they serve.

**BACKGROUND**

## I. Overview of the Child Welfare System

At any given time, nearly 500,000 children in the United States are in state foster care or have been adopted through a state agency. Compl., ECF No. 1, ¶ 57.[2] To support the state child welfare systems that serve these children, the federal government spends nearly $10 billion a year. *Id.* ¶ 54. Congress allocates most of this money through title IV–E and IV–B of the Social Security Act (the "Act"). Under title IV–E, states are partially reimbursed for providing foster care,

---

[2] Unless otherwise noted, all citations to the Complaint are to paragraphs or portions of paragraphs admitted in Defendants' Answer, ECF No. 53, which may be relied upon for purposes of summary judgment. *See Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir. 1980).

adoption assistance, and guardianship assistance. Under title IV–B, states and tribes obtain grants for services that protect children from abuse or neglect, preserve and reunite families, and promote and support adoption. *See* 42 U.S.C. §§ 621, 624, 670, 674. Agencies that receive this funding are commonly referred to as "title IV–E agencies." This case focuses on two highly vulnerable groups that are overrepresented in the child welfare system.

*LGBTQ+ Youth*—As ACF recognized in a 2011 Information Memorandum, studies reveal that "LGBTQ youth are overrepresented in foster care." AR 2853. While LGBTQ+ people represent approximately 5 to 10 percent of the general U.S. population, studies indicate they account for nearly 20 percent of youth in the foster care system. AR 2853, 2934.

Federally funded studies also demonstrate that LGBTQ+ youth experience disproportionately negative treatment and outcomes after entering the child welfare system. LGBTQ+ youth are more than twice as likely to report being treated poorly within the child welfare system as their non-LGBTQ+ peers. AR 1222. LGBTQ+ foster youth also cycle through higher numbers of total placements, higher rates of placement in group homes, longer stays in residential care, higher rates of homelessness, greater rates of hospitalization for emotional reasons, and greater rates of justice system involvement. AR 1222, 1514, 2854. Despite the grim reality outlined by studies, "there is little or no [national] data on the experiences of these youth," 80 Fed. Reg. 7132, 7155—making it "impossible to track whether the system is . . . improv[ing] in the treatment and care of this very vulnerable . . . population," AR 1512.

Additionally, LGBTQ+ foster and adoptive parents can provide stable, healthy homes for LGBTQ+ youth in care, but are a "significant untapped resource in the effort to find permanent families for all children . . . in foster care." AR 2938; AR 2858-59. Nevertheless, LGBTQ+ parents have historically experienced significant discrimination when seeking to adopt or foster. *See* AR 2858. And even states that welcome LGBTQ+ foster and adoptive parents lack data to help them recruit and support those caregivers. *See* AR 2938.

*AI/AN Youth*—AI/AN youth are similarly overrepresented "at a rate of 2.7 times greater than their proportion in the general population." AR 2494. Many of these children are placed in non-tribal homes, continuing a long history of removing AI/AN youth from their families on a

1 large scale with severe consequences for tribal communities. AR 2244-45.

2 In 1978, Congress enacted the Indian Child Welfare Act ("ICWA") to address the "high

3 percentage of Indian families . . . broken up by the removal . . . of their children." 25 U.S.C. §

4 1901(4). In doing so, Congress recognized that children are a vital resource "to the continued

5 existence and integrity of Indian tribes" and declared that it was national policy to "protect . . .

6 Indian children and to promote the stability . . . of Indian tribes and families." *Id.* §§ 1901(3),

7 1902. ICWA provides protections to AI/AN children who meet the statutory definition of "Indian

8 Child," *id.* § 1903(4), and imposes requirements that states must follow in custody proceedings

9 involving those children. These include, among other things, that parties seeking to terminate

10 parental rights or make a foster care placement notify the child's tribe and parents of proceedings,

11 *id.* § 1912(a); that such parties demonstrate to the court that they have made active efforts without

12 success to prevent the breakup of the family, *id.* § 1912(d); that such parties prove that continued

13 custody by the parent or Indian custodian is likely to result in serious physical or emotional

14 damage to the child, *id.* § 1912(e)-(f); and that child welfare agencies comply with placement

15 preferences that prioritize placing children with extended family members and/or within their

16 tribal community, *id.* § 1915. Additionally, the child's tribe has a right to intervene and may

17 petition to transfer the proceeding to tribal court jurisdiction. *Id.* § 1911(b)-(c).

18 As discussed further below, *see infra* 7-8, it is "unclear how well state agencies and courts

19 have implemented ICWA's requirements into practice." 81 Fed. Reg. 20,283, 20,284. This is

20 caused by a "confusion regarding how . . . to apply [ICWA]," even in "states with large AI/AN

21 populations." *Id.* ACF has recognized that addressing these issues is "complicated" by the lack of

22 "comprehensive national data on the status of AI/AN children for whom ICWA applies." *Id.*

23 **II.    The Adoption and Foster Care Analysis and Reporting System**

24 To improve the wellbeing of children in foster care and their life outcomes, maximize the

25 benefit of the government's child welfare expenditures, and ensure that child welfare agencies

26 know the demographics and needs of the children in their care, Congress passed a series of laws

27 between 1978 and 2014 that first authorized and then required HHS to develop a comprehensive

28 reporting system, which became AFCARS. *See* 42 U.S.C. § 679(c); Compl. ¶¶ 58-60.

Pursuant to the Social Security Act, AFCARS must:

(3) provide comprehensive national information with respect to--

(A) the demographic characteristics of adoptive and foster children and their biological and adoptive or foster parents,

(B) the status of the foster care population (including the number of children in foster care, length of placement, type of placement, availability for adoption, and goals for ending or continuing foster care),

(C) the number and characteristics of--

(i) children placed in or removed from foster care,

(ii) children adopted or with respect to whom adoptions have been terminated, and

(iii) children placed in foster care outside the State which has placement and care responsibility,

(D) the extent and nature of assistance provided by Federal, State, and local adoption and foster care programs and the characteristics of the children with respect to whom such assistance is provided; and

(E) the annual number of children in foster care who are identified as sex trafficking victims--

(i) who were such victims before entering foster care; and

(ii) who were such victims while in foster care; and

(4) utilize appropriate requirements and incentives to ensure that the system functions reliably throughout the United States.

42 U.S.C. § 679(c)(3)-(4). The AFCARS data collection must also "avoid unnecessary diversion of resources from agencies responsible for adoption and foster care." *Id.* § 679(c)(1).

After collecting the data, ACF must "disseminate the data and information made available through" AFCARS via the National Adoption Information Clearinghouse, a public database that centralizes information related to child welfare, adoption, and foster care. *Id.* § 679a(4). The full AFCARS dataset is available through the National Data Archive on Child Abuse and Neglect to those who complete an application process. Answer ¶ 63; *see also* Compl. ¶ 63 (admitted in part). States and tribes that receive funds under title IV–B or title IV–E of the Social Security Act are required to report information to AFCARS as prescribed by ACF's regulations. Compl. ¶ 64. ACF

1  reimburses 50 percent of states' expenditures to "develop, install, and operate data collection . . .

2  systems" that comply with AFCARS requirements. 42 U.S.C. § 674(a)(3)(C), (c).

3  **III.  Regulatory History**

4  A. <u>1993 Rule</u>

5  AFCARS currently operates under regulations issued in 1993.[3] *See* Title IV–B and IV–E

6  of the Social Security Act: Data Collection for Foster Care and Adoption, 58 Fed. Reg. 67,912

7  (Dec. 22, 1993) ("1993 Rule"). The 1993 Rule required states to report a limited number of data

8  elements about foster and adopted youth, including date of birth, sex, race, the circumstances of a

9  child's removal from a home, the presence of abuse or neglect, previous placements, details of the

10  current placement, adoptive parents, the length of time youth remain in foster care, information

11  about their caretakers, and whether parental rights are terminated. *See id.* at 67,912, 67,926-27.

12  In devising the 1993 Rule, ACF recognized that AFCARS data provides broad benefits to

13  diverse stakeholders, including Congress, states, federal agencies, tribes, child welfare advocates,

14  and researchers—and ultimately youth in care themselves. Comprehensive data would "enable

15  policymakers to assess . . . why children are in foster care and develop remedies to prevent it." *Id.*

16  at 67,912. This data would also help policymakers "to gain a better understanding of the foster

17  care program" and "eventually . . . to improve the child welfare system." *Id.* ACF expected that

18  the data would be a "catalyst" for local improvement, "allow[ing] and encourag[ing] States to

19  manage programs more effectively." *Id.* at 67,915. It would also "strengthen and preserve family

20  life insofar as the demographic information provided on children in foster care will aid in

21  permanency planning[4] for these children and their families." *Id.* at 67,923.

