# EXHIBIT E

Jennifer C. Pizer (CA Bar No. 152327)
Lambda Legal Defense and Education Fund
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 590-5903
jpizer@lambdalegal.org

M. Currey Cook (NY Bar No. 4612834)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
120 Wall St., 19th Fl.
New York, New York 10005
ccook@lambdalegal.org
Telephone: (212) 809-8585

Sasha Buchert (OR Bar No. 070686)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Sbuchert@lambdalegal.org
Telephone: (202) 804-6245

Kristen Miller (DC Bar No. 229627)
(admitted *pro hac vice*)
Jeffrey B. Dubner (DC Bar No. 1013399)
(admitted *pro hac vice*)
Sean A. Lev (DC Bar. No. 449936)
(admitted *pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
jdubner@democracyforward.org
kmiller@democracyforward.org
slev@democracyforward.org
Telephone: (202) 448-9090

Kathryn E. Fort (MI Bar No. 69451)
(admitted *pro hac vice*)
Michigan State University College of Law
Indian Law Clinic
648 N. Shaw Lane
East Lansing, M.I. 48824
fort@msu.edu
Telephone: (517) 432-6992

*Counsel for Plaintiffs*                    *Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| CALIFORNIA TRIBAL FAMILIES COALITION, YUROK TRIBE, CHEROKEE NATION, FACING FOSTER CARE IN ALASKA, ARK OF FREEDOM ALLIANCE, RUTH ELLIS CENTER, and TRUE COLORS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, JOOYEUN CHANG, in her official capacity as Acting Assistant Secretary for the Administration for Children and Families, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, and ADMINISTRATION FOR CHILDREN AND FAMILIES, <br><br> Defendants. | Case No. 20-cv-6018 (MMC) <br><br> **DECLARATION OF GERALD W. PETERSON IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

I, Gerald W. (Jerry) Peterson, hereby state as follows:

1.   I am the Executive Director of Ruth Ellis Center ("REC").

2.   I am submitting this Declaration in support of Plaintiffs' Motion for Summary Judgement to prevent defendant agencies from implementing the May 12, 2020 rule titled "Adoption and Foster Care Analysis and Reporting System" (the "2020 Final Rule").

3.   Founded in 1999, REC is a 501(c)(3) non-profit organization that has established a national reputation for quality and innovation in providing trauma-informed services for lesbian, gay, bi-attractional, transgender and questioning (LGBTQ+) youth, and young adults in Michigan, with an emphasis on young people of color, youth experiencing homelessness, youth involved in the child welfare and juvenile justice systems, and/or youth experiencing barriers to health and wellbeing.

4.   It is our mission to create opportunities for LGBTQ+ young people to build their vision for a positive future. Our vision is a world where LGBTQ+ young people are safe and supported no matter where they go. As we have continued to evolve, so have the ways we help our young people. At REC, we work toward our vision through a growing number of services and programs that support the LGBTQ+ youth and young adult community—from providing outreach and safety-net services, to skill-building workshops and HIV prevention programs.

5.   REC provides services through five core programs. First, REC runs a health and wellness center that provides fully integrated primary and behavioral health care, including care for long-term medical issues, STI testing treatment, HIV prevention services, and transition care for transgender youth. The latter includes gender-affirming hormone treatment, birth control, and screening for medical emergencies. In addition to providing these services, REC seeks to track youth access to healthcare while in government systems of care. We provide the aforementioned services to youth in Michigan foster care who either choose to access services from REC or are referred to

1    REC by child welfare caseworkers who know that REC will be affirming and supportive of youth's

2    identity and expression.

3        6.   Second, REC's drop-in center provides support groups, case management, and a safe

4    place for LGBTQ+ youth and young adults to connect with each other and their community. Youth

5    in Michigan's foster care system access our drop-in center. Over the years, such youth have

6    consistently accessed the drop-in center for a variety of reasons. Oftentimes they are experiencing

7    homelessness due to a lack of an affirming placement while in Michigan's foster care system. At

8    other times, they have exited the foster care system without a permanent home and are, therefore,

9    experiencing homelessness or housing instability (or are otherwise in need of assistance and

10   support).

