BRYAN CAVE LEIGHTON PAISNER LLP
Katherine Keating (CA State Bar No. 217908)
Courtney Thompson (CA State Bar No. 335623)
Three Embarcadero Center, 7th Floor
San Francisco, CA  94111-4070
Telephone: (415) 675-3400
Facsimile: (415) 675-3434
E-Mail: katherine.keating@bclplaw.com
          courtney.thompson@bclplaw.com

Michael Neville (NY State Bar No. 5759303)
(*pro hac vice application pending*)
Elizabeth Goldberg (NY State Bar No. 2829430) (on the brief)
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Facsimile: (212) 541-4630
E-Mail: michael.neville@bclplaw.com
          elizabeth.goldberg@bclplaw.com

*Counsel for* FAMILY EQUALITY and
NATIONAL CENTER FOR LESBIAN RIGHTS

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| CALIFORNIA TRIBAL FAMILIES COALITION, *et al.*,<br><br>                Plaintiffs,<br><br>        v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>                Defendants. | Case No. 3:20-cv-6018-MMC<br><br><br>**BRIEF OF AMICI CURIAE FAMILY EQUALITY AND NATIONAL CENTER FOR LESBIAN RIGHTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing not yet scheduled<br><br>Judge:  Hon. Maxine M. Chesney |

1

**TABLE OF CONTENTS**

2

**Page**

INTRODUCTION ............................................................................................................. 1

INTERESTS OF AMICI ................................................................................................. 2

I.    THE SEXUAL ORIENTATION INFORMATION ELIMINATED BY THE
      2020 FINAL RULE IS CRITICAL TO UNDERSTANDING AND IMPROVING
      THE WELFARE OF LGBTQ+ YOUTH IN FOSTER CARE ......................................... 4

      A.    Meaningful Improvement in the Child Welfare System Requires Consistent
            and Reliable Information About the Population of Children in Care,
            Their Needs, and Their Experiences ....................................................... 4

      B.    LGBTQ+ Youth Are Disproportionately Represented in Foster Care and
            Experience Worse Conditions and Outcomes Within the System ........................ 5

      C.    Better Information About LGBTQ+ Foster Care Populations Means Better-
            Informed State and Federal Policy ........................................................ 8

      D.    Information About the Sexual Orientation of Individual Foster Youth, Foster
            and Adoptive Parents, and Guardians Enables Better Outcomes for Individual
            Youth ..................................................................................... 10

      E.    By Reducing Negative Outcomes for LGBTQ+ Foster Youth, Better
            Information Reduces Systemic Costs ....................................................... 12

II.   NEITHER CONCERNS ABOUT THE SENSITIVITY OF SEXUAL
      ORIENTATION DATA NOR THE COST OF COLLECTING IT JUSTIFY ITS
      ELIMINATION ............................................................................................. 13

      A.    Child Welfare Personnel Can and Should Collect Sexual Orientation
            Data in the Same Manner That They Collect Other Sensitive Information .......... 14

            1.    Child Welfare Workers Routinely Ask Sensitive Questions of
                  Foster Children, Foster and Adoptive Parents, and Guardians ................. 14

            2.    Questions About Sexual Orientation Can Be Administered
                  Appropriately to Youth ......................................................... 15

            3.    Questions About Sexual Orientation Can Be Affirming for
                  LGBTQ+ Foster Youth, Foster and Adoptive Parents, and Guardians ...... 16

            4.    Training and Support – Not Ignoring the Subject – Will Reduce Staff
                  Discomfort with Collecting Sexual Orientation Information .................... 17

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

i

B.    The Cost of Collecting Sexual Orientation Is Far Lower Than the Cost of Not Collecting It ................................................................................................. 18

CONCLUSION ........................................................................................................................ 19

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

BRIEF OF AMICI CURIAE FAMILY EQUALITY AND NCLR                    CASE NO. 3:20-CV-6018-MMC

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

28 CFR § 115.41(d)(7) ................................................................ 15

4

58 Fed. Reg. 67,912 (Dec. 22, 1993) ............................................ 4

5

81 Fed. Reg. 90,524 (Dec. 14, 2016) ............................................ 1

6

84 Fed. Reg. 16,572 (proposed April 19, 2019)................................ 11, 14

7

8

Administration for Children and Families, *ACYF-CB-IM-11-03, Lesbian, Gay, Bisexual, Transgender and Questioning Youth in Foster Care* (April 6, 2011), https://www.acf.hhs.gov/sites/default/files/documents/cb/im1103.pdf ................... 5

9

10

*AFCARS Technical Bulletin #1: Data Elements* (rev'd Feb. 2012), https://www.acf.hhs.gov/sites/default/files/documents/cb/afcars_tb1.pdf........................... 14

11

Alameda County Social Services Agency, "SOGIE and LGBTQ+ Practice and Policy in the Department of Children and Family Services," https://alamedasocialservices.org/opg/place/LGBTQdeptpolicy.cfm.............................. 15, 18

12

13

Alameda County Social Services Agency, "SOGIE and LGBTQ+ Practice and Policy in the Department of Children and Family Services," https://alamedasocialservices.org/opg/place/LGBTQdeptpolicy.cfm.............................. 15, 18

14

15

Annie E. Casey Foundation, *Putting Family First: Developing an Evidence-Based Child Welfare Preventive Practice Model* (March 20, 2020), https://www.aecf.org/resources/putting-family-first/.................................... 10

16

17

California Dep't of Social Serv., "All-County Letter 10-20: Documentation of Sexual Orientation and Gender Identity in the Child Welfare Services Case Management System" (March 13, 2019), https://www.cdss.ca.gov/Portals/9/ACL/2019/19-20.pdf?ver=2019-04-03-081756-557.................................................................... 15

18

19

20

21

Center for the Study of Social Policies, *Out of the Shadows: Supporting LGBTQ Youth in Child Welfare through Cross-System Collaboration* (2016), https://cssp.org/resource/out-of-the-shadows/.................................. 6

22

23

Child Welfare League of America, *National Blueprint for Excellence in Child Welfare* (2013), https://www.cwla.org/our-work/cwla-standards-of-excellence/national-blueprint-for-excellence-in-child-welfare/................................. 5

24

25

*Congregate Care, Residential Treatment and Group Home State Legislative Enactments 2014-2019* (Oct. 30, 2020), National Conference of State Legislatures, http://www.ncsl.org/research/human-services/congregate-care-and-group-home-state-legislative-enactments.aspx .............................. 12

26

27

28

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

iii

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

Fenway Institute and NORC, *Helping Your Organization Collect Sexual Orientation and Gender Identity Data* (2019), available at https://fenwayhealth.org/wp-content/uploads/TFI-54_SOGI-Data-Collection-Series-of-3-Tip-Sheets-for-pride-month_HelpingYourOrganization.pdf .................. 16, 17, 18

*How to Analyze YRBS Sexual Minority Data*, Centers for Disease Control and Prevention (June 2018), https://www.cdc.gov/healthyyouth/data/yrbs/pdf/2017/2017_analyze_sexual_minority_data.pdf ............................................................................................ 15

*The Importance of School Stability for Youth in Foster Care*, Advocates for Children of New York (Sept. 2009), https://www.advocatesforchildren.org/sites/default/files/library/school_stability_youth_fostercare.pdf?pt=1 ....................................................................... 7

