# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA TRIBAL FAMILIES COALITION, YUROK TRIBE, CHEROKEE NATION, FACING FOSTER CARE IN ALASKA, ARK OF FREEDOM ALLIANCE, RUTH ELLIS CENTER, and TRUE COLORS, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, JOOYEUN CHANG, in her official capacity as Assistant Secretary for the Administration for Children and Families, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, and ADMINISTRATION FOR CHILDREN AND FAMILIES,<br><br>    Defendants. | Case No. 3:20-cv-6018-MMC |

**DECLARATION OF JOSEPH KRACKE-BOCK, M.S.S.W., DEPUTY ASSOCIATE COMMISSIONER, CHILDREN'S BUREAU, ADMINISTRATION FOR CHILDREN AND FAMILIES, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**

I, Joseph Kracke-Bock, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that my testimony below is true and correct:

1. I am the Deputy Associate Commissioner of the Children's Bureau ("CB") within the Administration for Children and Families ("ACF"), in the United States Department of Health and Human Services ("HHS"). I have held this position since 2002. The Children's Bureau administers the federal child welfare programs authorized under titles IV-B and IV-E of the Social Security Act and the Child Abuse Prevention and Treatment Act. The agency engages in partnerships with federal, state, tribal, and local agencies to provide support and guidance for the well-being of children and families across the nation. As Deputy Associate Commissioner, I oversee the day-to-day operations of the

1

Children's Bureau, including direction over the development and interpretation of federal child welfare legislation, regulation, policy, and standards. I also have oversight of federal monitoring protocols that assess state practices against federal requirements to ensure those practices comport with Federal law, regulation and policy. My oversight includes engaging state and tribal child welfare agencies in corrective action to bring them into compliance with federal law and improving the child welfare policies and procedures of such Title-IV agencies to comport with best practices.

2. I received a Masters of Science in Social Work degree from the University of Texas at Austin in 1989.

3. In addition to my personal knowledge regarding AFCARS, this declaration is based upon other knowledge and information I obtained in the regular course of business throughout my career in child welfare, which spans more than thirty years. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above-captioned case.

4. I am submitting this declaration in order to describe the effects of a decision by this Court vacating the 2020 AFCARS rule.

5. The Adoption and Foster Care Analysis and Reporting System ("AFCARS") collects case-level information from state and tribal title IV-E agencies on all children in foster care and those who have been adopted with title IV-E agency involvement. AFCARS is a nationwide system that requires title IV-E agencies from all 50 states and numerous tribes to collect and submit data to HHS. Examples of data reported in AFCARS include demographic information on the foster child as well as the foster and adoptive parents, the number of removal episodes a child has experienced, the number of placements in the current removal episode, and the current placement setting. Title IV-E agencies are required to submit the AFCARS data twice a year based on two 6-month reporting periods. The Secretary first promulgated AFCARS regulations in 1993.

6. In 2016, HHS published a revision of the AFCARS provisions in the Federal Register, but these provisions never were implemented ("2016 Final Rule"). The 2016 Final Rule updated AFCARS to

add 153 data elements to the original 119 data elements, bringing to 272 the total number of data elements that state and tribal child welfare agencies would have been required to report to HHS. The 2016 Final Rule initially provided two fiscal years for title IV–E agencies to comply.

7. In May 2020, HHS issued a final AFCARS rule ("2020 Final Rule") that retained, revised, and omitted elements included in the 2016 AFCARS Final Rule. Some of the omitted elements related to compliance with the Indian Child Welfare Act (ICWA) and sexual orientation data of foster children and foster/adoptive parents and legal guardians. The 2020 Final Rule, however, did include the data element added by the 2016 Final Rule that asked whether conflict related to a child's sexual orientation or gender identity contributed to the child's removal from home. The 2020 Final Rule also included some data elements focused on the needs of ICWA applicable children. This information includes whether the child, child's parents, and providers are members of an Indian Tribe, name of the child's Indian Tribe, whether ICWA applies, whether the state agency made inquiries to determine if the child is an Indian child as defined in ICWA, and whether the child's Indian tribe was sent legal notice.

