STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney
MICHELLE LO (NYBN 4325163)
Chief, Civil Division
EMMET P. ONG (NYBN 4581369)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612-5217
    Telephone: (510) 637-3929
    Facsimile: (510) 637-3724
    E-mail: emmet.ong@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA TRIBAL FAMILIES COALITION *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>    Defendants. | Civil Action No. 3:20-cv-06018-MMC (LB)<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: December 3, 2021<br>Time: 9:00 a.m. |

# **TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................................1

II.  STATEMENT OF ISSUES TO BE DECIDED ................................................................2

III.  BACKGROUND ................................................................................................................3

    A.  2016 Final Rule..................................................................................................3

        1.  Sexual Orientation Elements.................................................................3

        2.  ICWA-Related Elements .......................................................................4

    B.  2018 Advance Notice of Proposed Rulemaking .................................................5

    C.  2019 Notice of Proposed Rulemaking ...............................................................6

        1.  Sexual Orientation Elements.................................................................6

        2.  ICWA-Related Elements .......................................................................8

    D.  2020 Final Rule..................................................................................................9

        1.  Sexual Orientation Elements...............................................................10

        2.  ICWA-Related Elements .....................................................................11

    E.  Procedural History ...........................................................................................13

IV.  LEGAL STANDARD ......................................................................................................13

    A.  Motion for Summary Judgment ........................................................................13

    B.  Review Under the Administrative Procedure Act ..............................................14

V.  ARGUMENT ...................................................................................................................14

    A.  The 2020 Final Rule Is in Accordance With Law .............................................14

    B.  The Removal of the Sexual Orientation Data Elements from the 2020 Final
        Rule Was Not Arbitrary or Capricious ...........................................................16

    C.  The Removal of Certain ICWA-Related Data Elements from the 2020 Final
        Rule Was Not Arbitrary or Capricious ...........................................................20

    D.  Even if Plaintiffs Prevail, the 2020 Final Rule Should Not Be Set Aside ........24

VI.  CONCLUSION.................................................................................................................27

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Envtl. Conservation v. EPA,*
    540 U.S. 461 (2004) ............................................................................................ 14

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ...................................................................... 24, 25

*Am. Forest Res. Council v. Ashe,*
    946 F. Supp. 2d 1 (D.D.C. 2013) .................................................................. 25, 27

*Am. Great Lakes Ports Ass'n v. Schultz,*
    962 F.3d 510 (2020) ............................................................................................ 25

*Am. Mining Cong. v. EPA,*
    965 F.2d 759 (9th Cir. 1992) .............................................................................. 19

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ...................................................................................... 13, 14

*Black Oak Energy, LLC v. FERC,*
    725 F.3d 230 (D.C. Cir. 2013) ............................................................................ 25

*California v. Azar ,*
    950 F.3d 1067 (9th Cir. 2020) ...................................................................... 22, 23

*Cal. Cmtys. Against Toxics v. EPA*
    688 F.3d 989 (9th Cir. 2012) .................................................................. 24, 25, 26

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ............................................................................................ 13

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ............................................................................................ 15

*Earth Island Inst. v. United States Forest Serv.,*
    442 F.3d 1147 (9th Cir. 2006) ............................................................................ 14

*F.C.C. v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................................... 17, 20

*Home Box Office v. FCC,*
    567 F.2d 9 & n.58 (D.C. Cir. 1977) .................................................................... 19

*Lands Council v. Powell,*

395 F.3d 1019 (9th Cir. 2005) ....................................................................... 14

*Local Joint Exec. Bd. of Las Vegas v. NLRB*,
    840 F. App'x 134 (9th Cir. 2020) ............................................................... 24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................... 13

*Mayo Found. for Med. Educ. & Research v. United States*,
    562 U.S. 44 (2011) ....................................................................................... 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................... 14

*Nat'l Cable and Telecomms. Ass'n v. Brand-X Internet Servs.*,
    545 U.S. 967 (2005) ...................................................................... 15, 17, 20

*Neighbors Against Bison Slaughter v. Nat'l Park Serv.*,
    No. CV 19-128-BLG-SPW, 2021 U.S. Dist. LEXIS 22584 (D. Mont. Feb. 4, 2021) ................ 26-27

*Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*,
    460 F.3d 1125 (9th Cir. 2006) ..................................................................... 14

*Pac. Coast Fed'n of Fishermen's Ass'ns v. United States Bureau of Reclamation*,
    426 F.3d 1082 (9th Cir. 2005) ..................................................................... 14

*Perez-Guzman v. Lynch*,
    835 F.3d 1066 (9th Cir. 2016) ..................................................................... 15

*Porter v. Cal. Dep't of Corr.*,
    419 F.3d 885 (9th Cir. 2005) ....................................................................... 13

*Sugar Cane Growers v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) .................................................................. 25-26

*U.S. Postal Serv. v. Gregory*,
    534 U.S. 1 (2001) ......................................................................................... 14

*United States Sugar Corp. v. Envtl. Prot. Agency*,
    830 F.3d 579 (D.C. Cir. 2016) ..................................................................... 25

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ..................................................................................... 15

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ..................................................................................... 15

*DOC v. New York*,
   139 S. Ct. 2551 (2019) ............................................................................................ 22

*Vt. Pub. Serv. Bd. v. FCC*,
   661 F.3d 54 (D.C. Cir. 2011) ................................................................................... 19

## Statutes

42 U.S.C § 675 ............................................................................................................. 15

42 U.S.C. § 1302 .......................................................................................................... 16

42 U.S.C. § 622 ............................................................................................................ 11

42 U.S.C. § 629h ............................................................................................................ 9

42 U.S.C. § 679 ................................................................................................ 2, 3, 15, 16

5 U.S.C. § 706 .................................................................................................... 2, 3, 14

## Rules

Federal Rule of Civil Procedure 56 ............................................................................. 13

Federal Rule of Civil Procedure 25 ............................................................................... 1

## Other

Social Security Act, Section 1102 ................................................................................. 3

Social Security Act, Section 422 ................................................................... 11, 12, 13, 24

Social Security Act, Section 438 ................................................................................... 9

Social Security Act, Section 479 ................................................................................... 3

Social Security Act, Section 706 ................................................................................. 13

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on December 3, 2021 at 9:00 a.m., or as soon thereafter as this matter may be heard by the Honorable Maxine M. Chesney, Senior United States District Judge of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Defendants[1] will and hereby do move the Court for an order granting summary judgment as to all claims in Plaintiffs'[2] complaint ("(Complaint"), Dkt. No. 1, and denying Plaintiffs' motion for summary judgment, Dkt. No. 66.  This motion is based on this notice, the supporting memorandum of points and authorities set forth below, all pleadings and papers on file with the Court, and all other matters properly before this Court.

## RELIEF SOUGHT

Defendants seek an order granting summary judgment to Defendants as to all claims in the Complaint and denying Plaintiffs' motion for summary judgment.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The Adoption and Foster Care Analysis and Reporting System ("AFCARS") is a data collection system for national adoption and foster care data authorized under the Social Security Act and administered by U.S. Department of Health and Human Services ("HHS") and HHS's Administration for Children and Families ("ACF").  In 2016, HHS issued a final rule updating the AFCARS regulations to add new data elements, including those related to sexual orientation and the Indian Child Welfare Act of 1978 ("ICWA").  HHS issued the 2016 AFCARS rule even though the state child welfare agencies tasked with collecting the data expressed concerns about the costs and burdens of that rule and the unreliability of certain data it sought to collect.

---

[1] Defendants are Xavier Becerra, in his official capacity as Secretary of Health and Human Services; JooYeun Chang, in her official capacity as Acting Assistant Secretary and Principal Deputy Assistant Secretary at the Administration for Children and Families; U.S. Department of Health and Human Services; and Administration for Children and Families.  Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Becerra and Ms. Chang are automatically substituted for Alex Azar and Lynn A. Johnson, respectively.

[2] Plaintiffs are California Tribal Families Coalition, Yurok Tribe, Cherokee Nation, Facing Foster Care in Alaska, Ark of Freedom Alliance, Ruth Ellis Center, and True Colors, Inc.

1      In 2017, under a new administration, HHS requested additional comments regarding these issues.

2 Based on the comments it received, as well as other information, HHS determined that the sexual

3 orientation and some of the ICWA-related data elements did not satisfy the statutory mandate that

4 AFCARS avoid unnecessary diversion of resources from agencies and collect data that is reliable and

5 consistent.  In May 2020, HHS issued a new AFCARS rule that did not include these elements.

