Jennifer C. Pizer (CA Bar No. 152327)
Lambda Legal Defense and Education Fund
4221 Wilshire Blvd., Suite 280
Los Angeles, CA 90010
(213) 590-5903
jpizer@lambdalegal.org

M. Currey Cook (NY Bar No. 4612834)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
120 Wall St., 19th Fl.
New York, New York 10005
ccook@lambdalegal.org
Telephone: (212) 809-8585

Sasha Buchert (OR Bar No. 070686)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Sbuchert@lambdalegal.org
Telephone: (202) 804-6245

Jeffrey B. Dubner (DC Bar No. 1013399)
(admitted *pro hac vice*)
Kristen Miller (DC Bar No. 229627)
(admitted *pro hac vice*)
Sean A. Lev (DC Bar. No. 449936)
(admitted *pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
jdubner@democracyforward.org
kmiller@democracyforward.org
slev@democracyforward.org
Telephone: (202) 448-9090

Kathryn E. Fort (MI Bar No. 69451)
(admitted *pro hac vice*)
Michigan State University College of Law
Indian Law Clinic
648 N. Shaw Lane
East Lansing, M.I. 48824
fort@msu.edu
Telephone: (517) 432-6992

*Counsel for Plaintiffs*                    *Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| CALIFORNIA TRIBAL FAMILIES COALITION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>Defendants. | Case No. 3:20-cv-6018-MMC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR VOLUNTARY REMAND WITHOUT VACATUR**<br><br>Hearing Date: December 3, 2021<br>Time: 9:00 a.m. |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................... **ERROR! BOOKMARK NOT DEFINED.**

INTRODUCTION ...................................................... **ERROR! BOOKMARK NOT DEFINED.**

BACKGROUND ......................................................... **ERROR! BOOKMARK NOT DEFINED.**

ARGUMENT ................................................................................................................. 3

    I. The Court Should Vacate the 2020 Rule ............................................................. 3

        A. The Errors in the 2020 Rule Are Serious .......................................... 4

        B. Vacatur Would Not Be Disruptive ..................................... 8

        C. The Equities Weigh in Favor of Vacatur .......................................... 13

CONCLUSION ............................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
   988 F.2d 146 (D.C. Cir. 1993) ........................................................................*passim*

*Am. Acad. of Pediatrics v. FDA,*
   399 F. Supp. 3d 479 (D. Md. 2019) ................................................................ 13

*Am. Forest Res. Council v. Ashe,*
   946 F. Supp. 2d 1 (D.C. Cir. 2013) ............................................................ 7, 16

*Am. Great Lakes Ports Ass'n v. Schultz,*
   962 F.3d 510 (D.C. Cir. 2020) ...................................................................... 13

*AquAlliance v. U.S. Bureau of Reclamation,*
   312 F. Supp. 3d 878 (E.D. Cal. 2018) .......................................................... 4, 8

*Black Oak Energy v. FERC,*
   725 F.3d 230 (D.C. Cir. 2013) ...................................................................... 6, 7

*Cal. Cmtys. Against Toxics v. EPA,*
   688 F.3d 989 (9th Cir. 2012) ........................................................................ 4, 9

*California by & through Becerra v. DOI,*
   381 F. Supp. 3d 1153 (N.D. Cal. 2019) ........................................................ 4, 9

*California v. Bernhardt,*
   472 F. Supp. 3d 573 (N.D. Cal. 2020) .................................................. 4, 12, 13

*California v. U.S. Bureau of Land Mgmt.,*
   277 F. Supp. 3d 1106 (N.D. Cal. 2017) ................................................. 1, 5, 8, 9

*In re Clean Water Act Rulemaking,*
   No. 20-cv-4636, --- F. 3d ----, 2021 WL 4924844 (N.D. Cal. Oct. 21, 2021) .............. 4, 5, 6, 8

*Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.,*
   365 F.3d 435 (6th Cir. 2004) ........................................................................ 12

*Ctr. for Env't Health v. Vilsack,*
   No. 15-cv-01690, 2016 WL 3383954 (N.D. Cal. June 20, 2016) ........................ 3, 6

*Del. Riverkeeper Network v. EPA,*
   No. 20-3412, 2021 WL 3476173 (E.D. Pa. Aug. 6, 2021) .................................... 7

*Idaho Farm Bureau Fed'n v. Babbitt,*
   58 F.3d 1392 (9th Cir. 1995) ........................................................................ 3, 8

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.,*
   109 F. Supp. 3d 1238 (N.D. Cal. 2015) ........................................................ 4, 6, 16

*Nat'l Family Farm Coal. v. EPA,*
   960 F.3d 1120 (9th Cir. 2020) .......................................................................... *passim*

*Natural Res. Def. Council v. Norton,*
   No. 05-cv-1207, 2007 WL 14283 (E.D. Cal. Jan. 3, Jan. 3, 2007) ................................ 1, 8, 17

*Neighbors Against Bison Slaughter v. Nat'l Park Serv.,*
   No. 19-cv-128, 2021 WL 717094 (D. Mont. Feb. 5, 2021) .................................... 16

*Neighbors For Env't Justice v. EPA,*
   Nos. 20-72091, 20-73276, Doc. No. 80 (9th Cir. July 14, 2021) ............................ 7

*Nw. Env't Advocates v. EPA,*
   No. 12-cv-01751, 2018 WL 6524161 (D. Or. Dec. 12, 2018) ............................ 3, 16

*Pascua Yaqui Tribe v. U.S. EPA,*
   No. 20-cv-266, --- F. 3d ----, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021) ............................ 7

*Pollinator Stewardship Council v. EPA,*
   806 F.3d 520 (9th Cir. 2015) .......................................................................... *passim*

*Safer Chemicals, Healthy Families v. EPA,*
   791 Fed. Appx. 653 (9th Cir. 2019) ...................................................................... 7

*SKF USA Inc. v. U.S.,*
   254 F.3d 1022 (Fed. Cir. 2001) ...................................................................... 7

