1

2

3

4          IN THE UNITED STATES DISTRICT COURT

5          FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7   CALIFORNIA TRIBAL FAMILIES               Case No.  20-cv-06018-MMC
    COALITION, et al.,
8                                            **ORDER DENYING PLAINTIFFS'**
            Plaintiffs,                      **MOTION FOR SUMMARY**
9                                            **JUDGMENT; GRANTING**
         v.                                  **DEFENDANTS' MOTION FOR**
10                                           **SUMMARY JUDGMENT; DENYING AS**
    XAVIER BECERRA, et al.,                  **MOOT DEFENDANTS' MOTION FOR**
11                                           **VOLUNTARY REMAND**
            Defendants.

12

13          Before the Court are three motions:  (1) plaintiffs California Tribal Families

14  Coalition, Yurok Tribe, Cherokee Nation, Facing Foster Care in Alaska, Ark of Freedom

15  Alliance, Ruth Ellis Center, and True Colors, Inc.'s Motion for Summary Judgment (Doc.

16  No. 66); (2) defendants Xavier Becerra, JooYeun Chang, U.S. Department of Health and

17  Human Services, and Administration for Children and Families' Cross-Motion for

18  Summary Judgment (Doc. No. 103); and (3) defendants' Motion for Voluntary Remand

19  Without Vacatur (Doc. No. 102).  The motions have been fully briefed, including, with

20  leave of court, supplemental briefing.  Additionally, also with leave of court, amicus briefs

21  have been filed by (1) the American Academy of Pediatrics, (2) Family Equality and

22  National Center for Lesbian Rights, and (3) twenty-eight members of Congress.

23          Having read and considered the papers filed in support of and in opposition to the

24  motions, as well as the administrative record submitted by defendants, the Court rules as

25  follows.

26                              **BACKGROUND**

27          In their complaint, plaintiffs challenge a rule issued by the Department of Health

28  and Human Services ("HHS") on May 12, 2020.  See 85 Fed. Reg. 28,410 ("2020 Rule"),

1    The 2020 Rule revised regulations HHS had promulgated in 2016, see 81 Fed. Reg.

2    90,524 ("2016 Rule"), which regulations, in turn, revised regulations HHS initially

3    promulgated in 1993, see 58 Fed. Reg. 67,912 ("1993 Rule"), by which initial

4    promulgation it implemented a data collection system known as the "Adoption and Foster

5    Care Analysis and Reporting System" ("AFCARS"), see id. at 67,912.  As discussed in

6    greater detail below, AFCARS is a system by which states and tribes that receive grants

7    and entitlements under the Social Security Act provide the Administration for Children

8    and Families ("ACF"), an agency within HHS, with "data on the almost 500,000 children

9    in foster care or adopted through a state [or tribal] agency."  (See Compl. ¶¶ 54, 57, 64;

10    Ans. ¶¶ 54, 57, 64).

11      Plaintiffs allege HHS's issuance of the 2020 Rule was "arbitrary and capricious,"

12    and, consequently, said Rule "should be vacated" under the Administrative Procedure

13    Act ("APA").  (See Compl. ¶¶ 249, 252.)  Specifically, plaintiffs challenge the decision to

14    remove from AFCARS various questions HHS had added by the 2016 Rule, namely,

15    questions pertaining to the states' application of the Indian Child Welfare Act ("ICWA")

16    (see Compl. ¶ 11) and questions pertaining to the sexual orientation of youth, foster and

17    adoptive parents, and legal guardians (see Compl. ¶ 195).

18                           **DISCUSSION**

19      The Court first summarizes the 1993 Rule that implemented AFCARS, as well as

20    the 2016 and 2020 Rules that revised AFCARS, and next addresses the parties'

21    respective motions for summary judgment on plaintiffs' claim that HHS violated the APA

22    when it issued the 2020 Rule.

23    **A.  AFCARS**

24      In 1986, Congress directed HHS to "study the various methods of establishing,

25    administering, and financing a system for the collection of data with respect to adoption

26    and foster care in the United States," see 42 U.S.C. § 679(a), to "submit to the Congress

27    a report that . . . proposes a method of establishing, administering, and financing" such

28    system, see 42 U.S.C. § 679(b)(1), and to "promulgate final regulations providing for the

1    implementation of . . . the system proposed," see 42 U.S.C. § 679(b)(2).  In 1993, HHS,

2    after conducting the above-referenced study, submitting its findings to Congress,

3    providing public notice of its proposal, and considering responsive comments it received

4    from states and others, issued the 1993 Rule, which established AFCARS.  See 58 Fed.