22  ACF identified several purposes for which it would use the data, including budget

23  projections; trend analyses and planning; targeting areas for technical assistance efforts,

24  discretionary service grants, research/evaluation, and regulatory change; and justification for

25  policy changes and legislative proposals. *Id.* at 67,912. ACF also explained that it would use the

26  _____

27  [3] As explained below, *infra* 15, states will not need to comply with the 2020 Final Rule until 2022.

28  [4] In the child welfare setting, achieving "permanency" means exiting care to a permanent family-based living situation, whether that is reunification with the parent(s), guardianship, or adoption.

1   data "to respond to questions and requests from other Departments and agencies." *Id.*

2       B. <u>2003–2016 Rulemaking</u>

3       1. *Need for Revision to AFCARS Requirements*

4       As early as 2003, HHS recognized in public reports that the data collected under the 1993

5   Rule was insufficient.[5] These reports, together with the passage of the Adoption Promotion Act of

6   2003, Pub. L. No. 108–145, 117 Stat. 1879, prompted ACF to request public comment on

7   potential improvements to AFCARS. Compl. ¶ 94. This led to a rulemaking effort that took 13

8   years to complete. ACF issued notices of proposed rulemaking ("NPRMs") in 2008 and 2015, a

9   supplemental NPRM ("SNPRM") in April 2016, and ultimately a final rule in December 2016.[6]

10  Throughout this rulemaking process, ACF recognized that AFCARS's ability to fulfill the

11  agency's goals was hampered by the limited scope of AFCARS data elements. Of most relevance

12  to this case, ACF noted the significant absence of comprehensive national data on the

13  demographics and status of both LGBTQ+ youth and AI/AN youth.

14      First, ACF recognized that "[r]esearch has shown that LGBTQ youth are often

15  overrepresented in the population of youth served by the child welfare system and in the

16  population of youth living on the streets." 80 Fed. Reg. at 7155. However, ACF observed, "there

17  is little or no data on the experiences of these youth." *Id.* Therefore, ACF requested comment in

18  the 2015 NPRM on whether and how to collect "data relating to LGBTQ statuses." *Id.*

19      Second, ACF noted that "there is no comprehensive national data on the status of AI/AN

20  children for whom ICWA applies at any stage in the adoption or foster care system." 81 Fed. Reg.

21  at 20,284. As a result, "it is unclear how well state agencies and courts have implemented ICWA's

22  requirements into practice" and there was "confusion regarding how and when to apply the law"

23  even in "states with large AI/AN populations." *Id.*

24

---

25  [5] *See, e.g.*, HHS OIG, OEI-07-01-00660, Adoption and Foster Care Analysis and Reporting

26  System (AFCARS): Challenges and Limitations (2003), https://oig.hhs.gov/oei/reports/oei-07-01-00660.pdf (discussing the limitations of existing AFCARS data).

27  [6] Adoption and Foster Care Analysis and Reporting System, 81 Fed. Reg. 90,524 (Dec. 14, 2016)

28  ("2016 Final Rule"); 81 Fed. Reg. 20,283 (Apr. 7, 2016) ("2016 SNPRM"); 80 Fed. Reg. 7132 (proposed Feb. 9, 2015) ("2015 NPRM"); 73 Fed. Reg. 2082 (Jan. 11, 2008) ("2008 NPRM").

1   ACF found that "AFCARS data can bridge this gap." *Id.* Specifically, collecting ICWA

2   data would serve "several uses in the public interest including: To assess the current state of foster

3   care and adoption of Indian children under the Act, to develop future national policies concerning

4   ACF programs that affect Indian children under the Act, and to meet federal trust obligations[.]"

5   *Id.*; *see also id.* at 20,284-86 (identifying additional ways ACF will use the data). These uses

6   reflected "Department-wide priorities to affirmatively protect the best interests of Indian children

7   and to promote the stability and security of Indian tribes, families, and children." *Id.* at 20,284.

8   Collecting ICWA data elements also implemented the Social Security Act's mandate for AFCARS

9   because doing so would "provide more comprehensive demographic and case-specific

10  information." *Id.*; *see id.* at 20,288. Accordingly, ACF proposed to include a series of data

11  elements on how the state agency implemented ICWA in a child's case. ACF detailed the need for

12  and benefit of each specific element. *Id.* at 20,288-91. ACF also identified alternatives that it had

13  considered and rejected, noting that "including too few data elements . . . may exclude Indian

14  children and families from the additional benefit of improving AFCARS data." *Id.* at 20,295-96.

15  　　　2.   *2016 Final Rule*

16  　　　In response to the 2015 NPRM and 2016 SNPRM, ACF received 217 comments from

17  states, tribes, public interest groups, universities, and private citizens. 81 Fed. Reg. at 90,525-26.

18  After considering comments, ACF issued a 74-page Final Rule adopting many of the proposed

19  data elements, but "remov[ing]" and "modif[ying] others" in response to comments. *Id.* at 90,524.

20  In support of its determination, ACF explained that the "more comprehensive information"

21  collected by the 2016 Final Rule would "deepen [ACF's] understanding of guardianships" and

22  help "address the unique needs of Indian children as defined in ICWA." *Id.* at 90,525.

23  　　　The 2016 Final Rule included data elements on most of the topics proposed in the 2015

24  NPRM and 2016 SNPRM, including health assessments; health, behavioral, and mental health

25  conditions; school enrollment; educational stability; transition planning; sexual orientation;

26  ICWA; and sex trafficking. *See id.* at 90,539-41, 90,550, 90,552-56. In various places, it deleted,

27  modified, or clarified the newly proposed data elements in response to comments from title IV–E

28  agencies and others. For example, in response to comments from title IV–E agencies, ACF deleted

1   data elements regarding whether children had qualifying disabilities under the Individuals with

2   Disabilities in Education Act. *Id.* at 90,534. ACF also considered alternative agency actions,

3   including "whether other existing data sets could yield similar information." *Id.* at 90,565. These

4   alternatives were ultimately rejected as insufficient because "AFCARS is the only comprehensive

5   case-level data set on the incidence and experiences of children who are in out-of-home care." *Id.*

6      *LGBTQ+ Youth and Adults*—Regarding sexual orientation, ACF was "persuaded" by

7   commenters that "we do not have a full picture of [LGBTQ+ youth's] experiences in foster care,"

8   even though they "are overrepresented in the child welfare system," "have unique service needs,

9   are at an increased risk for poor outcomes," and "experience more placements." *Id.* at 90,534.

10  Accordingly, the Final Rule required title IV–E agencies to report (1) the voluntarily self-reported

11  sexual orientation for youth age 14 and older; (2) the voluntarily reported sexual orientation of

12  foster parents, adoptive parents, and legal guardians; and (3) whether there was family conflict

13  related to the child's sexual orientation, gender identity, or gender expression at removal. *Id.* at

14  90,526, 90,534, 90,554, 90,558-59. ACF noted that this data would "better support children and

15  youth in foster care who identify as LGBTQ" by "ensur[ing] that foster care placement resources

16  and services are designed appropriately," and by "assist[ing] title IV–E agencies in recruiting and

17  training foster care providers in meeting the needs of these youth." *Id.* at 90,534-35. Further, the

18  sexual orientation data for prospective foster parents, adoptive parents, and guardians will help

19  "recruit[] . . . and retain[] an increased pool" of homes for children in care. *Id.* at 90,554, 90,559.

20     ACF acknowledged that some title IV–E agencies opposed the sexual orientation elements.

21  These agencies argued that the elements, which call for a voluntary response, could result in an

22  undercount of LGBTQ+ children in foster care; that sexual orientation data is sensitive; and that

23  collecting the data could pose safety concerns due to the risk of discrimination. *Id.* at 90,534. ACF

24  considered but rejected those concerns. It rejected the sensitivity concern because youth could

25  decline to disclose their sexual orientation and because child welfare databases are subject to

26  confidentiality requirements. *Id.* at 90,535. ACF also noted that state agencies and advocacy

27  organizations "have developed guidance and recommended practices" for addressing sexual

28  orientation in child welfare settings, in addition to resources provided by ACF itself. *Id.* at 90,526.