11       7.   Third, REC operates a Center for Lesbian and Queer Women and Girls that provides

12   outreach and case management services to girls and women, including education, workforce

13   development, health and wellness, family/parenting support, juvenile justice, and foster care support

14   services. Queer women and girls in Michigan's foster care system access these services regularly,

15   including women and girls who have both a juvenile justice and a foster care case—so called

16   "dually-involved" or "crossover youth." In my role at REC, I have observed that Black LGBTQ+

17   youth are disproportionately involved in the juvenile justice system compared to their White

18   LGBTQ+ peers. Conflict over a youth's identity or expression in foster care settings often leads to

19   juvenile justice involvement as does exposure to policing due to homelessness or youth engaging in

20   survival crimes while experiencing homelessness. This pattern frequently occurs for the lesbian and

21   queer girls accessing our services, as well as other LGBTQ+ youth.

22       8.   Fourth, through the Ruth Ellis Institute, REC advocates for policies to reform both

23   Michigan's foster care system and nation-wide systems of care, including the child welfare system,

24   to ensure that LGBTQ+ youth can be safe and supported. This advocacy has included, among other

things: encouraging the State of Michigan to collect sexual orientation- and gender identity-related demographic information for youth in foster care; to implement sexual orientation, gender identity, and gender expression ("SOGIE") nondiscrimination protections in state law and policy; and to deliver training to all professionals in Michigan's child welfare system on how to affirm and support LGBTQ+ youth in care in order to improve youth's safety, well-being and permanency[1] outcomes. At the national level, REC is a recognized leader in providing services to children and families to minimize behaviors and actions by family that are harmful or rejecting of a LGBTQ+ youth's identity and to encourage family acceptance. REC has shared its work in the community, in collaboration with Michigan's child welfare system, at national conferences, and at meetings with federal policymakers regarding system improvement for LGBTQ+ youth.

9.   Fifth, REC operates several pilot programs designed to study how novel direct services and trainings might improve outcomes for LGBTQ+ youth. Some pilot programs have been developed and operated as a part of REC's role as a demonstration site for ACF's Children's Bureau's LGBTQI2-S Quality Improvement Center.

10. As an example, in recognition of the importance of sexual orientation and gender identity data to its other programs, REC is currently operating a pilot program to train foster care workers in three Michigan counties on collecting such data in a culturally competent manner. Through this training, REC has helped foster care workers to collect data in a manner that ensures youth's confidentiality is protected, that youth are protected from harm and discrimination if they disclose their identity, and that questions about identity are posed in a respectful and affirming manner. This pilot has demonstrated the absolute necessity of collecting such data for improving outcomes. Also,

---

[1] Achieving "permanency" means exiting care to a permanent family-based living situation, whether that is reunification with the parent(s), guardianship, or adoption.

it has shown that while child welfare agencies need and greatly benefit from skilled training and technical assistance, quality and safe SOGI data collection in the child welfare system is possible.

11. Similarly, and as referenced above, REC is conducting a pilot program to work directly with the families of LGBTQ+ youth to improve and track long term outcomes of family acceptance of their child's identity. Family acceptance is understood to play a significant role in improving outcomes for such youth, including by reducing the over-representation of LGBTQ+ youth in foster care. REC is currently working with the State of Michigan child welfare system to focus efforts on identifying when family conflict is present before or at the time of removal, a data element in both the AFCARS 2020 Final Rule and the 2016 Rule. As child welfare agencies focus more on providing services to families to prevent removal and offer services that allow children to remain at home due to requirements in the recent federal Family First Prevention Services Act, REC is playing a critical role in ensuring those efforts in Michigan are inclusive of the safety and well-being of LGBTQ+ youth. As part of that work, REC has advocated for Michigan to collect SOGIE-data, so it is possible to track long-term outcomes, the only way to measure the success of these efforts.