The Trevor Project, "The Trevor Project Research Brief: LGBTQ Youth with a History of Foster Care" (May 2021), https://www.thetrevorproject.org/wp-content/uploads/2021/05/LGBTQ-Youth-with-a-History-of-Foster-Care_-May-2021.pdf ............................................................................................................... 7

Frank J. Bewkes*, et al.*, *Welcoming All Families: Discrimination Against LGBTQ Foster and Adoptive Parents Hurts Children*, Center For American Progress (Nov. 20, 2018), https://www.americanprogress.org/issues/lgbt/reports/2018/11/20/461199/welcoming-all-families// ............................................................................... 13

David M. Brodzinsky & Evan B. Donaldson, *Expanding Resources for Children III: Research-Based Best Practice in Adoption by Gays and Lesbians*, Evan B. Donaldson Adoption Institute (2011), https://www.adoptioninstitute.org/wp-content/uploads/2013/12/2011_10_Expanding_Resources_BestPractices.pdf....................... 12

Aisha Canfield & Shannan Wilber, "SOGIE Data Collection in Public Systems of Care: A Practice Guide for Santa Clara County" (July 2019), https://www.nclrights.org/wp-content/uploads/2020/05/Final-SCC-SOGIE-Data-Collection-Practice-Guide-8.8.19.pdf ................................................... 18

Steven D. Cohen, *The Evidence Decision-Makers Want*, Center for the Study of Social Policy (December 2019), https://cssp.org/resource/evidence-decisionmakers-report/ ........................................................................................ 5

Amy Dworsky *et al.*, *Homelessness During the Transition From Foster Care to Adulthood*, 103 AM. J. OF PUB. HEALTH 318 (2013)................................................. 7

Amy Dworsky, *et al.*, *Missed Opportunities: Pathways from Foster Care to Youth Homelessness in America*, Chapin Hall at the University of Chicago (July 2019), https://www.chapinhall.org/wp-content/uploads/Chapin-Hall_VoYC_Child-Welfare-Brief_2019-FINAL.pdf ......................................... 8

iv

Randi Feinstein, *et al.*, *Justice For All? A Report On Lesbian, Gay, Bi Sexual And Transgendered Youth In The New York Juvenile Justice System*, Urban Justice Center (2001), https://files.eric.ed.gov/fulltext/ED471676.pdf ...................................... 8

Jessica N. Fish, Laura Baams, *et al.*, "Are Sexual Minority Youth Overrepresented in Foster Care, Child Welfare, and Out-of-Home Placement? Findings from Nationally Representative Data," CHILD ABUSE & NEGLECT (March 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7306404/...................................... 6

Gary Gates, *LGBT Parenting in the United States*, The Williams Institute, UCLA School of Law (Feb. 2013), http://williamsinstitute.law.ucla.edu/research/census-lgbt-demographics-studies/lgbt-parenting-in-the-united-states/ .......................................... 11

Shoshana K. Goldberg & Kerith J. Conron, *How Many Same-Sex couples are Raising Children?*, Williams Institute (July 2018), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Parenting-Among-Same-Sex-Couples.pdf.......................................... 11

M.H. Morton, B. Horwitz, *Federal Actions to Prevent & End Youth Homelessness: Recommendations Based on Research and a National Convening of Experts and Stakeholders*, Chapin Hall at the University of Chicago (Oct. 2019), https://www.chapinhall.org/wp-content/uploads/Federal-actions-to-prevent-and-end-youth-homelessness-final.pdf .................................... 9

Angela Irvine, *"We've Had Three of Them": Addressing the Invisibility of Lesbian, Gay, Bisexual and Gender Non-Conforming Youths in the Juvenile Justice System* , 19 COLUM. J. OF GENDER & L. 675 (2012). ................................................ 6

Lisa M. Kodadek, *et al.*, "Collecting sexual orientation and gender identity information in the emergency department: the divide between patient and provider perspectives." EMERGENCY MEDICINE JOURNAL, 36(3) (Jan. 10, 2019), https://emj.bmj.com/content/36/3/136.abstract ...................................... 17

H.M. Levitt, *et al.*, *How discrimination in adoptive, foster, and medical systems harms LGBTQ+ families: Research on the experiences of prospective parents*, JOURNAL OF GAY & LESBIAN SOCIAL SERVICES (2020), https://www.tandfonline.com/doi/abs/10.1080/10538720.2020.1728461 ........................... 11

Mandi Martinez, *et al., Cognitive Pretesting Of The National Crime Victimization Survey Supplemental Victimization Survey*, U.S. Census Bureau (Feb. 23, 2017), http://www.census.gov/srd/papers/pdf/rsm2017-03.pdf............................... 16

Donna F. Ossorio, Jackson de Carvalho, *Foster Care Placement and the Impact of Placement Instability*, INTERNATIONAL JOURNAL OF HUMANITIES AND SOCIAL SCIENCE REVIEW Vol. 5(4) (December 2019), http://www.ijhssrnet.com/uploades/volumes/1577287331.pdf................................ 7

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

Andrew D. Pinto, *et al.*, *Routine collection of sexual orientation and gender identity data: a mixed-methods study*, 191 CANADIAN MED. ASS'N J. at E63 (Jan. 21, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6336479...........................9

Julia Raifman, *et al.*, "Sexual Orientation and Suicide Attempt Disparities Among US Adolescents: 2009–2017," 145 PEDIATRICS 3 (March 1, 2020), https://pediatrics.aappublications.org/content/145/3/e20191658..............................7

Brandon Andrew Robinson, *Child Welfare Systems and LGBTQ Youth Homelessness: Gender Segregation, Instability, and Intersectionality*, 96 CHILD WELFARE 2 (2018)...........................................................................................6

David M. Rubin, *et al.*, *The Impact of Placement Stability on Behavioral Well-Being for Children in Foster Care*, 119 PEDIATRICS 336 (Feb. 2007) ................................7

Jordan E. Rullo, *et al., Patient acceptance of sexual orientation and gender identity questions on intake forms in outpatient clinics: a pragmatic randomized multisite trial*, 53 HEALTH SERVICES RESEARCH at 3792 (Oct. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6153164/...................................16

Tonia Scott, *Placement Instability and Risky Behaviors of Youth Aging Out of Foster Care*, 29 CHILD ADOLESC. SOC. WORK J. 61 (2012)............................................7

Julie Seibert, *et al.*, *Patterns of Treatment/Therapeutic Foster Care and Congregate Care Placements in Three States*, Office of Assistant Secretary for Planning and Evaluation, Off. of Hum. Serv. Policy - U.S. Dep't of Health and Hum. Serv. (Aug. 2019), https://aspe.hhs.gov/system/files/pdf/262086/TreatmentFosterCareReport.pdf ...................13

Shannan Wilber, *et al.*, *CWLA Best Practice Guidelines: Serving LGBT Youth in Out-of-Home Care*, Child Welfare League of America (2006), https://www.nclrights.org/wp-content/uploads/2013/07/bestpracticeslgbtyouth.pdf ...............................................7

Shannan Wilber, *Guidelines for Managing Information Related to the Sexual Orientation and Gender Identity and Expression of Children in Child Welfare Systems*, Putting Pride Into Practice Project, Family Builders By Adoption (Jan. 2013), http://cssr.berkeley.edu/cwscmsreports/documents/Information%20Guidelines%20P4.pdf .....................................................................................................3

Bianca D.M. Wilson, *et al.*, *Sexual and Gender Minority Youth in Foster Care*, Williams Institute (Aug. 2014), https://www.acf.hhs.gov/sites/default/files/documents/cb/pii_rise_lafys_report.pdf.........................................................................................................................6