8. States are required to comply with the 2020 Final Rule by October 1, 2022. They currently continue to report data as required by the pre-2016 AFCARS regulations (the 1993 regulations). These regulations do not include ICWA or sexual orientation data elements.

9. Vacating the 2020 Final Rule would delay HHS from receiving updated data and comprehensive historical information on key data elements included in the 2020 Final Rule. The 2020 Final Rule substantially altered the data collection specified in the initial 1993 AFCARS rule to permit more complete reporting on all foster care entries and exits, child placements, case plans, caseworker visits, as well as reporting on prior guardianships, and whether a child has siblings also in foster care. While the 2020 final rule removed approximately one-third of the data elements from the 2016 Final Rule -- from 272 to 183, including those at issue in this litigation, the 2020 Final Rule still includes an increase of 64 data elements over the 1993 regulations.

10. If the 2020 Final Rule remains in place while the HHS considers the collection of the

ICWA and sexual orientation data elements at issue in this litigation, updated AFCARS data reporting based on the 2020 Final Rule will begin in 2023.  The ICWA elements retained in the 2020 Final Rule will be available for use in descriptive reports and analyses that will provide important information about outcomes for ICWA applicable children and youth placed in foster care.  Vacating the 2020 Final Rule would delay the ability of the agency to conduct and report such analyses and would likely affect the types of analyses that the agency could provide.

11.     HHS and Title IV-E agencies have been working on implementing the 2020 Final Rule for the last one-and-a-half years, which includes developing policies, training tools, and technology systems. HHS has procured a contract worth about $24.4 million to develop an enterprise system to receive new AFCARS data based on the 2020 final rule.  Modifications to the enterprise system to implement the ICWA and sexual orientation elements included in the 2016 Final Rule but omitted from the 2020 Final Rule would require significant analysis, additional funding, potential contract acquisition or modification and project plan or schedule changes, as well as additional meetings with various stakeholders, including states and Tribes.

12.     If this Court were to vacate the 2020 Final Rule and reinstate the 2016 ICWA and sexual orientation data elements at issue in this case, state and tribal Title IV-E agencies will likewise need to modify or develop new local policies, training guides and tools, and revise implementation plans in collaboration with impacted stakeholders.  Reinstatement of additional data elements will also affect local agencies' plans to modify existing and/or new technology systems.  These technology system changes may require new contract solicitations, amendments to existing technology contracts, and funding approvals. Changes would likely have an impact upon the other obligations title IV-E agencies must meet through regular work, such as mandated federal reporting for other title IV-B/IV-E programs.

13.     Reinstating the 2016 ICWA and sexual orientation data elements at issue in this case in AFCARS would require states to engage tribal and youth partners to ensure data are collected accurately and can be used or made available to staff and decision makers.  Title IV-E agencies would need to

ensure that they have staffing capacity in multiple areas (program, policy, technology) to support that effort. Many agencies are currently struggling to meet the 2020 AFCARS requirements and reinstating the additional 2016 data elements may derail that work, as existing new technology system projects already have contractual development and implementation schedules.

14. Finally, while there is overlap in the 2016 and 2020 AFCARS data collection, some elements carried over from 2016 to 2020 were modified and thus are different. In some cases, vacating the 2020 final rule and reinstating the ICWA and sexual orientation data elements from the 2016 Final Rule that are at issue in this litigation will result in double work for Title IV-E agencies to comply with a final AFCARS data collection. This is because system modifications that states and Tribes already made to collect 2020 Final Rule data will not always line up to collect the 2016 Final Rule data. Therefore, Title IV-E agencies would need to implement additional system modifications in order to revert even partially to the 2016 Final Rule and collect the ICWA and sexual orientation data elements removed from the 2020 Final Rule. Additionally, reverting to the 2016 Final Rule would entail HHS and Title IV-E agencies collecting the additional data elements that are not the subject of Plaintiffs' challenge.

I, Joseph Kracke-Bock, declare under penalty of perjury that the foregoing is true and correct. Executed on October 14, 2021.

_____
Joseph Kracke-Bock