6 Plaintiffs claim that, in doing so, Defendants acted in an arbitrary or capricious manner, and not in

7 accordance with law, in violation of the Administrative Procedure Act ("APA").  Plaintiffs' contentions

8 are without merit.

9      HHS is permitted to reconsider the wisdom of its policy on a continuing basis, whether in

10 response to changed factual circumstances or a change in administrations.  A court may not second

11 guess HHS's reconsideration as long as it offered a reasoned explanation for the change.  HHS's actions

12 amply satisfy that standard.  HHS gave due consideration to the comments received it and adequately

13 explained why the sexual orientation and ICWA-related data elements did not satisfy the requirements

14 of the AFCARS statute.  Plaintiffs nevertheless argue that Defendants failed to respond to significant

15 comments and failed to explain their actions sufficiently.  But, as demonstrated below, Plaintiffs'

16 contentions, at their core, merely reflect their disagreement with the wisdom of HHS's decision, which

17 is not a cognizable basis for the Court to set aside the 2020 final rule.

18      Accordingly, the Court should find that the 2020 AFCARS final rule satisfies the APA, grant

19 summary judgment to Defendants as to all of Plaintiffs' claims, and deny Plaintiffs' summary judgment

20 motion.  However, if the Court should find that the 2020 final rule violates the APA, the rule should not

21 be set aside but remanded to HHS without vacatur.

22 **II.      STATEMENT OF ISSUES TO BE DECIDED**

23      Whether, under 5 U.S.C. § 706(2)(A), the 2020 Final Rule was "not in accordance with law"

24 because, by not requiring the collection of sexual orientation data, the 2020 Final Rule did not satisfy the

25 statutory mandate for AFCARS, as set forth in 42 U.S.C. § 679.

26      Whether, under 5 U.S.C. § 706(2)(A), the 2020 Final Rule was arbitrary or capricious by not

27 requiring the collection of sexual orientation data.

28      Whether, under 5 U.S.C. § 706(2)(A), the 2020 Final Rule was arbitrary or capricious by not

requiring the collection of certain data related to the Indian Child Welfare Act of 1978.

Whether, under 5 U.S.C. § 706(2)(A), the 2020 Final Rule should be set aside if it is determined to be arbitrary, capricious or not in accordance with law.

## III.   BACKGROUND

AFCARS is a data collection system for national adoption and foster care data authorized under Section 479 of the Social Security Act ("Act"), codified at 42 U.S.C. § 679.  *Id.*  Section 679(c) requires AFCARS to:

> (1) avoid unnecessary diversion of resources from agencies responsible for adoption and foster care; (2) assure that data collected is reliable and consistent over time and among jurisdictions through the use of uniform definitions and methodologies; (3) provide comprehensive national information with respect to — the demographic characteristics of adoptive and foster children and their biological and adoptive or foster parents . . . ; and (4) utilize appropriate requirements and incentives to ensure that the system functions reliably.

The data for AFCARS are collected and reported by state and tribal child welfare agencies, which are known as "Title IV-E agencies" because they receive funding under Title IV-E of the Act (as well as Title IV-B).  Section 1102 of the Act instructs the Secretary of HHS to promulgate regulations necessary for the effective administration of the functions for which HHS is responsible under the Act.

### A.   2016 Final Rule

On December 14, 2016, HHS issued a final rule ("2016 Final Rule") updating the AFCARS regulations, which were originally published in 1993 and had approximately 119 data elements.  81 Fed. Reg. 90,524; *see* AR 22 (noting 2016 Final Rule had 272 elements, 153 of which were new).[3]  The 2016 Final Rule added 153 new data elements, including those related to sexual orientation, 81 Fed. Reg. at 90,524, and ICWA, *id.* at 90,527.  The 2016 Final Rule provided for an implementation timeframe that required Title IV-E agencies to continue reporting AFCARS data in accordance with the existing regulations until September 30, 2019.  *Id.* at 90,569.

#### 1.   Sexual Orientation Elements

The 2016 Final Rule required Title IV-E agencies to report the child's self-reported sexual orientation for youths age 14 and older.  *Id.* at 90,534.  The commenters who supported collecting

---

[3] On December 23, 2020, Defendants filed the certified administrative record ("AR").  Dkt. No. 52.

1   LGBTQ-related data (primarily advocacy organizations) asserted that LGBTQ children are over-

2   represented in the child welfare system, but a full picture of their experiences in foster care does not

3   exist.  *Id.*  Such youth often have unique service needs, are at an increased risk for poor outcomes, are

4   more likely to be placed in group settings and experience more placements.  *Id.*  State commenters

5   opposed the collection of sexual orientation data, questioning its reliability "because the youth would

6   self-report which could result in an undercount of LGBTQ children in foster care."  *Id.*  States also

7   expressed concerns over sexual identity data being in a government record and used in a discriminatory

8   way and that collecting the data may "pose safety concerns because the LGBTQ community is still

9   vulnerable to discrimination in many parts of the country."  *Id.*

10          Based on the comments, HHS explained that it was persuaded to include a data element on a

11  child's self-reported sexual orientation, which would require the child to self-identify as "straight or

12  heterosexual," "gay or lesbian," "bisexual," "don't know," "something else," or "decline" if the child

13  declined to report this information.  *Id.*  HHS addressed the state concerns by noting that the child may

14  decline to report the information if they do not feel comfortable disclosing it and that such information

15  would be protected by confidentiality requirements.  *Id.* at 90,535.

16                      **2.      ICWA-Related Elements**

17          The 2016 Final Rule also required Title IV-E agencies to collect and report data elements

18  relevant to Indian children, as defined in ICWA, who are in the state's placement and care responsibility

19  and who exit to reunification, adoption or who are transferred to the custody of the Indian tribe.  *Id.* at

20  90,527.  Tribes and advocacy organization commenters believed that collecting ICWA-related data in

21  AFCARS would: (1) provide data on core ICWA requirements as well as assess how the child welfare

22  system is working for Indian children; (2) facilitate access to culturally-appropriate services and high

23  quality placements for tribal children; (3) help address and reduce the disproportionality of American

24  Indian/Alaska Native ("AI/AN") in foster care; and (4) provide avenues for collaboration between states

25  and tribes, including improved policy development, technical assistance, training and resource allocation

26  as a result of having reliable data available.  *Id.*

27          While commenters from some states generally supported the overall goal and purpose of

28  including ICWA-related data in AFCARS, they also reiterated concerns related to the implementation

1   period, penalties, timeline for submission, limited access to court records and the associated burden.  *Id.*

2   at 90,527-28.  For example, many states noted that the burden of reporting ICWA-related information

3   would be significantly higher than HHS's estimates because they would require significant upgrades to

4   their case management system to be able to report the data.  *Id.* at 90,566.  They also cited the increased

5   workload due to manually entering information from paper court orders or case narratives into the

6   system for AFCARS reporting.  *Id.*  States commented that certain of the proposed ICWA-related

7   information would not be easily captured in a single data field and may therefore be better assessed

8   through qualitative case file review.  *Id.* at 90,527.  Several states said that they have a small number of

9   AI/AN children in their AFCARS reporting population and they requested that federal funding be made

10   available to the fullest extent possible to help prepare for the low-occurring event of reporting the

11   ICWA-related information.  *Id.* at 90,528-29.

12   Based on the comments, HHS determined that the benefits outweighed the burden associated

13   with collecting and reporting the additional ICWA data.  *Id.* at 90,528.  But HHS directly acknowledged

14   that it "received too few estimates to reference for calculating the cost and burden associated with this

15   final rule."  *Id.* at 90,566.

16   **B.      2018 Advance Notice of Proposed Rulemaking**

17   On February 24, 2017, the President issued Executive Order 13777, which directed federal

18   agencies to establish task forces to make recommendations regarding their repeal, replacement, or

19   modification of existing regulations to lower regulatory burdens on the American people.  82 Fed. Reg.