*U.S. Sugar Corp. v. EPA,*
   830 F.3d 579 (D.C. Cir. 2016) ...................................................................... 7

*Zambrana v. Califano,*
   651 F.2d 842 (2d Cir. 1981) ...................................................................... 12

**Statutes**

42 U.S.C. § 679(a)(2)(A), (d) ...................................................................... 15

**Other Authorities**

45 C.F.R. § 1356.86 (2012) ...................................................................... 11

45 C.F.R. § 1355.44 (2012) ...................................................................... 12

45 C.F.R. § 1355.45 (2012) ...................................................................... 12

81 Fed. Reg. 90,524 (Dec. 14, 2016) .......................................................................... *passim*

84 Fed. Reg. 16,572 (Apr. 19, 2019)..................................................................... 10, 12, 13

85 Fed. Reg. 28,410 (May 12, 2020) ...............................................................*passim*

Fed. R. Civ. P. 1 ........................................................................................................ 17

# INTRODUCTION

There is no dispute in this case that the 2020 Final Rule must be remanded. Instead, the key question before the Court is whether to allow that Rule to remain in force indefinitely, with no possible route for obtaining judicial review of its legality, while Defendants consider undertaking a new rulemaking with no timetable for completion. Defendants cannot justify this extraordinary remedy, and the Court should deny their motion to remand *without* vacatur.

Defendants' motion fails both prongs of the Ninth Circuit's test for remand without vacatur. The first prong requires vacatur if an agency is unlikely to adopt the same rule on remand, *see Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120, 1144 (9th Cir. 2020), yet Defendants urge the Court to leave the unlawful Rule in place *because* they are unlikely to re-adopt it on remand. The second prong requires Defendants to show extraordinary and irreparable disruption such as, in prior cases, species extinction or statewide blackouts, *see California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017), yet all Defendants plausibly point to here are some unquantified costs to Defendants and state agencies to conform their databases and training practices to the requirements in place before the 2020 Final Rule was issued. Even those alleged disruptions can be addressed through tailoring the remedy in the Court's equitable discretion, rather than forgoing vacatur altogether and leaving an unlawful rule in place without the possibility of judicial review.

This case thus falls far outside the "limited circumstances," *Nat'l Family Farm Coal.*, 960 F.3d at 1144, in which courts consider withholding the ordinary remedy of vacatur. The Court should not let Defendants "'have it both ways,' by being permitted to operate under the challenged [agency action] while maintaining that all litigation regarding [the action] should cease." *Natural Res. Def. Council v. Norton*, No. 05-cv-1207, 2007 WL 14283, at *12 (E.D. Cal. Jan. 3, 2007). Accordingly, the Court should remand the 2020 Final Rule *with* vacatur or deny Defendants' motion and grant Plaintiffs' motion for summary judgment.

# BACKGROUND

The factual and procedural background of this case is stated in Plaintiffs' motion for summary judgment. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' MSJ Mem."), Doc. No.

66, at 2–16. In brief, this case is about whether Defendants will collect a range of important data on the experiences and needs of children in foster care, including, most notably, data on (1) the sexual orientation of children aged 14-and-up and the legal guardians and adoptive or foster parents of children in the child welfare system, and (2) whether children protected by the Indian Child Welfare Act ("ICWA") are receiving the assistance and safeguards guaranteed by that statute. Defendants have previously recognized that this data will "better support [LGBTQ+] children in foster care," who "are at an increased risk for poor outcomes," by "ensur[ing] that foster care placement resources and services are designed appropriately," and will "help address . . . the disproportionality of [American Indian and Alaska Native] children in foster care" by "prevent[ing] AI/AN children from entering the foster care system." Adoption and Foster Care Analysis and Reporting System, 81 Fed. Reg. 90,524, 90,527, 90,534 (Dec. 14, 2016) ("2016 Final Rule"); *see also* Pls.' MSJ Mem. at 2–4.

In 2016, Defendants issued a final rule requiring the collection of this data; in 2020, they issued a final rule eviscerating it. *See* Adoption and Foster Care Analysis and Reporting System, 85 Fed. Reg. 28,410 (May 12, 2020) ("2020 Final Rule"). There is no dispute in this case that the 2020 Final Rule caused concrete and particularized harm to the Plaintiffs in this case, who include Yurok Tribe, the largest sovereign Indian tribe in California; Cherokee Nation, one of the largest sovereign Indian tribes in the United States; a membership association of 38 sovereign Indian tribes located in California; an organization consisting of and serving foster youth and foster care alumni; an organization that works with LGBTQ+ youth who have experienced trafficking; and two organizations that work with LGBTQ+ youth in the foster care system. *See* Pls.' MSJ Mem. at 16–19; *see also* Pls.' MSJ Mem. Exs. A–E.

These organizations fought for this data for years. It took 13 years for Defendants to update the Adoption and Foster Care Analysis and Reporting System ("AFCARS") regulations after they first recognized that they needed improvement. *See* Pls.' MSJ Mem. at 7. Even today, five years after successfully convincing Defendants to collect the data, it is still uncollected and unavailable—meaning that the tribes' ability to care for their children, vindicate their rights under ICWA, and even obtain funding continues to be impaired, as does the youth organizations' ability

to provide direct services, identify and respond to the needs of the youth that they serve, and work with states to improve the treatment of LGBTQ+ youth. *Id.* at 18–19.

Now, Defendants argue that this Court should strip Plaintiffs of any ability to challenge the 2020 Final Rule, leaving it on the books indefinitely while Defendants consider whether to issue one or more proposed rules under which the sexual orientation data might eventually be collected through AFCARS and some ICWA data might eventually be collected through some unspecified mechanism. *See* Defs.' Mot. for Voluntary Remand Without Vacatur ("RWV Mot."), Doc. No. 102, at 6; *see also* Joint Submission, Doc. No. 96, at 2, 11 n.3. They offer no timeline for issuing a proposed rule, finalizing such a rule, or requiring compliance from child welfare agencies—a process that, as noted above, has historically taken years. Nor do they guarantee that they would actually issue a final rule, or that it would require the same data; indeed, they could not do so without improperly prejudging the rulemaking under the Administrative Procedure Act. Accordingly, their proposal is to terminate proceedings in this Court with no determination of Plaintiffs' rights or the legality of Defendants' actions, and no timeline for curing the harm wrought by the 2020 Final Rule.