5    Reg. at 67,912, 67,914-17.

6         In the 1993 Rule, HHS described AFCARS as a system "designed to collect

7    uniform, reliable information on children who are under the responsibility of a State title

8    IV-B/IV-E agency for placement and care."[1]  See 58 Fed. Reg. at 67,912.  HHS also

9    identified therein the purpose for establishing AFCARS, namely, "[t]o address policy

10   development and program management issues at both the State and Federal levels."

11   See id.  As explained by HHS, the data collected would "enable policymakers to assess

12   the reasons why children are in foster care and develop remedies to prevent it," and,

13   additionally, would "be useful for research, the ultimate purpose of which [being] to gain a

14   better understanding of the foster care program and the causes and other factors

15   contributing to its expansion and other changes [,] and, eventually, to make suggestions

16   and proposals for change to improve the child welfare system."  See id.

17        The 1993 Rule added 45 C.F.R. § 1355.40 to the Code of Federal Regulations,

18   which regulation required each state that "administers or supervises the administration of

19   titles IV-B and IV-E" to transmit semi-annually to ACF "information on each child in foster

20   care and each child adopted during the reporting period," specifically, a number of "data

21   elements" identified in the 1993 Rule.  See 45 C.F.R. §§ 1355.40(a)(1), (b)(1) (1993).[2]

22   Among the "data elements" each agency was required to report were the age, sex, and

---

[1] "Title IV-B of the Social Security Act . . . is a formula program," under which the
federal government provides grants to state and tribal agencies that provide "child
welfare services."  See id. at 67,912; see also 42 U.S.C. §§ 622-628.  "Title IV-E of the
[Social Security] Act is an entitlement program," under which the federal government
pays for certain costs incurred by state and tribal agencies to provide "foster care" and
"adoption" services.  See 58 Fed. Reg. at 67,912; see also 42 U.S.C. §§ 670-679c.

[2] In 2012, the regulation was amended to require tribal agencies to transfer
information to ACF in the same manner as state agencies.  See 77 Fed. Reg. at 906.

1   race of each child, the date the child was removed from his/her home, the date the child

2   was placed in foster care or was adopted, the race/ethnicity of the foster caretaker(s) or

3   adoptive parent(s), and which of fifteen identified "[a]ctions or conditions" was

4   "associated with the child's removal."  See 45 C.F.R., Part 1355, Appendixes (1993).

5          In 2015, HHS issued a notice of proposed rulemaking, in which HHS stated the

6   AFCARS regulations "need[ed] to be revised and updated" to "[i]ncorporate statutory

7   requirements since 1993," see 80 Fed. Reg. at 7132, e.g., a statutory requirement that

8   the "data collection system" obtain information as to "the annual number of children in

9   foster care who are identified as sex trafficking victims," see 42 U.S.C. § 679(c)(3)(E),

10  and also "to enhance the type and quality of information title IV-E agencies report to ACF

11  by modifying and expanding data elements," see 80 Fed. Reg. at 7132.

12         On December 14, 2016, HHS announced the 2016 Rule, whereby it added a

13  number of new data elements to AFCARS, such as whether a child is a full-time student,

14  see 81 Fed. Reg. at 90,541, is pregnant, see id. at 90,542, or has siblings, see id. at

15  90,544.  Additionally, as relevant to the instant action, HHS "incorporate[d] data elements

16  related to [ICWA]," see id. at 90,524, such as requiring a state agency to state, as to each

17  child, whether it "researched whether there is reason to know that a child is an 'Indian

18  Child' as defined in ICWA," see id. at 90,535, and, if it answers it "knows or has reason to

19  know that a child is an Indian child as defined in ICWA," to identify "all federally

20  recognized Indian tribes that are or may potentially be the Indian child's tribe(s)," see id.

21  at 90,536.  Further, as relevant to the instant action, HHS added data elements pertaining

22  to the sexual orientation of minors 14 years of age and older, see id. at 90,534, the foster

23  parent(s), see id. at 90,554, and the adoptive parent(s) or guardian(s), see id. at 90,558-

24  59, as well as a data element indicating whether a child's removal from home was on

25  account of sexual orientation, see id. at 90,549.  The revisions to AFCARS, as set forth in

26  the 2016 Rule, were to become effective "two fiscal years" after said Rule was

27  promulgated, see id. at 90,529.