1    ACF also rejected commenters' requests to include additional data elements asking about

2  gender identity or gender expression, or to include additional response options. Instead, it chose to

3  make the sexual orientation response options identical to demographic data routinely gathered on

4  sexual orientation by the Centers for Disease Control and Prevention ("CDC") through its Youth

5  Risk Behavior Surveillance System questionnaire. *Id.* at 90,534.

6    *AI/AN Youth*—As to AI/AN youth, ACF concluded that "the benefits outweigh the burden

7  associated with collecting" "national data on children subject to ICWA." *Id.* at 90,527-28. By

8  collecting such data for the first time, ACF would be able to "assess the experiences of AI/AN

9  children in child welfare systems" and "target guidance and assistance to states." *Id.* at 90,527.

10 ACF also noted benefits highlighted by commenters, including that such data would "help address

11 . . . the disproportionality of AI/AN children in foster care" by "prevent[ing] AI/AN children from

12 entering the foster care system." *Id.* Those commenters believed that "collecting ICWA-related

13 data in AFCARS is a step in the right direction to ensure that Indian families will be kept

14 together[.]" *Id. See also* 81 Fed. Reg. at 20,284-85 (discussing benefits in depth).

15    In light of these benefits, ACF retained most of the ICWA data elements and explained its

16 rationale for each element. *See id.* at 90,535-39, 90,545-48, 90,552-53, 90,556-58, 90,560-61.

17 Consistent with the 2016 SNPRM, the first three elements were designed to assess whether ICWA

18 applies and whether the title IV–E agency had made the statutorily mandated inquiries about a

19 child's ICWA status. *Id.* at 90,535-37. These data elements were "essential" because they would

20 "provide a national number of children in . . . out-of-home care . . . to whom ICWA applies." *Id.* at

21 90,536. ACF explained that such data would also help determine whether title IV–E agencies

22 "need resource[s] or training to support [their] inquiry" efforts, *id.* at 90,535, which are in turn

23 critical to ensuring that ICWA youth are identified and receive ICWA's protections, *see id.* at

24 90,536. For roughly 98 percent of children (*i.e.*, all those to whom ICWA does not apply), those

25 three elements were the only ICWA-related data that agencies would need to provide.

26    For the roughly 2 percent of cases in which ICWA applies, the 2016 Final Rule also

27 required title IV–E agencies to answer a broader set of questions tracking whether and how

28 ICWA's protections had been implemented. Again, the 2016 Final Rule explained the need for

each element, each of which was intended to help the federal government improve ICWA's implementation and secure better outcomes for AI/AN youth. For example, one data element required title IV–E agencies to report whether a court made certain statutorily mandated evidentiary findings before removing an ICWA child from their parents' home. *Id.* at 90,548. ACF explained that the "removal data elements will provide data on the extent to which . . . ICWA [children] are removed in a manner that conforms to ICWA's standards" and will "help[] identify needs for training and technical assistance[.]" *Id.* Further, the removal standards provide "important protections" by "prevent[ing] the breakup of Indian families[.]" *Id.* at 90,546.

ACF noted that states and organizations representing state child welfare agencies "generally supported the overall goal and purpose of including ICWA-related data." *Id.* at 90,527. ACF also addressed several concerns raised by commenters, including the "burden" of collecting the data, but ultimately determined that the "benefits outweigh the burden." *Id.* at 90,528. ACF explained that it "careful[ly] consider[ed] input received from states and tribes," as well as an estimate of the burden that "us[ed] the best available information." *Id.* at 90,566. Notably, these estimates accounted for the fact that the majority of the ICWA data elements would apply in only 2 percent of all cases. *See id.* at 90,568 (assuming agencies would spend on average 3 hours per case gathering and entering data for non-ICWA children, and 10 hours per case for ICWA children). At the same time, ACF considered and rejected alternatives that would have added data. ACF rejected, for example, a request from tribes to require agencies to report "data that accurately reflects tribal involvement" in custody proceedings, noting that ACF "must balance the need to have the information with the burden and cost it places on state agencies[.]" *Id.* at 90,536.

Although most states indicated that they would need more than a year to prepare to comply with the 2020 Final Rule, only two states said that they would need as much as two or three years. *Id.* at 90,529. To assure ample time, the 2016 Final Rule nevertheless provided two years to implement the required changes, setting the compliance date of October 1, 2019. *Id.*

**IV.    The 2020 Final Rule**

A.    2018 Delay, 2018 ANPRM, and 2019 NPRM

After a change in administration, Defendants set out to prevent the 2016 Final Rule from

ever taking full effect. Instead of providing technical assistance to help title IV–E agencies meet their new obligations—as promised in the 2016 Final Rule, *see, e.g.*, *id.* at 90,563-65; Compl. ¶ 134—Defendants began laying the groundwork to gut the 2016 Final Rule.

First, Defendants proposed to delay the compliance date, even though the 2016 Final Rule provided more time than requested by all but two states. Although the majority of comments they received opposed any delay, Defendants nevertheless delayed implementation by a year without any analysis of the effect on youth in foster care, families, tribes, or other interested parties. *See* Adoption and Foster Care Analysis and Reporting System, 83 Fed. Reg. 42,225 (Aug. 21, 2018). Around the same time, Defendants also issued an ANPRM seeking suggestions for "streamlining" the data elements. Adoption and Foster Care Analysis and Reporting System, 83 Fed. Reg. 11,449, 11,449 (proposed Mar. 15, 2018) ("2018 ANPRM"). Although the 2016 Final Rule had included a detailed analysis of the burden placed on title IV–E agencies by the new requirements, *see* 81 Fed. Reg. at 90,567-68, the 2018 ANPRM assumed that there were "data elements … that are overly burdensome" and asked commenters to identify them, along with "specific recommendations on which data elements in the regulation to remove." 83 Fed. Reg. at 11,450.

In response, Defendants received 237 comments, including comments from 38 states. Most, although not all, states took up Defendants' invitation to claim that the requested data elements were overly burdensome, with some claiming that it would take as many as 95,000 hours—the equivalent of 47.5 people working full-time for a year. 84 Fed. Reg. 16,572, 16,573. However, only one-third of the states proposed to cut the sexual orientation elements and roughly half of the states recommended eliminating some of the ICWA elements. *Id.* at 16,574. By contrast, at least five states urged Defendants to retain the sexual orientation elements, and at least three states expressly requested that it retain many or all of the ICWA elements. Compl. ¶ 147.

When discussing the comments, Defendants ignored the former altogether and misstated the latter. For example, Defendants claimed that "states with higher numbers of tribal children in their care reported that they supported including *limited* information related to ICWA in AFCARS," 84 Fed. Reg. at 16,574 (emphasis added), when in actuality the state with the largest number of AI/AN youth in care, California, expressed "steadfast and unequivocal support for the

1   data collection set forth in the [2016] final rule, including the . . . ICWA and LGBTQ

2   information." AR 720. Nor did Defendants even acknowledge that some of the tribes that

3   submitted comments have title IV–E agencies—which are required to comply with most AFCARS

4   requirements—and that all opposed the proposed streamlining. *E.g.*, AR 1060.

5        The vast majority of non-state commenters likewise opposed the proposed retrenchment,

6   and Defendants' analysis similarly misstated those comments. For example, Defendants claimed

7   that commenters supporting the requirements of the 2016 Final Rule "did not provide specific

8   comments on . . . cost or burden[.]" 84 Fed. Reg. at 16,574. However, numerous commenters

9   explained that states' burden estimates were overstated because, *inter alia*, much of the burden of

10  updating states' systems would exist regardless of the ICWA data elements; many states had

11  already begun updating their systems and incurring costs; and title IV–E agencies would need to

12  answer only 3 out of 24 ICWA-related data elements in 98% of cases. AR 761, 988, 2781, 2898.

13       Defendants issued a new NPRM on April 19, 2019. Adoption and Foster Care Analysis

14  and Reporting System, 84 Fed. Reg. 16,572 (proposed Apr. 19, 2019) ("2019 NPRM"). The sole

15  stated purpose of the NPRM was "to reduce the AFCARS reporting burden." *Id.* at 16,572. In

16  keeping with Defendants' single-minded focus, the 2019 NPRM's "Costs and Benefits" section

17  did not acknowledge *any* benefits that would be foregone by eliminating data elements. *See id.*

18  Instead, it focused solely on the "costs . . . attributable to the 2016 final rule." *Id.* Likewise, when

19  discussing specific data elements, the NPRM omitted any analysis of the extensive benefits

20  Defendants had identified, including developing a more comprehensive picture of a child's

21  experience in care, when proposing and enacting the 2016 Final Rule.