12. In a related effort to improve long-term outcomes for LGBTQ+ youth in care, REC is currently shifting from operating a group home specifically for LGBTQ+ youth to providing training and technical assistance on LGBTQ+-supportive programing for all group homes in Michigan. The majority of youth served in REC's group home were involved in the foster care system. Many ended up in group care due to an insufficient number of foster homes that would accept and support them. We shifted to working on improving the quality of all group homes because we could not meet the demand for group care for LGBTQ+ youth. In addition, moving LGBTQ+ youth to REC's group home often meant that youth were no longer in their home community or near family or had to change schools – disruptions that are harmful.

13. REC's mission and its programs for and advocacy on behalf of LGBTQ+ youth will be harmed and less effective if the 2020 Final Rule is implemented and sexual orientation data for youth 14 and over and for LGBTQ foster parents, adoptive parents, and guardians is not available for the State of Michigan and at the national level through AFCARS.

14. Through my work over the past eight years at REC and the associated advocacy and collaboration with Michigan's child welfare system, I have observed that LGBTQ+ youth are over-represented in care compared to their non-LGBTQ peers and experience worse outcomes – such as physical and emotional harm, lack of supportive and affirming services (including medical and behavior health care), placement in group homes or other congregate care settings rather than a family home, heightened justice system involvement, and exiting care to homelessness. My observation of over-representation has been reflected in studies done in both Los Angeles[2] and New York City,[3] which have shown that LGBTQ+ youth represent between nineteen to thirty-four percent of youth in the foster care system, although an online review of national studies documents that they represent only five to ten percent of the general population. The 2013 Los Angeles study was funded by HHS/ACF, in part, to confirm the overwhelming anecdotal information from the field, and other more limited studies, that shed light on the over-representation problem. Another more recent HHS/ACF study found that thirty-two percent of youth in Cuyohoga County, Ohio's foster care system identify as LGBTQ+.[4]  The 2013 Los Angeles study, the 2020 New York City study, and the 2021 Ohio study all found that youth there have experienced some of the same

---

[2] Bianca D.M. Wilson, et al., *Sexual and Gender Minority Youth in Foster Care: Assessing Disproportionality and Disparities in Los Angeles*, 6 (2014), https://www.acf.hhs.gov/sites/default/files/documents/cb/pii_rise_lafys_report.pdf.

[3] Theo G.M. Sandfort, *Experiences and Well-Being of Sexual and Gender Diverse Youth in Foster Care in New York City:  Disproportionality and Disparities*, 5 (2020), https://www1.nyc.gov/assets/acs/pdf/about/2020/WellBeingStudyLGBTQ.pdf.

[4] Matarese, M., Greeno, E., Weeks, A., Hammond, P., *The Cuyahoga youth count: A report on LGBTQ+ youth's experience in foster care*, The Institute for Innovation & Implementation, University of Maryland School of Social Work (2021), https://theinstitute.umaryland.edu/our-work/national/lgbtq/cuyahoga-youth-count/.

challenges in care and disproportionately poor outcomes that I have observed for LGBTQ+ youth in care in Michigan. Given that 85% of youth in care in Michigan are African American (AFCARS currently requires data collection of the race of children and youth), compared to representing about 14% of the general population, there is significant intersectional overlap between race and LGBTQ+ identity when evaluating and addressing overrepresentation in government system of care and outcomes.

15. The 2020 Final Rule's removal of sexual orientation data elements impairs and frustrates REC's mission and activities by impeding its ability to advocate for reforms that improve the treatment and outcomes of LGBTQ+ youth, including LGBTQ+ youth of color, to provide and connect LGBTQ+ youth to its trauma-informed services, and to obtain funding for its services.

16. *First*, the removal of sexual orientation data impairs the ability of REC to effectively advocate through the Ruth Ellis Institute for legislation, regulations, and policies that would ensure that LGBTQ+ youth are safe and supported in the child welfare system.