Svetlana Yampolskaya, *et al.*, *High cost child welfare cases: Child characteristics and child welfare services*, CHILDREN AND YOUTH SERVICES REVIEW 111 (April 2020*), https://www.sciencedirect.com/science/article/pii/S0190740919312423 .................12

N. Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption*, ADOPTION ADVOCATE (35) (May 2011). ............................................................. 13

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

BRIEF OF AMICI CURIAE FAMILY EQUALITY AND NCLR                    CASE NO. 3:20-CV-6018-MMC

**INTRODUCTION**

Family Equality and the National Center for Lesbian Rights ("NCLR") (collectively, "Amici") submit this brief as amici curiae in support of the motion for summary judgment of plaintiffs California Tribal Families Coalition, Yurok Tribe, Cherokee Nation, Facing Foster Care in Alaska, Ark of Freedom Alliance, Ruth Ellis Center, and True Colors, Inc. (collectively, "Plaintiffs").[1]  Amici offer this brief to assist the Court in understanding the importance of the sexual orientation data lost to policymakers, advocates, and child welfare agencies under the 2020 Final Rule.  Voluntarily reported information about the sexual orientation of LGBTQ+ foster youth, as well as foster and adoptive parents, is critical to promoting the safety, permanency, and well-being of LGBTQ+ youth, and the proffered justifications for eliminating this information from AFCARS reporting – especially the suggestion that LGBTQ+ youth and families are better off invisible – are fundamentally flawed.[2]

LGBTQ+ youth are among the most marginalized and vulnerable in the country.  They are more likely to enter foster care than their non-LGBTQ+ counterparts and, once in the system, experience worse outcomes.  Yet basic information critical to formulating policies and practices to promote their welfare is often missing, as agencies are not required to collect information necessary to understand how many LGBTQ+ youth are in foster care, their demographics and status, and their experiences in care.

After a painstaking effort that took 13 years and involved more than 200 comments from states, tribes, public interest groups, universities, and private citizens, 81 Fed. Reg. at 90,525-26, the Administration for Children and Families ("ACF") issued a Final Rule in 2016 requiring title

---

[1] No party's counsel authored this brief, in whole or in part, and no person – other than the amici curiae, their members, or their counsel – contributed money intended to fund the preparation or submission of this brief.

[2] As used in this brief, "LGBTQ+" includes lesbian, bisexual, transgender, queer, questioning, and two-spirit youth, as well as other terms youth may use to describe their sexual orientation, gender identity, and gender expression.  Some of the studies cited in this brief address gender identity as well as sexual orientation, as reflected in the terms "SOGI" (sexual orientation/gender identity) or "SOGIE" (sexual orientation/gender identity or expression).  As the 2016 Final Rule added sexual orientation but not gender identity questions to the AFCARS data set, this brief focuses on the former.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

IV-E agencies to report (1) the voluntarily self-reported sexual orientation of youth aged 14 and older; and (2) the voluntarily self-reported sexual orientation of foster parents, adoptive parents, and legal guardians for inclusion in the Adoption and Foster Care Analysis and Reporting System ("AFCARS").  81 Fed. Reg. at 90,526, 90,534, 90,554, 90,558-9.

This information is vital for informing policy and directing resources at both the federal and state level and would allow the agencies collecting the data to create effective, individualized case plans and offer targeted services to improve the experiences of LGBTQ+ youth and families. The elimination of sexual orientation information from AFCARS data collection through the 2020 Final Rule, *see* Compl. (ECF 1), ¶¶ 152, 178, senselessly deprives policymakers, advocates, and child welfare workers of data critical to understanding and addressing the needs of LGBTQ+ youth and families in foster care.

## INTERESTS OF AMICI

Amici curiae are not-for-profit organizations that work to promote the best interests of youth in the child welfare system by promoting affirming policies and practices and equal access to foster and adoption services for our country's diverse families, in particular those comprised of LGBTQ+ parents.  The collection of sexual orientation information from foster youth, foster and adoptive parents, and guardians is critical to help identify the number and experiences of LGBTQ+ youth in foster care, trends in types of placements, rate of disruptions, and the number of foster placements within LGBTQ+-parented families.  This data will inform federal law, policy, and funding determinations.  Eliminating this national dataset will undermine the ability to track demographic trends and identify gaps in services, will place LGBTQ+ youth, foster and adoptive parents, and guardians at continued risk of mistreatment and discrimination, and will result in additional costs to state and tribal child welfare agencies.

**Family Equality** (formerly Family Equality Council) is a national organization that connects, supports, and represents LGBTQ+ parents and their children.  The organization is committed to changing attitudes and policies to ensure that all families are respected, loved, and celebrated.  For over 40 years, Family Equality has been a community of parents, children, grandparents, and grandchildren, reaching across the country and raising voices toward fairness

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

1  for all families.  Family Equality spearheads the Every Child Deserves a Family Campaign, a

2  national effort to end anti-LGBTQ+ discrimination in the child welfare system and promote the

3  best interests of all children in the foster care and adoption system by increasing their access to

4  loving and stable temporary and permanent homes.  Family Equality also supports LGBTQ+

5  youth seeking family formation, including foster youth.  Family Equality submits this brief on

6  behalf of all of the LGBTQ+ former foster youth, parents, and same-sex couples with whom it has

7  worked.

8  **National Center for Lesbian Rights** ("**NCLR**") is a non-profit, public interest law firm

9  that litigates precedent-setting cases at the trial and appellate court levels, advocates for equitable

10  public policies affecting the LGBTQ+ community, provides free legal assistance to LGBTQ+

11  people and their legal advocates, and conducts community education on LGBTQ+ issues.  NCLR

12  has been advancing the civil and human rights of LGBTQ+ people and their families across the

13  United States since it was founded in 1977.  NCLR's Youth Project, established in 1993, engages

14  in litigation, public policy advocacy, and system reform efforts to promote the health and well-

15  being of LGBTQ+ youth in their families, schools, and public systems of care.  For decades,

16  NCLR has collaborated with public child welfare agencies and contract providers across the

17  country to develop best practices, nondiscrimination policies, and procedures to appropriately

18  serve and support LGBTQ+ children.  That work has included training and technical assistance

19  regarding collection of sexual orientation- and gender identity-related demographic information,

20  including NCLR's 2013 publication "Guidelines for Managing Information Related to the Sexual

21  Orientation & Gender Identity and Expression of Children in Child Welfare Systems."[3]

22

23

24

25

26  ---

[3] Shannan Wilber, *Guidelines for Managing Information Related to the Sexual Orientation and Gender Identity and Expression of Children in Child Welfare Systems*, Putting Pride Into Practice Project, Family Builders By Adoption (Jan. 2013), *available at* http://cssr.berkeley.edu/cwscmsreports/documents/Information%20Guidelines%20P4.pdf.

3

# I.

## THE SEXUAL ORIENTATION INFORMATION ELIMINATED BY THE 2020 FINAL RULE IS CRITICAL TO UNDERSTANDING AND IMPROVING THE WELFARE OF LGBTQ+ YOUTH IN FOSTER CARE.

Data collection is among the most prosaic and least exciting topics in child welfare. It is nevertheless critically important to the well-being of the children and youth entrusted to the care of state and tribal agencies. The available data show that LGBTQ+ youth enter the foster care system in disproportionately high numbers and fare worse than their non-LGBTQ+ counterparts, at great personal cost to the youth and at great financial cost to child welfare systems. We need additional data to better understand and improve the welfare of LGBTQ+ youth.