20   12,285.  On March 15, 2018, HHS published an Advance Notice of Proposed Rulemaking ("2018

21   ANPRM") explaining that the HHS task force identified the 2016 Final Rule as one in which the

22   reporting burden may impose costs that exceed benefits.  83 Fed. Reg. 11,449, 11,450.  HHS noted that

23   "[s]ome state title IV-E agencies provided in their previous comments specific information on

24   compliance cost and burden estimates" but that HHS "received too few estimates to reference for

25   calculating the cost and burden associated with this final rule."  *Id.*

26   To that end, HHS solicited comments on the ICWA-related data elements added to AFCARS by

27   the 2016 Final Rule and their associated burden.  *Id.*  In the 2018 ANPRM, HHS also explained that it

28   "previously . . . received comments questioning the utility, reliability, and purpose of certain data

1  elements at the national level" and requested "specific recommendations on which data elements in the

2  regulation to remove because they would not yield reliable national information." *Id.*  HHS also

3  proposed extending the implementation timeframe for the 2016 Final Rule from October 1, 2019 to

4  October 1, 2021, *id.*, which it later shortened to October 1, 2020, 83 Fed. Reg. 42,225, 42,226.

5  **C.     2019 Notice of Proposed Rulemaking**

6  On April 19, 2019, HHS published a Notice of Proposed Rulemaking ("2019 NPRM") proposing

7  to reduce the data elements required by the AFCARS to from 272 to 183.  84 Fed. Reg. 16,572, 16,576.

8  The 2019 NPRM proposed a final rule that did not include, among other things, data elements asking for

9  information on sexual orientation and reduced the ICWA-related data elements.

10  **1.     Sexual Orientation Elements**

11  HHS received 237 comments in response to the 2018 ANPRM, including from 38 states, 38

12  Indian tribes or consortiums, and 62 organizations representing various interests.  *Id.* at 16,573.  A third

13  of the states recommended that the sexual orientation data elements be removed due to reliability

14  concerns (youth self-reporting could result in undercounting) and the implications of having this private

15  and sensitive information in a government record.  *Id.* at 16,574.  These states further noted that sexual

16  orientation information would be in the case file if it is important to decisions affecting the child.  *Id.* at

17  16,576.  But if the child's sexual orientation is not pertinent to the child's wellbeing, asking for sexual

18  orientation may be perceived as intrusive and worrisome to those who have experienced trauma and

19  discrimination as a result of gender identity or sexual orientation.  *Id.*  Furthermore, the mandatory

20  conversation required to obtain this information may be contraindicated based on a child's history of

21  trauma and discrimination resulting from their sexual orientation.  *Id.*

22  In addition to the comments responding to the 2018 ANPRM, HHS reviewed the 2016 document

23  entitled "Current Measures of Sexual Orientation and Gender Identity in Federal Surveys" prepared by

24  the Office of Management and Budget ("OMB") Federal Interagency Working Group on Improving

25  Measurement of Sexual Orientation and Gender Identity in Federal Surveys.  *Id.*  The OMB paper

26  identified issues for agencies to consider when choosing sexual orientation and gender identity

27  ("SOGI") questions for inclusion in federal surveys and administrative databases.  *Id.*  The OMB paper

28  advised that "new questions added to a survey or data base should be validated with qualitative

1   techniques and question validation efforts should include both the SOGI and non-SOGI groups." *Id.*

2   The paper noted that "teenagers may be in the midst of developing their sexual orientation . . . and

3   therefore they may be unsure of how to respond to SOGI questions" and that adolescents may use

4   different terms to describe their sexual orientation than terms used by adults. *Id.*  In addition, bullying

5   related to sexual orientation may cause some adolescents to be reluctant to identify themselves with the

6   AFCARS terms, which emphasized that respondents must be confident that their responses are private,

7   anonymous, and confidential.  *Id.*  The OMB paper also admonished agencies to take into account

8   cultural or racial/ethnic considerations and geography (for example, there may be regional differences in

9   comfort with SOGI questions).  *Id.*

10   Based on the comments and its review of the OMB paper, HHS determined that AFCARS was

11   not the appropriate vehicle to collected sexual orientation information.  *Id.*  HHS explained that it was

12   not feasible to test the validity or accuracy of adding questions related to sexual orientation across all

13   title IV-E agencies.  *Id.*  Furthermore, it would be impossible to ensure that the child's response to the

14   question on sexual orientation would remain confidential given that it would be in the case file and

15   information on the child's case must be disclosed to courts and providers under specific circumstances,

16   to assist the child and family.  *Id.*  Furthermore, information on sexual orientation is not appropriate to

17   be included unless it is relevant to the child's needs.  *Id.*  HHS determined that the sexual orientation

18   elements were more appropriately collected through a survey, which would allow for testing of the

19   questions, training, and addressing the confidentiality issues raised by the OMB paper.  *Id.* at 16,576-77.

20   Based on support from commenters, HHS retained the data element concerning whether the

21   child's sexual orientation, gender identity, or gender expression contributed to family conflict that

22   resulted in the child's removal from the home.  *Id.* at 16,577.  Because the case worker would gather this

23   information during the course of the investigation that resulted in the child's removal from the home, it

24   did not require the worker to have a conversation in instances where it is not appropriate or not

25   applicable to the child's wellbeing.  *Id.*  As HHS explained, such data would be appropriate for a

26   national data set because it will provide insight into issues of potential discrimination, safety concerns,

27   and homelessness experienced by youth.  *Id.*

28

1

## 2. ICWA-Related Elements

2      Thirty-six of the 38 states supported streamlining the AFCARS rule, based their self-assessment

3 of the cost and burden of compliance. *Id.* at 16,573.  Specific to the ICWA-related data elements, half of

4 the states expressed concern with the large number of and detailed questions asked related to ICWA's

5 requirements, with five states expressly asking for no ICWA-related data elements in AFCARS. *Id.* at

6 16,574.  Many states commented that certain of the elements were redundant, overly detailed, could be

7 streamlined, or are too specific for a national data set and are better suited for a qualitative review. *Id.*

8 Four states reported that ICWA-applicable children in their out-of-home care populations were well

9 under one percent. *Id.*  States with higher numbers of tribal children in their care supported including

10 limited information related to ICWA to inform policy decisions and program management. *Id.*

11      The 38 tribes and tribal interest commenters opposed streamlining the ICWA-related data

12 elements. *Id.*  These commenters expressed that the state burden of collection was outweighed by the

13 benefits, which included allowing for more in-depth data and limited federal oversight regarding ICWA,

14 insights into state compliance with ICWA's requirements, that national data would inform policy

15 changes, and enhanced identification of Indian children in state custody. *Id.*

16      Based on these comments, which include more detailed cost/burden estimates than Defendants

17 had in issuing the 2016 Final Rule, HHS determined that streamlining of the ICWA data elements was

18 warranted.  Taking into account the statutory mandate that AFCAR avoid unnecessary diversion of

19 resources from agencies, HHS found that requiring every state to modify its systems to report on a large

20 number of data elements when the foster care population does not reflect that the data elements will be

21 applicable to a majority of their children does not meet this mandate. *Id.* at 16,575.  HHS pointed to

22 AFCARS data from September 2016 showing that, in 33 states, children who have a reported race as

23 AI/AN made up less than one percent of the children in foster care. *Id.*

24      HHS also addressed the comments in support of retaining the excluded elements, which, in large

25 part, stated that they were necessary for policy making purposes and that the benefits of more data

26 outweigh the burden to report it. *Id.*  First, the commenters that opposed streamlining are not required to

27 report AFCARS data. *Id.*  Second, the commenters did not identify any specific policies that required

28 this data and why AFCARS specifically is the best means for collecting it. *Id.*  HHS noted that

1    Congress, despite not having the additional data from the 2016 Final Rule, managed to pass 24 laws

2    amending federal child welfare programs since AFCARS became effective.  *Id.*

3          HHS also explained that, through HHS's Court Improvement Program ("CIP"), state courts will

4    be encouraged to use CIP grant funds to assess their courts' ICWA practice, support the courts' data

5    infrastructure, and train key court personnel on the importance of monitoring ICWA.[4]  *Id.* at 16,575.

6    Specifically, CIP grantees will be encouraged and supported to collect and monitor data on court

7    inquiries, orders and findings related to identification of Indian children as defined in ICWA, notice to

8    Indian tribes, tribal participation as parties in hearings involving Indian children, tribal intervention in

9    dependency cases, transfer of ICWA cases to tribal courts, and placement of Indian children according

10   to tribal preferences. *Id.*

11         Based on its assessment of the comments received, HHS proposed to remove data elements that

12   were based on U.S. Department of Interior ("DOI") regulations, qualitative in nature, or requirements of

13   the courts.[5]  However, HHS did not propose to exclude all the ICWA-related elements that were in the

14   2016 Final Rule.  HHS maintained the data elements that tribes had identified as the most important,

15   from a national perspective, which included elements related to the tribal membership of children in

16   foster care and their foster care/adoptive placements, whether ICWA applies to the child, and

17   notification of proceedings per ICWA requirement.  *Id.* at 16,577-78.