## ARGUMENT

### I.      The Court Should Vacate the 2020 Final Rule.

The Ninth Circuit "order[s] remand without vacatur only in limited circumstances," *Nat'l Family Farm Coal.*, 960 F.3d at 1144, and leaves "invalid rule[s] in place only 'when equity demands' that [the court] do so," *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)). Because vacatur is the "ordinary remedy," Defendants "bear[] the burden of demonstrating vacatur is inappropriate." *Nw. Env't Advocates v. EPA*, No. 12-cv-01751, 2018 WL 6524161, at *3 (D. Or. Dec. 12, 2018); *see also Ctr. for Env't Health v. Vilsack*, No. 15-cv-01690, 2016 WL 3383954, at *13 (N.D. Cal. June 20, 2016) ("[G]iven that vacatur is the presumptive remedy for a . . . violation such as this, it is Defendants' burden to show that vacatur is unwarranted.").

"To determine whether vacatur is appropriate," the Ninth Circuit applies the *Allied-Signal* test, which requires "weigh[ing] [1] the seriousness of the agency's errors against [2] the

disruptive consequences of an interim change that may itself be changed." *Nat'l Family Farm Coal.*, 960 F.3d. at 1144 (quoting *Pollinator Stewardship Council*, 806 F.3d at 532)); *see also Cal. Cmtys. Against Toxics v. EPA ("CCAT")*, 688 F.3d 989, 992 (9th Cir. 2012) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). A court may decline to vacate agency decisions "only … 'when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error.'" *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 882 (E.D. Cal. 2018) (quoting *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015)).

As discussed further below, the Court should vacate the 2020 Final Rule because its fundamental flaws outweigh the minimal consequences that would result from its vacatur.

A.  The Errors in the 2020 Rule Are Serious.

The first *Allied-Signal* prong weighs in favor of vacatur because the 2020 Rule is fundamentally flawed and Defendants are unlikely to reach to same result on remand.

*First*, the 2020 Final Rule is riddled with the kind of deficiencies that courts in the Ninth Circuit have acknowledged as serious errors under *Allied-Signal*. Courts have repeatedly recognized that non-technical violations of the Administration Procedure Act ("APA"), such as arbitrary and capricious decision-making, weigh in favor of vacatur. For example, the Ninth Circuit vacated over an agency's objection where the agency's decision was unsupported by substantial evidence, understated certain risks associated with the agency action, and entirely failed to acknowledge other risks. *Nat'l Family Farm Coal.*, 960 F.3d at 1144-45. Likewise, Northern District cases have found serious error where agency rulemaking was unreasoned and internally inconsistent, *In re Clean Water Act Rulemaking*, No. 20-cv-4636, --- F. Supp. 3d ----, 2021 WL 4924844, at *7 (N.D. Cal. Oct. 21, 2021); relied on a flawed cost-benefit analysis, *California v. Bernhardt*, 472 F. Supp. 3d 573, 615–18, 631 (N.D. Cal. 2020); or failed to provide a reasoned explanation for disregarding the facts and circumstances underlying the prior rule, *California by & through Becerra v. DOI*, 381 F. Supp. 3d 1153, 1178 (N.D. Cal. 2019). In contrast, "[c]ourts generally only remand *without vacatur* when the errors are minor procedural

4

1    mistakes, such as failing to publish certain documents in the electronic docket of a notice-and-

2    comment rulemaking." *U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d at 1125 (emphasis added).

3              Here, the 2020 Final Rule is plagued by flaws that are on all fours with those that have

4    warranted vacatur in previous cases. The 2020 Rule's overarching and core justification is

5    grounded in a cost-benefit analysis that is deficient four times over: it failed entirely to consider

6    the benefits of the removed data elements, disregarded facts and circumstances that underlay the

7    cost-benefit analysis in the 2016 Rule, contradicted the evidence before the agency, and refused to

8    respond meaningfully to comments. Pls.' MSJ Mem. at 21–24; Pls.' Reply ISO Mot. for Summ. J.

9    & Opp'n to Defs.' Cross-Mot. for Summ. J. ("Pls.' MSJ Reply", Doc. No. 105 at 3–7.

10             Likewise, the agency's rationales for removing the specific sexual orientation and ICWA

11   data elements challenged here were arbitrary and capricious in multiple respects. Pls.' MSJ Mem.

12   at 24–30; Pls.' MSJ Reply at 3–15. Defendants' justification for eliminating the sexual orientation

13   questions ignored statutory requirements and rested on a plain misreading of the record,

14   conclusory dismissals of comments, and unexplained reversals from the 2016 Rule. Pls.' MSJ

15   Mem. at 20, 24–27; Pls' MSJ Reply at 7–11. Before this Court, Defendants can only attempt to

16   salvage their decision through *post hoc* rationalizations found nowhere in the record. *See* Pls.'

17   MSJ Reply at 7–11. As to the ICWA elements, Defendants' rationale was wholly unreasoned,

18   internally inconsistent, disregarded the facts and circumstances underlying the prior rule without

19   explanation, and failed to acknowledge and respond to significant comments. Pls.' MSJ Mem. at

20   27–30; Pls.' MSJ Reply at 11–14. These are not the sort of "minor procedural mistakes" that

21   typically weigh against vacatur. *U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d at 1125.

22             *Second*, "such fundamental flaws in the agency's decision make it unlikely that the same

23   rule would be adopted on remand." *Nat'l Family Farm Coal.*, 960 F.3d. at 1145. In such instances,

24   courts in the Ninth Circuit have found that the first *Allied-Signal* prong weighs in favor of vacatur.