28         On February 24, 2017, President Trump issued an executive order "to lower

United States District Court
Northern District of California

1  regulatory burdens on the American people" and directed federal agencies "to review

2  existing regulations and make recommendations regarding their repeal, replacement, or

3  modification."  See 83 Fed. Reg. at 11,449.  In response thereto, HHS, on March 15,

4  2018, issued an "advance notice of proposed rulemaking" ("2018 ANPRM") in which HHS

5  sought "public suggestions . . . for streamlining the [AFCARS] data elements and

6  removing any undue burden related to reporting AFCARS."  See id.  Thereafter, HHS

7  extended the date on which the 2016 Rule would become effective, specifically, to

8  October 1, 2020.  See 83 Fed. Reg. at 42,225.

9       On April 19, 2019, HHS, having reviewed the comments received in response to

10  the 2018 ANPRM, issued a notice of proposed rulemaking ("2019 NPRM"), in which HHS

11  proposed to "streamline the AFCARS data elements that were finalized in the [2016

12  Rule]."  See 84 Fed. Reg. at 16,572.  Specifically, HHS proposed that, with regard to "the

13  out-of-home care data file,"[3] the number of data elements be decreased from 272 to 183,

14  "representing 170 that [HHS] propose[d] to keep from the 2016 final rule and 13 [HHS]

15  propose[d] to modify."  See 84 Fed. Reg. at 16,576.  As relevant to the instant action,

16  HHS proposed removing some of the "ICWA-related data elements," such as "court

17  findings related to involuntary and voluntary termination of parental rights," while retaining

18  others, such as "[w]hether the state title IV-E agency made inquiries of whether the child

19  is an Indian child," see id. at 16,577-78, and proposed removing data elements pertaining

20  to sexual orientation, other than whether the child's "sexual orientation, gender identity, or

21  gender expression" was a "circumstance surrounding the child at removal," which data

22  element HHS proposed retaining, see id. at 16,576-77.

23       On May 12, 2020, HHS announced the 2020 Rule, by which it "finalize[d] the out-

24  of-home care data elements proposed in the 2019 NPRM," see 85 Fed. Reg. at 28,410,

25  _____

26       [3] For purposes of AFCARS, "[t]he out-of-home care reporting population includes a
    child of any age who is in foster care under the placement and care responsibility of the
27  title IV-E agency; is receiving title IV-E foster care maintenance payments under a title IV-
    E agreement; or has run away or whose whereabouts are unknown at the time the title
28  VI-E agency becomes responsible for the child."  See 81 Fed. Reg. at 90,524.

1   without "substantive changes," <u>see</u> <u>id.</u> at 28,411.  The 2020 Rule, consistent with the

2   2019 NPRM, "reduces data elements related to [ICWA]" and "does not include data

3   elements asking for information on . . . the sexual orientation of the child, foster parent,

4   adoptive parent, or legal guardian." <u>See</u> <u>id.</u> at 28,410.

5   In light of the 2020 Rule, which presently is in effect, the 2016 Rule never became

6   effective.

7   **B.  Motions for Summary Judgment**

8   As noted, plaintiffs challenge under the APA HHS's issuance of the 2020 Rule.

9   Under the APA, a court shall "hold unlawful and set aside agency action, findings,

10   and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

11   not in accordance with law." <u>See</u> 5 U.S.C. § 706(2).  "The scope of review under the

12   'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment

13   for that of the agency" and "may not set aside an agency rule that is rational, based on

14   consideration of the relevant factors and within the scope of the authority delegated to the

15   agency by [a] statute." <u>See</u> <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile</u>

16   <u>Ins. Co.</u>, 463 U.S. 29, 42-43 (1983).  The record must indicate, however, that the agency

17   "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action

18   including a rational connection between the facts found and the choice made." <u>See</u> <u>id.</u> at

19   43 (internal quotation and citation omitted).

20   "Agencies are free to change their existing policies so long as they provide a

21   reasoned explanation for the change." <u>Encino Motorcars, LLC v. Navarro</u>, 579 U.S. 211,

22   221 (2016).  An agency "need not demonstrate to a court's satisfaction," however, "that

23   the reasons for the new policy are <u>better</u> than the reasons for the old one; it suffices that

24   the new policy is permissible under the statute, that there are good reasons for it, and

25   that the agency <u>believes</u> it to be better, which the conscious change of course adequately

26   indicates." <u>See</u> <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009)

27   (emphases in original).

28   The Court next considers whether, as plaintiffs assert, HHS's decision to remove

6

from AFCARS some of the data elements it added by the 2016 Rule was arbitrary and capricious, or whether, as defendants assert, such decision was lawful under the APA.