22       Guided by this imbalanced valuation, Defendants proposed to eliminate the data elements

23  about the sexual orientation of youth in foster care age 14 and older and their foster parents,

24  adoptive parents, and legal guardians; most of the ICWA-related data elements; and various data

25  elements regarding health assessments, educational stability, and other issues. *Id.* at 16,576.

26       As discussed further below, Defendants' rationales for these changes were brief,

27  conclusory, and contrary to their 2016 conclusions. As justification for cutting the sexual

28  orientation questions, the 2019 NPRM relied primarily on the sensitivity concern explicitly

considered and rejected in 2016. *Compare* 84 Fed. Reg. at 16,576 *with* 81 Fed. Reg. at 90,526, 90,535. Similarly, the 2019 NPRM proposed eliminating the majority of ICWA-related data elements even though Defendants had found just three years earlier that each one was essential. *Compare, e.g.*, 84 Fed. Reg. at 16,577 (proposing to eliminate the removal element discussed above, *supra* 11), *with* 81 Fed. Reg. at 90,548 (explaining that this "information will provide data on the extent to which . . . ICWA [children] are removed in a manner that conforms to ICWA's standards" and will "help[] identify needs for training and technical assistance"). In most cases, Defendants did not even acknowledge their prior conclusions. Instead, they generally provided a generic and conclusory rationale that such data were "better suited for a qualitative review," 84 Fed. Reg. at 16,574, even though nearly all of the data elements they proposed to cut were yes/no options, dates of recorded events, or similarly quantitative and discrete facts, *see* 81 Fed. Reg. at 90,584-97; *see also* AR 2396-97. Defendants also summarily asserted that the ICWA data violated the Act's mandate that AFCARS not unnecessarily divert resources from agencies, *see* 84 Fed. Reg. at 16,574, but again refused to consider whether the benefit outweighed the burden, as would be needed to determine whether any purported "diversion" would be "necessary."

Defendants also significantly changed their methodology for estimating the hours needed for reporting and recordkeeping for each child in care. Because title IV–E agencies need to answer only 3 questions for children to whom ICWA does not apply, the 2016 Final Rule separately calculated burdens for ICWA- and non-ICWA children, estimating 10 hours per child for the former and 3 hours per child for the latter. *See* 81 Fed. Reg. at 90,568. By contrast, the 2019 NPRM's calculations lumped *all* children together, assuming agencies would spend the same number of hours on each case even though the vast majority of ICWA questions would be asked of just 2 percent of children. *See* 84 Fed. Reg. at 16,589. This unexplained methodological change increased the estimate for the 2016 Final Rule to 6 hours per child for *all* children, including the 98% of children for whom title IV–E agencies would only need to answer 3 questions. *Id.* This allowed the agency to assume a 33% across-the-board cost savings for all children, significantly inflating the apparent savings from gutting the 2016 Final Rule's requirements. *Id.* at 16,586.

1

B.  2020 Final Rule

2      In response to the 2019 NPRM, ACF received 150 comments. 85 Fed. Reg. at 28,411. As

3  before, the majority (but not all) of the state title IV–E agencies supported eliminating data

4  elements, while all 33 Indian tribes or tribal organizations and nearly all other organizational,

5  private, and congressional commenters opposed the changes. *Id.*; Answer ¶ 177. The 2020 Final

6  Rule, like the 2019 NPRM before it, made no mention of the tribal title IV–E agencies that

7  opposed the elimination of the requirements. Nor did it respond to the state title IV–E agencies

8  that supported the sexual orientation and ICWA data elements. *See* 85 Fed. Reg. at 28,411-12.

9      Despite the arguments made by the majority of comments, Defendants finalized their 2019

10  proposals without substantive changes on May 12, 2020. *See* 85 Fed. Reg. at 28,410-11. As most

11  relevant to this case, they eliminated the two sexual orientation elements (for youth 14 and over

12  and for foster parents, adoptive parents, and legal guardians) and the majority of ICWA-related

13  data elements. *See id.* at 28,411-13. They also provided states with an additional two years to

14  comply with the new requirements, even though they were allegedly *reducing* the burden from

15  what states had been preparing for since 2016. *Id.* at 28,411. As a result, states will not need to

16  comply with the new requirements until October 1, 2022. *Id.* at 28,413.

17      The sole purpose of the changes, according to the 2020 Final Rule's executive summary,

18  was to comply with a 2017 executive order—which has since been revoked—that directed

19  agencies to identify regulations that could be repealed or modified.[7] 85 Fed. Reg. at 28,410. ACF

20  did not attempt to explain why the executive order supported its decision; it simply cited the order

21  as a conclusory justification for its choice. *See id.* Although the only relevant factor in the

22  executive order that could have plausibly supported the Rule required the agency to ask whether

23  the regulation "impose[s] costs that exceed benefits," 82 Fed. Reg. at 12,286, Defendants again

24  declined to analyze the benefits of the 2016 Rule, let alone explain why they were exceeded by the

25  costs. *See* 85 Fed. Reg. at 28,410 (under "Costs and benefits," listing only the supposed cost

26

27  _____

[7] Exec. Order No. 13777, Enforcing the Regulatory Reform Agenda, 82 Fed. Reg. 12,285 (Feb. 24, 2017); Exec. Order No. 13992, Revocation of Certain Executive Orders Concerning Federal

28  Regulation, 86 Fed. Reg. 7,049 (Jan. 20, 2021) (revoking Executive Order 13777).

1   savings of eliminating portions of the 2016 Final Rule); *see also* AR 2246-47 (explaining why

2   Exec. Order 13777 did not justify the proposed changes). Likewise, in granting states an additional

3   two years to comply with the remaining requirements, Defendants did not balance the delay

4   against the lost years of national data. Nor did they consider implementing the data elements that

5   had been undisputed since 2016 on a faster timetable.

6       As in the 2019 NPRM, Defendants downplayed the analyses provided by the

7   overwhelming body of adverse commenters because they "were not agencies responsible for

8   reporting data to AFCARS." 85 Fed. Reg. at 28,412. This was another unexplained departure from

9   the approach Defendants took in the 1993 and 2016 rulemakings. *See, e.g.*, 58 Fed. Reg. at 67,912

10  (including "national advocacy organizations" among the groups interested in AFCARS data).

11  **V.     Plaintiffs and Procedural History**

12      Plaintiffs in this case include California Tribal Families Coalition (a coalition of 38 tribes

13  located in California), the Yurok Tribe, Cherokee Nation, Facing Foster Care in Alaska (a foster

14  youth and foster care alumni organization), Ark of Freedom Alliance (an organization that works

15  with LGBTQ+ youth who have experienced trafficking), the Ruth Ellis Center (an organization

16  that works with LGBTQ+ youth in Michigan), and True Colors, Inc (an organization that works

17  with LGBTQ+ youth in Connecticut). As part of their missions, these Plaintiffs work to improve

18  outcomes in the child welfare setting for LGBTQ+ youth, AI/AN youth, or both.[8]

19      Plaintiffs filed suit on August 27, 2020, alleging that the 2020 Final Rule was "arbitrary,

20  capricious, an abuse of discretion, or otherwise not in accordance with law." Compl. ¶ 249-50 (not

21  admitted) (citing 5 U.S.C. § 706(2)(A)). Defendants served an answer and the administrative

22  record on December 23, 2020. ECF Nos. 52, 53.

23                          **LEGAL STANDARD**

24      Summary judgment is appropriate where the moving party "shows that there is no genuine

25  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

26  ────────────────

27  [8] Ex. A, Decl. of Delia Sharpe ("CTFC Decl.") ¶¶ 4-12; Ex. B, Decl. of Joseph L. James ("Yurok Decl.") ¶¶ 3-7; Ex. C, Decl. of Lou Stretch ("Cherokee Decl.") ¶¶ 4-8; Ex. D, Decl. of Amanda

28  Metivier ("FFCA Decl.") ¶¶ 3-13; Ex. E, Decl. of Gerald W. Peterson ("REC Decl.") ¶¶ 3-12.

Civ. P. 56(a). Where the questions are purely legal in nature, a court can resolve a challenge to a federal agency's action on a motion for summary judgment. *See Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010). "Generally, judicial review of agency action is limited to review of the record on which the administrative decision was based." *Zieroth v. Azar*, No. 20-cv-172, 2020 WL 5642614, at *1 (N.D. Cal. Sept. 22, 2020) (quoting *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989)). "A reviewing court can, however, 'go outside the administrative record . . . for the limited purpose of background information.'" *Id.*

## ARGUMENT

### I.       Plaintiffs Have Standing to Pursue Their Claims

To demonstrate Article III standing a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

"[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). Here, Congress explicitly required the Secretary of HHS to

> [P]rovide comprehensive national information with respect to—(A) the demographic characteristics of adoptive and foster children and their biological and adoptive or foster parents, (B) the status of the foster care population, . . . [and] (D) the extent and nature of assistance provided by Federal, State, and local adoption and foster care programs and the characteristics of the children with respect to whom such assistance is provided.