17. Specifically, the removed data elements would help REC to identify the most effective policies—and advocate for their development and implementation by the State of Michigan—by improving REC's understanding of the problems faced by LGBTQ+ youth, especially with respect to race, permanency, placement in congregate care, homelessness, and other barriers to health and well-being. While, as referenced above, I see these systemic problems through the lens of the youth REC serves, we have no statewide data to document these challenges and to compare to our observations.

18. The sexual orientation data would indicate how many LGBTQ+ youth are in Michigan's child welfare system and, when compared against data tracking other outcomes and aspects of identity, the extent to which those youth disproportionately experience homelessness, trafficking, and other barriers to well-being.

19. Through AFCARS data, as mentioned above, we know that youth of color are over-represented in Michigan's child welfare system and nationally and have worse outcomes than their White peers in care. With data regarding the sexual orientation of youth in care, we would be able to cross reference that information with data on race. REC would then be able to advance a policy agenda that addresses those barriers and accounts for any differences in experiences and outcomes by race for LGBTQ+ youth. This is critical to one aspect of our core mission, to serve LGBTQ+ youth of color, and to better meet the day-to-day, real-life needs of the youth we serve, who are majority youth of color. Specifically, this data can be utilized to target intersectional issues of disproportionality, including race and ethnicity, by providing targeted insight into exactly who is experiencing overrepresentation and how REC can best serve these populations. Also, while we suspect that LGBTQ+ youth of color face some of the worst outcomes of any population of youth in foster care, we have no data to demonstrate why targeted interventions and additional programs are necessary to address these disparities and, ultimately, to show what works and why.

20. Sexual orientation data would also improve REC's ability to advocate effectively for reform by providing forceful and persuasive evidence that such reform is necessary. Historically, REC has encountered resistance from state policymakers to certain proposed policies. For the past eight years, nearly every time I have raised the issue of the need to improve conditions and outcomes for LGBTQ+ youth in care, Michigan policymakers and other child welfare professionals, have asked, "How many are there?" I have been unable to answer this question due to the lack of statewide SOGI-data. For example, REC encountered exactly this problem when it proposed that Michigan reform its foster care licensing rules to require that bed assignments be made based on where the child feels safest as opposed to the sex the child was assigned at birth. Because REC could not demonstrate that there were a sufficient number of LGBTQ+ children and youth in Michigan's

system to justify the cost of reform, policymakers did not take action then and we have yet to see concrete reform.

21. While there is increasing anecdotal recognition of placement issues in residential treatment, the lack of data prevents providers from instituting equitable and ethical solutions. The scant data causes limitations on identifying evidence-based solutions to the barriers LGBTQ+ children and youth experience and hinders the ability of organizations to justify maintaining or expanding programs. By removing the sexual orientation data elements from AFCARS, the 2020 Final Rule renders REC's advocacy efforts less effective and more time-consuming than they otherwise would be, forcing REC to divert resources away from its other activities. Instead of being able to rely on data collected from the state (and resulting nationwide data from all states), REC must divert resources to sharing its own experiences, working with REC youth clients to tell their own stories, and reaching out to child welfare professionals and advocates across the state to gather and compile information. Such efforts take staff time, resulting in time away from providing services to youth and additional cost to the organization.

22. *Second*, the removal of sexual orientation data impedes REC's ability to provide direct services to LGBTQ+ youth. If REC had access to the sexual orientation data, in combination with data tracking other outcomes (*e.g.*, homelessness and placement outcomes), it would be better positioned to assess the extent to which its pilot programs are successful in improving the well-being of LGBTQ+ youth. For example, if REC had access to such data, it could assess the impacts of its pilot program to help families accept the identity of their LGBTQ+ children by evaluating whether outcomes improved over time for LGBTQ+ youth in the geographic areas included in the program. Specifically, REC could assess whether LGBTQ+ youth experience improved placement outcomes, reduced homelessness, and reduced over-representation in care due to family rejection. The ability to measure success is essential for REC to justify the value of our services to funders

and to convince youth, families, and child welfare professionals that our programs are helpful and valuable. Further, the Family First Prevention Services Act, in addition to encouraging prevention work, will require state child welfare agencies to use evidence-based services and programs. Without data, it is impossible to show evidence-based outcomes.