Understanding the contours and dimensions of the challenges faced by the uniquely vulnerable population of LGBTQ+ youth in care is the first step in effectively addressing their needs. Put simply, it is exceedingly difficult to solve problems we can't quantify. Not only is consistent collection of aggregated sexual orientation information necessary to inform policy and direct resources at the federal and state level, but the local child welfare agencies who collect the data can use it to develop more effective individualized case plans to improve outcomes for individual youth in care.

### A. Meaningful Improvement in the Child Welfare System Requires Consistent and Reliable Information About the Population of Children in Care, Their Needs, and Their Experiences.

As a starting principle, data about children served by the child welfare system is necessary to effectively care for them. This is why AFCARS was created in the first place. As reflected in AFCARS' implementing regulations, the system was created to provide "data and information upon which to propose, develop, change and implement policy," with applications for budgeting, trend analysis, short- and long-term planning, technical-assistance targeting, grant-making, and evaluation of policy changes and legislative proposals. 58 Fed. Reg. 67,912. AFCARS data is meant to "enable policymakers to assess the reasons why children are in foster care and develop remedies to prevent it." *Id.* Information is collected to provide "a better understanding of the foster care program" and to enable "suggestions and proposals for change to improve the child welfare system." *Id.*

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

The importance of such data is borne out in practice.  A 2019 study asked federal, state, and local government officials and non-profit service providers in the child welfare field to reflect on the evidence they had used in making their most important decisions, as well as evidence that would have been useful but was unavailable.[4]  First and foremost was "data from agency operations, typically in order to better understand the characteristics of the population being served and the results of their encounters with the system or organization," including "national trend data … about changes … in the size and composition of the foster care population."[5]  Similarly, the Child Welfare League of America's "National Blueprint for Excellence in Child Welfare" identifies "data collection … focused on measuring outcomes and achieving success" as a guiding principle for quality improvement.[6]

Child welfare professionals agree that the first step in effectively serving a population in the child welfare system is collecting the information necessary to understand that population and its needs.  Yet basic information about LGBTQ+ foster youth – a population long recognized as being over-represented in the foster care system – is missing and, under the 2020 Final Rule, will continue to be unavailable to policymakers, advocates, and child welfare agencies.

**B.     LGBTQ+ Youth Are Disproportionately Represented in Foster Care and Experience Worse Conditions and Outcomes Within the System.**

The disproportionate representation of LGBTQ+ youth in the foster care system and the worse outcomes they experience relative to their peers underscore the need for this data.  ACF has acknowledged that LGBTQ+ youth "are often overrepresented in the population of youth served by the child welfare system and in the population of youth living on the streets."[7]  A 2013 study of

---

[4] Steven D. Cohen, *The Evidence Decision-Makers Want* at 4, Center for the Study of Social Policy (December 2019), *available at* https://cssp.org/resource/evidence-decisionmakers-report/.

[5] *Id*. at 5.

[6] Child Welfare League of America, *National Blueprint for Excellence in Child Welfare* (2013), *available at* https://www.cwla.org/our-work/cwla-standards-of-excellence/national-blueprint-for-excellence-in-child-welfare/.

[7] Administration for Children and Families, *ACYF-CB-IM-11-03, Lesbian, Gay, Bisexual, Transgender and Questioning Youth in Foster Care* at 1-2 (April 6, 2011), *available at* https://www.acf.hhs.gov/sites/default/files/documents/cb/im1103.pdf.

Bryan Cave Leighton Paisner LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070

Los Angeles County's foster care system (the "L.A. Study") found that nearly 20% of youth identified as LGBTQ+, nearly twice the percentage of LGBTQ+ youth in the general population.[8] Other studies have estimated even higher numbers.[9]  Data is needed to understand the reasons for this over-representation of LGBTQ+ youth in the foster care system, including whether – as a study of youth in the juvenile justice system found – LGBTQ+ youth are removed from their home to protect them from abuse at a higher percentage than their non-LGBTQ+ counterparts.[10]

Once they have entered the foster care system, LGBTQ+ youth experience mistreatment at higher rates than their non-LGBTQ+ counterparts.  Over twice as many LGBTQ+ youth reported being treated poorly by the foster care system, as compared to non-LGBTQ+ youth.[11] LGBTQ+ youth reported being segregated, stigmatized, isolated, and institutionalized based on their gender expression and sexuality.[12]  LGBTQ+ youth also report being separated from other youth "for their own protection" or to prevent them from "preying on" other youth, blamed for the

---

[8]  Bianca D.M. Wilson, *et al.*, *Sexual and Gender Minority Youth in Foster Care*, Williams Institute (Aug. 2014), *available at* https://www.acf.hhs.gov/sites/default/files/documents/cb/pii_rise_lafys_report.pdf.

[9] *E.g.*, Center for the Study of Social Policies, *Out of the Shadows: Supporting LGBTQ Youth in Child Welfare through Cross-System Collaboration* (2016), *available at* https://cssp.org/resource/out-of-the-shadows/ (reporting estimate of 22.8% of youth in out-of-home care identifying as LGBQ, compared to 7 to 11% in general population); Jessica N. Fish, Laura Baams, *et al.*, *Are Sexual Minority Youth Overrepresented in Foster Care, Child Welfare, and Out-of-Home Placement? Findings from Nationally Representative Data*, CHILD ABUSE & NEGLECT (March 2019), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7306404/ (LGB youth "nearly 2.5 times as likely as heterosexual youth to experience foster care placement").

[10] *See, e.g.*, Angela Irvine, *"We've Had Three of Them": Addressing the Invisibility of Lesbian, Gay, Bisexual and Gender Non-Conforming Youths in the Juvenile Justice System* at 691-92, 19 COLUM. J. OF GENDER & L. 675 (2012).

[11] Wilson, *et al.*, *supra*, n.8, at 35.

[12] Brandon Andrew Robinson, *Child Welfare Systems and LGBTQ Youth Homelessness: Gender Segregation, Instability, and Intersectionality*, 96 CHILD WELFARE 2, at 34 (2018).

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

harassment and abuse they receive from other youth, or disciplined for age-appropriate conduct that would not be punished if it were between youth of different sexes.[13]

LGBTQ+ youth also suffer from worse health outcomes, including disproportionately high levels of suicidal ideation and attempts.[14]  The L.A. Study found that 13.47% of LGBTQ+ youth in foster care had been hospitalized for emotional reasons, as compared to 4.25% of non-LGBTQ+ youth.  A recent report by the Trevor Project showed that LGBTQ foster youth were three times as likely as to have attempted suicide in the past year than LGBTQ youth who were not in foster care.[15]  LGBTQ+ youth are also more likely to experience multiple placements, with resulting negative impacts, including mental health and safety,[16] educational instability,[17] and homelessness.[18]  Indeed, LGBTQ+ youth in the foster care system experience homelessness at a

[13] Shannan Wilber, *et al.*, *CWLA Best Practice Guidelines: Serving LGBT Youth in Out-of-Home Care*, Child Welfare League of America (2006), 6-8, *available at* https://www.nclrights.org/wp-content/uploads/2013/07/bestpracticeslgbtyouth.pdf.

[14] Julia Raifman, *et al.*, "Sexual Orientation and Suicide Attempt Disparities Among US Adolescents: 2009–2017," 145 PEDIATRICS 3,  (March 1, 2020), *available at* https://pediatrics.aappublications.org/content/145/3/e20191658 (adolescents identifying as sexual minorities more than three times as likely to attempt suicide relative to heterosexual counterparts).