18         **D.    2020 Final Rule**

19         In response to the 2019 NPRM, HHS received 150 comments, including from 24 states and local

20   child welfare agencies; 33 Indian tribes, tribal organizations or consortiums; 10 organizations

21   representing tribal interests; and a number of national advocacy groups and other commenters.  85 Fed.

22

23         [4] Section 438(b)(1)(C) of the Act, , codified at 42 U.S.C. § 629h(b)(1)(C), requires grantees to
     demonstrate "meaningful and ongoing collaboration among the courts in the State . . . and, where
24   applicable, Indian tribes."

25         [5] The ICWA-related data elements from the 2016 Final Rule that HHS proposed to remove are
     request to transfer to tribal court, denial of transfer, court findings related to involuntary and voluntary
26   termination of parental rights, including good cause findings, qualified expert witness testimony,
     whether active efforts were made prior to the termination/modification, removals under ICWA, available
27   ICWA foster care/pre-adoptive placement preferences, adoption/guardianship placement preferences
     under ICWA, good cause and basis for good cause under ICWA, and information on active efforts.  84
28   Fed. Reg. at 16,577.

1   Reg. at 28,411. The overwhelming majority of state and local agencies supported streamlining the data

2   elements as proposed in the 2019 NPRM.  *Id.*  Based on this feedback, and its review of the need for and

3   utility of the data elements, HHS issued the 2020 Final Rule.  The 2020 Final Rule excluded

4   approximately one-third of the data elements from the 2016 Final Rule (from 272 to 183), which was

5   still a net increase of 64 data elements from the 119 elements that were in the AFCARS regulations that

6   existed prior to the 2016 Final Rule.  *Id.* at 28,410.  The 2020 Final Rule did not include the sexual

7   orientation data elements and reduced the ICWA-related data elements.  *Id.*

### 1.   Sexual Orientation Elements

9   Half of the state and local child welfare agencies specifically commented on the proposal to

10  remove the sexual orientation data elements.  *Id.*  Of those, the majority agreed with the proposal,

11  expressing that AFCARS is not the appropriate vehicle to collect this information, that it was unclear

12  how this information in a federal database will result in support services for children, and that this

13  information should be tracked separately from AFCARS.  *Id.*

14  The majority of the national advocacy organizations and other commenters supported continued

15  inclusion of the sexual orientation elements on grounds that the data would "would (1) enhance

16  recruitment of foster homes; (2) aid permanency and case decision-making; (3) promote visibility for

17  marginalized groups; (4) help to analyze youth outcomes; (5) address disparities; and (6) enable

18  Congress to legislate appropriately at the national-level." *Id.* at 28,413.  Some commenters also pointed

19  to 2013 professional guidelines addressing the need to collect sexual orientation information for such

20  purposes as developing case plans and tracking individual case outcomes in support of their

21  recommendation.  *Id.*

22  However, as HHS noted, Title IV-E agencies explained that reporting sexual orientation to a

23  national database would not enhance their work because, if it was relevant to the circumstances of the

24  child, it would be captured by their casework and already documented in the case file.  *Id.*  Thus, the

25  2013 professional guidelines were not relevant to a federal collection because they were largely a set of

26  best practices for how to interact with clients, and gather and manage SOGI information at the case,

27  local, and state level.  *Id.*  HHS explained that would continue to rely on the OMB paper because it

28  provides direction for federal agencies to consider before requiring SOGI information in surveys and

1  administrative databases.  *Id.* (citing 2019 NPRM, 84 Fed. Reg. at 16,576)

2      HHS emphasized that these elements were removed because they "would not meet the

3  requirements for reliability and consistency, thus are ineffective at providing a national picture of

4  children placed in out-of-home care."  *Id.* at 28,419.

5            **2.**     **ICWA-Related Elements**

6      Eleven state and local child welfare agencies commented on the simplification of the ICWA-

7  related data elements, the overwhelming majority of which were in favor of the proposal.  *Id.* at 28,411.

8  These commenters agreed with keeping the data elements that are essential to understanding nationally

9  the ICWA-applicable population of children in foster care, while removing those that were based on

10  DOI regulations, qualitative in nature, or requirements of the courts.  *Id.*  Further reduction in these data

11  elements was also recommended due to an extremely low population of AI/AN children in foster care in

12  certain states.  *Id.*

13      Comments from tribes and other commenters opposed the streamlining on grounds that (1) the

14  information is needed to assess compliance with ICWA, (1) Section 422(b)(9) in Title IV-B of the Act

15  includes processes regarding ICWA;[6] and (3) unlike DOI, ACF has established relationships with states

16  and AFCARS is already in place to receive data on Native American children in state foster care

17  systems, and therefore is better positioned to collect ICWA-related data.  *Id.* at 28,412.

18      Defendants explained that, in publishing the 2020 Final Rule, it was attempting to correct any

19  confusion or misperception created by justifying the ICWA-related data elements in the 2016 Final Rule

20  on the basis of consistency with DOI's final rule on ICWA.  *Id.* at 28,412-13 (discussing 2016 Final

21  Rule, 81 Fed. Reg. at 38,778).  HHS noted that DOI is the lead agency for ICWA compliance and that

22  retaining all the ICWA-related data elements in 2016 Final Rule would have put HHS in the position of

23  interpreting various ICWA requirements.  *Id.* at 28,412.  However, HHS only has authority for the

24  collection of data elements that are used for functions and oversight under HHS authority, namely the

25  Title IV-B and IV-E child welfare programs.  *Id.*

26   

27       [6] Section 422(b)(9) of the Act, codified at 42 U.S.C. § 622(b)(9), provides that "[e]ach plan for child welfare services . . . shall . . . contain a description, developed after consultation with tribal organizations . . . in the State, of the specific measures taken by the State to comply with the Indian

28  Child Welfare Act."

1    Defendants also clarified that section 422(b)(9) of the Act does not provide the legal authority

2    for HHS to collect ICWA-related data in AFCARS or for HHS to determine state compliance with

3    ICWA.  *Id.*  Nor does it provide authority for HHS to require states to report specific details on ICWA's

4    requirements in AFCARS to be used for ICWA compliance, which was mischaracterized in the 2016

5    final rule.  *Id.*  HHS explained that the AFCARS authority did allow it to collect ICWA-related data

6    elements regarding whether a child's connections with his or her family, heritage, and community are

7    preserved, which would provide context for other Title IV-B and IV-E monitoring.  *Id.*  HHS also

8    explained that the ICWA-related data elements in the 2016 Final Rule would not be available for ICWA

9    compliance purposes because ACF is unable to release information, other than to the child's tribe, for

10   confidentiality reasons.  *Id.*

11   HHS also pointed out its view that the Title IV-E agencies that opposed streamlining due to a

12   perceived ''need'' for the data, misunderstand AFCARS and its functionality.  *Id.*  The information

13   reported to AFCARS is "aggregated and de-identified at the national level, meaning it does not include

14   names, numbers, or other information."  *Id.*   As Defendants explained, AFCARS is designed to have a

15   few response options that must be broad enough to capture a range of experiences across the country,

16   which is what is appropriate for a national dataset.  *Id.*

17   HHS also stated that the comments it received in response to the 2018 ANPRM comments

18   showed that the burden estimate for the 2016 Final Rule was too low.  *Id.* at 28,420.  Through the

19   comments process HHS was able to provide a more grounded burden estimate based on state estimated

20   hours and costs.  *Id.*  In addition to re-examining the legal rationale, as discussed, HHS weighed this

21   significant burden against the possible benefits of collecting the additional ICWA-related data at issue

22   here, and concluded that as a policy matter such collection under AFCARS was inconsistent with HHS's

23   focus upon improving quality of services and achieving positive outcomes for children and families.  *Id.*

24   at 28,411.  HHS was not persuaded that these commenters provided ample justification or a rational

25   basis for why AFCARS is the most effective vehicle for collecting the information required under the

26   2016 Final Rule that the agency proposed to remove, which in large part was qualitative data.  *Id.* at

27   28,412.  Nor did commenters explain adequately how the data would help their specific work with

28   children and families served by the Title IV-E agency.  *Id.* According to HHS, "[t]his final rule will

1    provide ample data for analysis via a combination of information from the data elements and will

2    provide more robust national information on children in foster care not available in the current