25   *See, e.g., id.* (vacating rule); *Pollinator Stewardship Council*, 806 F.3d at 532 (vacating where "a

26   different result may be reached on remand"); *In re Clean Water Act Rulemaking*, --- F. Supp. 3d --

27   --, 2021 WL 4924844 at *8 (vacating where agency "signaled it could not or will not adopt the

28   same rule on remand"); *Ctr. for Env't Health v. Vilsack*, No. 15-cv-01690, 2016 WL 3383954, at

1   *11 (N.D. Cal. June 20, 2016) (vacating where it was "far from certain" that the agency would

2   "adopt the same rule").

3       So too here. Defendants are unlikely to reach the same result on remand merely by

4   "offer[ing] better reasoning or . . . comply[ing] with procedural rules." *Nat'l Family Farm Coal.*,

5   960 F.3d at 1145. The 2020 Rule's flaws go to the "very factors [the agency] chose to use as the

6   basis for its [decision]" and are not "mere technical or procedural formalities that the [agency] can

7   easily cure." *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1244–45 (vacating agency

8   action with serious errors).

9       In fact, *Defendants themselves* have indicated that they intend to issue a proposed rule that,

10  if finalized, would reverse the most significant changes in the 2020 Final Rule by collecting the

11  removed data elements at issue in this litigation and revisiting the cost-benefit analysis

12  undergirding the 2020 Final Rule. RWV Mot. at 5. "Even without admitting error, the scope of

13  potential revisions [the agency] is considering supports vacatur of the current rule because the

14  agency has demonstrated that it will not or could not adopt the same rule upon remand." *In re*

15  *Clean Water Act Rulemaking*, --- F. Supp. 3d ----, 2021 WL 4924844 at *8.

16      Defendants nevertheless argue that the 2020 Rule's deficiencies do not warrant vacatur

17  precisely because Defendants intend to propose a new and different rule that will collect the

18  removed sexual orientation and ICWA data elements. RWV Mot. at 7. This argument turns *Allied-*

19  *Signal*'s first prong on its head. As just explained, the first prong weighs *in favor* of vacatur where

20  the agency is unlikely to adopt the same rule on remand.

21      Defendants cite to no cases that support their premise that the first prong weighs *against*

22  vacatur in such circumstances. Indeed, all of Defendants' cases either stand for the opposite

23  proposition or fail to address *Allied-Signal* at all. For example, in *Black Oak Energy v. FERC*, the

24  D.C. Circuit found that the first prong tipped against vacatur because it was plausible that "FERC

25  can redress its failure of explanation on remand while *reaching the same result*." 725 F.3d 230,

26  244 (D.C. Cir. 2013) (emphasis added). Weighing the possibility that the agency would

27  "ultimately conclude[] that [its original decision] was the proper path" against the "certain"

28  disruption that would accompany vacatur, the court "deem[ed] it better to preserve the status quo

as FERC reconsider[ed] its [decision]." *Id. Black Oak Energy* therefore indicates only that

withholding vacatur *may* be appropriate when the agency is likely to keep the same rule on

remand. It provides no support for Defendants' contention that courts should remand without

vacatur when the agency plans on changing course, as Defendants intend to do here.

The same is true for Defendants' other out-of-circuit cases. *See U.S. Sugar Corp. v. EPA*,

830 F.3d 579, 630 (D.C. Cir. 2016) (finding that agency failed to adequately explain its decision to

use carbon monoxide in calculating emission standards, but declining to vacate those standards

because it was "likely that EPA [would] be able to adequately explain its use of CO on remand");

*Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 44–45 (D.C. Cir. 2013) (finding that the first

prong did "not weigh strongly in favor" of vacatur because it was "plausible that [FWS] can

redress its failure of explanation on remand while reaching the same result."); *Allied-Signal, Inc.*,

988 F.2d at 151 (declining to vacate an unreasoned rule "because of the possibility that the

Commission may be able to justify the rule" on remand).[1]

Nor are Defendants saved by the two unpublished Ninth Circuit orders they provide,

neither of which is precedential nor discusses the *Allied-Signal* test. In *Neighbors for*

*Environmental Justice v. EPA*, the Ninth Circuit's single-page unpublished order offers no

analysis, stating only that the EPA's motion for remand without vacatur was granted. Order, Nos.

20-72091, 20-73276, Doc. No. 80 (9th Cir. July 14, 2021). The court's analysis in *Safer*

*Chemicals, Healthy Families v. EPA* is likewise perfunctory, failing to mention the *Allied-Signal*

factors and offering its decision to remand without vacatur in one conclusory sentence. 791 Fed.

Appx. 653, 656 (9th Cir. 2019). Defendants' interpretation of these unpublished orders as showing

that courts should remand without vacatur "without analyzing [the] *Allied-Signal* factors," RWV

Mot. at 8, has not been adopted by courts within this Circuit. *See, e.g.*, *Pascua Yaqui Tribe v. U.S.*

---

[1] Defendants cite to one Eastern District of Pennsylvania case that declined to vacate an agency rule where the agency expressed an intention to reach a different result on remand. *See Del. Riverkeeper Network v. EPA*, No. 20-3412, 2021 WL 3476173, at *1, *3 (E.D. Pa. Aug. 6, 2021). The court, however, did not apply the *Allied-Signal* framework or discuss the seriousness of the agency's errors. *Id.* at *3–4. Rather, the court grounded its decision in "the principles discussed in *SKF-USA*." *Id.* at *4 (citing *SKF USA Inc. v. U.S.*, 254 F.3d 1022, 1028–29 (Fed. Cir. 2001)). Because *SKF* does not address vacatur, *see generally* 254 F.3d 1022, it is irrelevant here.