### 1. ICWA-Related Data Elements

In 1978, Congress enacted ICWA, declaring therein that "it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." See 25 U.S.C. § 1902.

The Supreme Court has summarized the provisions of ICWA as follows:

> At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. Section 1911 lays out a dual jurisdictional scheme. Section 1911(a) establishes exclusive jurisdiction in the tribal courts for proceedings concerning an Indian child 'who resides or is domiciled within the reservation of such tribe,' as well as for wards of tribal courts regardless of domicile. Section 1911(b), on the other hand, creates concurrent but presumptively tribal jurisdiction in the case of children not domiciled on the reservation: on petition of either parent or the tribe, state-court proceedings for foster care placement or termination of parental rights are to be transferred to the tribal court, except in cases of 'good cause,' objection by either parent, or declination of jurisdiction by the tribal court.

> Various other provisions of ICWA Title I set procedural and substantive standards for those child custody proceedings that do take place in state court. The procedural safeguards include requirements concerning notice and appointment of counsel; parental and tribal rights of intervention and petition for invalidation of illegal proceedings; procedures governing voluntary consent to termination of parental rights; and a full faith and credit obligation in respect to tribal court decisions. See §§ 1901–1914. The most important substantive requirement imposed on state courts is that of § 1915(a), which, absent 'good cause' to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families.

See Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 36-37 (1989) (internal footnote omitted).

The Bureau of Indian Affairs ("BIA"), an agency within the Department of the Interior ("DOI"), has promulgated regulations, see 25 C.F.R. §§ 23.1-23.144; see also 25 U.S.C. § 1952 (providing Secretary of Interior "shall promulgate such rules and

1    regulations as may be necessary to carry out the provisions of [ICWA]"), which

2    regulations set forth, inter alia, procedures a state court is required to follow when, in a

3    case involving a child who is or may be an Indian child, a motion is made to transfer a

4    foster care proceeding to a tribal court, see 25 C.F.R. §§ 23.115-23.119, or when a party

5    to a state court foster care or adoption proceeding asserts that "good cause" exists not to

6    follow the "placement preferences" set forth in ICWA, see 25 C.F.R. § 23.132.

7        With ICWA and the above regulations in mind, HHS, prior to its issuance of the

8    2016 Rule, provided public notice that it intended to "collect data elements in AFCARS

9    related to ICWA's statutory standards for removal, foster care placement, and adoption

10   proceedings." See 81 Fed. Reg. at 20,284.  Thereafter, in the 2016 Rule, HHS added a

11   number of ICWA-related data elements to AFCARS, which elements can be summarized

12   as follows:  (1) whether the title IV-E agency conducted research to determine if a child is

13   an "Indian child" as defined in ICWA and knows or has reason to know the child is an

14   Indian child, see 81 Fed. Reg. at 90,535-36; (2) whether the child is a member of a tribe,

15   see id. at 90,570, as well as whether the parents, the foster parent(s), and/or adoptive

16   parent(s)/guardian(s) are members of a tribe, see id. at 90,545, 90,553, 90,558; and

17   (3) whether, during the course of any child custody, foster care, termination of parental

18   rights, and/or adoption proceeding in which the child is or may be an Indian child, the

19   procedures required by ICWA and BIA regulations were followed, see id. at 90,536-38,

20   90,546-48, 90,552-53, 90,556-57, 90,560-61.

21       In the 2020 Rule, HHS retained in AFCARS the ICWA-related data elements

22   pertaining to the title IV-E agency's own actions, namely, data elements bearing on

23   whether such agency has "[r]eason to know a child is an 'Indian Child' as defined in

24   [ICWA]" and "made inquiries whether the child is an Indian child," see 85 Fed. Reg. at

25   28,424, along with data elements pertaining to whether the child, parents of the child,

26   foster parent(s), and/or adoptive parent(s)/guardian(s) are members of a tribe, see id. at

27   28,424, 28,427, 28,431, 28,432, as well as whether notice of the pendency of a state

28   court proceeding had been given to the tribe or tribes in the manner required by ICWA,

United States District Court
Northern District of California

1   see id. at 28,424-25; see also 25 U.S.C. § 1912(a) (providing "party seeking the foster

2   care placement of, or termination of parental rights to, an Indian child" must give notice of

3   proceeding to "the Indian child's tribe").