42 U.S.C. § 679(c)(3). It further required the Secretary to "disseminate [that] data and information" through the National Adoption Information Clearinghouse. *Id.* § 679a(4). Congress thus created a statutory entitlement to data on youth in foster and adoptive care, along with data on the assistance provided to them. Because Plaintiffs were denied that information with regard to the eliminated data elements, they have suffered a concrete injury-in-fact and "need not allege any *additional* harm beyond the one Congress has identified." *Spokeo*, 136 S. Ct. at 1549.

Even if Plaintiffs needed to show injury caused by the denial of information, they have amply established that injury. An organization has standing to sue in its own right when "it show[s] a drain on its resources from both a diversion of its resources and frustration of its

1    mission." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (internal citations

2    omitted); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Here, Plaintiffs

3    have shown that their mission-driven activities—which aim to improve outcomes for youth in

4    child welfare systems—have been impaired by the 2020 Final Rule, causing Plaintiffs to divert

5    their resources to combat the effects of the Rule.[9]

6         *First*, the 2020 Final Rule's removal of sexual orientation and ICWA data impairs the

7    ability of Facing Foster Care in Alaska ("FFCA"), the Ruth Ellis Center ("REC"), and the tribal

8    plaintiffs to provide direct services. To begin, the removal of sexual orientation data harms the

9    ability of FFCA and REC to provide direct services by impairing their ability to identify and

10   comprehend the needs of the youth they serve. FFCA Decl. ¶ 34; REC Decl. ¶ 22. Similarly, such

11   data would help these organizations to assess and improve their services. *Id*. In the absence of such

12   data, these organizations' services are less effective and more time consuming, diverting resources

13   away from other activities.

14        Likewise, the 2020 Final Rule makes it more difficult for the Cherokee Nation and the

15   Yurok Tribe (collectively "Tribes") to care for their children by removing data that is critical to

16   helping tribes identify their children, Cherokee Decl. ¶¶ 15-16, 21; Yurok ¶¶ 11, 16, and by

17   increasing the likelihood of ICWA implementation errors. Cherokee Decl. ¶¶ 18-19, 22; Yurok

18   Decl. ¶¶ 9-10. For example, improper implementation of ICWA's inquiry and notice

19   requirements—which is made more likely by the 2020 Final Rule—prevents the Tribes from

20   identifying individual children and from tracking the total number of children in state care.

21   Cherokee Decl. ¶¶ 10-13; Yurok Decl. ¶¶ 10, 12. This in turn impedes their ability to effectively

22   provide services to their children. Cherokee Decl. ¶¶ 10-11, 13, 16, 20-22; Yurok Decl. ¶¶ 11–17.

23   As a result, the Tribes' children often suffer worse outcomes, harming the Tribes' sovereign

24   _____

25   [9] In addition to suing in its own right, California Tribal Families Coalition ("CTFC") has standing
     to sue on behalf of its member tribes because its members—including Plaintiff Yurok—"would
26   otherwise have standing to sue in their own right, the interests at stake are germane to [CTFC's]
     purpose, and neither the claim asserted nor the relief requested requires the participation of
27   individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),
     Inc.*, 528 U.S. 167, 181 (2000); *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154
28   (9th Cir. 2015). *See also* CTFC Decl. ¶¶ 18-22 (detailing harms to member tribes).

interests in protecting the well-being of their people. *Id.* The Tribes are also forced to expend greater resources to provide their child welfare services, causing the Tribes to provide fewer, less effective services and diverting resources away the Tribes' other activities. Cherokee Decl. ¶¶ 8, 10, 13-14, 19, 22; Yurok Decl. ¶ 18.

*Second*, by removing ICWA data, the rule prevents CTFC, Cherokee Nation, and Yurok from identifying recurring implementation issues and working with title IV-E agencies to fix them. CTFC Decl. ¶¶ 16, 19-20; Yurok Decl. ¶¶ 9-10; Cherokee Decl. ¶¶ 10-12, 18-19. This in turn makes errors more likely, which will result in worse outcomes for the Tribes' children, harming their sovereign interests. Yurok Decl. ¶¶ 12-15; Cherokee Decl. ¶¶ 10-11.

*Third*, the 2020 Final Rule impedes the ability of CTFC, Yurok, FFCA and REC to obtain funding, which often depends on the type of data that the 2020 Final Rule removed. CTFC Decl. ¶ 17; Yurok Decl. ¶ 19; FFCA Decl. ¶¶ 36-37; REC Decl. ¶¶ 23-24.

*Fourth*, the 2020 Final Rule undermines FFCA's ability to provide trainings to professionals who work with LGBTQ+ and AI/AN youth in child welfare settings. FFCA Decl. ¶ 35. If FFCA and AFA had access to such data, their trainings could more effectively communicate the significance of the challenges faced by such youth and provide more targeted recommendations for supporting those youth. *Id.*

*Fifth,* the 2020 Final Rule harms the ability of three of the Plaintiffs—CTFC, FFCA, and REC—to design and advocate for policies that will improve outcomes for LGBTQ+ youth and AI/AN children in the child welfare system. CTFC Decl. ¶¶ 8, 10, 14-15; FFCA Decl. ¶¶ 24-32; REC Decl. ¶¶ 16-22. Specifically, the rule removes data that would improve the quality of these organizations' policy solutions and provide persuasive evidence of the need for reform. CTFC Decl. ¶¶ 14-15; FFCA Decl.¶¶ 24-32; REC Decl. ¶¶ 16-22. Consequently, their advocacy efforts are less effective and more time consuming, diverting resources away from other activities. *Id.*[10]

---

[10] While Plaintiffs' counsel believe that True Colors, Inc. and Ark of Freedom Alliance ("AFA") had standing at the time of the Complaint, this motion does not rely on either to establish standing. As a result of the pandemic's impact on their operations and staffing issues, True Colors and AFA were unable to provide a declaration at this time. Counsel will provide the Court with further updates as necessary. If the Court finds that any other Plaintiff has standing, it need not determine

## II.      The 2020 Final Rule Is Not in Accordance with Law

As explained above, Defendants are statutorily required to collect

[C]omprehensive national information with respect to—(A) the demographic characteristics of adoptive and foster children and their biological and adoptive or foster parents, (B) the status of the foster care population, . . . [and] (D) the extent and nature of assistance provided by Federal, State, and local adoption and foster care programs and the characteristics of the children with respect to whom such assistance is provided.

42 U.S.C. § 679(c)(3). By refusing to collect demographic data regarding sexual orientation, the Rule is "not in accordance with law" and must be set aside. 5 U.S.C. § 706(2)(A).

Although the Social Security Act does not define the term "demographic characteristics," the word "demographics" means "characteristics of human populations and population segments, especially when used to identify consumer markets." *Demographics*, American Heritage Dictionary (3d ed. 1994); *cf. Keithley v. Homestore.com, Inc.*, No. 03-cv-4447, 2007 WL 2701337, at *11 (N.D. Cal. Sept. 12, 2007) (identifying this definition as the "ordinary meaning" of "demographics"). Sexual orientation is unquestionably a "characteristic[] of human populations." For example, in a white paper that, as discussed further below, *see infra* 24-25, Defendants purported to rely on in the Rule, an OMB working group recognized "sexual identity questions" as a type of "demographic question[]." AR 180. As numerous studies and surveys included or discussed in the administrative record reflect, sexual orientation is similarly recognized as a demographic matter in academic literature. *See, e.g.*, AR 494, 505, 2937. By eliminating demographic questions regarding sexual orientation from AFCARS, Defendants thus acted contrary to the statute. In any event, as discussed *infra* Part III (B), even if Defendants' obligation to collect demographic characteristics does not *require* collection of data on sexual orientation, their failure *even* to consider whether sexual orientation is an important demographic characteristic constitutes a failure to consider an important aspect of the problem, making the Rule arbitrary and capricious.