23. *Third*, the 2020 Final Rule also harms REC by impairing its ability to obtain funding to provide its services. Both private funders and Michigan's Department of Health and Human Services ("MDHSS")—which funds many of REC's services through government contracts and grants—are reluctant, and often unwilling, to provide grants or contracts for services without data that shows how many LGBTQ+ youth will be served. Similarly, REC would almost certainly be able to expand several of its programs if AFCARS required child welfare agencies to collect the sexual orientation data because the data would show a critical need for such programs.

24. For example, as referenced above, REC is currently conducting a pilot program in three counties to train social workers and other professionals working within the child welfare system on how to collect sexual orientation and gender identity data—which will in turn be useful for REC's other activities once collected—in a manner that is culturally competent and affirming. If all county child welfare agencies in Michigan were required to collect and report those data to the state as part of AFCARS, MDHSS would likely fund an expanded program to ensure that other counties receive training on data collection. Similarly, if REC had access to statewide data that confirmed the over-representation of youth in care and their disproportionate placement in congregate care, we could show that programs focused on family acceptance and an expansion of affirming family home placements are essential to address existing disparities. This would allow REC to justify additional requests for grant funding or funding from MDHSS.

25. The removal of the sexual orientation data element for foster parents, adoptive parents, and guardians also harms REC's mission and negatively impacts its ability to serve youth. Lack of

data hampers REC's policy advocacy to increase the number of affirming foster placements for LGBTQ youth because, without data, it is impossible to accurately measure efforts MDHSS has made to recruit and retain LGBTQ+ families, who are among the most likely to support and affirm LGBTQ+ youth. In addition, the State of Michigan has been involved in legal proceedings in recent years regarding whether state-funded child placing agencies may refuse to serve and license same-sex couples who wish to be foster parents. Without data, it is impossible for REC to most effectively demonstrate the harm to children resulting from fewer affirming family placements caused by discriminatory policies that exclude potential foster parents. In addition, the historical and current lack of foster homes that are affirming and supportive of LGBTQ+ youth has caused REC to devote resources in the past to providing group homes for LGBTQ+ youth and, going forward, to training all group homes on how to better serve youth. With data on guardians and foster and adoptive parents, REC could accurately assess the extent to which LGBTQ+ families are recruited and retained, advocate for more efforts if needed, and then shift its resources away from addressing congregate care and put more focus on family and community-based services, which are better for children.

26. I have seen first-hand that requirements under federal law drive system improvement. For example, in Michigan, the child welfare and juvenile justice systems share a data collection system. Because the federal Prison Rape Elimination Act requires that juvenile facilities ask about and document information on a youth's sexual orientation and gender identity to assess their safety, Michigan's data system has fields for sexual orientation and gender identity information.  These fields have been used only in the three-county pilot referenced above (Asking About SOGIE). This limited level of data collection still does not provide the full range of data needed to support policy and practice improvements. Without a federal requirement to report this data to AFCARS, and without additional resources and support from the federal government, the resources to develop and

implement a statewide plan to train workers on collecting the data and state administrators to report and interpret the data do not exist at this time. The requirements of the 2016 Rule to collect sexual orientation information (and, hopefully, associated training and technical assistance by HHS and ACF) are critical to ensuring that such data is collected for children in the child welfare system statewide as well as for guardians, foster parents, and adoptive parents. Without such data, REC's mission and services will be negatively impacted, and more importantly, I believe the disparities and harm LGBTQ+ youth in Michigan's system experience will persist.

27. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated: May 14, 2021                                    Respectfully submitted,

                                                       Gerald W. Peterson