[15] The Trevor Project, "The Trevor Project Research Brief: LGBTQ Youth with a History of Foster Care." (May 2021) *available at* https://www.thetrevorproject.org/wp-content/uploads/2021/05/LGBTQ-Youth-with-a-History-of-Foster-Care_-May-2021.pdf.

[16] David M. Rubin, *et al.*, *The Impact of Placement Stability on Behavioral Well-Being for Children in Foster Care*, 119 PEDIATRICS 336 (Feb. 2007) (youth who experience placement instability are at a 36% to 63% higher risk of behavioral problems); Donna F. Ossorio, Jackson de Carvalho, *Foster Care Placement and the Impact of Placement Instability*, INTERNATIONAL JOURNAL OF HUMANITIES AND SOCIAL SCIENCE REVIEW Vol. 5(4) (December 2019), *available at* http://www.ijhssrnet.com/uploades/volumes/1577287331.pdf (placement instability as "a devastating experience"; "higher levels of placement stability have been linked with less positive mental health outcomes and increased rates of emergency room admissions").

[17] *The Importance of School Stability for Youth in Foster Care*, Advocates for Children of New York (Sept. 2009), *available at* https://www.advocatesforchildren.org/sites/default/files/library/school_stability_youth_fostercare.pdf?pt=1 (LGBTQ youth more likely to experience multiple placements, often requiring them to switch schools; school mobility associated with significantly lower tests scores and higher frequency of repeating grades).

[18] Amy Dworsky *et al.*, *Homelessness During the Transition From Foster Care to Adulthood*, 103 AM. J. OF PUB. HEALTH 318, 320 (2013); Tonia Scott, *Placement Instability and Risky Behaviors of Youth Aging Out of Foster Care*, 29 CHILD ADOLESC. SOC. WORK. J. 61 (2012) (placement

7

1  higher rate than their non-LGBTQ+ counterparts.[19]  And more homeless youth with a foster care

2  history identify as LGBTQ+ than homeless youth who have not been in the system,[20] primarily

3  due to lack of acceptance and safety in foster care placements.[21]  LGBTQ+ youth of color stay

4  longer in foster care and are at a higher risk of discrimination and violence than other groups of

5  youth.[22]

6       Given the overwhelming consensus that LGBTQ+ youth need to be better served by the

7  child welfare system and the fact that information about a population is necessary to effectively

8  serve it, the 2020 Final Rule's elimination of voluntarily collected information about the sexual

9  orientation of foster youth is inexplicable.

10 **C.    Better Information About LGBTQ+ Foster Care Populations Means Better-Informed
       State and Federal Policy.**

11      Although child welfare professionals, *see, e.g.*, Declaration of Gerald W. Peterson

12 ("Peterson Decl.") (ECF 66-5), ¶¶ 14, 17, and independently conducted studies confirm that

13 LGBTQ+ foster youth need better support, the data necessary to tailor effective solutions and

14 achieve meaningful improvement is missing.

15      The sexual orientation data element removed by the 2020 Final Rule would help to identify

16 and address problems faced by LGBTQ+ foster youth.  It would enable policymakers, advocates,

17 and child welfare agencies to identify trends in the numbers and types of placements, and rates of

18

19

20 instability associated with increased rates of substance use, risky sexual practices, and unplanned
   pregnancies, and experiences of intimate partner violence).

21

[19] Wilson, *et al.*, *supra*, n.8, at 7, 38.

22
[20] Amy Dworsky, *et al.*, *Missed Opportunities: Pathways from Foster Care to Youth
23 Homelessness in America*, Chapin Hall at the University of Chicago (July 2019), *available at*
   https://www.chapinhall.org/wp-content/uploads/Chapin-Hall_VoYC_Child-Welfare-Brief_2019-
24 FINAL.pdf.

25 [21] Wilson, *et al.*, *supra*, n.8, at 12 (citing Randi Feinstein, *et al.*, *Justice For All? A Report On
   Lesbian, Gay, Bi Sexual And Transgendered Youth In The New York Juvenile Justice System*,
26 Urban Justice Center (2001), *available at* https://files.eric.ed.gov/fulltext/ED471676.pdf).

27 [22] Kerith J. Conron, *et al.*, *A Research Agenda to Reduce System Involvement and Promote
   Positive Outcomes with LGBTQ Youth of Color Impacted by the Child Welfare and Juvenile
28 Justice Systems*, The Williams Institute (2019).

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

1   disruption, as well as health, education, and other disparities among LGBTQ+ foster youth.[23]

2   Informed by that data, policymakers, advocates, and child welfare agencies could develop policies,

3   programs, and practices to address specific problems.  For example, access to basic information

4   about numbers and circumstances of youth of color and LGBTQ youth is the first step in

5   identifying "the factors that drive [them] to run away from foster care at disproportionate rates."

6   With this information, "data-driven interventions" can be developed and tested, enabling child

7   welfare systems and practitioners to "be better prepared to prevent this from occurring."[24]

8         Data about the experiences and outcomes of LGBTQ+ youth in foster care also helps

9   advocates and agencies articulate the need for policies aimed at avoiding or mitigating particular

10   harms.  When advocates and agencies propose policies, practices, or legislation aimed at reducing

11   the entry of LGBTQ+ youth into the foster care system or improving outcomes of those already in

12   care, they invariably face questions that are difficult or impossible to answer without the data

13   eliminated under the 2020 Final Rule: "How big is the problem and how do you know?"  *See, e.g.*,

14   Peterson Decl., ¶ 20; Declaration of Amanda Metivier (ECF 66-4), ¶¶ 28-29.

15         In addition to helping develop new policies and practices aimed at correcting problems and

16   issues, sexual orientation data collection would also enable policymakers, advocates, and child

17   welfare agencies to identify and replicate best practices.  For example, better information would

18   assist "in an assessment of what is happening in different jurisdictions and whether efforts to

19   mitigate running away from foster care— especially among youth of color and LGBTQ youth—

20   have any impact."[25]  When quantitative data reveals disparities among subpopulations served in

21   ─────────────────────────

22   [23] *See* Andrew D. Pinto, *et al.*, *Routine collection of sexual orientation and gender identity data: a
     mixed-methods study*, 191 CANADIAN MED. ASS'N J. at E63 (Jan. 21, 2019), *available at*

23   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6336479 ("[D]ata [about patients' sexual
     orientation] can help organizations identify health inequities related to sexual orientation and

24   gender identity.").

25   [24] M.H. Morton, B. Horwitz, *Federal Actions to Prevent & End Youth Homelessness:
     Recommendations Based on Research and a National Convening of Experts and Stakeholders* at

26   19, Chapin Hall at the University of Chicago (Oct. 2019), *available at*
     https://www.chapinhall.org/wp-content/uploads/Federal-actions-to-prevent-and-end-youth-

27   homelessness-final.pdf.

28   [25] *Id*. at 19.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

1   child welfare, it also clarifies the need to develop and evaluate innovative approaches to

2   improving outcomes.

3       The need for data to identify, quantify, and address the challenges facing LGBTQ+ foster

4   youth is the reason the 2016 Final Rule included sexual orientation information in AFCARS

5   reporting: "By requiring this information to be reported, we hope to move closer toward our goal

6   to better support children and youth in foster care who identify as LGBTQ and ensure that foster

7   care placement resources and services are designed appropriately to meet their needs."  81 Fed.