3    AFCARS." *Id.* at 28,411.

4         **E.    Procedural History**

5         Plaintiffs are two Indian tribes and five nonprofits.  *See* Compl. ¶¶ 18-47.  Several of the

6    nonprofits focus on tribal interests, while others serve LGBTQ+ children.  *Id.*  Plaintiffs are challenging

7    HHS's decision in the 2020 Final Rule to remove certain ICWA-related and sexual orientation elements

8    added by the 2016 Final Rule, alleging that Defendants' actions were arbitrary, capricious and not in

9    accordance with law, in violation of Section 706(2)(A) of the APA.  *See id.*  On December 23, 2020,

10   Defendants answered the Complaint, denying liability, and filed the certified administrative record.  Dkt.

11   Nos. 52, 53.  On May 17, 2021, Plaintiffs filed their motion for summary judgment.  Dkt. No. 66.  On

12   September 3, 2021, Defendants requested a stay of summary judgment briefing (which Plaintiffs

13   opposed) so that the Court could first consider their planned motion for voluntary remand without

14   vacatur.  Dkt. No. 96.  Defendants' request remains pending before the Court.  On October 15, 2021,

15   Defendant filed their motion for voluntary remand without vacatur.  Dkt. 102.

16   **IV.    LEGAL STANDARD**

17        **A.    Motion for Summary Judgment**

18        "A court shall grant summary judgment when the pleadings and evidence demonstrate "that there

19   is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of

20   law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking

21   summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact.

22   *Celotex*, 477 U.S. at 322.  A genuine issue of material fact is one that "might affect the outcome of the

23   suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In

24   determining whether a genuine issue of material fact exists, the court must view all facts, and reasonable

25   inferences drawn therefrom, in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus.*

26   *Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885,

27   891 (9th Cir. 2005).  Once the moving party has met its burden, the nonmoving party "may not rest upon

28

1  mere allegation or denials of his pleading, but must set forth specific facts showing that there is a

2  genuine issue for trial." *Anderson*, 477 U.S. at 256.

3      **B.   Review Under the Administrative Procedure Act**

4      "Pursuant to the Administrative Procedure Act, a court may set aside the decision of an

5  administrative agency . . . only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in

6  accordance with law.'" *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1132 (9th

7  Cir. 2006) (quoting 5 U.S.C. § 706(2)(A)).  "An agency's action is arbitrary and capricious if the agency

8  fails to consider an important aspect of a problem, if the agency offers an explanation for the decision

9  that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to

10 a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the

11 governing law." *Id.* (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005)).  Courts

12 "will sustain an agency action if the agency has articulated a rational connection between the facts found

13 and the conclusions made." *Pac. Coast Fed'n of Fishermen's Ass'ns v. United States Bureau of*

14 *Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm*

15 *Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

16     "Review under this standard is narrow, and the reviewing court may not substitute its judgment

17 for that of the agency."  *Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147, 1156 (9th Cir.

18 2006) (citing *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 6-7 (2001)).  "Even when an agency explains its

19 decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account 'if

20 the agency's path may reasonably be discerned.'"  *Pac. Coast Fed'n of Fishermen's Ass'ns*, 426 F.3d at

21 1090 (quoting *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004)).

22 **V.   ARGUMENT**

23     **A.   The 2020 Final Rule Is in Accordance With Law**

24     Plaintiffs contend that the 2020 Final Rule is "not in accordance with law" (5 U.S.C.

25 § 706(2)(A)) and must be set aside.  Plaintiffs argue that the AFCARS statute obligates Defendants to

26 collect demographic data and that by eliminating demographic questions regarding sexual orientation

27 from AFCARS, Defendants acted contrary to the statute.  Dkt. No. 66, Plaintiffs' Motion for Summary

28 Judgment ("Pls' MSJ") at 20.  Plaintiffs' contentions are without merit.

1      Plaintiffs' assertions are governed by *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467

2  U.S. 837, 842-43 (1984).  Under this standard, a court first asks, "whether Congress has directly spoken

3  to the precise question at issue." *Id.* at 842.  If the answer is yes, the court must give effect to

4  Congress's intent.  If the answer is no—that is, if the statute is ambiguous—"the question for the court is

5  whether the agency's answer is based on a permissible construction of the statute." *Id.* at 844.

6      Applying *Chevron* step one, Congress has not spoken to the precise issue in this case.  The

7  AFCARS statute does not define "demographics" and does not otherwise attend to the precise question

8  whether the statue requires the collection of sexual orientation data by AFCARS. *See generally* 42

9  U.S.C. § 679; *see also* 42 U.S.C. § 675 ("Definitions").  The dictionary definition of "demographics" is

10  extraordinary broad and, thus, offers little guidance. *See Mayo Found. for Med. Educ. & Research v.*

11  *United States*, 562 U.S. 44, 52 (2011) (applying a dictionary definition at step one).  Per *Merriam-*

12  *Webster*, "demographics" means "the statistical characteristics of human populations (such as age or

13  income) used especially to identify markets," without any mention of sexual orientation.

14  https://www.merriam-webster.com/dictionary/demographics (last visited October 15, 2021).  Therefore,

15  because the plain text of the statute does not "speak[ ] with the precision necessary to say definitively

16  whether [the statute] applies to" the collection of sexual orientation data, analysis is required under

17  *Chevron* step two. *Mayo Found. for Med. Educ. & Research*, 562 U.S. at 53 (second alteration in

18  original) (quoting *United States v. Eurodif S.A.*, 555 U.S. 305, 319 (2009)).

19      "At step two of Chevron, [courts] must 'accept the agency's construction of the statute' so long

20  as that reading is reasonable, 'even if the agency's reading differs from what the court believes is the

21  best statutory interpretation.'" *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1079 (9th Cir. 2016) (quoting

22  *Nat'l Cable and Telecomms. Ass'n v. Brand-X Internet Servs.*, 545 U.S. 967, 980 (2005)).  For the

23  following reasons, the 2020 Final Rule is a permissible and reasonable interpretation of the statute.

24      First, "*Chevron* deference is appropriate 'when it appears that Congress delegated authority to

25  the agency generally to make rules carrying the force of law, and that the agency interpretation claiming

26  deference was promulgated in the exercise of that authority.'" *Mayo Found. for Med. Educ. & Research*,

27  562 U.S. at 53 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).  That is the case

28

here.  Congress has granted broad authority to the Secretary of HHS to "make and publish such rules and regulations, not inconsistent with th[e] Act."  42 U.S.C. § 1302(a).

Second, while mandating the collection of demographic data, the statute also requires that AFCARS "avoid unnecessary diversion of resources from agencies" and that "the data collected is reliable and consistent."  42 U.S.C. § 679(c)(1), (2).  Consistent with the statute's admonitions, HHS, while recognizing the value of collecting the sexual orientation elements, determined that they should be excluded from the 2020 Final Rule due to concerns about their reliability.  2019 NPRM, 84 Fed. Reg. at 16,577 ("While we understand the importance of collecting sexual orientation data and appreciate the comments that supported keeping the data elements, we must balance this with the need to collect accurate data per the statue and in a manner that is consistent with children's treatment needs."), 16,574 (acknowledging concerns that sexual orientation data elements "will not be reliable because youth would self-report, which could result in an undercount").  Plaintiffs make no attempt to reconcile the statute's express requirement that HHS take a calibrated approach to data collection with their argument that the statute *requires* AFCARS to collect sexual orientation data.  Indeed, Plaintiffs' theory of statutory construction, when taken to its logical conclusion, would require Defendants to issue an AFCARS rule that collects any and every data element that can be reasonably construed as demographic in nature.  That is not, and cannot be, a reasonable interpretation of the statute.

Third, while the 2020 Final Rule excludes sexual orientation, it does include many other demographic data elements related to adoptive and foster children and their biological and adoptive or foster parents (e.g., date of birth, sex, race and ethnicity), all of which fall comfortably within the definition of "demographics."

For the foregoing reasons, HHS's determination to include some demographic data elements, while excluding others, is based on a reasonable and permissible interpretation of the AFCARS statute and, thus, is not contrary to law.