*EPA*, No. 20-cv-266, --- F. Supp. 3d ----, 2021 WL 3855977, at *4 (D. Ariz. Aug. 30, 2021) (considering *Safer Chemicals* and concluding that "[c]ourts faced with a motion for voluntary remand employ the same equitable analysis courts use to decide whether to vacate agency action after a ruling on the merits." (quoting *ASSE Int'l, Inc. v. Kerry*, 182 F. Supp. 3d 1059, 1064 (C.D. Cal. 2016))). This Court should similarly apply the full *Allied-Signal* test. *See, e.g.*, *In re Clean Water Act Rulemaking*, --- F. Supp. 3d ----, 2021 WL 4924844 at *3, *8 (applying the full test where "the EPA stated its intent . . . to promulgate a revised rule" in light of the new administration's policies); *Natural Res. Def. Council*, 2007 WL 14283, at *1, *12–13 (same where agency intended to take new action "within 18 months").

Without further analysis to explain the court's reasoning, these unpublished orders cannot support Defendants' request for remand without vacatur. Rather, this Court should be guided by the robust body of published case law, which makes clear that the serious, non-technical errors in the 2020 Rule "heavily favor[] vacating the [agency action]," *U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d at 1125, especially since it is "unlikely that the same rule would be adopted on remand," *Nat'l Farm Family Coal.*, 960 F.3d at 1145.

B.  <u>Vacatur Would Not Be Disruptive.</u>

Because "it is exceedingly 'unlikely that the same rule would be adopted on remand,'" vacatur would be compelled here even if Defendants could show substantially disruptive effects. *Nat'l Farm Family Coal.*, 960 F.3d at 1145. But even if Defendants could somehow satisfy the first prong of the *Allied-Signal* test, they would still fail to satisfy the second prong, because they cannot show that the consequences of setting aside the 2020 Final Rule are so exceptionally disruptive as to warrant vacatur. As this Court has noted, "the rare exceptions to vacatur involve irreparable and severe disruptive consequences." *U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d at 1125; *see also AquAlliance*, 312 F. Sup. 3d at 882 (explaining that the "limited circumstances" under which the Ninth Circuit declines to vacate are "serious irreparable environmental, or possibly other forms of[,] significant harm to the public interest") (citations omitted). For example, the Ninth Circuit has declined to vacate unlawful regulations where doing so would result in the extinction of an endangered species. *Idaho Farm Bureau Fed. v. Babbitt*, 58 F.3d

1392, 1405–06 (9th Cir. 1995). Likewise, it remanded a rule without vacatur in order to avoid statewide blackouts, worsened air pollution (which would have undermined the very purpose of the statute at issue), and a billion dollars of waste. *CCAT*, 688 F.3d at 993–94.

None of Defendants' claimed disruptions rise to the level of such severe consequences or outweigh the 2020 Final Rule's flaws. Their vague assertions of unquantified costs are far below the threshold that courts have rejected as significant before—and, in any case, will largely be incurred anyway if Defendants follow through on their intention to propose a collection that includes the elements eliminated by the 2020 Final Rule.

*First*, Defendants argue that vacating the 2020 Final Rule will require HHS and the states to expend time and money to update HHS's data collection system and bring state Title IV–E agencies into compliance with the reinstated data element requirements from the 2016 Final Rule. RWV Mot. at 8–9. They provide no evidence that these costs are unduly disruptive. Courts routinely hold that compliance costs far larger than those at issue here—even when in the hundreds of millions—are insufficient to outweigh serious agency error and certainly do not rise to the level of species extinction or rolling blackouts. *U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d at 1125–26; s*ee also California by & through Becerra*, 381 F. Supp. 3d at 1179 (finding that the need for regulated entities to have time to "convert their accounting systems" was not sufficiently disruptive to remand without vacatur because "any significant change in the rules . . . inevitably will result in a period of adjustment for interested parties").

By any measure, Defendants' suggestion that these compliance costs will be "extraordinar[y]," RWV Mot. at 8, is overblown. Tellingly, Defendants have not quantified the anticipated costs. They note that the contract for modernizing their data collection platform cost $24.4 million, *See* Declaration of Joseph Kracke-Bock ("Bock Decl."), Doc. No. 102-1, ¶ 11, but provide no reason to believe that changing individual data fields would incur even a fraction of that cost. They refer generally to the cost to local child welfare agencies, which may have to amend ongoing "plans to modify existing and/or new technology systems," *id.* ¶ 12, but again offer no estimate of the cost. Even the dubious burden analysis in the 2019 NPRM shows that any cost will be well below the threshold for withholding vacatur: Defendants reported that state

9

commenters estimated "$600,000 to $1 million for total initial costs" per state, Adoption and

Foster Care Analysis and Reporting System, 84 Fed. Reg. 16,572, 16,574 (Apr. 19, 2019),

meaning that the cost of changing the particular data fields would be some fraction of that amount.

Moreover, given Defendants' stated intention of promulgating a new rule, many—if not

all—of these compliance costs will be incurred regardless of whether the 2020 Rule is vacated.

For example, Defendants complain that vacatur would require HHS and the Title IV–E agencies to

develop new policies and training elements to implement the ICWA and sexual orientation data

elements. RWV Mot. at 8–9. But HHS and the agencies would need to do those things anyway if

Defendants make good on their intentions to begin collecting those elements through a new

rulemaking. *See id.* at 5. Defendants cannot claim that these implementation costs are

"extraordinarily disruptive" when the basis for their request to remand without vacatur is a

rulemaking that may well impose many if not all of those same costs. The specter of "disruptive

consequences of *an interim change that may itself be changed*," *Nat'l Family Farm Coal.*, 960

F.3d. at 1144 (quoting *Pollinator Stewardship Council*, 806 F.3d at 532) (emphasis added), is

simply absent here.