4       The ICWA-related data elements removed from AFCARS by the 2020 Rule were

5   those pertaining to actions required to be reported by the agencies but taken by the state

6   courts rather than the agencies themselves, namely, data elements bearing on whether

7   state court proceedings were conducted in accordance with the procedures required

8   under ICWA, i.e., proceedings, as summarized by HHS, comprising "request[s] to transfer

9   to tribal court, denial[s] of transfer, court findings related to involuntary and voluntary

10  termination of parental rights, including good cause findings, qualified expert witness

11  testimony, whether active efforts were made prior to the termination/modification,

12  removals under ICWA, available ICWA foster care/pre-adoptive placement preferences,

13  adoption/guardianship placement preferences under ICWA, good cause and basis for

14  good cause under ICWA, and information on active efforts."  See 84 Fed. Reg. at 16,577

15  (setting forth proposed revisions to 2016 Rule); see also 85 Fed. Reg. at 28,411 (stating

16  proposed revisions were promulgated without "substantive changes").

17      Plaintiffs argue HHS's removal from the 2016 Rule of the above-referenced ICWA-

18  related data elements was arbitrary and capricious because, according to plaintiffs,

19  HHS's decision to "disregard[ ]" the position it took in 2016 was "wholly unreasoned."

20  (See Pls.' Mot. at 27:20-21, 28:25-26).  In particular, according to plaintiffs, HHS only

21  considered the burdens imposed by the 2016 Rule and not the benefits that would be

22  realized by said Rule.  As set forth below, the Court disagrees.

23      Initially, the Court observes that the comments received in response to HHS's

24  proposal to remove some of the ICWA-related data elements basically fell within one or

25  the other of two groups.  First, as HHS pointed out, of the thirty-eight states that offered

26  comments, thirty-six indicated support for removal of ICWA-related data elements, in light

27  of what those states projected would be hundreds and, in some instances, thousands of

28  extra hours of work it would take to answer all the ICWA-related data elements in the

2016 Rule, as well as those states' belief that such extra work "would pull valuable resources away from the field and decrease the amount of time caseworkers have to work with families and children." See 84 Fed. Reg. at 16,573; see also 85 Fed. Reg. at 28,412 (noting "the vast majority of state commentators . . . specified that a lower reporting burden will help their work with children and families by enabling caseworkers to spend less time on data entry").[4]  Second, as HHS also pointed out, Indian tribes, advocacy groups, and two states, as well as the majority of other entities and citizens who submitted comments, opposed elimination of any ICWA-related data elements, focusing on benefits they believed would be realized from requiring state agencies to answer all applicable ICWA-related data elements, which benefits included the potential "insight into state compliance with ICWA's requirements" and the potential acquisition of information addressing "concerns that there are children in state custody who are not identified as Indian children and thus are not protected under ICWA." See 84 Fed. Reg. at 16,573-74; see also 85 Fed. Reg. at 28,412 (noting "common reasons" given by those opposing revisions to 2016 Rule were that data would "help [HHS] track outcomes, address disparities, and address a perceived need for research and legislation").

Having considered the comments, HHS set forth its conclusion that "[t]he need for streamlining was convincingly argued through the states' detailed work and cost estimates" and that "the 2016 final rule has many data elements that can be streamlined while still providing critical information on the out-of-home care population from a national perspective." See 84 Fed. Reg. at 16,575.  As HHS explained, the ICWA-related data elements it retained were the elements tribes had "identified as the most important pieces of information to be able to know the number of children nationally where ICWA applies and provide some national information on whether the state made inquiries and whether notification to the Indian child's tribe occurred." See id. at 16,577; see also id. (stating

_____

[4] The Court has considered the analysis HHS set forth in both the 2019 NPRM and the 2020 Rule.  See id. at 28,412-13 (responding to commentors opposing 2019 proposal).

1  retained data elements were "essential for identifying the number of children in out-of-

2  home care nationally, who should be afforded the protections of ICWA").

3          As HHS further explained, the removed data elements "asked for detailed

4  information on ICWA, tied to DOI requirements and the ICWA statute, and court actions,"

5  see id., which information, it determined, in accordance with comments it received from

6  "[m]any states," was "too specific for a national data set and [was] better suited for a

7  qualitative review," see id. at 16,574-75; see also id. at 16,573 (noting "many new data

8  elements are qualitative and therefore more accurately evaluated by quality assurance

9  staff, through a case review or other monitoring efforts").  As one of several examples,

10  see id. at 16,578, HHS stated that, although, consistent with the 2016 Rule, it would

11  require state IV-E agencies to report whether the termination or modification of the

12  parental rights of an Indian child occurred on a voluntary or involuntary basis, it would not

13  require reporting of ICWA-required court findings as to "reasonable doubt on continued

14  custody, qualified expert witness testimony, and whether efforts to prevent the breakup of

15  an Indian family were unsuccessful," as those state court findings would be "specific to

16  each case and court action and thus need context to fully understand them," see id.  The

17  above-described determination by HHS was consistent with its statutory mandate to

18  implement a "data collection system," i.e., AFCARS, that "avoid[s] unnecessary diversion

19  of resources from agencies responsible for adoption and foster care."  See 42 U.S.C.