---

whether True Colors or AFA also would. *See Town of Chester, N.Y. v. Laroe Estates*, *Inc.*, 137 S. Ct. 1645, 1651 (2017).

1    **III.    The 2020 Final Rule Is Arbitrary and Capricious**

2        Under the APA, "[t]he reviewing court shall ... hold unlawful and set aside agency action,

3    findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise

4    not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious

5    if the agency fails to consider an important aspect of a problem, if the agency offers an explanation

6    for the decision that is contrary to the evidence, or if the agency's decision is so implausible that it

7    could not be ascribed to a difference in view or be the product of agency expertise. *Motor Vehicle*

8    *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Where an agency reverses

9    its prior position, it must "display awareness that it is changing position," "show that there are

10   good reasons for the new policy," and provide "a reasoned explanation . . . for disregarding facts

11   and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC*

12   *v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502,

13   515-16 (2009)). An agency must also "consider and respond to significant comments," *Perez v.*

14   *Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), and "consider the alternatives that are within the

15   ambit of the existing policy," *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020)

16   (alterations adopted and internal quotation omitted).

17        A.  <u>The 2020 Final Rule Is Arbitrary and Capricious as a Whole</u>

18        The 2020 Final Rule is arbitrary and capricious because its rationale is grounded in a cost-

19   benefit analysis that failed to consider the benefits, contradicted the evidence before the agency,

20   disregarded facts and circumstances that underlay the prior policy, and refused to respond

21   meaningfully to significant comments. *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040

22   (D.C. Cir. 2012) ("[W]hen an agency decides to rely on a cost-benefit analysis as part of its

23   rulemaking, a serious flaw undermining that analysis can render the rule unreasonable.").

24        *First*, Defendants' explanation for the Rule is grounded in a cost-benefit analysis that

25   "fail[ed] to include . . . the benefit of [the removed data elements] in either quantitative or

26   qualitative form." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d

27   1172, 1198 (9th Cir. 2008). The Rule's sole justification for removing nearly 100 data elements

28   was to comply with Executive Order 13777, *see* 85 Fed. Reg. at 28,410, which required agencies

to identify and reevaluate regulations that "impose costs that exceed benefits," E.O. 13777 §

3(d)(iii). Accordingly, Defendants identified the 2016 Final Rule as "one in which the reporting

burden may impose costs that exceed benefits." 85 Fed. Reg. at 28,410.

Despite making this cost-benefit analysis the centerpiece of its justification, the 2020 Final

Rule declines to analyze the benefits of the 2016 Final Rule at all. The Executive Summary notes

the estimated cost savings that would result from "reduc[ing] the title IV-E agency reporting

burden from the 2016 Final Rule," but omits any discussion of benefits to children and families—

ACF's core constituents. *Id.* Likewise, the full cost-benefit analysis discusses only the

"[e]stimated burden and costs . . . of the overall information collection" when supporting its

conclusion that the 2020 Final Rule "will avoid [an] unnecessary diversion of resources." *Id.* at

28,419. Conspicuously absent is *any* mention of the benefits that would result from gathering the

removed data elements, much less an explanation of why the costs exceed those benefits. *Id.*[11] Nor

does the Rule consider the benefits when discussing individual removed data elements. *See, e.g.*,

*id.* at 28,413 (sexual orientation data elements); *id.* at 28,412-13 (ICWA data elements).

This failure is arbitrary and capricious because an agency "cannot put a thumb on the scale

by undervaluing the benefits" of an action that conflicts with its preferred policy. *Ctr. for*

*Biological Diversity*, 538 F.3d at 1198; *see State v. U.S. Bureau of Land Mgmt.*, 277 F.Supp.3d

1106, 1122 (N.D. Cal. 2017) ("Merely to look at only one side of the scales, whether solely the

costs or solely the benefits . . . fail[s] to take [an] 'important aspect' of the problem into account

and [is] therefore arbitrary.").

*Second*, Defendants' refusal to consider the benefits of the eliminated data elements

"disregard[ed] facts and circumstances that underlay" the prior agency rule without a "reasoned

explanation." *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Fox Television Stations*, 556 U.S. at

516). The 2016 Final Rule robustly analyzed the benefits of the individual data elements

---

[11] While the 2020 Final Rule refers to Defendants' reasoning in the 2019 NPRM, that document's "Costs and Benefits" section similarly focused solely on the costs associated with reporting information, rather than the benefits derived from that data. *See* 84 Fed. Reg. at 16,572 (summarizing the "costs and benefits" without any mention of benefits); *id.* at 16,586 (discussing only costs); *id.* at 16,587-90 (providing a "burden estimate" of the costs).

throughout the rulemaking. *See, e.g.*, 81 Fed. Reg. at 90,527-28. Against that background, the 2016 cost-benefit analysis concluded that the 2016 Final Rule "maximize[s] net benefits" and "balances the need for more current data with concerns from commenters about the burden that new reporting requirements represent." *Id.* at 90,565-56.

In coming to the opposite conclusion in the 2020 Final Rule's cost-benefit analysis, Defendants do not acknowledge their prior position, let alone provide reasons for departing from it. 85 Fed. Reg. at 28,419. And in failing to consider any benefits whatsoever, Defendants ignored the many benefits of individual elements discussed by the 2016 Final Rule. *Compare, e.g.,* 2020 Final Rule, 85 Fed. Reg. at 28,413 (failing to discuss benefits of sexual orientation elements), *with* 2016 Final Rule, 81 Fed. Reg. at 90,534 (noting that the sexual orientation data will help "ensure that . . . services are designed appropriately to meet [the] needs [of LGBTQ youth]").[12]

*Third*, the cost-benefit analysis relied on a "burden estimate" that contradicted the evidence in the record. As explained above, the 2019 NPRM's calculations—which were adopted by the 2020 Final Rule—were predicated on the understanding that the 2016 Final Rule would require title IV–E agencies to ask every ICWA question for all children. *See* 84 Fed. Reg. at 16,589 (assuming agencies would spend the same amount of time collecting data in each case); 85 Fed. Reg. at 28,420 (adopting those calculations). But this is inconsistent with the 2016 Final Rule's requirements, which directed agencies to collect the vast majority of ICWA data elements in only 2 percent of cases. *Supra* 10-11. By ignoring the evidence in the record, Defendants impermissibly "overvalu[ed] the costs" of collecting ICWA data. *Ctr. for Biological Diversity*, 538 F.3d at 1198.

*Fourth*, Defendants failed to respond meaningfully to significant comments, both about the burden of the rule and the benefits of the data elements that Defendants cut. For example, numerous commenters explained why Defendants' cost estimates were overstated. Among other things, comments on the 2018 ANPRM and 2019 NPRM explained that: much of the burden of updating states' systems would exist regardless of the ICWA data elements, *e.g.*, AR 988; that

---

[12] Likewise, the 2020 Final Rule's methodology for calculating the burden associated with collecting ICWA data represents an unacknowledged departure from that used by the 2016 Final Rule. *See supra* 13-14.

1    many states had already begun updating their systems and incurring such costs, *e.g.*, *id.*; AR 761;

2    and that title IV–E agencies would need to answer only three ICWA-related data elements for 98

3    percent of cases, *see, e.g.,* AR 2781, 2898. None of these concerns are addressed in the 2020 Final

4    Rule. In fact, the 2019 NPRM explicitly misrepresented such comments on the 2018 ANPRM,

5    claiming that non-state commenters "did not provide specific comments on . . . cost or burden[.]"

6    84 Fed. Reg. at 16,574. Because Defendants failed to "consider and respond to significant

7    comments" that cast doubt on the primary justification for the Rule, the 2020 Final Rule was

8    unlawful. *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775 (9th Cir. 2018) (quoting

9    *Perez,*575 U.S. at 96).

10        B.   The Elimination of the Sexual Orientation Elements Was Arbitrary and Capricious

11        In removing the data elements regarding the sexual orientation of youth age 14 and older

12    and of foster parents, adoptive parents, and legal guardians, Defendants acted arbitrarily.