8   Reg. 90,534.  The 2020 Final Rule does not explain how this goal can be achieved without the

9   sexual orientation data it eliminated.  Simply put, it cannot.

10  **D.     Information About the Sexual Orientation of Individual Foster Youth, Foster and
        Adoptive Parents, and Guardians Enables Better Outcomes for Individual Youth.**

11      Collection of sexual orientation data will also help child welfare agencies effectively

12  support individual LGBTQ+ youth.  Information reported for AFCARS is de-identified, aggregate

13  data reported by each state.  But the data is collected by those who work directly with individual

14  youth and foster or adoptive parents.  When youth choose to disclose sexual orientation to

15  caseworkers, that information not only contributes to an overall understanding of the numbers and

16  experiences of LGBTQ+ foster youth as a distinct population but also allows caseworkers to factor

17  sexual orientation into individualized case plans.  For example, the youth's sexual orientation may

18  be relevant to the abuse or neglect that led to child welfare intervention.  As such, it is critical

19  information for the agency's approach to reunification services, placement, and permanency

20  planning.  Effective case planning on the individual level can also help prevent the negative

21  outcomes that LGBTQ+ foster youth experience more often than their non-LGBTQ+ peers.[26]

22      For some youth, sexual orientation information might already have been included in a case

23  file.  For example, a youth might have informed a caseworker that family conflict over sexual

24  orientation is the reason the youth cannot live at home.  For others, sexual orientation might never

25

26  _____

    [26] *See* Annie E. Casey Foundation, *Putting Family First: Developing an Evidence-Based Child*
27  *Welfare Preventive Practice Model* (March 20, 2020), *available at*
    https://www.aecf.org/resources/putting-family-first/ (discussing value of targeted "services and
28  support for families that address their unique needs and meet the specific goals of their case").

BRIEF OF AMICI CURIAE FAMILY EQUALITY AND NCLR                CASE NO. 3:20-CV-6018-MMC

1   have come up in interactions with caseworkers.  Contrary to the supposition expressed in the 2019

2   Notice of Proposed Rulemaking, however, this does not mean that sexual orientation "is not

3   relevant to the child's needs." 84 Fed. Reg. 16,576.  Invisibility of sexual orientation to

4   caseworkers does not make LGBTQ+ youth any less vulnerable to negative outcomes; it only

5   makes it less likely that child welfare professionals will implement measures and direct resources

6   tailored to the unique needs of each youth.

7        As noted above, some of the negative outcomes LGBTQ+ youth experience are directly

8   related to poor fit with or lack of cultural competence of foster caregivers.  A better understanding

9   of the numbers of LGBTQ+ youth served by the agency can lead to more effective LGBTQ+-

10  specific training and support for foster parents and caregivers.  Knowledge of an individual

11  youth's sexual orientation also increases the likelihood of placement in an LGBTQ+-supportive

12  environment.  Similarly, collecting information about the sexual orientation of current and

13  prospective foster and adoptive parents helps agencies identify affirming families.  Without any

14  mechanism for collecting and tracking this information, agencies and caseworkers must rely on ad

15  hoc, informal networks to identify parents best situated to care for LGBTQ+ youth.

16       Collecting information about the sexual orientation of foster and adoptive parents can also

17  highlight the need for agencies to recruit and support LGBTQ+ adults to serve in that role.

18  Existing data show that LGBTQ+ adults tend to be more willing than non-LGBTQ+ adults to

19  foster and adopt children.[27]  These data are critical for child welfare agencies facing chronic

20  shortages of family-based placement resources.  The data is also important to understanding the

21  harmful impact of policies that exclude or disqualify LGBTQ+ families.[28]  Agencies that identify

22

23  [27] Gary Gates, *LGBT Parenting in the United States*, The Williams Institute, UCLA School of
    Law (Feb. 2013), *available at* http://williamsinstitute.law.ucla.edu/research/census-lgbt-

24  demographics-studies/lgbt-parenting-in-the-united-states/; Shoshana K. Goldberg & Kerith J.
    Conron, *How Many Same-Sex couples are Raising Children?*, Williams Institute (July 2018),

25  *available at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/Parenting-Among-Same-
    Sex-Couples.pdf.

26
    [28] *See, e.g.*, H.M. Levitt, *et al.*, *How discrimination in adoptive, foster, and medical systems harms

27  LGBTQ+ families: Research on the experiences of prospective parents*, JOURNAL OF GAY &
    LESBIAN SOCIAL SERVICES, 1-22 (2020), *available at*

28  https://www.tandfonline.com/doi/abs/10.1080/10538720.2020.1728461; David M. Brodzinsky,

11

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

1   the need for more LGBTQ+ foster parents can engage in outreach to assure potential parents that

2   they are not only welcome but vital to achieving the goal of increasing the number of qualified

3   families serving children in care.

4       Creating the infrastructure and policy to support the collection and analysis of both child-

5   and family-specific sexual orientation information is thus critical to the ability of the child welfare

6   profession to fulfill its obligation to protect the safety, permanency, and well-being of all children

7   in care.

8   **E.   By Reducing Negative Outcomes for LGBTQ+ Foster Youth, Better Information Reduces Systemic Costs.**

9       The poor outcomes documented for LGBTQ+ foster youth, including a greater number of

10  foster care placements, overrepresentation in congregate care, longer stays in foster care, lack of a

11  permanent family, and psychiatric hospitalizations, carry substantial costs to child welfare

12  systems, which the collection of sexual orientation data would help reduce.  Identifying LGBTQ+

13  foster youth through the voluntary sexual orientation question and implementing effective

14  interventions to reduce instability, minimize costly stays in group homes, hospitals, and juvenile

15  justice facilities, and improve permanency in family home settings would provide substantial cost

16  savings.

17      For example, congregate care (in which LGBTQ+ foster youth are overrepresented),

18  including group homes, residential treatment facilities, psychiatric institutions, and emergency

19  shelters, costs state governments three to five times more than family foster care.[29]  Based on

20  _____

21  Evan B. Donaldson, *Expanding Resources for Children III: Research-Based Best Practice in
Adoption by Gays and Lesbians*, Evan B. Donaldson Adoption Institute (2011), *available at*

22  https://www.adoptioninstitute.org/wp-

23  content/uploads/2013/12/2011_10_Expanding_Resources_BestPractices.pdf (nearly half of
respondents reported experiencing bias or discrimination from a child welfare worker or birth

24  family member during the adoption process).

25  [29] *Congregate Care, Residential Treatment and Group Home State Legislative Enactments 2014-
2019,* (Oct. 30, 2020), National Conference of State Legislatures, *available at*

26  http://www.ncsl.org/research/human-services/congregate-care-and-group-home-state-legislative-
enactments.aspx; *see also* Svetlana Yampolskaya, *et al.*, *High cost child welfare cases: Child*

27  *characteristics and child welfare services*, CHILDREN AND YOUTH SERVICES REVIEW 111 (April
2020), *available at* https://www.sciencedirect.com/science/article/pii/S0190740919312423

28  ("residential treatment and group home placements and services were also associated with having

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

average annual foster care maintenance payments per child of $19,107 in FY2010,[30] placing an LGBTQ+ youth with an affirming, supportive foster family rather than having her remain in congregate care would save a minimum of $38,214 per child per year.  Similarly, a child adopted from foster care costs a state 75% less per year than a child who remains in foster care.  Thus, finding an affirming, supportive family for an LGBTQ+ youth leading to adoption would result in a savings of at least $29,000 per youth.[31]

Other financial costs are more difficult to quantify, including costs associated with LGBTQ+ youth who exit foster care to homelessness and are commercially sexually exploited and victimized at higher rates than their non-LGBTQ+ peers.  Reducing the severity of family rejection based on sexual orientation results in a reduction in suicidal ideation and self-harm, depression, substance abuse, and sexually transmitted infections, all of which are costly not only to youth personally, but to the child welfare system and communities as a whole.