**B.      The Removal of the Sexual Orientation Data Elements from the 2020 Final Rule Was Not Arbitrary or Capricious**

HHS is permitted to "consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, or a change in

1     administrations." *Nat'l Cable & Telecomm. Ass'n*, 545 U.S. at 981 (internal citation omitted).  As the

2     Supreme Court has explained, there is no "heightened scrutiny" when an agency changes its policy.

3     *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 525 (2009).  While the agency must provide a

4     "reasoned explanation" for its new policy, "it need not demonstrate to a court's satisfaction that the

5     reasons for the new policy are *better* than the reasons for the old one."  *Fox Television*, 556 U.S. at

6     515.  "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it,

7     and that the agency *believes* it to be better, which the conscious change of course adequately

8     indicates."  *Id.*

9             Here, the 2020 Final Rule offers a reasoned explanation for excluding the sexual orientation data

10    elements, namely that the sexual orientation questions would not result in a reliable and consistent data

11    collection, as required by the AFCARS statute.  Regarding the 2016 Final Rule, state commenters

12    expressed such concerns over the sexual orientation element.  Specifically, states commented that the

13    number of AFCARS children in foster care would be underreported because the information would need

14    to be self-reported to a case worker.  2016 Final Rule, 81 Fed. Reg. at 90,534.  While Defendants

15    generally acknowledged the concerns expressed by the state commenters, they did not specifically

16    discuss the reliability issue.  *See generally id.* at 90,534-35.  However, when HHS later reviewed the

17    AFCARS regulations in 2018, it noted that it had received comments questioning the reliability of

18    certain data elements and asked for specific recommendations for data elements to be removed because

19    they would not yield reliable national information.  2018 ANPRM, 83 Fed. Reg. at 11,450.

20            In response to 2018 ANPRM, the state commentators again raised the issue of unreliability due

21    to self-reporting.  2019 NPRM, 84 Fed. Reg. at 16,573.  Defendants also availed itself of an OMB

22    working paper, which provided guidance to federal agencies when choosing SOGI questions for

23    inclusion in administrative databases.  *Id.* at 16,574.  HHS took into consideration OMB's

24    recommendation that even validated questions be tested for new settings with a different audience.  AR

25    187.  Therefore, while the 2016 Final Rule used the language from a pre-existing survey, Youth Risk

26    Behavior Surveillance System ("YRBSS"), contrary to Plaintiffs' arguments that it was used "in an

27    indistinguishable setting" (*see* Pls' MSJ at 259-22), there is no indication in the record that the YRBSS

28    question was validated with children in foster homes, who have unique considerations and would need

to be asked the sensitive sexual orientation questions by a case worker (2016 Final Rule, 81 Fed. Reg. at 90,535) and thus could not remain anonymous.  Indeed, the YRBSS is self-administered in schools, which means that the child answers the questions on paper without identifying themselves.  AR 179.  Furthermore, nothing in the record suggests the YRBSS question was tested for purposes of a national database, which would be important given that OMB cautioned that the reported prevalence of SOGI populations may be lower due to regional differences in comfort levels with SOGI questions.  2019 NPRM, 84 Fed. Reg. at 16,576; AR 188.

OMB also noted that "[t]he use of nonresponse categories (Don't Know / Refused / Other / Something else) may reduce the number of SOGI respondents who identify themselves as such, without yielding usable data."  AR 189.  This is because "[t]hese categories may also indicate confusion with the question or response category wording, rather than the SOGI status of respondents."  *Id.*  That the YRBSS question includes three non-response categories ("don't know," "something else," or "decline"), 2016 Final Rule 81 Fed. Reg. at 90534, further reinforces that the sexual orientation question in the 2016 Final Rule was not reasonably designed to collect reliable data.  This is especially true given the uncertainties related to collecting such data from adolescents, who may not have finished developing, or may use different terms to describe, their sexual orientation.  2019 NPRM, 84 Fed. Reg. at 16,576.  In light of the foregoing, it was reasonable for HHS to conclude that the sexual orientation question would need testing and that it was not feasible to do it on a nationwide basis.  *Id.*

Plaintiffs' argument regarding the 2013 professional guidelines misconstrues Defendants' reasoning for deeming the guidelines to be irrelevant.  Contrary to Plaintiffs' contentions (Pls' MSJ at 26:1-3), commenters did not cite the guidelines for purposes of mitigating any sensitivity and confidentiality concerns.  Rather, commenters brought those guidelines to the attention of HHS on grounds that they were developed "to address the need to collect sexual orientation information for such purposes as developing case plans and tracking individual case outcomes in support of their recommendation."  2020 Final Rule, 85 Fed. Reg. at 28,413, *see also* AR 2340.  However, as Title IV-E agencies had commented, reporting sexual orientation of a youth or provider to a national database would not enhance their work with LGBTQ+ youth because, if that information was relevant to the circumstances of the child or a family, it would be captured by their casework and already documented

1   in the case file.  *Id.*  Accordingly, it was reasonable for Defendants to determine that the 2013

2   guidelines, which concerned collection of data at the state and local level, were not relevant to collecting

3   data at the federal level.  *Id.*

4        Plaintiffs also complain that HHS did not adequately address significant comments, including

5   that excluding the sexual orientation question would make it more difficult to address the

6   overrepresentation of LGBTQ+ youth in care and the litany of poor outcomes for those youth.  Pls' MSJ

7   at 27:5-9.  This argument is without merit for two reasons.  First, as Plaintiffs' acknowledge (*id.* at

8   27:10-11), Defendants addressed these comments expressly, explaining that reporting sexual orientation

9   at the national level would not enhance the work of Title IV-E agencies with LGBTQ+ youth  (2020

10  Final Rule, 85 Fed. Reg. at 28,413).  Second, even if Defendants had not done so, Defendants were not

11  required to expressly address these comments because, under Ninth Circuit precedent, they are not

12  "significant."  Comments are only "significant" if they "raise relevant points and which, if adopted,

13  would require a change in the agency's proposed rule."  *Am. Mining Cong. v. EPA*, 965 F.2d 759, 771

14  (9th Cir. 1992) (citing *Home Box Office v. FCC*, 567 F.2d 9, 35 & n.58 (D.C. Cir. 1977)); *see also Vt.*

15  *Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 63 (D.C. Cir. 2011) (holding that where agency adequately

16  explained its decision, its failure to expressly address comments proposing alternatives was neither

17  arbitrary nor capricious).  In addition to not assisting Title IV-E agencies with their work with LGBTQ+

18  youth, the sexual orientation information could be unreliable due to undercounting resulting from self-

19  reporting and the issues identified in the OMB paper.  For these reasons, the sexual orientation question

20  did not satisfy the statutory requirements that AFCARS avoid unnecessary diversion of resources from

21  Title IV-E agencies and collect reliable data.  Because Defendants are not at liberty to ignore these

22  express statutory mandates, the specific comments identified by Plaintiffs, even if adopted, would not

23  have *required* Defendants to retain the sexual orientation elements in the 2020 Final Rule.  Therefore,

24  these comments are not "significant" and did not need to be expressly addressed by Defendants (as

25  discussed, Defendants did respond to them).

26        Plaintiffs also take issue with Defendants' change of course on the issues of confidentiality and

27  privacy.  Plaintiffs contend that HHS had previously considered these exact concerns and resolved them

28  on grounds the respondent could decline to answer the questions and all child welfare databases are

1    subject to confidentiality requirements.  Pls' MSJ at 26:22-26.  However, Defendants are permitted to

2    reconsider their position on these questions.  *Nat'l Cable & Telecomm. Ass'n*, 545 U.S. at 981.  In

3    response to the 2018 ANPRM, commenters, for the first time, noted that simply asking the sexual

4    orientation question, if not done in relation to addressing the child's wellbeing, could be perceived as

5    intrusive and worrisome to those who have experienced trauma and discrimination as a result of gender

6    identity or sexual orientation.  2019 NPRM, 84 Fed. Reg. at 16,576.  Furthermore, a mandatory

7    conversation may be contraindicated based on the child's history of abuse or neglect.  *Id.*  In addition,

8    while information in case files is kept confidential, Defendants recognized that it is impossible to ensure

9    that a child's response to a question on sexual orientation would be kept private, anonymous or

10   confidential.  *Id.*  Due to the child being in the custody of a Title IV-E agency, information regarding the

11   child's sexual orientation may need to be disclosed to courts and providers under specific circumstances.

12   *Id.*  Accordingly, Defendants provided a reasoned explanation for the change in policy.  *Fox Television*,

13   556 U.S. at 515.  The law requires no more.  While Plaintiffs may disagree with this explanation,

14   Defendants need not demonstrate that the reasons for the sexual orientation policies reflected in the 2020

15   Final Rule are better than the reasons undergirding the policies reflected in the 2016 Final Rule.  *Id.*

16          For the foregoing reasons, the removal of the sexual orientation data elements from the 2020

17   Final Rule was not arbitrary or capricious.

18          **C.    The Removal of Certain ICWA-Related Data Elements from the 2020 Final Rule
                    Was Not Arbitrary or Capricious**

19

20          HHS also adequately explained its reasons for excluding from the 2020 Final Rule certain of the

21   ICWA-related data elements that were in the 2016 Final Rule, consistent with the statutory requirement

22   that AFCARS avoid unnecessary diversion of resources from agencies.