Indeed, Defendants' argument would have weighed against the 2020 Final Rule even more

strongly than it weighs against vacating at this juncture. States were just five months away from

beginning to collect data under the 2016 Final Rule when Defendants issued the 2020 Final Rule,

and had been preparing to collect that data for nearly three and a half years. By Defendants' logic,

all of that preparation was wasted and the 2020 Final Rule *imposed* costs to change plans

midstream—yet Defendants did not even mention this concern in the 2019 NPRM or 2020 Final

Rule. Here, Title IV–E agencies have been preparing to comply with the 2020 Final Rule for less

than two years, and still have a full year before they must begin collecting data under it. There is

no way that Defendants' argument can be accepted without adding to the strength of Plaintiffs'

arguments that the 2020 Final Rule was arbitrary and capricious.

For similar reasons, Defendants' alarmist claim that implementing the ICWA and sexual

orientation data elements will "disrupt[] the flow of billions of dollars of federal funding" is

nonsense. RWV Mot. at 9. Defendants imply that this catastrophic result would occur because the

state agencies will be too preoccupied with the new changes to attend to their current reporting

requirements. *Id.* This is pure speculation. Defendants provide no factual basis to believe that

states will be unable to meet their reporting requirements. Even beyond that, Defendants

determine whether to issue penalties for noncompliance with reporting requirements. Excusing

states from reporting penalties during any transitional period, either by rule or on a case-by-case

basis, would be far easier than reopening the entire 2016 and 2020 rules for another round of

rulemaking. And even if Defendants' hands were tied, the implication that "billions of dollars"

might be jeopardized is outlandish: the maximum penalty for violations of a state's reporting

requirements is 5.5% of federal funding, *see* 45 C.F.R. § 1356.86(b) (2012), meaning that

Defendants' doomsday hypothetical would occur only if every state in the nation incurred the

maximum penalty for multiple reporting periods.[2]

    *Second*, Defendants argue that vacating the 2020 Rule will "delay HHS from receiving

updated data and comprehensive historical information," citing 64 data elements in the 2020 Final

Rule that were not in the 1993 rule. RMV Mot. at 9. This claim lacks any basis. Of the 64 data

elements, 51 are exactly the same in the 2016 Rule, which would be reinstated if the 2020 Rule

were vacated. *See* 85 Fed. Reg. at 28,422 (noting that the 2020 Final Rule included only "13

modified data points" from the 2016 Final Rule). There is no reason that reverting to the 2016

Final Rule would affect Defendants' authority to require state agencies to collect this data or state

agencies' ability to collect it.

    And even among the 13 elements that differ from the 2016 Final Rule to the 2020 Final

Rule, the changes are minimal and would not prevent states from reverting back to the 2016 Rule

version of those elements. Four of the thirteen simply change the word "gender" to "sex" in the

---

[2] Defendants also point to the cost of litigation itself, but this can be rejected out of hand. The only thing that remains after Defendants file their reply in support of their motion to remand is oral argument. As to their assertion that litigating the case "would interfere with Defendants' ongoing reconsideration process by forcing HHS to structure its administrative process around pending litigation, rather than its policy priorities and expertise," RWV Mot. at 6, there is no reason that this is so. The pendency of this case has never prevented Defendants from embarking on a new rulemaking; they have simply chosen not to do so.

name of the data element, without changing state agencies' responses. *See* 84 Fed. Reg. at 16,579, 16,584–86 (describing changes incorporated in 45 C.F.R. §§ 1355.44(b)(2), (e)(13), (e)(18), & 1355.45(b)(2)). A fifth does not change state agencies' data systems at all; it simply clarifies when a state agency should indicate that a child's race is "unknown." *Id.* at 16,580 (45 C.F.R. § 1355.44(b)(7)(vi)). Defendants themselves described a sixth as "minor." *Id.* at 16,582 (45 C.F.R. § 1355.44(d)(4)). The rest are either similar in scope to the change that Defendants described as "minor," *see id.* at 16,580, 16,583 (45 C.F.R. § 1355.44(b)(9), (b)(17), (e)(4), (e)(8)) or reflect the arbitrary elimination of ICWA questions, *see id.* at 16,579–80 (45 C.F.R. § 1355.44(b)(3)-(5)). The claim that making these minor changes would slow down state agencies' ability to collect and report this data by 2023 or impair Defendants' ability to receive the data—much less that any such impediment would be severely disruptive—is specious.[3]

*Third*, to the extent that collection of the 13 modified elements *would* be delayed by sudden vacatur—or that Title IV–E agencies would have difficulty coming into immediate compliance with the newly reinstated data elements in the 2016 Rule, or that federal funding would somehow be jeopardized—these problems can be readily addressed through the Court's ability to exercise equitable discretion in tailoring the remedy to the facts of the case. *See generally, e.g.*, *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004) ("It is well-established that federal courts possess broad discretion to fashion equitable remedies."); *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981) ("The remanding court is vested with equity powers and, while it may not 'intrud[e] upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.'" (quoting *Ford Motor Co. v. NLRB*, 305 U.S. 364, 373 (1939))).

For example, this Court has discretion to defer vacatur in order to provide HHS and Title IV–E agencies time to prepare for implementation of the 2016 Rule. *See California v. Bernhardt*, 472 F. Supp. 3d at 631–32 (delaying, but not forgoing, vacatur to "minimize the expenditure of

---

[3] Defendants' purported fear of delaying collection is also belied by the fact that Defendants have repeatedly delayed the collection of these very elements, first by one year in the 2018 delay rule and then by another two years in the 2020 Final Rule. *See* Pls.' MSJ Mem. at 12, 16.

1  resources"). Likewise, the Court could take such concerns into account when setting a new

2  compliance deadline for the 2016 Rule, which has passed and will now need to be reset. *See, e.g.*,

3  *id.* at 631 ("The fact that vacatur may not lead to 'immediate compliance' with the 2016 Rule does

4  not warrant a remand without vacatur."); *Am. Acad. of Pediatrics v. FDA*, 399 F. Supp. 3d 479,

5  483–87 (D. Md. 2019) (resetting lapsed deadline after vacating agency action that had altered that

6  deadline).