20  § 679(c)(1).

21          Further, HHS, after acknowledging comments by tribes and others as to benefits

22  that would be realized if all ICWA-related data elements in the 2016 Rule were retained,

23  see 84 Fed. Reg. at 16,574, balanced those potential benefits against the burdens that

24  had been identified by state title IV-E agencies.  In so doing, HHS made a judgment call

25  that the claimed benefits from obtaining information about how state courts comply with

26  ICWA would be better realized through a process other than AFCARS, such as the Child

27  and Family Services Review process, see id. at 16,575, whereby HHS reviews, inter alia,

28  a state agency's implementation of the statutory requirement that it develop a "plan" that

11

1    "contain[s] a description . . . of the specific measures taken by the State to comply with

2    [ICWA]," see 42 U.S.C. § 622(b)((9), 45 C.F.R. § 1355.34(b)(2)(ii)(E), and/or by the Court

3    Improvement Program, see 84 Fed. Reg. at 16,578; 85 Fed. Reg. at 28,424, whereby

4    HHS provides grants to state courts that sufficiently demonstrate, inter alia, they engage

5    in "meaningful and ongoing collaboration [with] . . . Indian tribes," see 42 U.S.C.

6    § 629h(b)(3).

7         Although a court may find the issuance of a rule arbitrary and capricious where the

8    administrative agency "only [takes] into account the costs to the [regulated entities] and

9    completely ignore[s] the benefits that would result from compliance," see California v

10   United States Bureau of Land Mgmt., 277 F. Supp. 3d 1106, 1122 (N.D. Cal. 2017), the

11   record in the instant case, as set forth above, shows HHS did not ignore the benefits

12   identified in comments, but, rather, stated why it concluded those benefits, when weighed

13   against the burdens identified, did not warrant retention of all ICWA-related data

14   elements in AFCARS.  Where, as here, an agency has balanced the potential burdens

15   and benefits of a proposed rule, courts are "prohibited from second-guessing the

16   agency's weighing of risks and benefits and penalizing it from departing from the

17   inferences and assumptions of others."  See California v. Azar, 950 F.3d 1067, 1096 (9th

18   Cir. 2020) (internal quotation, alterations, and citation omitted).

19        Accordingly, to the extent plaintiffs' claim is based on HHS's removal of ICWA-

20   related data elements, plaintiffs are not entitled to summary judgment and defendants are

21   entitled to summary judgment.

22        **2. Sexual Orientation Data Elements**

23        When HHS provided public notice in 2015 that it intended to revise its existing

24   AFCARS regulations, it did not take a position on "collecting data on LGBTQ youth," but

25   sought public comment on whether to collect such information.  See 80 Fed. Reg. at

26   7155.  In the 2016 Rule it later issued, HHS stated it had "received comments both in

27   favor and against title IV-E agencies collecting and reporting [sexual orientation]

28   information to AFCARS," and, having considered those comments, found it appropriate to

12

1    add, as noted above, data elements "related to the sexual orientation of the child," the

2    child's "foster parent(s)," and the child's "adoptive parent(s) or legal guardian(s)," as well

3    as a data element indicating whether "there is family conflict related to the child's sexual

4    orientation, gender identity, or gender expression as a [c]hild and family circumstance at

5    removal reported when a child is removed from home."  See 81 Fed. Reg. at 90,526.

6         In the 2020 Rule, as also noted, HHS, with the exception of the data element

7    pertaining to whether a "circumstance at removal" was the child's sexual orientation,

8    gender identity, or gender expression, eliminated the data elements pertaining to the

9    sexual orientation of the child, the foster parents, and the adoptive parents/legal

10   guardians.  See 85 Fed. Reg. at 28,413.

11        In challenging the removal of the above-referenced data elements, plaintiffs first

12   argue HHS is statutorily required to collect data on the sexual orientation of children,

13   foster parents, and adoptive parents, i.e., that HHS's promulgation of a regulation that

14   does not include those data elements is, under the APA, "not in accordance with law."