13        *First*, Defendants failed to consider Congress's explicit command that they collect data

14    regarding the "demographic characteristics of adoptive and foster children and their biological and

15    adoptive or foster parents." 42 U.S.C. § 679(c)(3)(A). As explained above, sexual orientation is a

16    key piece of demographic information that HHS is obligated to collect. *See supra* 20. But even if

17    sexual orientation were merely optional under the Act, the APA required Defendants to consider

18    whether eliminating those data elements detracted from the goals of the statutory scheme. *See*

19    *Hoag Memorial Hosp. Presbyterian v. Price*, 866 F.3d 1072, 1079 (9th Cir. 2017) (holding that an

20    agency has a "duty to do *something* to ensure compliance with the applicable substantive

21    requirement"). Neither the 2020 Final Rule, the 2018 ANPRM, nor the 2019 NPRM made *any*

22    attempt to determine whether eliminating the sexual orientation questions impaired Defendants'

23    ability to collect information on demographic characteristics. Therefore, Defendants "entirely

24    failed to consider an important aspect of the problem," and the 2020 Final Rule was arbitrary and

25    capricious. *State Farm*, 463 U.S. at 43.

26        *Second*, Defendants' explanation was contrary to the evidence before them. They justified

27    eliminating the sexual orientation elements on the premise that such questions did not comply with

28    a 2016 white paper published by the OMB Federal Interagency Working Group on Improving

Measurement of Sexual Orientation and Gender Identity in Federal Surveys (the "OMB White

Paper"). *See* 85 Fed. Reg. at 28,413; 84 Fed. Reg. at 16,576-77. According to Defendants, the

OMB White Paper "advises that new questions added to a survey or data base should be validated

with qualitative techniques and [that] question validation efforts should include both the SOGI

[*i.e.*, sexual orientation and gender identity] and non-SOGI groups." 84 Fed. Reg. at 16,576.

Because of "the need to validate questions related to sexual orientation and [to] ensure [that]

responses . . . are . . . confidential," Defendants concluded "that AFCARS is not the appropriate

vehicle to collect this information." *Id.*

This reasoning misstated the OMB White Paper. The working group did not recommend

that validation testing be employed for any "new questions added to a survey or data base." *Id.*

Rather, it recommended validation only when an agency chooses to develop a question not

previously used on other surveys or used in "a new setting with a different audience."[13] The

questions ACF incorporated in the 2016 Final Rule were taken directly from the Centers for

Disease Control and Prevention's Youth Risk Behavior Surveillance System ("YRBSS"), a

program that surveys many of the same youth. The OMB White Paper explicitly recognized the

YRBSS questions as one of the "current measures of sexual identity . . . in Federal

surveys/studies."[14] Indeed, the 2016 Final Rule had rejected suggestions to broaden the questions

beyond the YRBSS model, hewing to the precise questions approved by the OMB White Paper.

*See* 81 Fed. Reg. at 90,534. To suggest that the OMB White Paper—which endorsed the very

questions used in the 2016 Final Rule in an indistinguishable setting—undermined the 2016 Final

Rule was thus "counter to the evidence before the agency, or . . . so implausible that it could not be

ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

Defendants' purported concern that the questions seeking *voluntary* responses "may be

perceived as intrusive" and could not be asked in a sensitive, confidential manner, 84 Fed. Reg. at

---

[13] Federal Interagency Working Group on Improving Measurement of Sexual Orientation and
Gender Identity in Federal Surveys, *Current Measures of Sexual Orientation and Gender Identity
in Federal Surveys* 17 (2016), https://nces.ed.gov/FCSM/pdf/buda5.pdf ("OMB White Paper").

[14] *Id.* at 5, 9.

16,576, is similarly refuted by the evidence before them. Numerous commenters cited to professional guidelines for collecting sexual orientation information from youth in child welfare systems, which mitigate any sensitivity and confidentiality concern. *See, e.g.*, AR 2340-41. The 2020 Final Rule dismissed those guidelines, asserting that they "are not relevant to . . . *Federal* administrative data collection" because they provide guidelines "for child welfare staff and child welfare agencies on how they . . . gather and manage SOGI information at the *case, local, and state* level." 85 Fed. Reg. at 28,413 (emphasis added). This reasoning was irrational, because—by Defendants' own admission—"casework[er]s are . . . responsible for gathering most of the information that is to be reported to AFCARS." AR 301. The answers to the sexual orientation questions, like most other AFCARS data, are therefore collected by "child welfare staff and child welfare agencies . . . [who] gather and manage SOGI information at the case . . . level"—the very subject of the guidelines Defendants found irrelevant. 85 Fed. Reg. at 28,413. The guidelines were thus directly on point, and the 2020 Final Rule's basis for dismissing them was nonsensical.

Moreover, case workers already collect sensitive information that is reported to AFCARS such as abuse history, reproductive health decisions, trafficking, and mental health diagnoses and medications. ACF made no effort to explain why voluntarily disclosed sexual orientation could not be recorded and safeguarded in a consistent manner. Furthermore, if Defendants' rationale held water at all, it would only be as to the question asking about the sexual orientation of youth age 14 and older. Defendants did not even attempt to explain why their purported concerns justified deleting the question about the sexual orientation of the adults who serve as foster parents, adoptive parents, and legal guardians.

*Third*, Defendants disregarded facts and circumstances that underlay their prior policy. When issuing the 2016 Final Rule, ACF had considered the exact concerns on which Defendants purported to rely in 2020. It explicitly noted that both youth and parents could decline to answer the questions, and that all child welfare databases are subject to confidentiality requirements. *See* 81 Fed. Reg. at 90,535. The 2016 Final Rule even cited the exact type of guidelines that the 2020 Final Rule dismissed as irrelevant. *See* 81 Fed. Reg. at 90,526. Contrary to the Supreme Court's explicit guidance, the 2020 Final Rule did not even "display awareness that [Defendants were]

1  changing position," *Fox Television Stations*, 556 U.S. at 515, much less provide a "reasoned

2  explanation" for "disregarding facts and circumstances that underlay . . . the prior policy," *id.* at

3  515-16. This "unexplained inconsistency" requires that the 2020 Final Rule be found arbitrary and

4  capricious. *See Encino Motorcars*, 136 S. Ct. at 2126.

5       *Fourth*, Defendants failed to respond meaningfully to significant comments opposing the

6  elimination of the sexual orientation questions. Commenters explained that abandoning the

7  questions would make it more difficult to address the overrepresentation of LGBTQ+ youth in

8  care and the litany of poor outcomes for those youth. *E.g.*, AR 2650; AR 2853-55 (exclusion of

9  data "would negatively impact the safety, permanency, and well-being of LGBTQ children").

10 Defendants acknowledged these and several other objections in a single sentence, 85 Fed. Reg. at

11 28,413, and made no attempt to refute them; instead, they ignored them. That is unlawful. The

12 APA requires that agencies do more than merely "[n]od[] to concerns raised by commenters only

13 to dismiss them in a conclusory manner." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020);

14 *California ex rel. Becerra v. DOI*, 381 F. Supp. 3d 1153, 1169 (N.D. Cal. 2019) (responding to

15 significant comments with a "conclusory statement—unsupported by facts, reasoning or

16 analysis—is legally insufficient"). Here, the Defendants barely even acknowledged the adverse

17 comments, much less provided a rational explanation rebutting them.

18       C.  The Elimination of the ICWA Elements Was Arbitrary and Capricious

19       Defendants' elimination of ICWA data elements was likewise arbitrary and capricious.

20       *First*, the 2020 Final Rule's primary explanation for eliminating or sharply narrowing 18

21 of 24 ICWA data elements was wholly unreasoned. The 2020 Final Rule asserts that "[r]etaining

22 all of the 2016 final rule ICWA-related data elements would put HHS in the position of

23 interpreting various ICWA requirements" and "determin[ing] state compliance with ICWA." 85

24 Fed. Reg. at 28,412. In Defendants' view, legal authority to conduct such activities belongs

25 squarely to the Department of Interior ("DOI"), not HHS. *Id.* This is a mischaracterization of the

26 2016 Final Rule that cannot "be ascribed to a difference in view or the product of agency

27 expertise." *State Farm*, 463 U.S. at 43. Far from "interpreting" ICWA, the 2016 Final Rule

28 intentionally deferred to DOI's interpretation by making the data elements "consisten[t] with

1   DOI's final rule on ICWA." 85 Fed. Reg. at 28,412. Indeed, DOI specifically urged HHS to "keep

2   the vast majority of the ICWA-related data elements in the 2016 final rule." AR 7.

3        Nor did the 2016 Final Rule's collection of ICWA data require HHS to "determine

4   compliance" or "penalize states for failure to comply with ICWA," as Defendants assert. 85 Fed.