## II.
## NEITHER CONCERNS ABOUT THE SENSITIVITY OF SEXUAL ORIENTATION DATA NOR THE COST OF COLLECTING IT JUSTIFY ITS ELIMINATION

The 2016 Final Rule adding sexual orientation information to AFCARS reflected ACF's determination that voluntarily reported information about the sexual orientation of foster youth, foster and adoptive parents, and guardians "will assist title IV-E agencies to help meet the needs of LGBTQ youth in foster care."  81 Fed. Reg. 90,526.  Plaintiffs have demonstrated that the 2020 Final Rule's justifications for reversing course and eliminating the sexual orientation questions were, among other things, contrary to the evidence.  Plaintiffs' Mot. for S.J. (ECF 66) at 24-27.

high costs"); Julie Seibert, *et al.*, *Patterns of Treatment/Therapeutic Foster Care and Congregate Care Placements in Three States*, Office of Assistant Secretary for Planning and Evaluation, Off. of Hum. Serv. Policy - U.S. Dep't of Health and Hum. Serv. (Aug. 2019), *available at* https://aspe.hhs.gov/system/files/pdf/262086/TreatmentFosterCareReport.pdf ("[Therapeutic foster care] has been proven to be more cost-effective than congregate care.").

[30] N. Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption*, ADOPTION ADVOCATE (35) (May 2011).

[31] Frank J. Bewkes, *et al.*, *Welcoming All Families: Discrimination Against LGBTQ Foster and Adoptive Parents Hurts Children*, Center For American Progress (Nov. 20, 2018), *available at* https://www.americanprogress.org/issues/lgbt/reports/2018/11/20/461199/welcoming-all-families/.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

1   Here, Amici offer further insight into the purported concerns about the intrusiveness and

2   sensitivity of sexual orientation information and the extent to which the 2020 Final Rule's analysis

3   failed to account for the cost of ***not*** having information about the sexual orientation of foster youth

4   and foster and adoptive parents.

5   **A.      Child Welfare Personnel Can and Should Collect Sexual Orientation Data in the**
         **Same Manner That They Collect Other Sensitive Information.**

6
        The proposition that "asking for sexual orientation may be perceived as intrusive," 84 Fed.

7   Reg. 16,576 (2020 Final Rule), ignores both that caseworkers must routinely ask foster youth and

8   parents highly personal questions – including questions related to sex – and that anyone

9   uncomfortable with disclosing sexual orientation information can simply decline to answer.[32]  It

10  also ignores the affirming value that asking about sexual orientation can have for LGBTQ+ foster

11  youth, foster and adoptive parents, and guardians and the extent to which training and support for

12  child welfare personnel can increase the cultural competency of those who might be

13  uncomfortable talking about sexual orientation.

14  **1.      Child Welfare Workers Routinely Ask Sensitive Questions of Foster Children,**
            **Foster and Adoptive Parents, and Guardians.**
15
        As part of their charge to protect those in their care, child welfare agencies routinely

16  collect, record, and manage sensitive information from foster children, foster and adoptive adults,

17  and guardians.  The nature of child welfare practice requires workers to establish the necessary

18  rapport and trust to talk with children and families about a range of sensitive, private matters.

19  AFCARS already requires case workers to collect personal, private, and confidential data,

20  including information about sexual exploitation, mental health diagnoses, and physical and sexual

21  abuse.[33]  As recognized in the 2016 Final Rule, confidentiality protections for information in child

22  welfare case files are already in place.  81 Fed. Reg. 90,535.  The 2020 Final Rule offers no reason

23

24

25  ─────────────────────

26  [32] As a practical matter, taking pressure off any youth or parent ill-at-ease with a question about
    sexual orientation is as simple as prefacing it with, "if you want to answer …."

27  [33] *See AFCARS Technical Bulletin #1: Data Elements* (rev'd Feb. 2012), *available at*
    https://www.acf.hhs.gov/sites/default/files/documents/cb/afcars_tb1.pdf.

28

why voluntarily disclosed sexual orientation information should be handled differently than other categories of sensitive data.

### 2. Questions About Sexual Orientation Can Be Administered Appropriately to Youth.

Agencies that collect sexual orientation information from youth have demonstrated that they can do so safely and effectively. *See, e.g.*, Peterson Decl., ¶ 10. Sexual orientation questions have been included in the Center for Disease Control and Prevention's Youth Risk Behavior Surveillance System surveys in some state and large urban school districts since 1995 and have been included at a national level since 2015.[34] Regulations promulgated under the Prison Rape Elimination Act require youth and adult correctional officers to collect sexual orientation information as part of the initial screening process to identify residents and inmates who might be vulnerable to sexual assault while incarcerated. 28 CFR § 115.41(d)(7). Indeed, some state and county child welfare agencies have already begun collecting sexual orientation information in recognition of the value of doing so and in anticipation of an AFCARS reporting requirement,[35] without any indication of adverse consequences.

The notion that it is overly intrusive to provide a mechanism for a 14- to 17-year old to voluntarily disclose sexual orientation information to a caseworker speaks more to the discomfort of adults than the sensitivity of youths. Service providers often overestimate the extent to which individuals will be uncomfortable responding to sexual orientation questions. A survey in the

---

[34] *How to Analyze YRBS Sexual Minority Data* at 1, Centers for Disease Control and Prevention (June 2018), *available at* https://www.cdc.gov/healthyyouth/data/yrbs/pdf/2017/2017_analyze_sexual_minority_data.pdf.

[35] *See, e.g.*, California Dep't of Social Serv., "All-County Letter 10-20: Documentation of Sexual Orientation and Gender Identity in the Child Welfare Services Case Management System" (March 13, 2019), *available at* https://www.cdss.ca.gov/Portals/9/ACL/2019/19-20.pdf?ver=2019-04-03-081756-557 ("it is imperative to child safety, permanency and well-being, for social workers and probation officers to discuss and document sensitive demographics, such as SOGIE, with their clients."); Alameda County Social Services Agency, "SOGIE and LGBTQ+ Practice and Policy in the Department of Children and Family Services," *available at* https://alamedasocialservices.org/opg/place/LGBTQdeptpolicy.cfm ("We routinely collect and analyze [SOGIE] information about the minors … in our care for the purposes of creating individualized case plans, monitoring agency trends and performance, and reporting to government agencies, among other reasons.").

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

15

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

health care context found that while about 80% of providers thought that patients would refuse to answer sexual orientation questions, only 10% of patients said they would refuse to answer.[36] Other research "found a high response rate to questions about sexual orientation and gender identity"[37]  Even as to older, non-LGBTQ+ adults (the population least likely to be comfortable with questions about sexual orientation), a study concluded that "collection of SOGI information using routine clinical intake forms is not likely to be distressing to heterosexual, cisgender, white, and older adult populations," providing "strong support for the feasibility and acceptability of the implementation of routine collection of SOGI data in outpatient clinical settings."[38]  The Census Bureau's cognitive testing of sexual orientation questions for the Department of Justice's National Crime Victim Survey to be administered to 16- and 17-year old youth found that "[t]here were no significant differences between the responses to the questions and probes given by adults and teens" and no findings that the questions were too sensitive to obtain responses.[39]

### 3.    Questions About Sexual Orientation Can Be Affirming for LGBTQ+ Foster Youth, Foster and Adoptive Parents, and Guardians.