23          In issuing the 2016 Final Rule, HHS acknowledged that it "received too few estimates to

24   reference for calculating the cost and burden associated with this final rule."  2016 Final Rule, 81 Fed.

25   Reg. at 90,566.  The comments responding to the 2018 ANPRM and the 2019 NPRM provided HHS

26   with new evidence that its burden estimate for the 2016 Final Rule was too low.  2020 Final Rule, 85

27   Fed. Reg. at 48,420.  Furthermore, an overwhelming majority of the states (36 out of 38) that provided

28   comments to 2018 ANPRM supported streamlining the AFCARS rule, with half of the states expressing

1  concerns specific to the ICWA data elements.  HHS also observed that data from September 2016

2  showed that, in 33 states, less than one percent of the children in foster care were reported as AI/AN.

3  2019 NPRM, 84 Fed. Reg. 16,573.  Thus, it was reasonable for Defendants to conclude that it would be

4  inconsistent with their statutory mandate to require every state to modify its systems to report data that is

5  virtually inapplicable to two-thirds of the states.

6      In the 2020 Final Rule, Defendants also addressed comments supporting the retention of all the

7  ICWA-related elements in the 2016 Final Rule that Defendants proposed to remove or simplify.  For

8  example, Defendants noted that while the commenters, who were (for the most part) not Title IV-E

9  agencies actually responsible for reporting data to AFCARS, expressed their desire to have the data for

10  policymaking purposes, as they had earlier articulated in response to the 2018 ANPRM, they did not

11  identify any additional evidence that required this data for policymaking on a federal level or why

12  AFCARS specifically is the best means for collecting it.  2020 Final Rule, 85 Fed. Reg. 28,412.

13      Defendants also explained that they would foster the Court Improvement Plan as an alternative

14  means of collecting data about Indian children in out of home care.  *Id.* at 28,424; *see also* 2019 NPRM,

15  84 Fed. Reg. at 16,578.  Defendants also addressed the comments citing the benefit of collecting data to

16  assess ICWA compliance by the states.  In addition to the policy-based rationale for removing certain

17  ICWA data elements, Defendants explained their legal interpretation that AFCARS authority permitted

18  HHS to collect ICWA-related data regarding whether a child's connections with his or her family,

19  heritage, and community are preserved, but did not authorize HHS to require states to report specific

20  details on ICWA's requirements in AFCARS to be used for ICWA compliance.  2020 Final Rule, 85

21  Fed. Reg. at 28,412-13.  HHS also explained that the ICWA-related data elements in the 2016 Final

22  Rule would not be available for ICWA compliance purposes because ACF is unable to release

23  information, other than to the child's tribe, for confidentiality reasons.  *Id.* at 28,413; *see also* 2019

24  NPRM, 84 Fed. Reg. at 16,578.

25      Plaintiffs argue that HHS should have required these states to collect these data elements

26  notwithstanding the burden.  First, Plaintiffs argued Defendants overvalued the costs because agencies

27  would be required to collect all the data elements in only two percent of cases.  This argument does not

28  recognize that HHS was evaluating the burden to include implementing a data system, developing

1    materials for collecting data, training and other costs and burdens that states would need to assume

2    simply to develop the systems and protocols to collect the data.  *Id.* at 28,420-23.  Furthermore,

3    Plaintiffs' argument, at its core, merely reflects their disagreement with how much weight to assign to

4    the burden of collecting the removed ICWA-related elements; however, the Court may not substitute its

5    (or Plaintiffs') judgment for that of HHS.  *California v. Azar* , 950 F.3d 1067, 1096 (9th Cir. 2020) ("We

6    are also prohibited from 'second-guessing the [agency]'s weighing of risks and benefits and penalizing

7    [it] for departing from the . . . inferences and assumptions' of others."  (quoting *DOC v. New York*, 139

8    S. Ct. 2551, 2571 (2019) (alterations in original))).

9         Second, Plaintiffs argue that Defendants failed to respond meaningfully to significant comments

10   about the burden, citing comments that states should have already begun the process of implementing

11   the 2016 Final Rule (AR 761), that there would be a burden to states to upgrade their systems even

12   without the ICWA data elements (AR 988), that Title IV-E agencies would need to answer only three

13   ICWA-related questions in 98 percent of cases (AR 2781, 2898), and that the justification that ICWA

14   data elements are better suited to qualitative assessments is not warranted because the ICWA data

15   elements were answerable in a yes/no format (AR 2396-97).  However, HHS had already received

16   burden estimates from states that estimated that they would incur costs for upgrading systems and

17   modifying protocols to collect new elements.  Indeed, in response to the 2018 ANPRM, states estimated

18   it would take between "200 to 25,000 hours to accomplish tasks related to the ICWA-related data

19   elements."  84 Fed. Reg. at 16,573.  States reported that their tasks would include: "Developing or

20   modifying policies, procedures, rules, case management systems, and electronic case records to comply

21   with the AFCARS requirements, Searching for and gathering the information required to be reported for

22   the data elements, Entering the information into the system, and Training staff on the requirements and

23   changes."  *Id.*

24        Moreover, these comments are not significant.  Even assuming their truth and that Defendants

25   adopted them, it was still reasonable for HHS to determine that requiring two-thirds of the nation to

26   implement a data system that will collect no useful data more than 99% of the time is fundamentally

27   inconsistent with the statutory mandate that AFCARS avoid unnecessary diversion of resources from

28   agencies.  Therefore, because the comments did not require Defendants to change their position on

1    removing the ICWA-related elements, and Defendants offered a reasoned explained for their decision,

2    Defendants were free to disregard these comments.

3         Plaintiffs also claim that Defendants failed to respond to a comment that collecting the

4    information through alternative methods, such as the CIP, seemed unlikely to be successful as such

5    methods would require states to voluntarily prioritize ICWA data collection (AR 2649-50; *see also, e.g.,*

6    AR 2399).  Plaintiffs' argument fails to consider Ninth Circuit precedent that requires the Court to give

7    "particularly deferential review" to Defendants' predictive judgment areas within its field of discretion

8    and expertise.  *California*, 950 F.3d at 1096 (citations omitted).  Here, HHS's predictions about the

9    availability of data through the CIP (which HHS administers) concern matters squarely within HHS's

10   area of discretion and expertise, and are entitled to deference because HHS is best positioned to

11   anticipate the behavior of the CIP grantees.  *Id.* at 1100.  In light of this deference, and that nothing

12   about this comment, even if adopted, would require a change in position, the comment was not

13   significant and did not require a specific response.

14        Plaintiffs also argue that Defendants misunderstood the purpose of collecting ICWA data

15   because such data was intended for use to inform policy-driven activities, not to assess or enforce ICWA

16   compliance in a specific case.  Pls' MSJ at 28:13-18.  But even if Plaintiffs are correct, Defendants

17   explained their policy judgment that the benefit of having the data for policymaking purposes was

18   overstated.  The commenters did not identify any specific policies that required this data or why

19   AFCARS specifically is the best means for collecting it, and ignored the fact that Congress has passed

20   numerous federal child welfare programs despite not having this data.  In any case, the Court should

21   decline Plaintiffs' invitation to weigh costs and benefits, and, in doing so, substitute its judgment for that

22   of HHS.

23        Plaintiffs' contention that Defendants engaged in internally inconsistent analysis with respect to

24   HHS's authority to collect ICWA-related data under AFCARS is also without merit because it relies on

25   statements taken out of context.  Contrary to Plaintiffs' assertions, HHS never stated that it lacked 'legal

26   authority . . . to collect ICWA-related data in AFCARS.'"  Pls' Mot. at 28:7-8.  Rather, HHS explained:

27   "Retaining all of the 2016 final rule ICWA-related data elements would put HHS in the position of

28   interpreting various ICWA requirements. We have authority only for the collection of data elements that

1   are used for functions and oversight under HHS authority, namely the title IV–B and IV–E programs."