7         With such options available, nothing prevents the Court from ordering vacatur in a manner

8  that would allow for a reasonable transition to the 2016 Rule, while facilitating the continued

9  collection of the data elements in the 2020 Rule. This would completely eliminate all of the

10  hypothetical disruption Defendants say would be risked by immediate vacatur. Defendants'

11  attempt to analogize this case to *American Great Lakes Ports Association v. Schultz* is therefore

12  misplaced. There, the D.C. Circuit declined to vacate the shipping rates paid to maritime pilots

13  years earlier because doing so would require the "recoup[ment] and redistribut[ion] of funds that

14  changed hands years ago in numerous separate transactions." 962 F.3d 510, 519 (D.C. Cir. 2020).

15  In contrast, "this is not a situation where '[t]he egg has been scrambled and there is no apparent

16  way to restore the status quo ante.'" *California v. Bernhardt*, 472 F. Supp. 3d at 631 (quoting

17  *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)).

18         C.  The Equities Weigh in Favor of Vacatur.

19         Because Defendants cannot satisfy the *Allied-Signal* test, there is no need to consider

20  further the relative equities of vacatur. But it bears emphasizing that remanding without vacating

21  the 2020 Rule would lead to far greater inequities than setting it aside. Plaintiffs and other

22  stakeholders struggled for years to obtain Defendants' commitment to collecting this critical

23  ICWA and sexual orientation data so that tribes could protect their children and their own

24  sovereign and statutory rights, states and nonprofits could better serve the most vulnerable

25  children in their communities, and—most importantly—the needs of children and families in the

26  child welfare system could be quantified and addressed. This culminated in the 2016 rulemaking,

27  which had an initial implementation window of two fiscal years.

28         Five years later, the data is *still* years away. Defendants' proposal would guarantee that

that delay continues for years to come. If the 2020 Final Rule is remanded without vacatur, the data will not be collected and made public until some years after Defendants finish a full notice-and-comment rulemaking, which may itself take years. *See* Joint Submission, Doc. No. 96, at 11 n.3. This presents a grim timeline in light of the Defendants' track record; HHS published the 2016 Rule after *13 years* of effort and needed more than 2 years to finalize even the deregulatory 2020 Rule. *Id.* Indeed, Defendants' motion makes clear that it is still in the very early stages of this process, as they are currently "work[ing] . . . to obtain the necessary departmental clearance from agency leadership to move forward with the rulemaking process." RWV Mot. at 5.

Compounding the long delay, remand without vacatur provides no guarantee that the ICWA and sexual orientation data elements will be reinstated given that Defendants cannot prejudge the rulemaking process under the APA. The most that Defendants can offer is to "issue one or more notice(s) of *proposed* rulemaking." *Id.* Defendants are wrong to say that "issu[ing] one or more [NPRMs]" would "directly address[] Plaintiffs' concerns and . . . address any purported deficiencies that are the subject of Plaintiffs' challenge." *Id.* Only a *final* rule—and the implementation thereof, presumably after another years-long compliance period that would follow the hypothetical final rule—would end the continuing harm to Plaintiffs and the children they serve. Defendants' submissions are glaringly silent as to how long it would take even to issue proposed rules, let alone one or more final rules. Particularly given Defendants' defense of the 2020 Final Rule in opposition to summary judgment, there can be no guarantee that a proposed rule would lead to a final rule actually collecting the data, much less on any reasonable timetable.

Indeed, Defendants may not even collect all of the data under AFCARS. *Id.* at 6 (noting that Defendants propose to collect the ICWA and sexual orientation data "under AFCARS or another legal authority"); *see also* Joint Submission, Doc. No. 96, at 2 (stating that ACF would issue a proposed rule to collect sexual orientation data elements in AFCARS, and an unspecified "separate and mandatory ICWA-related data collection under the authority of sections 471(a)(6) and 476(a)(2) of the Social Security Act"). As previously noted, it is unclear whether or how this would reverse the unlawful 2020 Final Rule. Joint Submission, Doc. No. 96, at 11 n.3. Nor can Plaintiffs or the Court be certain that this ill-defined effort under some other legal authority would

1   provide the same data that was required by the 2016 Rule, or that such data will be made public.

2   *Id.*

3           In the meantime, the continued lack of data impairs Plaintiffs' ability to improve the living

4   conditions and placement permanency of youth in child welfare systems and reduce the chance

5   that youth will end up homeless, incarcerated, or otherwise severely harmed while in care. *See*

6   Pls.' MSJ Mem. at 2, 18–19. To take just one example, the sexual orientation and ICWA data

7   would help the organizational Plaintiffs understand why LGBTQ+ and AI/AN youth persistently

8   experience such negative outcomes in the child welfare setting. *Id.* That understanding would then

9   allow Plaintiffs and other stakeholders to design and advocate for solutions to those problems. *Id.*

10  Keeping the 2020 Rule in place thus negatively affects the lives of some of the most vulnerable

11  children in our society. These harms, which undermine the very purpose of AFCARS,[4] certainly

12  outweigh any asserted marginal compliance costs that HHS and Title IV–E agencies would face if

13  the rule were vacated. *See supra* pages 9–12; *see also Pollinator Stewardship Council*, 806 F.3d at

14  532 (vacating an environmental rule because "leaving [it] in place risks more potential

15  environmental harm than vacating it").

16          Defendants nevertheless insist that, because Plaintiffs have not quantified their economic

17  injuries, the "harm[s] from keeping the 2020 Final Rule in place are too speculative and

18  amorphous to outweigh the disruptive consequences of vacatur." RWV Mot. at 10. This claim is

19  wrong for four reasons.

20          First, it ignores the ramifications of the 2020 Final Rule for children, which are far from

21  speculative or tenuous. As Defendants themselves have recognized, there is a direct relationship

22  between collecting this data and protecting children in the child welfare system. *See, e.g.*, 81 Fed.