15   See 5 U.S.C. § 706(2)(A) (providing courts shall "hold unlawful and set aside agency

16   action . . . not in accordance with law").  In support of this argument, plaintiffs rely on

17   § 679, the statute by which Congress directed HHS to develop a "data collection system,"

18   see 42 U.S.C. § 679(c), and which provides that said "data collection system . . . shall . . .

19   provide comprehensive national information with respect to . . .  the demographic

20   characteristics of adoptive and foster children and their biological and adoptive or foster

21   parents," see id.  According to plaintiffs, sexual orientation, being a demographic

22   characteristic, must be included as a data element in AFCARS.  As set forth below, the

23   Court disagrees.

24        First, neither the administrative record before the Court nor, as defendants point

25   out, any dictionary, provides meaningful guidance as to the intent of Congress in using

26   the word "demographic."  Further, neither the requirement to which plaintiffs cite, nor any

27   of the requirements among which it is listed, is unqualified.  Rather, the statute prefaces

28   those requirements with the admonition that HHS, in adopting the requisite data

13

collection system, "avoid unnecessary diversion of resources from agencies responsible

for adoption and foster care" and "assure that any data collected is reliable and

consistent over time and among jurisdictions through the use of uniform definitions and

methodologies."  See id.

Second, "[w]here an agency's statutory construction has been fully brought to the

attention of the public and the Congress, and the latter has not sought to alter that

interpretation although it has amended the statute in other respects, then presumably the

legislative intent has been correctly discerned."  See North Haven Board of Educ. v. Bell,

456 U.S. 512, 535 (1982) (internal quotation and citation omitted)).  Here, in 1990, when

it first proposed AFCARS, HHS submitted a report to Congress and provided public

notice of its proposed rule, in which it stated its intent to collect "demographic information

on the child," defined as "sex, birth date, race, ethnicity, previous stays in foster care,

service goals, availability for adoption, duration of care, funding sources, and what

happens to the child after the period of foster care is concluded," see 55 Fed. Reg.

39,543, which proposed rule became the 1993 Rule.  Thereafter, in 2014, more than

twenty years after AFCARS went into effect and Congress and the public were aware

that HHS was not collecting sexual orientation data, Congress amended § 679(c) to

require HHS to obtain through AFCARS "the annual number of children in foster care

who are identified as sex trafficking victims."  See Pub. L. No. 113-183, 128 Stat. 1919.

In so doing, Congress did not otherwise amend § 679(c), thus "presumably" indicating

HHS had "correctly discerned" congressional intent that the collection of sexual

orientation data was not statutorily mandated.  See North Haven Board of Educ., 456

U.S. at 535.

Although plaintiffs alternatively argue that, if collection of sexual orientation data is

not statutorily mandated, HHS's decision to remove sexual orientation data elements was

arbitrary and capricious, the Court again disagrees.  In particular, plaintiffs' assertions

that HHS did not "consider whether eliminating [sexual orientation] data elements

detracted from the goals of the statutory scheme" (see Pls.' Mot. at 24:17-18), acted

14

1    "contrary to the evidence before [it]" (see id. at 24:26), "disregarded facts and

2    circumstances that underlay their prior policy" (see id. at 26.22), and "failed to respond

3    meaningfully to significant comments opposing the elimination of the sexual orientation

4    questions" (see id. at 27:5) are not, as set forth below, supported by the record.

5          First, HHS expressly considered whether retaining those data elements would

6    advance the goals of the statutory scheme, and found it would not.  In that regard, HHS,

7    at the outset, identified comments, submitted by a number of states, that the sexual

8    orientation data would "not be reliable because the youth would self-report, which could

9    result in an undercount," see 84 Fed. Reg. at 16,574; it then, as discussed below in

10   greater detail, indicated it found those comments persuasive, see 85 Fed. Reg. at 28,419

11   (finding removed data elements would be "ineffective at providing a national picture of

12   children placed in out-of-home care"), and concluded removal of those data elements

13   "align[ed] with the statutory requirements in [§ 679(c)(2)] . . . to ensure that the data

14   collected is reliable," see id. at 28,411; 42 U.S.C. § 679(c)(2) (providing demographic

15   information collected by HHS must be "reliable"); City of Los Angeles v. Barr, 929 F.3d

16   1163, 1181 (9th Cir. 2019) (holding "agency need provide only a minimal level of analysis

17   to avoid its action being deemed arbitrary and capricious") (internal quotation and citation

18   omitted).