5   Reg. at 28,412. The 2016 Final Rule imposed penalties only for failure to submit data in

6   compliance with the AFCARS requirements—not for anything the data might show about ICWA

7   compliance. *See* 81 Fed. Reg. at 90,524-25. Moreover, if Defendants were correct that HHS lacked

8   "legal authority . . . to collect ICWA-related data in AFCARS," 85 Fed. Reg. at 28,412, the 2020

9   Final Rule would itself exceed HHS's authority as it retains data elements tracking ICWA

10   requirements, *e.g.*, *id.* at 28,414 (asking whether the title IV–E agency provided notice to tribes as

11   required by ICWA Section 1912(a)). Such "internally inconsistent analysis is arbitrary and

12   capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).

13        Likewise, the assertion that the removed ICWA data elements "would not be available for

14   ICWA compliance purposes"—because ACF "will not release specific information regarding a

15   child's tribal membership or ICWA applicability," 85 Fed. Reg. at 28,413—again misunderstands

16   the purpose of collecting ICWA data. The 2016 Final Rule makes clear that such data is intended

17   for use in the aggregate to inform policy-driven activities (such as targeting guidance and

18   assistance to states), not to assess or enforce ICWA compliance in a specific case. *Supra* 10. Nor

19   are Defendants saved by the 2019 NPRM's explanation that ICWA data is "better suited for a

20   qualitative review." 84 Fed. Reg. at 16,574. As noted above, nearly all of the removed data

21   elements were yes/no options, dates of recorded events, or similarly quantitative and discrete facts.

22   *See* 81 Fed. Reg. at 90,584-97 (listing the ICWA data elements adopted by the 2016 Final Rule);

23   *see also* AR 2396-97. This is hardly the "rational connection between the facts found and the

24   choice made" that is required to provide a "satisfactory explanation." *State Farm*, 463 U.S. at 43.

25        *Second*, Defendants' other ICWA-related rationales disregarded the facts and

26   circumstances that underlay their prior policy without explanation. Specifically, Defendants assert

27   that "[r]equiring every state . . . to report on a large number of [ICWA] data elements" would not

28   "meet [the] mandate" in Section 479(c)(1) of the Social Security Act to "avoid unnecessary

1    diversion of resources from agencies." 84 Fed. Reg. 16,575. But the 2016 Final Rule "carefully

2    considered [that] statutory requirement . . . and determined that the [2016] Final Rule does not

3    represent an unnecessary diversion of resources." 81 Fed. Reg. at 90,566. This determination was

4    supported by numerous findings as to the benefits of ICWA data, *supra* 10, and a burden estimate

5    that took into account the fact that states would be required to answer the majority of ICWA data

6    elements in only 2 percent of cases. *Id.* at 90,568. Defendants completely ignored their prior

7    determination as to Section 479(c)(1), as well as the underlying discussion of the benefits and

8    limited burden of collecting the ICWA data elements. *See supra* 21-22. Indeed, neither the 2019

9    NPRM nor the 2020 Final Rule "display[ed] awareness that [ACF was] changing position" on

10   Section 479(c)(1), much less provided a "reasoned explanation . . . for disregarding the facts and

11   circumstances that underlay . . . the prior policy." *Encino Motorcars*, 136 S. Ct. at 2126.

12       Defendants similarly failed to acknowledge the 2016 Final Rule's detailed explanations

13   regarding why each of the deleted ICWA data elements was essential. For example, with respect

14   to the decision to eliminate the ICWA "removal" data element—which required title IV–E

15   agencies to report whether a court made certain statutorily mandated findings before removing an

16   ICWA child from their parents' home—Defendants provided no discussion beyond their desire to

17   streamline ICWA data elements generally. *See* 84 Fed. Reg. at 16,577 (noting only that

18   Defendants proposed deleting that element); 85 Fed. Reg. at 28,411 (adopting the 2019 NPRM's

19   proposals without further discussion of the eliminated elements). This utter lack of explanation

20   completely ignores ACF's earlier findings on that element. Among other things, the 2016 Final

21   Rule found that "the removal data elements will provide data on the extent to which . . . ICWA

22   [children] are removed in a manner that conforms to ICWA's standards" and will help "identify

23   needs for training and technical assistance[.]" 81 Fed. Reg. at 90,548. ACF also explained that the

24   removal standards "prevent the continued breakup of Indian families[.]" 81 Fed. Reg. at 20,289.

25       Defendants likewise failed to acknowledge or account for their departure from earlier

26   findings on every other element that they removed or streamlined. *See* Ex. F (comparing the 2016

27   Final Rule's findings with the 2019 NPRM and 2020 Final Rule's discussion of each removed

28   element). Because Defendants failed "to address the apparent inconsistencies between [the] earlier

1   rule and the rule at issue here," the 2020 Final Rule is arbitrary and capricious. *Gomez-Sanchez v.*

2   *Sessions*, 892 F.3d 985, 995 (9th Cir. 2018) (citing *Encino Motorcars*, 136 S. Ct. at 2126).

3        *Third*, Defendants did not respond meaningfully to significant comments opposing the

4   removal of the ICWA data elements. These commenters—which included 3 states, all 33 Indian

5   tribes or tribal organizations, and the vast majority of other organizational, private, and

6   congressional commenters—explained at length the value of collecting such data. *See, e.g.,* AR

7   2896-98, 2400-06 (explaining how specific data elements will improve ICWA implementation and

8   outcomes for AI/AN children). Commenters also raised serious doubts about the 2019 NPRM's

9   rationale for removing ICWA data elements. For example, in response to ACF's suggestion that

10  removed data elements could be collected through "alternative methods" such as the Court

11  Improvement Program, California noted that this outcome seemed unlikely as such methods would

12  require states to voluntarily prioritize ICWA data collection. AR 2649-50; *see also, e.g.*, AR 2399.

13  Another commenter cautioned that the "generalized justification that ICWA data elements are

14  better suited to qualitative assessments does not stand to reason" because "the ICWA data

15  elements which were added in 2016 were answerable in 'yes' or 'no' format." AR 2396-97; *see*

16  *also, e.g.*, AR 2782 (arguing that removed data elements are quantitative).

17       These comments strike at the heart of Defendants' justification for removing ICWA data

18  elements. Yet the 2020 Final Rule fails to "consider and respond to [these] significant comments,"

19  85 Fed. Reg. at 28,412-13 (responding to ICWA-related comments), as required by the APA, *East*

20  *Bay*, 932 F.3d at 775. In fact, Defendants failed to acknowledge most of them. *See* 85 Fed. Reg. at

21  28,412 (summary of ICWA comments). Defendants even went so far as to claim that they "did not

22  receive comments specific to [the] data element" regarding ICWA inquiries, 85 Fed. Reg. at

23  28,414, even though they received comments urging ACF to retain the full element, *see, e.g.*, AR

24  2404-05. The 2020 Final Rule is thus "legally insufficient" and must be set aside. *California ex*

25  *rel. Becerra*, 381 F. Supp. 3d at 1169.

26                                      **CONCLUSION**

27       For the foregoing reasons, the 2020 Final Rule was contrary to law and arbitrary and

28  capricious, and must be set aside.

Dated: May 17, 2021                              Respectfully submitted,

By: _/s/ Kristen P. Miller_
Kristen P. Miller (DC Bar No. 229627)
(admitted *pro hac vice*)
Jeffrey B. Dubner (DC Bar No. 1013399)
(admitted *pro hac vice*)
Sean A. Lev (DC Bar No. 449936)
(admitted *pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
kmiller@democracyforward.org
jdubner@democracyforward.org
slev@democracyforward.org
Telephone: (202) 448-9090

Jennifer C. Pizer (CA Bar. No. 152327)
Lambda Legal Defense and Education Fund
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 590-5903
jpizer@lambdalegal.org

M. Currey Cook (NY Bar No. 4612834)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
120 Wall St., 19th Fl.
New York, New York 10005
ccook@lambdalegal.org
Telephone: (212) 809-8585

Sasha Buchert (Oregon Bar No. 070686)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Sbuchert@lambdalegal.org
Telephone: (202) 804-6245

Kathryn E. Fort (MI Bar No. 69451)
(admitted *pro hac vice*)
Michigan State University College of Law
Indian Law Clinic
648 N. Shaw Lane
East Lansing, M.I. 48824
fort@msu.edu
Telephone: (517) 432-6992

1

2          *Counsel for Plaintiffs*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28