Not only does research belie the concern that LGBTQ+ youth and parents would find questions about sexual orientation intrusive, but incorporating sexual orientation into routine interactions sends a positive and affirming message.  Avoiding the topic of sexual orientation while regularly collecting other sensitive personal information, can communicate that sexual orientation is a taboo subject too shameful or shocking for inclusion with other personal information in a youth's case record.  In the case of a prospective parent or guardian, avoiding the

---

[36] The Fenway Institute and NORC, *Helping Your Organization Collect Sexual Orientation and Gender Identity Data* at 2 (2019), *available at* https://fenwayhealth.org/wp-content/uploads/TFI-54_SOGI-Data-Collection-Series-of-3-Tip-Sheets-for-pride-month_HelpingYourOrganization.pdf.

[37] Pinto, *supra*, n.23, at E63.

[38] Jordan E. Rullo, *et al., Patient acceptance of sexual orientation and gender identity questions on intake forms in outpatient clinics: a pragmatic randomized multisite trial*, 53 HEALTH SERVICES RESEARCH at 3792, 3805 (Oct. 2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6153164/.

[39] Mandi Martinez, *et al., Cognitive Pretesting Of The National Crime Victimization Survey Supplemental Victimization Survey* at 20, U.S. Census Bureau (Feb. 23, 2017), *available at* http://www.census.gov/srd/papers/pdf/rsm2017-03.pdf.

topic could signal that LGBTQ+ adults are viewed as unsuitable candidates.  Conversely, giving young people in care the opportunity to volunteer sexual orientation information lets them know that this part of their identity need not be officially invisible, potentially building trust and giving them someone to talk to about sexual orientation issues.  Similarly, asking a prospective parent or guardian about sexual orientation along with other basic demographic information can signal that LGBTQ+ adults are welcome to serve in these roles.

Research from the health care field is instructive in this respect.  One study found that "adding inclusive SOGI data collection questions on registration forms can help LGBT patients feel more validated and affirmed."[40]  Another found that while emergency medical professionals tended to downplay the relevance of sexual orientation information to medical care, the patients themselves "feel routine SO/GI collection allows for recognition of individual identity and improved therapeutic relationships."[41]

### 4. Training and Support – Not Ignoring the Subject – Will Reduce Staff Discomfort with Collecting Sexual Orientation Information.

While some child welfare professionals might be uneasy at the prospect of asking youth or adults about sexual orientation, that does not justify abandoning the collection of this important information.  To the contrary, staff discomfort with discussing sexuality is an issue agencies must address irrespective of any AFCARS data collection mandate.  Given the disproportionate representation of LGBTQ+ youth in foster care and the unique challenges they face in the child welfare system, as well as the urgent need to recruit and support LGBTQ+ adults as foster and adoptive parents, the solution cannot be to entirely avoid the topic of sexual orientation.

As noted in the 2016 Final Rule, advocates and state and county agencies have already developed guidance and recommended practices for how to collect and handle sexual orientation

---

[40] The Fenway Institute, *supra*, n.36, at 1.

[41] Lisa M. Kodadek, *et al*., "Collecting sexual orientation and gender identity information in the emergency department: the divide between patient and provider perspectives." EMERGENCY MEDICINE JOURNAL, 36(3), at 136. (Jan. 10, 2019), *available at* https://emj.bmj.com/content/36/3/136.abstract.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4070

1   information in adoption, foster care and out-of-home placement settings.[42]  Increased competency

2   among staff in discussing sexual orientation issues will benefit LGBTQ+ youth, as well as foster

3   and adoptive parents.  As an analysis in the health care context found, "[a]dministrators have

4   noted that after implementing SOGI data collection, there was better overall cultural competency

5   among staff and fewer patient complaints."[43]

6           There is thus no basis for concluding that it is somehow in the interest of LGBTQ+ youth

7   to avoid collecting sexual orientation information.  To the contrary, requiring agencies to begin

8   giving youth and parents the opportunity to voluntarily disclose sexual orientation, with attendant

9   staff training and education, will allow child welfare professionals to make better-informed

10  decisions about individual youth while also promoting recruitment of LGBTQ+ foster and

11  adoptive parents and increased training support for non-LGBTQ+ caregivers.

**B.      The Cost of Collecting Sexual Orientation Is Far Lower Than the Cost of Not
         Collecting It.**

13          As Plaintiffs have demonstrated, the 2020 Final Rule's cost-benefit analysis completely

14  ignored not only the benefits of including sexual orientation data, but also the converse cost of *not*

15  collecting this information.  Plaintiffs' Mot. for S.J., 12-16.  Setting aside the human cost to

16  individual LGBTQ+ foster youth from the invisibility that stymies the development of more

17  effective policies, programs, and practices and prevents effective case-planning and care on an

18  individual level, the fiscal cost of the negative outcomes experienced by LGBTQ+ foster youth is

19  substantial.

---

[42] *E.g.*, Wilber, *supra*, n.3; Alameda County Social Services Agency, "SOGIE and LGBTQ+ Practice and Policy in the Department of Children and Family Services," *available at* https://alamedasocialservices.org/opg/place/LGBTQdeptpolicy.cfm ("We routinely collect and analyze [SOGIE] information about the minors … in our care for the purposes of creating individualized case plans, monitoring agency trends and performance, and reporting to government agencies, among other reasons."); Aisha Canfield & Shannan Wilber, "SOGIE Data Collection in Public Systems of Care: A Practice Guide for Santa Clara County" (July 2019), *available a*t https://www.nclrights.org/wp-content/uploads/2020/05/Final-SCC-SOGIE-Data-Collection-Practice-Guide-8.8.19.pdf.

[43] The Fenway Institute, *supra*, n.36, at 1.

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4070

18

1    As discussed in Section I.E of this brief, these include the high cost of congregate care,

2    placement instability, mental health hospitalization, and homelessness – all of which LGBTQ+

3    foster youth experience in disproportionately high numbers.  Though adding sexual orientation

4    data elements to AFCARS collection will create some administrative burden for the agencies that

5    have not yet undertaken the process, this one-time cost is far lower than the cost of continuing to

6    operate in the dark.

7                                              **CONCLUSION**

8    LGBTQ+ foster youth need help.  By eliminating the sexual orientation data element from

9    AFCARS reporting, the 2020 Final Rule instead pushes them back into the shadows.  Amici

10   Curiae Family Equality and the National Center for Lesbian Rights respectfully urge the Court to

11   grant Plaintiffs motion for summary judgment and set aside the 2020 Final Rule.

12   Dated:  June 25, 2021                         Respectfully Submitted,

13                                                   /s/ *Katherine Keating*

14                                                 Katherine Keating
                                                   BRYAN CAVE LEIGHTON PAISNER LLP
15                                                 Three Embarcadero Center, 7th Floor
                                                   San Francisco, CA  94111-4070
16                                                 Telephone: (415) 675-3400
                                                   Facsimile: (415) 675-3434
17                                                 E-Mail: katherine.keating@bclplaw.com

18

19

20

21

22

23

24

25

26

27

28

BRIEF OF AMICI CURIAE FAMILY EQUALITY AND NCLR                          CASE NO. 3:20-CV-6018-MMC