2   2020 Final Rule, 85 Fed. Reg. at 28,412.  Further, HHS expressly noted that DOI, not HHS, is the

3   "cognizant authority over implementing, overseeing, or assessing compliance with ICWA."  *Id.*  "The

4   AFCARS authority allows us to collect ICWA-related data elements in this final rule to inform us

5   whether a child's connections with his or her family, heritage, and community are preserved and will

6   provide context for other title IV–B and IV–E monitoring," *id.* at 28,412-13.  Moreover, HHS, in

7   responding to a comment, clarified that "*section 422(b)(9) of the Act* does not provide the legal authority

8   for HHS to collect ICWA-related data in AFCARS or for HHS to determine state compliance with

9   ICWA.  Rather, it simply requires a description of the specific measures taken by the state to comply

10   with ICWA.  HHS is not authorized to determine compliance with ICWA and/or penalize states for

11   failure to comply with ICWA through this requirement."  *Id.* at 28,412 (emphasis added).  In any case,

12   even if the Court were to disagree that HHS's legal analysis is permissible under *Chevron*—that HHS

13   lacked authority to collect certain ICWA-specific compliance elements under AFCARS, while

14   remaining able to collect ICWA-related elements that bear on the care provided under Titles IV–B and

15   IV–E—the agency's policy rationale on burdens and costs on states is more than sufficient to sustain the

16   2020 Final Rule.

17   For the forgoing reasons, the 2020 Final Rule is not arbitrary or capricious as it relates to the

18   ICWA-related elements.

19   **D.     Even if Plaintiffs Prevail, the 2020 Final Rule Should Not Be Set Aside**

20   The 2020 Final Rule is not arbitrary or capricious.  Nor was it not issued in accordance with law.

21   But if the Court should hold otherwise, the 2020 Final Rule should not be set aside.  Rather, it should be

22   remanded without vacatur.  "Whether agency action should be vacated depends on how serious the

23   agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"

24   *Cal. Cmtys. Against Toxics v. EPA (CCAT)*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal,*

25   *Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  "A flawed rule need

26   not be vacated.  Indeed, when equity demands, a regulation can be left in place while the agency follows

27   the necessary procedures to correct its action."  *Id.* at 991; *Local Joint Exec. Bd. of Las Vegas v. NLRB*,

28   840 F. App'x 134, 137 (9th Cir. 2020) ("Although the reasoning underlying the Board's rule in this case

1    was inadequate, and must be addressed by the Board upon remand, it does not necessarily follow that

2    the Board's rule must be vacated." (citing *CCAT*, 688 F.3d at 992)).

3         "The first *Allied-Signal* factor deals with the likelihood that a rule's deficiencies can be redressed

4    on remand . . . ."  *See Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 44 (D.D.C. 2013) (citing

5    *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013)); *see also United States Sugar*

6    *Corp. v. Envtl. Prot. Agency*, 830 F.3d 579, 630, (D.C. Cir. 2016) (characterizing factor as "likelihood of

7    cure on remand").  As explained in Defendants' motion for voluntary remand filed with this Court on

8    October 15, 2021, and the declarations of Aysha Schomburg and Joseph Kracke-Bock filed therewith,

9    all of which Defendants incorporate herein by reference, Defendants intend to reconsider the 2020 Final

10   Rule in light of a change in administration and the attendant change in policies.  In doing so, Defendants

11   are initiating a rulemaking process that would propose to collect, under AFCARS or an alternate legal

12   authority, the sexual orientation and ICWA-related data that are the subject of Plaintiffs' challenge.

13   Therefore, the purported errors raised by Plaintiffs are not sufficiently serious to warrant vacatur

14   because any such errors, assuming they exist, can be addressed on remand.  *See Allied-Signal*, 988 F.2d

15   at 150-51 (finding that the deficiencies were the failure of the agency to adequately state its reasoning,

16   and thus not "serious" because the agency, on remand, might be able to easily provide the necessary

17   explanation).  Furthermore, the alleged errors identified by Plaintiffs, which almost all focus on

18   perceived failures to provide an adequate explanation or adequately consider comments, are the types of

19   errors that can be addressed by further rulemaking.

20        Regarding the second *Allied-Signal* factor, Defendants' motion for voluntary remand also

21   explains in detail why vacatur would be extraordinarily disruptive.  AFCARS is a nationwide system

22   that requires Title IV-E agencies from all 50 states and numerous tribes to collect and submit data to

23   HHS.  Vacating the 2020 Final Rule and reinstating the 2016 Final Rule would require HHS, all 50

24   states, and tribal title IV-E agencies to modify and, in some cases, unwind the implementation work for

25   the 2020 Final Rule at great expense and burden.  *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510,

26   519 (2020) ("Under our precedents, a quintessential disruptive consequence arises when an agency

27   cannot easily unravel a past transaction in order to impose a new outcome.  We have rejected [such]

28   approaches . . . as 'an invitation to chaos.'" (quoting *Sugar Cane Growers v. Veneman*, 289 F.3d 89, 97

1    (D.C. Cir. 2002))).  Any changes would also divert the attention and resources of Title IV-E agencies

2    from their current obligations, including mandated federal reporting for other Title IV-B and Title IV-E

3    programs, thereby potentially disrupting the flow of billions of dollars in federal funding.

4              Vacating the 2020 Final Rule would also delay HHS from receiving updated data and

5    comprehensive historical information on key data elements included in the 2020 Final Rule.  It would

6    not serve the interests of anyone, including the foster care population, to prevent the implementation of

7    the 2020 Final Rule, which has 64 more data elements than the 1993 regulations currently in effect.  *See*

8    *CCAT*, 688 F.3d at 993-94 (finding that vacatur could stall the construction of a much needed power

9    plant and result in blackouts, thereby "necessitat[ing] the use of diesel generators that pollute the air, the

10   very danger the Clean Air Act aims to prevent").  Reverting to the 2016 Final Rule would also be a

11   waste of federal, state and tribal resources because some of data elements that were carried over from

12   2016 Final Rule to the 2020 Final Rule were modified and thus, while similar, are not identical.

13   Therefore, Title IV-E agencies would need to implement additional system modifications to revert even

14   partially to the 2016 Final Rule and collect the ICWA and sexual orientation data elements removed

15   from the 2020 Final Rule.  Moreover, reverting to the 2016 Final Rule would entail HHS and Title IV-E

16   agencies collecting the data elements that are not the subject of Plaintiffs' challenge.  It is difficult to

17   imagine anything more wasteful, and contrary to the statutory admonition that AFCARS avoid

18   unnecessary diversion of resources from Title IV-E agencies, than reinstating data elements that neither

19   side is seeking to collect.

20             Plaintiffs' allegations of harm from keeping the 2020 Final Rule in place are too speculative and

21   amorphous to outweigh the disruptive consequences of vacatur.  For example, Plaintiffs assert that not

22   having the data elements forces them to divert resources to address harms to their mission-driven

23   activities and impairs their ability to obtain funding.  But Plaintiffs do not attempt to quantify these

24   amounts or how they compare to the costs that would be incurred by HHS and Title IV-E agencies in

25   reverting back to the 2016 Final Rule.  *See Neighbors Against Bison Slaughter v. Nat'l Park Serv.*, No.

26   CV 19-128-BLG-SPW, 2021 U.S. Dist. LEXIS 22584, at *6-11 (D. Mont. Feb. 4, 2021) (remanding

27   without vacatur where agencies, without confessing error, sought to reconsider bison management plan

28   because harm alleged was too attenuated and loss of monetary value to local business did not outweigh

disruption of collaborative bison management goals and would result in confusion about the management framework for bison); *Am. Forest Res. Council*, 946 F. Supp. 2d at 43-44 (finding the "administrative and economic costs of remand without vacatur are too abstract and speculative to clearly outweigh its benefits" where plaintiff "ha[d] not attempted to quantify these costs . . . [or] provided any concrete examples of projects impacted by the consultation requirement or additional timber that could be harvested in the next three years if the rule were vacated").  Nor do Plaintiffs assert that they cannot continue their advocacy efforts without this data.

Accordingly, even if the Court finds for Plaintiffs, the 2020 Final Rule should be remanded without vacatur.

## VI.     CONCLUSION

For all the foregoing reasons, the Court should grant the Defendants' motion for summary judgment and deny Plaintiff's motion for summary judgment.  If the Court finds for Plaintiff, it should not set aside the 2020 Final Rule but remand it back to HHS without vacatur.

DATED:  October 15, 2021                     Respectfully submitted,

                                             STEPHANIE M. HINDS
                                             Acting United States Attorney

                                             /s/ *Emmet P. Ong*
                                             EMMET P. ONG
                                             Assistant United States Attorney

                                             *Attorneys for Defendants*