23  Reg. at 90,527 (ICWA data will "help address . . . the disproportionality of AI/AN in foster care"

24  by "prevent[ing] AI/AN children from entering the foster care system"); *id.* at 90,534 (recognizing

25  that LGBTQ+ youth "are at an increased risk for poor outcomes" and finding that sexual

---

[4] *See* 42 U.S.C. § 679(a)(2)(A), (d) (data collection is intended to help "develop appropriate
national policies with respect to adoption and foster care" and to "promote improved knowledge
on how best to ensure strong, permanent families for children").

1   orientation data will "better support [LGBTQ+] children in foster care" by "ensur[ing] that foster

2   care placement resources and services are designed appropriately").

3       Second, Plaintiffs have demonstrated through uncontradicted declarations that their

4   economic injuries—including the resources they have diverted to address the 2020 Rule's harms

5   and their reduced ability to obtain funding—are concrete and directly traceable to the rule. Pls.'

6   MSJ Mem. at 18–19. For example, Plaintiff Cherokee Nation "spends more than 4,000 hours a

7   year" working to identify its children in the child welfare system, far more than it would need to

8   spend if Defendants collected ICWA data. Cherokee Decl. ¶¶ 13, 18–19. Because it takes so long

9   to identify Cherokee children, these economic injuries in turn impair Cherokee's ability to quickly

10  provide services to its children. *Id.* ¶ 13.[5]

11      Notably, Defendants do not challenge Plaintiffs' standing or the traceability of these

12  injuries to the 2020 Rule. *See* Defs.' MSJ. Accordingly, the two cases Defendants rely on to argue

13  that Plaintiffs' economic injuries are speculative are inapposite. *See Neighbors Against Bison*

14  *Slaughter v. Nat'l Park Serv.*, No. 19-cv-128, 2021 WL 717094, at *3 (D. Mont. Feb. 5, 2021)

15  (asserted harms from vacatur were too attenuated where plaintiffs "failed to provide evidence of

16  [harms]"); *Am. Forest Res. Council*, 946 F. Supp. 2d at 43–44 (asserted harms from vacatur were

17  too speculative where plaintiffs did not "provid[e] any concrete examples of projects impacted" by

18  the agency action). Their argument rings particularly hollow when they themselves do not attempt

19  to quantify the supposed costs of vacatur, as discussed above. *See supra* page 9–10.

20      Third, Plaintiffs do not need to show that the harm they (and other members of the public,

21  such as children in foster care) will suffer "outweigh[s] the disruptive consequences of vacatur,"

22  as Defendants assert. RWV Mot. at 10. Rather, it is *Defendants* who "bear[] the burden of

23  demonstrating vacatur is inappropriate." *Nw. Env't Advocates*, 2018 WL 6524161, at *3. They

24  must show that vacatur "would cause serious and irremediable harms that significantly outweigh

25  the magnitude of the agency's error." *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1242.

26  Defendants' attempt to reverse the burden should be rejected—particularly where, as just

27  _____

28  [5] This is to say nothing of the costs to Plaintiffs from needing to participate in what would be at least the eighth request for comment on AFCARS in six or seven years.

1  discussed, they do not dispute that further delay will harm Plaintiffs and the children who

2  Congress intended AFCARS to aid.

3      Finally, Plaintiffs are entitled to a "just, speedy, and inexpensive *determination*" of their

4  claims. Fed. R. Civ. P. 1 (emphasis added). They filed suit more than a year ago, and Defendants

5  have never disputed that the 2020 Final Rule causes them concrete, particularized harm.

6  Remanding *without vacatur* would force Plaintiffs and the children they serve to live with that

7  harm for years to come—with no avenue to challenge the presumptively unlawful rule that causes

8  it. Granting Defendants' motion would let them "'have it both ways,' by being permitted to

9  operate under the challenged [rule] while maintaining that all litigation regarding [that rule] should

10  cease." *Natural Res. Def. Council*, 2007 WL 14283, at *12. The purpose of remand without

11  vacatur is to allow the government to correct technical errors in rulemaking, not to allow it to

12  shield a potentially unlawful rulemaking from legal review for years on end, to the detriment of

13  sovereign Indian tribes, organizations that serve vulnerable children, and—most importantly—

14  those children themselves.

15                                    **CONCLUSION**

16      For the foregoing reasons, the Court should vacate the 2020 Final Rule.

17  Dated: November 5, 2021                Respectfully submitted,

18                                         By: _/s/ Jeffrey B. Dubner_
19                                         Jeffrey B. Dubner (DC Bar No. 1013399)
                                           (admitted *pro hac vice*)
20                                         Kristen P. Miller (DC Bar No. 229627)
                                           (admitted *pro hac vice*)
21                                         Sean A. Lev (DC Bar No. 449936)
                                           (admitted *pro hac vice*)
22                                         Democracy Forward Foundation
23                                         P.O. Box 34553
                                           Washington, DC 20043
24                                         kmiller@democracyforward.org
                                           jdubner@democracyforward.org
25                                         slev@democracyforward.org
                                           Telephone: (202) 448-9090
26

27                                         Jennifer C. Pizer (CA Bar. No. 152327)
                                           Lambda Legal Defense and Education Fund
28                                         4221 Wilshire Blvd., Suite 280

Los Angeles, CA 90010
(213) 590-5903
jpizer@lambdalegal.org

M. Currey Cook (NY Bar No. 4612834)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
120 Wall St., 19th Fl.
New York, New York 10005
ccook@lambdalegal.org
Telephone: (212) 809-8585

Sasha Buchert (Oregon Bar No. 070686)
(admitted *pro hac vice*)
Lambda Legal Defense and Education Fund
1776 K Street, N.W., 8th Floor
Washington, DC 20006-2304
Sbuchert@lambdalegal.org
Telephone: (202) 804-6245

Kathryn E. Fort (MI Bar No. 69451)
(admitted *pro hac vice*)
Michigan State University College of Law
Indian Law Clinic
648 N. Shaw Lane
East Lansing, M.I. 48824
fort@msu.edu
Telephone: (517) 432-6992

*Counsel for Plaintiffs*