19         Second, the record does not support plaintiffs' argument that HHS's decision is

20   contrary to evidence in the administrative record, specifically, a report issued by the

21   Office of Management and Budget ("OMB") (see Administrative Record ("AR") 171-98),

22   which report HHS cited in support of its decision to eliminate sexual orientation data

23   elements from AFCARS, see 84 Fed. Reg. at 16,576, 85 Fed. Reg. at 28,413.  Although

24   the report "describe[s] how the concepts of SOGI [Sexual Orientation and Gender

25   Identity] are currently measured in U.S. Federal surveys" (see AR 173) and contains a

26   chart listing SOGI questions that have been asked by various federal agencies in surveys

27   (see AR 176-85), including one similar to the removed data element, it does not, contrary

28   to plaintiffs' argument, endorse any such listed question, let alone, as defendants point

United States District Court
Northern District of California

out, address its use in a survey that would not be anonymous.  Rather, it announces

therein a "forthcoming working paper [that] will describe what is known about the

reliability and validity of the currently available measures."  (See AR 192.)  Indeed, HHS,

in citing the report, points to OMB's recognition therein that "[t]eenagers may be in the

midst of developing their sexual orientation, experiencing sexual attraction, and beginning

to engage in sexual behavior, and therefore unsure of how to respond to SOGI

questions" (see AR 188), that "[a]dolescents may use different terms for SOGI concepts

than adults use" (see id.), that, due to "the use of the terms 'lesbian' and 'gay' as slurs,"

teenagers may be "reluctant to identify themselves with those terms" (see id.), and that

"the use of nonresponse categories ('Don't Know/Refused/Other/Something Else') may

reduce the number of SOGI respondents who identify themselves as such, without

yielding usable data" (see AR 189)[5]; see also 84 Fed. Reg. at 16,576.  In light of those

observations, HHS concluded it was "not feasible for [HHS] to test the validity or accuracy

of adding questions related to sexual orientation across all title IV-E agencies," see id., a

conclusion the Court finds is not arbitrary and capricious.

Third, HHS did not disregard without analysis the facts and circumstances that

underlay the 2016 Rule.  As set forth above, HHS explained that, in its view, the

collection of the sexual orientation information could result in unreliable data, which

finding is not contrary to any finding it made in connection with the 2016 Rule, as, in

2016, it made no finding as to reliability.  As an agency "must consider varying

interpretations and the wisdom of its policy on a continuing basis," see National Cable &

Telecommunications Ass'n v. Brand-X Internet Services, 545 U.S. 967, 981 (2005)

(internal citation and quotation omitted), the Court finds HHS did not act arbitrarily and

capriciously by considering, in 2020, a statutory requirement it did not address in 2016.

_____

[5] The sexual orientation question to be asked of minors in the 2016 Rule used four
nonresponse categories, specifically, "Don't know," "something else," "decline," and "non
applicable."  (See 81 Fed. Reg. 90,524, Attachment A.)  The sexual orientation questions
to be asked of adults in the 2016 rule used three nonresponse categories, specifically,
"Don't know," "something else," and "declined."  (See id.)

United States District Court
Northern District of California

1   Lastly, HHS did not fail to respond meaningfully to comments offered in support of

2   retaining the sexual orientation data elements, but, rather, as discussed above,

3   concluded the "importance of collecting sexual orientation data," i.e., the benefits

4   identified in some of the comments, was outweighed by "the need to collect accurate

5   data per the statute" see 84 Fed. Reg. 16,577; see also 85 Fed. Reg. at 28,413

6   (summarizing comments received), a determination that is neither arbitrary nor

7   capricious, see California, 950 F.3d at 1096 (holding courts are "prohibited from second-

8   guessing the agency's weighing of risks and benefits") (internal quotation, alterations,

9   and citation omitted); see also City of Los Angeles, 929 F.3d at 1182 (holding "wisdom of

10  [agency's] policy is not an element of [court's] arbitrary and capricious review").

11  Accordingly, to the extent plaintiffs' claim is based on HHS's removal of sexual

12  orientation data elements, plaintiffs are not entitled to summary judgment and defendants

13  are entitled to summary judgment.

**CONCLUSION**

14  For the reasons stated above:

15  1.  Plaintiffs' motion for summary judgment is hereby DENIED,

16

17  2.  Defendants' motion for summary judgment is hereby GRANTED, and

18  3.  Defendants' motion for voluntary remand without vacatur is hereby DENIED as

19  moot.

20  **IT IS SO ORDERED.**

21

22  Dated: November 4, 2022

23  MAXINE M. CHESNEY
    United States District Judge

24

25

26

27

28